**THE ROSEN LAW FIRM, P.A.**
Phillip Kim, Esq. (PK 9384)
Laurence M. Rosen, Esq. (LR 5733)
275 Madison Avenue, 34th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: lrosen@rosenlegal.com
Email: pkim@rosenlegal.com

Counsel for Plaintiff

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JAMES RANSON, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, <br><br> PLAINTIFF, <br><br> vs. <br><br> DEUTSCHE BANK AKTIENGESELLSCHAFT, STEFAN KRAUSE, JUERGEN FITSCHEN, ANSHUMAN JAIN, JOHN CRYAN, and MARCUS SCHENCK, <br><br> DEFENDANTS. | Case No. <br><br> **CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff James Ranson ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Deutsche Bank

Aktiengesellschaft ("Deutsche Bank" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired Deutsche Bank securities between April 15, 2013 and April 29, 2016, both dates inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated

## JURISDICTION AND VENUE

2.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

3.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

4.     Venue is proper in this District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as a significant portion of the Defendants' actions, and the subsequent damages, took place within this District. Additionally, Defendant Deutsche Bank conducts business within this District.

5.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6.    Plaintiff, as set forth in the accompanying Certification, purchased Deutsche Bank securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

7.    Defendant Deutsche Bank provides investment, financial, and related products and services worldwide. The Company is incorporated in the Federal Republic of Germany with principal executive offices located at Taunusanlage 12, 60325 Frankfurt am Main, Germany. The Company also maintains an office at 60 Wall Street, New York, NY. Deutsche Bank's securities trades on the NYSE under the ticker symbol "DB."

8.    Defendant Stefan Krause ("Krause") was the Chief Financial Officer ("CFO") of the Company from October 1, 2008 until May 21, 2015, and was a member of the Company's Management Board from April 1, 2008 to October 31, 2015.

9.    Defendant Juergen Fitschen ("Fitschen") has been a member of the Company's Management Board since April 1, 2009, and has been the Co-Chairman of the Management Board and the Co-Chief Executive Officer of the Company since May 31, 2012.

10.   Defendant Anshuman Jain ("Jain") was the Co-Chairman of the Company's Management Board and the Company's Co-Chief Executive Officer from May 31, 2012 to June 30, 2015, and was a Member of the Company's Management Board during the Class Period.

11.   Defendant John Cryan ("Cryan") has been the Co-Chief Executive Officer of the Company's Management Board since July 1, 2015, and was the Co-Chairman of the Company's Management Board during the Class Period.

3

12.     Defendant Marcus Schenck ("Schenck") has been the CFO of the Company and a Member of the Company's Management Board since May 21, 2015.

13.     Defendants Krause, Fitschen, Jain, Cryan, and Schenck are sometimes referred to herein as the "Individual Defendants."

14.     Each of the Individual Defendants:

(a)     directly participated in the management of the Company;

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was privy to confidential proprietary information concerning the Company and its business and operations;

(d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)     approved or ratified these statements in violation of the federal securities laws.

15.     Deutsche Bank is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

16.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Deutsche Bank under *respondeat superior* and agency principles.

17.     Defendant Deutsche Bank and the Individual Defendants are referred to herein, collectively, as the "Defendants."

### SUBSTANTIVE ALLEGATIONS

### Materially False and Misleading Statements

18.     On April 15, 2013, the Company filed a Form 20-F for the fiscal year ended December 31, 2012 (the "2012 20-F") with the SEC, which provided the Company's year-end financial results and position and stated that the Company's internal control over financial reporting and disclosure controls and procedures were effective as of December 31, 2012. The 2012 20-F was signed by Defendants Fitschen, Jain, and Krause. The 2012 20-F also contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Fitschen, Jain, and Krause attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

19.     The 2012 20-F stated that the Company abides by a "Code of Ethics" which is available for review at the Company's website, stating in part:

Item 16B: Code of Ethics

In response to Section 406 of the Sarbanes-Oxley Act of 2002, we have adopted a code of ethics that applies to our principal executive officers, principal financial officer, principal accounting officer or controller, or persons performing similar functions. A copy of this code of ethics is available on our Internet website at www.db.com/ir/en/content/code_of_ethics.htm, under the heading "Code of Ethics for Senior Financial Officers". Other than several nonsubstantive changes made in May 2006, April 2010 (based on a decision in March 2010) and November 2011, there have been no amendments or waivers to this code of ethics

since its adoption. Information regarding any future amendments or waivers will be published on the aforementioned website.

20.     On March 20, 2014, the Company filed a Form 20-F for the fiscal year ended December 31, 2013 (the "2013 20-F") with the SEC, which provided the Company's year-end financial results and position and stated that the Company's internal control over financial reporting and disclosure controls and procedures were effective as of December 31, 2013. The 2013 20-F was signed by Defendants Fitschen, Jain, and Krause. The 2013 20-F also contained signed SOX certifications by Defendants Fitschen, Jain, and Krause attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

21.     The 2013 20-F stated that the Company abides by a "Code of Ethics" which is available for review at the Company's website, stating in part:

> **Code of Business Conduct and Ethics**
> Deutsche Bank's Code of Business Conduct and Ethics describes the values and minimum standards for ethical business conduct that we expect all of our employees to follow. These values and standards govern employee interactions with our clients, competitors, business partners, government and regulatory authorities, and shareholders, as well as with other employees. The Code contains a voluntary commitment from the Management Board and the Group Executive Committee. It reflects our core values and our promise to our stakeholders. In addition, it forms the cornerstone of our policies, which provide guidance on compliance with applicable laws and regulations. The current version of Deutsche Bank's Code of Business Conduct and Ethics is available on our website at www.deutsche-bank.com/ir/en/content/code_of_ethics.htm.
>
> In response to Section 406 of the Sarbanes-Oxley Act of 2002, we have adopted a code of ethics that applies to our principal executive officers, principal financial officer, principal accounting officer or controller, or persons performing similar functions. A copy of this code of ethics is available on our Internet website at www.db.com/ir/en/content/code_of_ethics.htm, under the heading "Code of Ethics for Senior Financial Officers". Other than several nonsubstantive changes made in May 2006, April 2010 (based on a decision in March 2010) and November 2011, there have been no amendments or waivers to this code of ethics since its adoption. Information regarding any future amendments or waivers will be published on the aforementioned website.

22.   On March 20, 2015, the Company filed a Form 20-F for the fiscal year ended December 31, 2014 (the "2014 20-F") with the SEC, which provided the Company's year-end financial results and position and stated that the Company's internal control over financial reporting and disclosure controls and procedures were effective as of December 31, 2014. The 2014 20-F was signed by Defendants Fitschen, Jain, and Krause. The 2014 20-F also contained signed SOX certifications by Defendants Fitschen, Jain, and Krause attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

23.   The 2014 20-F stated that the Company abides by a "Code of Ethics" which is available for review at the Company's website, stating in part:

> **Code of Business Conduct and Ethics**
> Deutsche Bank's Code of Business Conduct and Ethics describes the values and minimum standards for ethical business conduct that we expect all of our employees to follow. These values and standards govern em-ployee interactions with our clients, competitors, business partners, government and regulatory authorities, and shareholders, as well as with other employees. The Code contains a voluntary commitment from the Management Board and the Group Executive Committee. It reflects our values and believes. In addition, it forms the cornerstone of our policies, which provide guidance on compliance with applicable laws and regulations.
>
> In accordance with Section 406 of the Sarbanes-Oxley Act of 2002, we adopted a code of ethics with special obligations that apply to our "Senior Financial Officers", which currently consist of Deutsche Bank's Co-Chairmen of the Management Board, Chief Financial Officer, Head of Group Reporting and the members of the Group Finance Committee. There were no amendments or waivers to this code of ethics in 2014. Information regarding any future amendments or waivers will be published on Deutsche Bank's code of ethics website, referred to below.
>
> The current versions of the codes of ethics are available from Deutsche Bank's website: www.deutsche-bank.com/ir/en/content/code_of_ethics.htm.

24.    On March 11, 2016, the Company filed a Form 20-F for the fiscal year ended December 31, 2015 (the "2015 20-F") with the SEC, which provided the Company's year-end financial results and position and stated that the Company's internal control over financial reporting and disclosure controls and procedures were effective as of December 31, 2015. The 2015 20-F was signed by Defendants Cryan, Fitschen, and Schenck. The 2015 20-F also contained signed SOX certifications by Defendants Cryan, Fitschen, and Schenck attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

25.    The 2015 20-F stated that the Company abides by a "Code of Ethics" which is available for review at the Company's website, stating in part:

**Code of Business Conduct and Ethics**
Deutsche Bank's Code of Business Conduct and Ethics describes the values and minimum standards for ethical business conduct that we expect all of our employees to follow. These values and standards govern em-ployee interactions with our clients, competitors, business partners, government and regulatory authorities, and shareholders, as well as with other employees. The Code contains a voluntary commitment from the Management Board. It reflects our values and believes. In addition, it forms the cornerstone of our policies, which provide guidance on compliance with applicable laws and regulations.

In accordance with Section 406 of the Sarbanes-Oxley Act of 2002, we adopted a code of ethics with special obligations that apply to our "Senior Financial Officers", which currently consist of Deutsche Bank's Co-Chairmen of the Management Board, Chief Financial Officer, Group Controller and certain other Senior Financial Officers. There were no amendments or waivers to this code of ethics in 2015. Information regarding any future amendments or waivers will be published on Deutsche Bank's code of ethics website, referred to below.

The current versions of the codes of ethics are available from Deutsche Bank's website: www.db.com/ir/en/documents.htm.

26.    The statements referenced in ¶¶ 18 – 25 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results, which were known to

8

Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Deutsche Bank has serious and systemic failings in its controls against financing terrorism, money laundering, aiding against international sanctions, and committing financial crimes; (2) Deutsche Bank's internal control over financial reporting and its disclosure controls and procedures were not effective; and (3) as a result, Deutsche Bank's public statements were materially false and misleading at all relevant times.

### The Truth Begins to Emerge

27.     On July 22, 2014, *The Wall Street Journal* published an article entitled "Deutsche Bank Suffers From Litany of Reporting Problems, Regulators Said", stating that the Federal Reserve Bank of New York found that the Company's U.S. operations suffer from a litany of serious financial-reporting problems that the Company has known about for years but not fixed, stating in pertinent part:

**Deutsche Bank Suffers From Litany of Reporting Problems, Regulators Said**

Letter From New York Fed Said Some Reports From Deutsche Bank's U.S. Operations Were 'Inaccurate and Unreliable'

**An examination by the Federal Reserve Bank of New York found that Deutsche Bank AG's giant U.S. operations suffer from a litany of serious financial-reporting problems that the lender has known about for years but not fixed**, according to documents reviewed by The Wall Street Journal.

**In a letter to Deutsche Bank executives in December, a senior official with the New York Fed wrote that reports produced by some of the bank's U.S. arms "are of low quality, inaccurate and unreliable. The size and breadth of errors strongly suggest that the firm's entire U.S. regulatory reporting structure requires wide-ranging remedial action."**

The criticism from the New York Fed represents a rebuke to one of the world's biggest banks, and it comes at a time when federal regulators say they are increasingly focused on the health of overseas lenders with substantial U.S. operations.

**The Dec. 11 letter, excerpts of which were reviewed by the Journal, said Deutsche Bank had made "no progress" at fixing previously identified problems. It said examiners found "material errors and poor data integrity" in its U.S. entities' public filings, which are used by regulators, economists and investors to evaluate its operations. The problems ranged from data-entry errors to not taking into account the value of collateral when assessing the riskiness of loans.**

**The shortcomings amount to a "systemic breakdown" and "expose the firm to significant operational risk and misstated regulatory reports," said the letter from Daniel Muccia, a New York Fed senior vice president responsible for supervising Deutsche Bank.**

The New York Fed has various tools at its disposal to address shortcomings by banks it regulates. It can issue private letters demanding action, as it did with Deutsche Bank, or, in more severe cases, impose restrictions on banks' activities.

**The letter, which hasn't been previously reported, ordered senior Deutsche Bank executives to ensure steps were taken to fix the problems. It also said the bank might have to restate some of the financial data it has submitted to regulators.**

\*     \*     \*

The letter sent to Deutsche Bank shows that the New York Fed's concerns about its U.S. operations have been building for years.

**"Since 2002, the FRBNY has highlighted significant weaknesses in the firm's regulatory reporting framework that has remained outstanding for a decade," Mr. Muccia wrote. He added: "Most concerning is the fact that although the root causes of these errors were not eliminated, prior supervisory issues were considered remediated and closed by senior management."**

Paul Miller, a former Fed bank examiner, said it is uncommon for a bank to repeatedly fail to address problems over many years. "Usually when a regulator points something out, the bank fixes it," said Mr. Miller, now an analyst at FBR Capital Markets.

**Deutsche Bank's external auditor, KPMG LLP, also identified "deficiencies" in the way the bank's U.S. entities were reporting financial data in 2013, according to a Deutsche Bank email reviewed by the Journal.**

Deutsche Bank's annual report and other filings have included a letter from KPMG signing off on the bank's financial statements.

A KPMG spokesman declined to comment.

10

Deutsche Bank's U.S. operations have been the source of regular headaches for the lender, partly due to regulatory concerns about the adequacy of its capital buffers. The bank in June raised €8.5 billion of new capital by selling shares to investors.

The complaints from regulators largely center on data from two big U.S. Deutsche Bank subsidiaries, and the New York branch of the German parent company. That data goes into filings that all U.S.-regulated banks file with regulators each quarter. The resulting reports, crammed with thousands of lines of densely packed data, are a trove of information for regulators, analysts and investors.

But in 2002, 2007 and **2012, New York Fed examiners voiced concerns to Deutsche Bank about the quality of the data, according to the December letter.**

**After conducting its 2012 annual assessment**, for example, the New York Fed flagged a specific concern about how a Deutsche Bank subsidiary was classifying potentially troubled assets. **The unit, Deutsche Bank Trust Company Americas, wasn't properly assessing the value of collateral when it reported the value of loans where borrowers were at risk of defaulting, according to a New York Fed letter to Deutsche Bank in June 2013. Regulators said that made the unit's reports "inaccurate."**

The New York Fed's concerns intensified when a review of the bank's regulatory reporting got under way in August. At a September meeting with two of Deutsche Bank's top U.S. executives, **Fed officials described the bank's reporting as the worst among its peers, according to the Deutsche Bank email about issues raised by regulators.** Mr. Muccia, a 40-year veteran of bank regulation, and his team said **the trust-company unit had misclassified the riskiness of 20% of its loans. Despite finding dozens of problems, Mr. Muccia said he thought the Fed team was "just scratching the surface," according to the email.**

A few months later, Mr. Muccia sent his letter detailing the exam's findings and more than a half-dozen areas in need of "immediate" action.

**Many of the problems stemmed from what the letter called a "disjointed" regulatory-reporting system and "weaknesses" in the technology systems used by Deutsche Bank subsidiaries**. Instead of automatically compiling and reporting data to federal regulators, Deutsche Bank officials were making manual changes to more than 800 pieces of data, the letter said. That data was tied to a variety of balance-sheet items, such as certain types of loans and deposits, whose values totaled about $337 billion.

[Emphasis added].

11

28.     On this news, shares of Deutsche Bank fell $1.05 per share or approximately 3% from its previous closing price to close at $34.80 per share on July 22, 2014, damaging investors.

29.     On June 5, 2015, *Bloomberg* published an article entitled "Deutsche Bank Investigating $6 Billion of Possible Money Laundering by Russian Clients" stating that the Company is conducting an internal probe into possible money laundering by Russian clients that may involve about $6 billion of transactions over more than four years, stating in pertinent part:

### Deutsche Bank Investigating $6 Billion of Possible Money Laundering by Russian Clients

by Ambereen Choudhury, Suzi Ring, Jake Rudnitsky and Greg Farrell

June 5, 2015 — 9:15 AM EDT Updated on June 5, 2015 — 12:24 PM EDT

Deutsche Bank AG is conducting an internal probe into possible money laundering by Russian clients that may involve about $6 billion of transactions over more than four years, according to people with knowledge of the situation.

The Bank of Russia approached Deutsche Bank in October asking the firm to examine the stock-trading activities of some clients in the country, said one person, who asked not to be identified because the discussions are private.

**Benjamin Lawsky's Department of Financial Services in New York is looking at unusual trading activity at the firm in Russia, another person said. Deutsche Bank is analyzing data from 2011 through early 2015, and has alerted Britain's Financial Conduct Authority, the European Central Bank and Germany's Bafin of the investigation**, two people said.

*        *        *

The transactions being examined involve stocks bought by Russian clients in rubles through Deutsche Bank, and simultaneous trades through London in which the bank bought the same securities for similar amounts in U.S. dollars, the people said. Deutsche Bank is probing whether the transactions allowed Russian clients to move funds out of the country without properly alerting the authorities, one person said.

*        *        *

The value of the suspect trades may be higher than is currently being reviewed and the investigation is continuing, one person said. The role played by Deutsche Bank staff is still being looked at, the people said.

[Emphasis added].

30.     On this news, shares of Deutsche Bank fell $0.71 per share from its previous closing price to close at $30.63 per share on June 5, 2015, damaging investors.

31.     On August 3, 2015, *Bloomberg* published an article entitled "DOJ Said to Probe Deutsche Bank on Russia Mirror Trades" stating that the U.S Department of Justice is investigating billions of dollars of trades the Company made on behalf of Russian clients, stating in pertinent part:

### DOJ Said to Probe Deutsche Bank on Russia Mirror Trades

by Keri Geiger and Greg Farrell

August 3, 2015 — 2:23 PM EDT Updated on August 4, 2015 — 4:02 AM EDT

**U.S. federal prosecutors are investigating billions of dollars of trades Deutsche Bank AG made on behalf of Russian clients as recently as this year**, according to people with knowledge of the situation.

**The Justice Department's criminal probe, which hasn't been previously reported, focuses on so-called mirror trades, these people said. Such trades may have allowed Russian clients to move funds out of the country without properly alerting authorities**, a person familiar with the situation has said.

\*          \*          \*

**New Headache**

The Russian trades have swiftly become a new headache for the bank. Bloomberg reported on June 5 that Deutsche Bank was conducting an internal investigation of whether $6 billion in trades in Moscow and London were connected with possible money laundering by Russian clients. **The bank was examining trades that took place from 2011 through early 2015**, people familiar with the situation said at the time of the report.

**"The sums we're talking about aren't peanuts," said Andreas Plaesier, an analyst at M.M. Warburg in Hamburg who recommends investors hold Deutsche Bank shares. "If you have several violations across the bank, then it**

**becomes a lot harder to argue these are isolated incidents and that can drive up the fine you have to pay."**

\*       \*       \*

The trades under investigation involve stocks bought by Russian clients in rubles through Deutsche Bank, and simultaneous trades through London in which the bank bought the same securities for similar amounts in U.S. dollars, people familiar with the matter have said.

\*       \*       \*

Those mirror trades have also come under scrutiny of New York's banking regulator, a person familiar with the matter has said. The state's Department of Financial Services has asked Deutsche Bank for e-mails, memos, client lists and other documents as it looks into **whether those trades were used to help Russian clients skirt U.S. sanctions laws**, according to the person. The DFS also asked for information about whether any of the bank's other operations, including those in New York, were connected with the trades, the person has said.

[Emphasis added].

32.     On this news, shares of Deutsche Bank fell $1.00 per share or approximately 3% over the next two trading days to close at $34.02 per share on August 4, 2015, damaging investors.

33.     On September 18, 2015, *The Wall Street Journal* published an article entitled "Deutsche Bank to Pull Investment-Banking Operations Out of Russia", stating that the Company is closing its investment-banking operations in Russia amid investigations by regulators from Europe and the U.S. of potential money laundering by the Company's Russian clients and the probing of the adequacy of the Company's compliance systems, stating in pertinent part:

**Deutsche Bank to Pull Investment-Banking Operations Out of Russia**

By **JENNY STRASBURG**

Sept. 18, 2015 4:53 a.m. ET

**Deutsche Bank AG will pull its investment-banking operations out of Russia, the German lender said Friday**, one of its first significant moves under a new co-chief executive planning broader companywide cutbacks.

The move, which the bank said will be largely complete by year-end, will affect around 200 investment-bank employees based in Russia who provide deal advisory and securities-trading services, The Wall Street Journal reported last week.

Hundreds of other Deutsche Bank employees who work in Russia in technology, cash-management and certain other financing services for institutions such as banks and corporations are expected to stay in place. But the lender will now provide core investment-banking, stock-trading and other existing banking services to Russian clients from other cities.

The bank said it would use third-party Russian firms to execute trades where necessary.

Deutsche Bank said in its statement the closure of its Russia investment-banking business will "reduce complexity, costs, risk, and capital consumption."

**The move comes as the lender and regulators from Europe and the U.S. investigate potential money laundering by Russian clients of Deutsche Bank, and probing the adequacy of the bank's compliance systems**, according to people familiar with the matter.

[Emphasis added].

34.    On this news, shares of Deutsche Bank fell $1.35 per share or approximately 5% from its previous closing price to close at $28.45 per share on September 18, 2015, damaging investors.

35.    On October 29, 2015, *Bloomberg* published an article entitled "Deutsche Bank Sets Aside $1.3 Billion, Mostly for Russia Probe", stating that the Company set aside $1.3 billion in the third quarter to cover suspected wrongdoing at its Russian equity unit, and that it found violations of internal policies and identified weaknesses in its oversight regime during its probe of the so-called Russian mirror trades, stating in pertinent part:

**Deutsche Bank Sets Aside $1.3 Billion, Mostly for Russia Probe**

October 29, 2015 — 5:16 AM EDT Updated on October 29, 2015 — 1:31 PM EDT

**Deutsche Bank AG increased its litigation reserves by 1.21 billion euros ($1.3 billion) in the third quarter, mainly to cover suspected wrongdoing at the lender's Russian equity unit.**

**The firm said Thursday it found violations of internal policies and identified weaknesses in its oversight regime during its probe into the so-called mirror trades, which may have allowed Deutsche Bank's Russian clients to move funds out of the country without properly alerting authorities.**

"We can't say much because we don't know much and that's shame on us," co-Chief Executive Officer John Cryan said at an investor conference in London. "It looks as though the bank was used."

The U.S. Justice Department and authorities in the U.K. and Russia are investigating whether Germany's biggest bank adequately vetted $6 billion in transactions that were part of a possible money-laundering scheme, people with knowledge of the matter said earlier this year.

The Russian investigation adds to a long list of legal woes facing Deutsche Bank, which has been buffeted by multiple probes, the departure of several top executives and allegations that senior officials were aware of traders' efforts to rig markets.

The bank said it would invest in anti-money-laundering infrastructure and look at "exiting relationships and locations with unacceptable risks." Deutsche Bank reiterated that it has already taken disciplinary action against a number of people in connection with its internal probe of the Russian trades.

**The investigation "has identified certain violations of Deutsche Bank's policies and deficiencies in Deutsche Bank's control environment," the company said in its quarterly earnings statement.** It's the first time the bank has said internal rules were broken.

The bank has been "advised that it's not our job to try and find out where the money comes from or where it goes to," Cryan told reporters in Frankfurt earlier Thursday.

Bloomberg News reported earlier this month that several close associates of Russian President Vladimir Putin may have benefited from the Deutsche Bank trades. Some of the accounts under scrutiny appear to contain assets that belong to Putin associates, according to people familiar with the investigation. They include

a relative of the president and two of his longtime friends, **Arkady and Boris Rotenberg, who grew rich from contracts with state-run firms and who are now under U.S. sanctions, the people said.**

[Emphasis added].

36.     On this news, shares of Deutsche Bank fell $2.42 per share or approximately 8% from its previous closing price to close at $27.89 per share on October 29, 2015, damaging investors.

37.     On April 14, 2016, *Bloomberg* published an article entitled "Deutsche Bank Found 'Systemic' Failure in Russia Cash Flight", stating that the Company found a "systemic" failure in its internal controls that were designed to prevent money laundering and financial crime, and which allowed a "suspected money-laundering pattern" to pump as much as $10 billion out of Russia from 2012 through 2014, stating in pertinent part:

**Deutsche Bank Found `Systemic' Failure in Russia Cash Flight**

April 14, 2016 — 12:01 AM EDT   Updated on April 14, 2016 — 3:50 AM EDT

Red flags started popping up inside Deutsche Bank AG in early 2014 about billions of dollars in suspect trades from Moscow. A Cypriot bank sent a query to London. Russia's central bank raised questions. Moscow back-office staffers compiled a list of dubious transactions.

Some of the warnings were ignored. Others were dismissed. It wasn't until early 2015, when Russian authorities began interviewing bank employees in Moscow, that top executives in Frankfurt were alerted and the bank began a full-scale internal investigation.

**What Deutsche Bank quickly found: a "systemic" failure in internal controls meant to prevent money laundering and financial crime. Those critical deficiencies, as it called them, allowed a "suspected money-laundering pattern" to pump as much as $10 billion out of Russia from 2012 through 2014.**

That is the harsh conclusion of an internal bank report analyzing the German lender's response to the so-called mirror trades, details of which were reviewed by Bloomberg News. Findings from the October 2015 report form the basis for

this article, alongside details from a Russian central bank audit of the bank's operations that resulted last year in a fine for reporting lapses.

**Personal Oversight**

**Deutsche Bank's internal audit found that the missed warnings went beyond the Moscow office to the bank's compliance, financial-crimes and money-laundering watchdogs in London and New York.** Deutsche Bank's handling of the Russia trades is now being investigated by U.S. prosecutors and European regulators, adding to the string of legal challenges in the U.S. and elsewhere for the bank as it attempts to increase profitability.

The Frankfurt-based bank's shares are now trading for one-third of book value, as shareholders demand managers get a handle on losses and legal costs. Deutsche Bank has set aside about 5.5 billion euros ($6.2 billion) for potential liabilities including the Russian trades.

John Cryan, who took over as co-chief executive officer in July, has said he'll personally oversee efforts to navigate out of the legal storms. He said he hopes to resolve investigations into the Russia trades and other major legal issues this year.

**The co-CEO said at a conference in London last month that "it's not our finest hour" and that the bank "clearly had a systems and control failure" related to Russian transactions.**

**'Weak Controls'**

"This could be expensive for Deutsche Bank with the U.S. authorities investigating and just given the sheer volume of the transactions we're talking about," said Andreas Plaesier, an analyst at M.M. Warburg in Hamburg who has a hold recommendation on the shares. "The weak controls really don't make Deutsche Bank look good, but any actual criminal energy is always going to be hard to stop."

\*     \*     \*

**Mirror Trades**

In the mirror trades, a Deutsche Bank counterparty in Russia would buy local blue-chip shares for rubles, while the same stocks would be sold in London for dollars, the bank and the Russian central bank reviews determined.

Such trades are legal in some cases. **What the U.S. Justice Department wants to know is whether Deutsche Bank broke anti-money-laundering protocols by not properly vetting them**, people familiar with the matter have said.

Deutsche Bank's internal report describes an interlocking web of offshore companies and Moscow brokers that attracted attention within the bank and from regulators for high volumes of trading, often in just one direction -- exclusively share sales, for example. All the companies were controlled from Russia, according to the report, and placed their orders through the bank's Moscow equities desk.

Trades by one of those brokers raised suspicions inside the global bank and among at least one of its partner banks for months in early 2014. **An audit of Deutsche Bank's Moscow operations, performed in mid-2014 by an outside firm, found "severe weaknesses" in the unit's processes for vetting customers.** The Russian central bank alerted Deutsche Bank about several Moscow brokerages it was trading with, and the bank's own staff also raised concerns.

**Calls for Probe**

Deutsche Bank stopped doing business with a few of the companies. **But calls from Moscow back-office staff for a broader probe into such trades were ignored by superiors in London, Deutsche Bank found.**

Several of the Russian brokers the bank identified later had their licenses revoked by the country's central bank. But neither the central bank nor Deutsche Bank reports address a key issue: whose money was being handled.

Some of the money spirited out of Russia belonged to close associates of Russian President Vladimir Putin, people familiar with the matter have previously told Bloomberg News. These associates include a relative of the president and two of his longtime friends, Arkady and Boris Rotenberg, the people said.

There's no indication that the Rotenbergs or other individuals are under investigation. A representative for the Rotenbergs said the brothers weren't involved in any such transactions. The Kremlin has called the allegations unsubstantiated.

**First Clue**

The first clue about the mirror-trade activity arrived in January 2014, the bank's inquiry found. Cyprus-based Hellenic Bank filed a request for assistance to Deutsche Bank's London office, asking about "suspicious high-volume transactions" through the account of a U.K.-registered company called Ergoinvest LLP.

**Hellenic sent at least two reminders to London before a response arrived, in March, from Deutsche Bank Moscow. The equities office there -- rather than**

**its compliance or anti-money-laundering departments -- vouched for the clients and the trades, the bank found.**

**While one part of Deutsche bank was defending Ergoinvest, yet another was posing questions about it: An anti-financial-crime unit in New York flagged questionable activity by the company, directing its inquiries to Hellenic Bank. The Cyprus bank, receiving conflicting signals about Ergoinvest, began asking the New York unit for clarification. It didn't respond, the bank found.**

### Crisscrossing Questions

Hellenic Bank declined to comment. Representatives for Ergoinvest -- which is owned by companies registered in the Commonwealth of Dominica, according to U.K. corporate registration data -- couldn't be located to comment.

In spite of the months of crisscrossing questions, Deutsche Bank continued doing business with Ergoinvest -- including mirror trades, according to the Russian central bank report -- until Russian authorities began asking about it and other brokers in 2015.

For all the suspicions raised about Ergoinvest, the transactions that were flagged didn't represent a complete mirror trade.

**Soon, however, back office staffers in Moscow pieced together an example not involving Ergoinvest, the Deutsche Bank review found. It showed both sides of a mechanism that was effectively moving cash out of Russia -- a small Russian broker buying shares in Moscow, and a British Virgin Islands holding company selling the same stocks for cash in London.**

### Cutting Ties

In late August, senior Moscow executives decided to stop doing business with both companies, according to the Russian central bank report. The same day, the Moscow back office offered to help colleagues in London look for similar trades by other clients with Russian ties, the bank found. But there was no response to the request, the bank found.

Deutsche Bank told Russian regulators that it didn't follow up on the trades because at the time it believed they were an isolated episode, according to the central bank report.

**Even as warnings accumulated, Deutsche Bank conducted an internal audit of the Moscow equities operation that gave it "satisfactory" grades and made no mention of the flagged trades. Almost a year later, the bank's review of**

the handling of the transactions characterized that 2014 audit as marked by "severe shortcomings."

After Russian authorities began interviewing people in the Moscow office about Ergoinvest and a local broker regarding possible tax evasion, Moscow staffers again alerted the bank's financial-crime team in London, sending a spreadsheet of the suspected mirror trades, the bank found.

**Project Square**

More than a week passed. Still awaiting response from London, on Feb. 25, 2015, Moscow compliance staff raised the issue to an incident-management group in Frankfurt.

The bank opened a full-scale inquiry, calling it Project Square. In less than two months, **the bank turned up more than 2,000 transactions that bypassed internal money-laundering controls.**

The U.S. Department of Justice, the U.K.'s FCA, through a spokespeople, declined to comment, as did Bafin, Germany's banking supervisor.

Russia's central bank examined a year of trading and determined Deutsche Bank had been the victim of a criminal scheme -- issuing a fine of about $5,000 for lapses such as missed deadlines and failure of staffers to indicate their middle names on some documents, people familiar with the situation have said. The central bank has declined to comment on its probe and didn't immediately respond to a request for comment for this article.

Since its internal audit, the bank has cut much of its operations in Russia, without linking the move to the mirror-trade probe. It dismissed three people in Moscow, all of whom have denied wrongdoing and are contesting the bank's action.

[Emphasis added].

38.    On April 28, 2016 during aftermarket hours, *Bloomberg* published an article entitled "Deutsche Bank's Thoma to Step Down in Wake of Board Clash", stating that that Georg Thoma, Chairman of the Supervisory Board of Integrity Committee, who was brought on the Board to help improve controls and work through the Company's various cases of misconduct, resigned as Chairman of the Committee effective immediately, stating in pertinent part:

**Deutsche Bank's Thoma to Step Down in Wake of Board Clash**

April 28, 2016 — 4:46 PM EDT  Updated on April 29, 2016 — 5:06 AM EDT

**Deutsche Bank AG supervisory board member Georg Thoma is stepping down two years before his contract ends, capping a week of turbulence at Germany's biggest lender after criticism that he went too far in probing potential wrongdoing within its ranks.**

Thoma, 71, will end his service on May 28, Deutsche Bank said in a statement from Frankfurt late Thursday. He's resigning from the board's integrity committee with immediate effect, the bank said.

**Thoma, a Shearman & Sterling LLP lawyer, was left isolated after pushing to investigate Chairman Paul Achleitner and mounting intensive inquiries into Deutsche Bank executives, people familiar with the matter have said. Friction arose as Thoma sought to examine potential links between individual board members and legal cases starting in 2014, one of the people said.**

That conflict burst into the open this week when at least two board members spoke out against him in public. Deputy Chairman Alfred Herling criticized him for being "overzealous" and spending too much in probing potential wrongdoing. Thoma hasn't responded to requests for comment on those assertions.

Deutsche Bank dropped 3.1 percent to 16.83 euros at 11:04 a.m. in Frankfurt. The shares have declined about 25 percent this year, while the Bloomberg Europe Banks and Financial Services Index lost 16 percent.

The remarks divided observers, with Dieter Hein, an analyst at Fairesearch-Alphavalue, saying Thoma was probably just doing his job, while Michael Seufert, an analyst at Norddeutsche Landesbank, said the question of going too far in probing wrongdoing is legitimate.

**'Lost Control'**

**Thoma was brought on to help improve controls and work through the bank's numerous cases of misconduct**. Achleitner told some colleagues at that time that the lawyer's experience would be a boon as post-financial-crisis scandals were just beginning to hit European banks, a person familiar with the matter said. The two men had worked on the privatization of the eastern German chemicals industry after the fall of communism, with Achleitner tapping Thoma for the board in 2013 as part of a wider overhaul.

[Emphasis added].

22

39.    On this news, shares of Deutsche Bank fell $0.50 per share or approximately 3% from its previous closing price to close at $18.96 per share on April 29, 2016, damaging investors.

40.    On May 1, 2016, *The Financial Times* published an article entitled "FCA warns Deutsche on 'serious' financial crime control issues", stating that the United Kingdom's Financial Conduct Authority ("FCA") sent a letter to Deutsche Bank on March 2, 2015, accusing it of having "serious" and "systemic" failings in its controls against financing terrorism, money laundering, aiding against international sanctions, and committing financial crimes. The FCA stated that its investigation uncovered, among other things, incomplete documentations, lack of monitoring, and influencing staff to take actions related to specific clients, which all amounted to a "serious" and "systemic" controls failure. The article stated in pertinent part:

May 1, 2016 6:00 pm

**Deutsche Bank has "serious" and "systemic" failings in its controls against money**

Caroline Binham in London and James Shotter in Frankfurt

**Deutsche Bank has "serious" and "systemic" failings in its controls against money laundering, terrorist financing and sanctions, according to confidential findings by the UK's financial watchdog, which had already put the lender in supervisory "special measures".**

**The Financial Conduct Authority conducted an in-depth review last year that found a catalogue of shortcomings at the bank, ranging from missing documents and a lack of transaction monitoring to inappropriate pressure put on staff to take on certain clients.** The watchdog has now ordered a separate independent review, according to a recent letter sent by the FCA to Deutsche.

**"Our overall conclusion was that DB UK had serious AML (anti-money laundering), terrorist financing and sanctions failings which were systemic in nature," said the FCA's letter, dated March 2. "Effective senior management engagement and leadership on financial crime had been lacking for a considerable period of time."**

The FCA's findings are another blow to Germany's biggest lender, which has been beset by misconduct issues including the rigging of Libor and is subject to an investigation into $10bn of suspicious Russian trades. Last week, the Frankfurt-based company was caught up in a storm after one of its board members resigned following a clash over how to deal with past scandals.

In the wake of its review across Deutsche's offices in the UK, India and Dublin, the FCA has ordered a so-called skilled persons report — sometimes known as a Section 166 report — to assess remedial work Deutsche must now carry out. These reports typically take many months to complete. Their findings can then spark an FCA enforcement investigation, which also normally take months before any conclusions and penalties are published.

                              *         *         *

The FCA's conclusions come after Deutsche's participation in the watchdog's anti-money laundering programme, which is testing 14 major banks' controls against financial crime, one lender at a time. It is a programme overseen by the FCA's supervision rather than enforcement team, meaning any remedies ordered are usually not made public.

It is separate to the FCA's "enhanced supervision" that Deutsche has been subject to after a series of regulatory failures, including the rigging of Libor, for which it paid a record $2.5bn.

The programme is also distinct from an enforcement investigation into $10bn of suspicious trades involving its Russian business. The FCA is unlikely to report its findings in that probe this year, according to people familiar with the matter. US and German authorities are also scrutinising the allegations.

[Emphasis added].

41.    On May 1, 2016, *Bloomberg* published an article entitled "Deutsche Bank Said to Be Faulted by FCA Over Lax Client Vetting", stating that the FCA faulted the Company for "serious" lapses in efforts to thwart money laundering and criticized the Company's ability to verify client's abilities and goals, or ensure that it wasn't aiding organizations subject to international sanctions, stating in pertinent part:

### Deutsche Bank Said to Be Faulted by FCA Over Lax Client Vetting

May 1, 2016 — 7:05 PM EDT

**U.K. regulators faulted Deutsche Bank AG in a March letter for "serious" lapses in efforts to thwart money laundering**, capping a review that already prompted the firm to make changes, according to a person with knowledge of the matter.

**Examiners criticized the bank's ability to verify some clients' identities and goals, or ensure that it wasn't aiding organizations subject to international sanctions, the Financial Conduct Authority found in the March 2 letter sent to the firm**, according to the person, who asked not to be identified discussing confidential communications. The FCA outlined lapses in the U.K. within two parts of the company the global markets division and the corporate and investment banking business.

\*     \*     \*

Deutsche Bank has earmarked funds for the money-laundering probe examining how clients moved money out Russia**.** An internal report analyzing the company's response to signs of so-called mirror trades there found control deficiencies that may have let a "suspected money-laundering pattern" pump as much as $10 billion out of the country from 2012 through 2014, Bloomberg reported last month. The company, under pressure to cut costs, said last year it would close its securities business in Russia.

The FCA acknowledged in the summary of its anti-money-laundering review that Cryan, who took office last July, was "determined" to improve Deutsche Bank's controls, the Financial Times wrote earlier on Sunday, quoting the letter. Still, the regulator found that until recently, **the bank's U.K. operations had "lacked a clear strategy and effective leadership in tackling the systemic AML failures that had occurred,"** the FT cited it as saying.

[Emphasis added].

42.     On this news, shares of Deutsche Bank fell $1.62 per share or approximately 9% over the next two trading days to close at $17.34 per share on May 3, 2016, damaging investors.

43.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

44.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or

otherwise acquired Deutsche Bank securities traded on the NYSE during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

45.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Deutsche Bank securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Deutsche Bank or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

46.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

47.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

48.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Deutsche Bank;

- whether the Individual Defendants caused Deutsche Bank to issue false and misleading public statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading public statements;

- whether the prices of Deutsche Bank securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and,

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

49.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

50.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Deutsche Bank securities are traded in efficient markets;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE, and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased and/or sold Deutsche Bank securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

51.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

52.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### Violation of Section 10(b) of The Exchange Act and Rule 10b-5
### Against All Defendants

53.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

54.     This Count is asserted against Deutsche Bank and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

55.      During the Class Period, Deutsche Bank and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

56.     Deutsche Bank and the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Deutsche Bank securities during the Class Period.

57.     Deutsche Bank and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of Deutsche Bank were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of Deutsche Bank, their control over, and/or receipt and/or modification of Deutsche Bank allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Deutsche Bank, participated in the fraudulent scheme alleged herein.

58.     Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Deutsche Bank personnel to members of the investing public, including Plaintiff and the Class.

59.     As a result of the foregoing, the market price of Deutsche Bank securities was artificially inflated during the Class Period. In ignorance of the falsity of Deutsche Bank's and the Individual Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of Deutsche Bank securities during the Class Period in purchasing Deutsche Bank securities at prices that were artificially inflated as a result of Deutsche Bank's and the Individual Defendants' false and misleading statements.

60.     Had Plaintiff and the other members of the Class been aware that the market price of Deutsche Bank securities had been artificially and falsely inflated by Deutsche Bank's and the Individual Defendants' misleading statements and by the material adverse information which Deutsche Bank's and the Individual Defendants did not disclose, they would not have purchased Deutsche Bank's securities at the artificially inflated prices that they did, or at all.

61.      As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

62.     By reason of the foregoing, Deutsche Bank and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of Deutsche Bank securities during the Class Period.

## COUNT II

### Violation of Section 20(a) of The Exchange Act
### Against The Individual Defendants

63.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

64.     During the Class Period, the Individual Defendants participated in the operation and management of Deutsche Bank, and conducted and participated, directly and indirectly, in the conduct of Deutsche Bank's business affairs. Because of their senior positions, they knew the adverse non-public information regarding Deutsche Bank's business practices.

65.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Deutsche Bank's financial condition and results of operations, and to correct promptly any public statements issued by Deutsche Bank which had become materially false or misleading.

66.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Deutsche Bank disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Deutsche Bank to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Deutsche Bank within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Deutsche Bank securities.

67.     Each of the Individual Defendants, therefore, acted as a controlling person of Deutsche Bank. By reason of their senior management positions and/or being directors of Deutsche Bank, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Deutsche Bank to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Deutsche Bank and possessed the power to control the specific activities which

comprise the primary violations about which Plaintiff and the other members of the Class complain.

68.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Deutsche Bank.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: May 10, 2016                        Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

By: /s/ Phillip Kim
Phillip Kim, Esq. (PK 9384)
Laurence M. Rosen, Esq. (LR 5733)
275 Madison Avenue, 34th Floor
New York, NY 10016
Phone: (212) 686-1060
Fax: (212) 202-3827

*Counsel for Plaintiff*