**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE DEUTSCHE BANK AKTIENGESELLSCHAFT SECURITIES LITIGATION | Case No. 1:16-cv-03495 (AT) (BCM) **CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS** **JURY TRIAL DEMANDED** |

TABLE OF CONTENTS

Page

NATURE OF THE ACTION .............................................................................................3

JURISDICTION AND VENUE .........................................................................................5

PARTIES ...........................................................................................................................6

SUBSTANTIVE ALLEGATIONS ..................................................................................10

The Bank's Management Structure and Its Risk Management During the
Class Period ..........................................................................................................10

Deutsche Bank's Prior Troubles With the Law ...................................................13

Deutsche Bank's Significant Deficiencies Related to Its AML Policies and
Procedures .............................................................................................................17

A.      The Challenges to AML Monitoring ..........................................................17

B.      The 2002 Warnings From the Federal Reserve Bank of New York .............20

C.      The October 11, 2005 Agreement With the Federal Reserve and the
New York State Banking Department ...........................................................21

D.      The 2007 Warnings From the FRBNY .......................................................26

E.      The 2012 and 2013 Additional Warnings From the FRBNY .......................27

F.      The December 11, 2013 Letter from the Federal Reserve Bank of New York 28

G.      During the Class Period, the Board of Governors of the Federal
Reserve System Ordered Deutsche Bank to Cease and Desist and
Imposed a Civil Monetary Penalty For Unsafe and Unsound Practices Related
to the Illicit Transmission of Funds ............................................................34

H.      During the Class Period, German Regulator BaFin Raided Deutsche Bank's
Headquarters and Arrested the Legal Department Head Responsible for the
Bank's AML operations .............................................................................37

I.      During the Class Period, UK's Financial Watchdog Placed Deutsche Bank's
London Office Under Enhanced Supervision ..............................................37

J.      During the Class Period, South Africa's Banking Regulator Fined Deutsche
Bank for Lax AML Controls ......................................................................38

K.      During the Class Period, Dubai's Regulator Fined Deutsche Bank For AML
Violations ................................................................................................39

During the Class Period, A Russian Mirror-Trade Scheme Perpetuated by Deutsche Bank
High-Ranking Employees Resulted in $10 Billion Illegally Laundered ..............................40

A.      The Mirror-Trade Scheme ........................................................................40

B.      Other Red Flags Disregarded by Deutsche Bank ........................................47

Confidential Witnesses Attest To Deutsche Bank' Internally Known
Deficiencies in Internal Controls, Particularly With Respect to Anti-Money Laundering
Controls ................................................................................................................50

    A.      Information provided by CW1 ........................................................50

    B.      Information provided by CW2 ........................................................53

    C.      Information provided by CW3 ........................................................56

Deutsche Bank's False Campaign to Regain the Public Trust ...........................................59

Materially False and Misleading Statements ........................................................................61

    A.      False and Misleading Statements Made in 2013 ...........................61

    B.      False and Misleading Statements Made in 2014 ...........................75

    C.      False and Misleading Statements Made in 2015 ...........................96

    D.      False and Misleading Statements Made in 2016 .........................116

The Truth Begins to Emerge ...............................................................................................122

PLAINTIFF'S CLASS ACTION ALLEGATIONS ............................................................149

LOSS CAUSATION ............................................................................................................151

COUNT I .............................................................................................................................152

Violation of Section 10(b) of The Exchange Act and Rule 10b-5
Against All Defendants .......................................................................................................152

COUNT II ............................................................................................................................154

Violation of Section 20(a) of the Exchange Act
Against The Individual Defendants ....................................................................................154

PRAYER FOR RELIEF ......................................................................................................156

DEMAND FOR TRIAL BY JURY .....................................................................................156

Lead Plaintiff Andrei Sfiraiala ("Sfiraiala") and Plaintiff Warren Ramanathan ("Ramanathan") (collectively, "Plaintiffs" or "Plaintiff") individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Deutsche Bank Aktiengesellschaft ("Deutsche Bank" or the "Bank"), Deutsche Bank Ltd. aka Deutsche Bank LLC ("Deutsche Bank Russia"), analysts' reports and advisories about the banks, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired Deutsche Bank securities on a United States exchange or pursuant to other transactions within the United States between January 31, 2013 and July 26, 2016, both dates inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.      Deutsche Bank has been repeatedly warned and sanctioned for illegal and unethical conduct for more than a decade, engaging in multiple schemes that extracted harsh punishments from regulators, comprising of billions in penalties and fines. Among other ploys,

Deutsche Bank manipulated the price of gold and silver, defrauded government-controlled mortgage companies Fannie Mae and Freddie Mac, misled investors about the quality of the mortgage loans that sparked the 2008 housing meltdown, masked twelve billion dollars' worth of losses, conspired with other banks to manipulate the Intercontinental Exchange London Interbank Offered rate ("Libor"), the most important benchmark interest rate used to make adjustments to adjustable rate mortgages, violated multiple U.S. sanctions, and defrauded investors by making false statements about its off-exchange trading platforms that directed preferential information to Deutsche Bank's "dark pool."   Moreover, Deutsche Bank's operations were riddled with serious deficiencies in its anti-money laundering ("AML") systems and controls.  In several instances, the bank failed to cooperate with governmental investigations into its illicit acts and went so far as to mislead the regulators.  For example, in connection with its investigation of Deutsche Bank's Libor manipulation, the Financial Conduct Authority of Britain said that "Deutsche Bank's failing were compounded by them repeatedly misleading us." In a similar vein, the regulator of the Dubai International Financial Centre fined Deutsche Bank for "serious contraventions," including misleading the regulator, and for failures in its internal governance and control systems related to booking clients and anti-money laundering processes.

    3.    Deutsche Bank also failed to address the significant internal control and reporting deficiencies that the regulators demanded be addressed for years, including requests that it fully address the deficiencies in its AML policies and procedures, customer due diligence practices, risk management processes, and internal control environmental related to the bank's correspondent banking and funds transfer clearing activities.  As a former Deutsche Bank vice-president turned whistleblower recounted, "Deutsche Bank was structurally designed by management to allow corrupt individuals to commit fraud."

4.      In light of these offenses, Deutsche Bank vowed cultural change, assuring investors during the Class Period that "Deutsche Bank is in a process of transformation . . . We want to win back people's trust . . . Deutsche Bank emphasizes integrity above all."  To that end, with respect to steps taken to prevent money laundering, Deutsche Bank declared that it had "significantly tighten[ed] [its] control environment," that it had "robust" controls to prevent money laundering, that it had "developed effective procedures for assessing clients" with "intensive checks" and "regular reviews," that it had appropriate compliance training for its employees, and that it adopted risk-based procedures for monitoring third parties.   But these assurances were illusory.  During the Class Period, high level employees, including the former Head of Equities for Deutsche Bank Russia, Defendant Wiswell, engaged in a so-called "mirror trading" scheme that resulted in *$10 billion* being laundered from Russia.  This scheme is currently the subject of world-wide government investigations and is expected to trigger hefty penalties in the billions to be levied against the bank.  Deutsche Bank does not deny the scheme but instead is pinning the blame on Wiswell, despite representations by Wiswell that the scheme was carried out routinely and openly, and in the face of repeated demands from regulators that the bank take specific steps to strengthen its controls and risk management processes to prevent money laundering.

5.      When the truth finally emerged through a series of events and corrective disclosures, it eviscerated *over $20 billion* in Deutsche Bank's market capitalization.

## JURISDICTION AND VENUE

6.      The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

7.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

8.     Venue is proper in this District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as the Company's stock trades on the New York Stock Exchange ("NYSE"), located within this District.

9.     In connection with the acts, conduct and other wrongs alleged in this complaint (the "Complaint"), Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the U. S. mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

10.     Plaintiff Sfiraiala, as set forth in the previously filed Certification, purchased Deutsche Bank securities on a United States exchange or pursuant to other transactions within the United States at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures and/or the materialization of the risks the banks were facing.

11.     Plaintiff Ramanathan, as set forth in the previously filed Certification, purchased Deutsche Bank securities on a United States exchange or pursuant to other transactions within the United States at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures and/or the materialization of the risks the banks were facing.

12.     Defendant Deutsche Bank is the parent company of the Deutsche Bank group of companies and provides investment, financial, and related products and services worldwide.  The Bank is incorporated in the Federal Republic of Germany with principal executive offices located at Taunusanlage 12, 60325 Frankfurt am Main, Germany. The Company also maintains

an office at 60 Wall Street, New York, NY.  Deutsche Bank's securities trade on the NYSE under the ticker symbol "DB."  During the Class Period, Deutsche Bank published on its website and filed with the Securities and Exchange Commission ("SEC") consolidated financial statements that included revenues and other metrics of Deutsche Bank and its consolidated subsidiaries, including Deutsche Bank Russia.  During the Class Period, Deutsche Bank also published on its website and filed with the SEC annual reports that disclosed information about contingent liabilities related to Deutsche Bank and its subsidiaries and/or affiliates, which form part of the Deutsche Bank Group.

13.     Defendant Deutsche Bank Russia is incorporated in the Russian Federation and its legal address is 82 Sadovnicheskaya Street, Building 2, Moscow, 115035, Russian Federation. Deutsche Bank is the sole participant of Deutsche Bank Russia and the party who governs and has ultimate control over Deutsche Bank Russia.  Deutsche Bank makes strategic decisions on the operations of Deutsche Bank Russia.  Deutsche Bank prepares publicly available financial statements that include metrics of Deutsche Bank Russia.  Deutsche Bank Russia is owned by the Deutsche Bank Group, which operates in the global banking market.  A large amount of Deutsche Bank Russia's funding is from, and credit exposures are to, the Deutsche Bank Group. The activities of Deutsche Bank Russia are closely linked with the requirements of the Deutsche Bank Group and the policies of the Deutsche Bank Group are determined for all Deutsche Bank Group members.  According to Deutsche Bank Russia, its Management Board provides overall risk and capital management supervision for the bank.  During the Class Period, the conduct of Deutsche Bank Russia affected the price of Deutsche Bank's securities.

14.     Defendant Stefan Krause ("Krause") has served as the Chief Financial Officer ("CFO") of Deutsche Bank from October 1, 2008 until May 21, 2015, and was a member Deutsche Bank's Management Board from April 1, 2008 to October 31, 2015.

15.     Defendant Juergen Fitschen ("Fitschen") has been a member of Deutsche Bank's Management Board since April 1, 2009, Co-Chairman of the Management Board and the Co-Chief Executive Officer of Deutsche Bank from May 31, 2012 to May 2016.

16.     Defendant Anshuman Jain ("Jain") has served as the Co-Chairman of Deutsche Bank's Management Board from 2009 to June 30, 2015, and the Bank's Co-Chief Executive Officer from May 31, 2012 to June 30, 2015.

17.     Defendant Stephan Leithner ("Leithner") has served as a member of Deutsche Bank's Management Board from June 1, 2012 to October 31, 2015.

18.     Defendant Stuart Lewis ("Lewis") has served as a member of Deutsche Bank's Management Board since June 1, 2012, and was the Bank's Chief Risk Officer.

19.     Defendant Rainer Neske ("Neske") has served as a member of Deutsche Bank's Management Board from April 1, 2009 to June 30, 2015.

20.     Defendant Henry Ritchotte ("Ritchotte") has served as a member of Deutsche Bank's Management Board from June 1, 2012 to December 31, 2015.  He was the Bank's Chief Operating Officer.

21.     Defendant John Cryan ("Cryan") has served as Deutsche Bnak's CEO since May 2016. He had served as the Co-Chief Executive Officer of Deutsche Bank from July 1, 2015 to May 2016, and was the Co-Chairman of the Bank's Management Board during the Class Period. During the Class Period, Cryan was also the Chairman of Deutsche Bank's Audit Committee and a member of the Bank's Risk Committee.

22.     Defendant Marcus Schenck ("Schenck") has served as the CFO of Deutsche Bank and a Member of the Bank's Management Board since May 21, 2015.

23.     Defendant Timothy Wiswell ("Wiswell") has served as the Head of Equities and Trading for Deutsche Bank Russia during the Class Period until mid-2015.

24.     Defendant Joerg Bongartz ("Bongartz") has served as the Chairman of the Management Board of Deutsche Bank Russia and Head of Global Transaction Banking Russia during the Class Period until September 13, 2015.

25.     Defendant Batubay Ozkan ("Ozkan") has served as a member of the Management Board of Deutsche Bank Russia during the Class Period.   Defendant Wiswell reported to Defendant Ozkan, who was the Head of Markets and Trading Operations for Russia & CIS at Deutsche Bank Russia until May 18, 2015.

26.     Defendants in ¶¶ 14-25 above are sometimes referred to herein as the "Individual Defendants."

27.     Defendants in ¶¶ 12-25 above are collectively referred to herein as "Defendants."

28.     Each of the Individual Defendants:

   (a)     directly participated in the management of the bank(s);

   (b)     was directly involved in the day-to-day operations of the bank(s) at the highest levels;

   (c)     was privy to confidential proprietary information concerning the bank(s) and its business and operations;

   (d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

   (e)     was directly or indirectly involved in the oversight or implementation of the bank(s) internal controls;

   (f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the bank(s); and/or

(g)    approved or ratified these statements in violation of the federal securities laws.

29.    Deutsche Bank and Deutsche Bank Russia are liable for the acts of the Individual Defendants and their employees under the doctrine of respondeat superior and common law principles of agency, because all of the wrongful acts complained of herein were carried out within the scope of their employment.

30.    The scienter of the Individual Defendants and other employees and agents of the banks is similarly imputed to the banks under respondeat superior, agency and other applicable principles.

## SUBSTANTIVE ALLEGATIONS

### The Bank's Management Structure and Its Risk Management During the Class Period

31.    Deutsche Bank describes itself as a leading global universal bank.  During the Class Period, the Management Board was responsible for managing the Bank and exercised control over the Deutsche Bank Group companies, ensuring compliance with all provisions of law and company internal policies.  Among the prime responsibilities of Deutsche Bank's Management Board were risk management and corporate control.[1]

32.    According to Deutsche Bank, the Bank's core risk management responsibilities were embedded in the Management Board.  The Management Board provided overall risk and capital management supervision for the consolidated Group and was exclusively responsible for day-to-day management of the Bank with the objective of creating sustainable value in the interest of its shareholders, employees and other stakeholders.  The Management Board was responsible for defining and implementing business and risk strategies, as well as

---

[1] *See, e.g.,* Deutsche Bank 2012 Annual Report (March 12, 2013) ("2012 Annual Report"); Deutsche Bank 2013 Annual Report (March 17, 2014) ("2013 Annual Report"); Deutsche Bank 2014 Annual Report  (March 20, 2015) ("2014 Annual Report"); Deutsche Bank 2015 Annual Report  (March 10, 2016) ("2015 Annual Report").

establishing the alignment of the Bank's overall performance with its business and risk strategy. *Id*.

33.     During the Class Period, Deutsche Bank was the party with ultimate control over Deutsche Bank Russia.  Deutsche Bank oversaw compliance and risk management procedures for all entities within the Deutsche Bank organization, including Deutsche Bank Russia.  *Id*. During the Class Period, Deutsche Bank Russia represented on its website that special internal control measures were being performed in accordance with Deutsche Bank Russia's internal control rules for the purpose of countering the laundering of proceeds obtained by illegal means and the financing of terrorism, and that a special internal control was executed via special programs approved by the bank and via other internal measures.  According to Deutsche Bank Russia, the official responsible for the internal controls submited written reports to the Chairman of the Board (Defendant Bongartz), detailing the results of the implementation of the special internal control rules.

34.     The Management Board of the Bank routinely reported on operational, strategic, regulatory as well as litigation and reputational risks at meetings with the Bank's Risk Committee.  The Risk Committee advised on overall risk appetite, risk strategy, monitored strategy implementation by the management, and discussed the risk strategy, key risk topics and portfolios.  The Risk Committee deliberated with the Management Board on issues of aggregate risk disposition and risk strategy.  *Id*.

35.     Deutsche Bank's Chief Risk Officer ("CRO") was a member of the Management Board and was responsible for the identification, assessment and reporting of risks arising within operations across all business and all risk types.  *Id*.

36.     During the Class Period, the members of the Management Board led the Bank's initiatives to "reinforce absolute integrity" and "operational discipline."  *Id.*

37.     During the Class Period, Deutsche Bank represented that it faced a number of risks, including Operational Risks and Reputational Risks.  The Bank referred to these categories of risks as significant risks.  *Id.*

38.     Deutsche Bank described Operational Risk as the risk of loss resulting from inadequate or failed internal processes, people and systems or from external events.  Operational Risk included legal risk.   According to Deutsche Bank, particular prominent examples of operational risks included:

- *Fraud Risk*.   Fraud Risk is the risk of incurring losses as a result of an intentional act or omission by an employee or by a third party involving dishonesty, for personal and/or business gain or to avoid personal and/or business loss such as falsification and/or alteration of records and/or reports, facilitation, breach of trust, intentional omission, misrepresentation, concealment, misleading, and abuse of position in order to obtain personal gain, business advantage and/or conceal improper/unauthorized activity.

- *Regulatory Compliance Risk*.   Regulatory Compliance Risk is the potential that we may incur regulatory sanctions (such as restrictions on business activities, fines or enhanced reporting requirements), financial and/or reputational damage arising from [the] failure to comply with applicable laws, rules and regulations.

- *Information Technology Risk*.   Information Technology Risk is the risk that our Information Technology will lead to quantifiable losses. This comes from inadequate information technology and processing in terms of manageability, exclusivity, integrity, controllability, and continuity.

*Id.*

39.     Deutsche Bank represented that Legal Risk could materialize in any of the risk categories described in the paragraph above.  *Id.*

40.     According to Deutsche Bank, the Operational Risk management function managed cross divisional and cross regional operational risk as well as risk concentrations and

promoted a consistent application of the Bank's operational risk management strategy across the bank. *Id*.

41.     Deutsche Bank described "reputational risk as the risk that publicity concerning a transaction, counterparty or business practice involving a client will negatively impact the public's trust in the organization." *Id*.

42.     Deutsche Bank recognized in its public filings that failure to have appropriate policies, procedures, and controls in place to prevent, detect, and report money laundering can have serious legal, financial, and reputational consequences for the Bank.

43.     Deutsche Bank's risk profile was presented monthly to the Management Board. Additionally, the Management Board regularly discussed the Bank's compliance reports. *Id*.

44.     On May 22, 2013, Deutsche Bank established an Integrity Committee to monitor compliance with acceptable business conduct.   Deutsche Bank represented that the Integrity Committee regularly advised and monitored the Management Board's measures to promote the Bank's compliance with legal requirements, authorities' regulations and the company's own in-house policies.   It also reviewed the Bank's Code of Business Conduct and Ethics and provided precautionary monitoring and strategic analysis of the Bank's legal and reputational risks.   The Meetings of the Integrity Committee were attended by the Chairperson of the Management Board and the Management Board members with functional responsibility for Legal and Compliance.  *Id*.

### Deutsche Bank's Prior Troubles With the Law

45.     Pervasive frauds have marred Deutsche Bank for most of the twenty-first century. Since 2008, Deutsche Bank has ***paid more than nine billion dollars in fines and settlements*** for such schemes as conspiring to manipulate the price of gold and silver, defrauding mortgage companies, and violating U.S. sanctions by trading in Iran, Libya, Syria, Myanmar, and Sudan.

13

46.     In 2010, Deutsche Bank's own employees accused it of having masked twelve billion dollars' worth of losses.  A former Deutsche Bank risk analyst and whistle-blower, Eric Ben-Artzi, told the SEC that, had the bank's true financial health been known in 2008, it might have collapsed, as Lehman Brothers had.  According to Ben-Artzi, the bank executives got away with a slap on the wrist for a huge crime: "There was cultural criminality," he said.  "Deutsche Bank was structurally designed by management to allow corrupt individuals to commit fraud."[2] Mr. Ben-Artzi, who joined Deutsche Bank in 2010 as a vice-president in the market-risk department, said that within a few months of his arrival at the Bank, he realized that something was very wrong, and called the internal hotline.  He then met with the Bank's top compliance officer, Mr. Rice.  When Mr. Bern-Artzi objected to the lawyer's instructions that what he said should be regarded as confidential, he was fired.[3]  Deutsche Bank ultimately paid the SEC a fine of fifty-five million dollars for making material misstatements about a $130 billion derivatives portfolio, inflating its value at the height of the financial crisis.  Andrew Ceresney, director of the SEC's Division of Enforcement, said that "Deutsche Bank's financial statements did not reflect the significant risk in these large, complex illiquid positions . . . Deutsche Bank failed to make reasonable judgments when valuing its positions and **lacked robust internal controls over financial reporting**."[4]

[2] Ed Caesar, *Deutsche Bank's $10-Billion Scandal*, The New Yorker, Aug. 29, 2016 (the "New Yorker Article").

[3] Eric Ben-Artzi, *We Must Protect Shareholders From Executive Wrongdoing*, Financial Times, Aug. 18, 2016.

[4] Ambereen Choudhury and Shane Strowmatt, *Deutsche Bank to Pay $55 Million to Settle Derivatives Probe*, Bloomberg, May 26, 2015.

47.     Reportedly, Deutsche Bank *faces as much as $14 billion in fines* to resolve a U.S. probe into the sale of mortgage-backed securities.[5] Deutsche Bank is being investigated over dealings in securities based on mortgages to people with shaky credit in the run-up to the 2008 financial crisis.  The U.S. government has accused the Bank of misleading investors about the quality of the mortgage loans.   A 650-page report released in April 2011 by the Senate's Permanent Subcommittee on Investigations highlights the role that Deutsche Bank played in fueling the mortgage investment frenzy that sparked the U.S. housing meltdown and led to a global financial crisis.  Documents collected and analyzed as part of the investigation detail, for example, how Deutsche Bank helped assemble a $1.1 billion CDO known as Gemstone 7, stood by as it was filled with low-quality assets that its top CDO trader referred to as "crap" and "pigs," and rushed to sell it "before the market falls off a cliff."[6]

48.     In late 2013, *Deutsche Bank agreed to pay $1.9 billion* to settle claims that it defrauded U.S. government-controlled Fannie Mae and Freddie Mac, the U. S.' biggest providers of housing finance, into buying $14.2 billion in mortgage-backed securities before the 2008 financial crisis.[7]

49.     Last year, Deutsche Bank was ordered to pay regulators in the U.S. and U.K. *two and a half billion dollars* for its role in manipulating the London Interbank Offered Rate ("LIBOR"), the most significant financial benchmark in the world.  The Bank's U.K.-based Deutsche Bank Group Services also agreed to plead guilty to one count of wire fraud for

---

[5] Liam Vaughan, Jake Rudnitsky, and Ambereen Choudhury, *A Russian Tragedy: How Deutsche Bank's "Wiz" Kid Fell to Earth: Mastermind or scapegoat, Tim Wiswell was at the heart of the bank's $10 billion mirror-trade scandal,* Bloomberg, Oct. 3, 2016.

[6]  *See*  https://www.hsgac.senate.gov/subcommittees/investigations/media/senate-investigations-subcommittee-releases-levin-coburn-report-on-the-financial-crisis, last visited Dec. 12, 2016.

[7] *Deutsche Bank to Fight Department of Justice's $14bn Fine*, The Guardian, Sept. 16, 2016.

engaging in a scheme to defraud counterparties to interest rate swaps by secretly manipulating U.S. Dollar Libor contributions.  Benjamin Lawsky, the superintendent of the New York Department of Financial Services, said in a press release about the settlement that "Deutsche Bank employees engaged in a widespread effort to manipulate benchmark interest rates for financial gain."[8]

50.     The Financial Conduct Authority in Britain ("F.C.A.") blamed the Bank not only for its Libor manipulation, but also for its lack of honesty during the course of the Libor investigation:  "*Deutsche Bank's failings were compounded by them repeatedly misleading us*," said Georgina Philippou of the F.C.A.  "The bank took far too long to produce vital documents and it moved far too slowly to fix relevant systems and controls."[9]

51.     Similarly, the German regulator Bafin commented in May 2015 that Deutsche Bank's management failed to prevent and adequately address the manipulations of benchmark interest rates.  Bafin said it had doubts whether Michele Faissola and Alan Cloete, key lieutenants to Defendant Jain, were unaware of the rigging rate.  Jain oversaw the investment bank when the manipulations occurred.  Bafin's investigation, which was carried out by auditor Ernst & Young, found *"major misconduct" by Deutsche Bank traders and "major failures" on the part of the members of the Bank's Management Board and Group Executive Committee*. Bafin concluded that "a business and organizational environment was created which was favorable to incorrect interbank offered rate submissions or even made them possible in the first place."  Bafin also criticized management board member Stephan Leithner and said Chief Risk

---

[8] Antoine Gara, *Deutsche Bank Pays $2.5 Billion to Settle LIBOR Manipulation Suit*, Forbes, Apr. 23, 2015.

[9] *Deutsche Bank Hit By Record $2.5bn Libor-rigging Fine*, The Guardian, Apr. 23, 2015.

Officer Stuart Lewis and general counsel Richard Walker did not handle the investigation properly.[10]

52.    Just today, Deutsche Bank's affiliate Deutsche Bank Securities Inc. agreed to pay $37 million in a settlement with New York's attorney general and federal securities regulators after admitting that it made false statements to investors about problems with its off-exchange trading platforms that directed preferential information to Deutsche Bank's "dark pool."  New York Attorney General Eric T. Schneiderman and the SEC said that between January 2012 and February 2014, Deutsche Bank did not disclose to investors that there was a significant problem with its "Dark Pool Ranking Model" and instead told investors that the system was still providing objective information that did not put outside investors at a disadvantage.  Deutsche Bank did not fix the problems with the system, and instead made sure that its own dark pool was not affected by the technical glitch, Schneiderman said.

**Deutsche Bank's Significant Deficiencies Related to Its AML Policies and Procedures**

*A.  The Challenges to AML Monitoring*

53.    Deutsche Bank recognized the dangers posed by money laundering and, to that end, claimed to have established the following minimum requirements, which applied during the Class Period to all Deutsche Bank branches and subsidiaries, *i.e.*, to the entire Deutsche Bank Group:[11]

---

[10] Nicholas Comfort, *Deutsche Bank's Faissola, Cloete Named in Bafin Rate Probe*, Bloomberg, July 17, 2015.

[11] Deutsche Bank defined money laundering as "the introduction of assets derived from illegal and criminal activities (Predicate offences) into the legal financial and business cycle. Offences are for example forgery of money, extortionate robbery, drug crime as well as fraud, corruption, organized crime, or terrorism etc. Predicate offences for money laundering are defined by local law."  With respect to the applicability of its Anti Money Laundering Policy, Deutsche Bank explained that "[a]ccording to section 25g of the German Banking Act (§25 g KWG), Deutsche Bank AG must ensure that the legal duties resulting from the regulations set out in this Act and

- **Ascertainment of customer identity**:

  - When entering into a lasting business relationship,
  - When performing a single transaction or deal,
  - Before accepting cash or physical values worth 15.000 EUR (or equivalent) outside an existing business relationship, also when performing a number of smaller payments adding up to this amount (smurfing)
  - When performing transfer of funds outside an existing business relationship value worth 1.000,- Euro (or equivalent)

- **Establishment of purpose of business relationship**: When entering into a lasting business relationship, Deutsche Bank must obtain information on kind and purpose thereof, if this is not clear from the business relationship itself.

- **Identification of Ultimate Beneficial Owner:** Whenever Deutsche Bank is required to identify a customer, it must establish and verify the identity of the ultimate natural person,

  - who owns or
  - controls the customer or its assets or
  - on whose behalf the transaction is carried out or the business relationship is established

- **Client account monitoring:** A permanent monitoring of clients' accounts must be implemented to detect unusual/suspicious transactions. Monitoring must be effected for applicable business areas using adequate processes and systems.

- **Correspondent banking**: Special attention must be paid to correspondent banking business and adequate security measures must be implemented.

- **Forbidden business**: Payable through accounts and relationships with shell banks are forbidden for Deutsche Bank and Deutsche Bank´s correspondent banks.

- **Reporting of suspicious circumstances/transactions**: Such circumstances/transactions must be reported to the competent authorities according to local law. Group Anti Money Laundering must be informed about all suspicious events, if not explicitly prohibited by local law.

- **Staff reliability**: Deutsche Bank Group must not employ staff who are deemed not reliable.

- **Anti Money Laundering controls**: The responsible Anti Money Laundering Officer must ensure by adequate customer- and business related controls that all applicable AML requirements are being adhered to and security measures are properly functioning.

---

the German Anti Money Laundering Act are fulfilled by our subordinated enterprises, branches, subsidiaries and affiliates in Germany and abroad.  Wherever local regulations are stricter than the requirements set out in this Policy, the stricter standard has to be applied."

- **Anti Money Laundering Training**: All employees (including trainees and temporary personnel) responsible for carrying out transactions and/or for initiating and/or establishing business relationships must undergo anti money laundering training. Deutsche Bank has decided to extend the target audience for AML to cover all staff. Initial training must be attended within three months after an employee has joined Deutsche Bank Group and subsequently every two years. Minimum content training requirements defined by the Global Head of AML have to be adhered to.

- **Anti Money Laundering Risk Analysis**: Deutsche Bank has set up a system to assess the level of risk exposure considering product and client risk and derive appropriate security measures from this analysis.

- **Embargo Requirements**: Deutsche Bank will adhere to all applicable embargo requirements and will check clients and transactions against applicable embargo lists.

54.     Deutsche Bank represented that it "is committed to the highest standards of anti-money laundering (AML) compliance and requires management and employees to adhere to these standards to prevent use of our products and services for money laundering purposes."

55.     Deutsche Bank presented several challenges to AML monitoring in international correspondent banking at a September 24, 2009, Mid-Atlantic Money Laundering Conference. The presentation was made by Deutsche Bank's Director and Global AML Monitoring Coordinator.  Deutsche Bank identified a number of "issues" as "challenges of AML monitoring," including that: "intermediate banks have no direct relationship with parties," "information in wires may be incorrect or inconsistent," "wires often contain insufficient information for AML research," and "correspondent banks process very high volumes."



56.     Confidential witnesses CW1 and CW2, identified *infra* at 50-56, stated that the slide accurately summarized the problems that continued to exist during their tenure with Deutsche Bank.

57.     Defendants' repeated failures to address these and other similar challenges permitted the pervasive AML violations during the Class Period.

### B.  The 2002 Warnings From the Federal Reserve Bank of New York

58.     According to the Federal Reserve Bank of New York ("FRBNY"), since 2002, the FRBNY has warned Deutsche Bank of significant weaknesses in the bank's regulatory reporting framework, including: a disjointed and inadequate regulatory reporting infrastructure; inadequate

monitoring functions; insufficient breadth and depth of regulatory reporting training; limited accountability policies; and material errors and poor data integrity.  Deutsche Bank did not disclose FRBNY findings to investors.  As detailed in a subsequent 2013 letter from the FRBNY, discussed *infra*, Deutsche Bank largely ignored these issues.  These and other deficiencies contributed to significant AML violations.

### C.  The October 11, 2005 Agreement With the Federal Reserve and the New York State Banking Department

59.     For years, Deutsche Bank knew of and was required by various regulators to address significant deficiencies related to its compliance with applicable federal and state laws, rules, and regulations concerning AML policies and procedures, including the Currency and Foreign Transactions Reporting Act, 31 U.S.C. 5311 et seq., as amended by the USA PATRIOT Act of 2001 (the Bank Secrecy Act or the "BSA"); the rules and regulations issued thereunder by the U.S. Department of the Treasury (31 C.F.R. Part 103); Regulation H of the Board of Governors of the Federal Reserve System (the "Board of Governors") (12 C.F.R. 208.62 and 208.63); and regulations of the New York State Banking Department (the "Department") (3 N.Y.C.R.R. Part 300).

60.     Deutsche Bank Trust Company Americas ("DBTCA") and its affiliates provide significant correspondent banking services to both U.S. and non-U.S. banks, and conduct a high volume of U.S. dollar funds transfer clearing for its correspondent banks.[12]  In connection with these activities, U. S. government bank examiners have identified numerous compliance and risk

---

[12] DBTCA, located at 60 Wall Street, New York, NY, a New York banking corporation, is a wholly owned subsidiary of Deutsche Bank Trust Corporation ("DBTC"), which is a wholly owned subsidiary of Defendant Deutsche Bank. DBTCA is a New York State chartered bank regulated by the New York State Department of Financial Services ("NYSDFS"). DBTCA is also a member of the Federal Reserve System and an FDIC-insured bank and, accordingly, is regulated by the Board of Governors of the Federal Reserve System (the "Federal Reserve") and the FDIC.  DBTCA is also a transfer agent registered with the SEC.

management deficiencies at DBTCA as of October 11, 2005.  Accordingly, U.S. banking regulators required DBTCA and its affiliates to enhance their due diligence and transaction monitoring policies and procedures relating to their correspondent banking and funds transfer clearing activities in order to ensure effective monitoring of the risks associated with these lines of business, including legal and reputational risks.  The banks were directed to ensure that they would fully address the deficiencies in their AML policies and procedures, customer due diligence practices, risk management processes, and internal control environmental related to the banks' correspondent banking and funds transfer clearing activities.  Pursuant to a Written Agreement dated October 11, 2005 with the Federal Reserve Bank of New York and the New York State Banking Department, Deutsche Bank undertook to take the following specific actions:[13]

**Management Review**

1.

(a) Within 120 days of this Agreement, the board of directors shall direct and oversee a review of the duties and responsibilities of the Bank's officers and the staffing required for an effective control environment for the correspondent banking and funds transfer clearing business lines. The primary purpose of the review shall be to enhance management's oversight of the Bank's BSA/AML compliance program in these business lines and to ensure that they are adequately staffed by qualified and trained personnel. The management review shall, at a minimum, address, consider, and include for its correspondent banking and funds transfer clearing business lines:

(i) An assessment of the effectiveness of the Bank's control infrastructure, corporate governance, organizational structure, and business line accountability, including reporting lines and duties to be performed by each officer; and

---

[13]  The Written Agreement was entered by and among DBTCA, the Federal Reserve Bank of New York, and the New York State Banking Department.  The Agreement stipulated that its provisions "shall be binding on [DBTCA], and each of its institution-affiliated parties in their capacities as such, and their successors and assigns."

(ii) a plan to recruit, hire, or appoint, as necessary, additional officers and staff with the requisite ability, experience, and other qualifications to competently perform their assigned duties.

(b) The board of directors shall forward to the Reserve Bank and the Department a written report that includes findings and conclusions of its management review, and a description of specific actions that the board of directors proposes to take to strengthen the management and oversight of the Bank's correspondent banking and funds transfer clearing operations.

## Anti-Money Laundering Compliance

2.

Within 60 days of this Agreement, the Bank shall submit to the Reserve Bank and the Department acceptable written revisions to the provisions of the Bank's BSA/AML program that cover correspondent banking and funds transfer clearing activities. The provisions shall be updated on an on-going basis as necessary to incorporate amendments to the BSA and the rules and regulations issued thereunder. The revised provisions shall, at a minimum:

(a) Improve the Bank's system of internal controls for correspondent banking and funds transfer clearing activities to ensure compliance with all recordkeeping and reporting requirements;

(b) include controls designed to ensure compliance with all requirements relating to correspondent accounts for non-U.S. persons, including, but not limited to, the prohibition on correspondent accounts for foreign shell banks (31 C.F.R. 103.177), and special due diligence requirements for certain correspondent accounts (31 C.F.R. 103.181);

(c) provide for thorough assessment of legal and reputational risks associated with correspondent banking and funds transfer clearing activities, and for regular review of risk tolerance by appropriate members of senior management of the Bank; and

(d) provide for the documentation of due diligence performed for respondent banks.

## Independent Testing

3.

Within 60 days of this Agreement, the Bank shall submit to the Reserve Bank and the Department an acceptable written plan for enhancing independent testing of AML compliance for the Bank's correspondent banking and funds transfer clearing activities. The plan, at a minimum, shall provide for and include:

(a) Procedures to assess and evaluate the correspondent banking and funds transfer clearing business lines:

> (i) compliance with the BSA, the rules and regulations issued thereunder, and all other applicable AML and suspicious activity reporting requirements;

> (ii) adherence to industry sound practices relating to respondent account due diligence;

> (iii) implementation of and compliance with written AML policies and procedures;

> (iv) training programs to ensure that appropriate personnel possess the requisite knowledge necessary to comply with the BSA; and

> (v) ongoing compliance monitoring of operations and customer due diligence, including a schedule of compliance reviews to be performed in those areas;

(b) the review of independent testing results by senior Bank management and escalation to the board of directors in appropriate circumstances;

(c) procedures to ensure that senior Bank management institute appropriate actions in response to the independent testing results; and

(d) procedures to ensure that independent testing results are communicated to the Reserve Bank and the Department on a regular basis and retained for subsequent supervisory review.

**Training**

4.

Within 60 days of this Agreement, the Bank shall submit to the Reserve Bank and the  Department an acceptable written plan to provide effective training to all appropriate Bank personnel in the correspondent banking and funds transfer clearing operations areas (including, but not limited to, compliance, correspondent account relationship, funds transfer clearing operations, and customer contact personnel) in all aspects of regulatory and internal policies and procedures related to the BSA and the identification and reporting of suspicious transactions, and to update the training on a regular basis to reasonably ensure that all personnel are trained in the most current legal requirements and in the Bank's AML risk management processes.

**Suspicious Activity Reporting and Customer Due Diligence**

5.

Within 60 days of this Agreement, the Bank shall submit to the Reserve Bank and the Department an acceptable written customer due diligence program designed to reasonably ensure the identification and timely, accurate, and complete reporting of all known or suspected violations of law against or involving the Bank and suspicious transactions at the Bank to law enforcement and supervisory authorities as required by the suspicious reporting provisions of Regulation H of the Board of Governors (12 C.F.R. 208.62) and 3 N.Y.C.R.R. 300.1. At a minimum, the program shall include:

(a) A methodology for assigning risk levels to the Bank's customer base, including correspondent account holders;

b) a risk-focused assessment of the Bank's customer base to:

(i) identify the categories of customers whose transactions and banking activities are routine and usual; and

(ii) determine the appropriate level of enhanced due diligence necessary for those categories of customers that pose a heightened risk of conducting potentially illicit activities at or through the Bank;

(c) for correspondent accounts established, maintained, administered, or managed in the United States for a foreign financial institution, procedures that comport with industry sound practices that are set forth in available public guidance (e.g. the New York Clearing House Association LLC's "Guidance for Counter Money Laundering Policies and Procedures in Correspondent Banking" (March 2002) and the Basel Committee on Banking Supervision's "Customer Due Diligence for Banks" (October 2001)), aid that include, but are not limited to:

(i) obtaining appropriate information about the respondent, its business operations, markets served, customer base, and its AML procedures, particularly with regard to its customer relationships that may present a heightened risk of money laundering; and

(ii) procedures designed to ensure that correspondent banking services provided by the Bank are reviewed and approved by appropriate levels of management, and are subject to appropriate on-going review;

(d) procedures designed to ensure proper identification and timely reporting of all known or suspected violations of law and suspicious transactions, including, but not limited to:

(i) effective monitoring of customer accounts and transactions, including funds transfer transactions conducted through the Bank's clearing operations, consistent with industry sound practices;

(ii) procedures for reviewing potentially suspicious activity, such as patterns of large U.S. dollar transactions through high risk jurisdictions, and funds transfers where transaction volumes and amounts appear inconsistent with any valid business purpose or where information on transactions, including shell corporations and other entities, is unavailable or apparently inaccurate;

(iii) appropriate participation by Bank senior management in the process of identifying, reviewing, and reporting potentially suspicious activity;

(iv) adequate referral of information about potentially suspicious activity through appropriate levels of Bank management, including a policy for determining action to be taken in the event of multiple filings of Suspicious Activity Reports on the same customer or where a customer fails to provide necessary due diligence information; and

(v) maintenance of sufficient documentation by the Bank with respect to its investigation and analysis of suspicious activity, including the resolution and escalation of concerns; and

(e) procedures for determining whether the closure of an account is warranted; effecting an account closure in a timely manner; and documenting such decision.

### D. The 2007 Warnings From the FRBNY

61.     A subsequent review by the FRBNY examiners in 2007 again voiced concerns about significant deficiencies in the firm's regulatory reporting framework, which had remained unaddressed since the FRBNY's 2002 warnings.  These deficiencies, which contributed to AML violations, included: a disjointed and inadequate regulatory reporting infrastructure; inadequate monitoring functions; insufficient breadth and depth of regulatory reporting training; limited accountability policies; and material errors and poor data integrity.  Deutsche Bank did not disclose FRBNY's findings and concerns to investors.

### E.  The 2012 and 2013 Additional Warnings From the FRBNY

62.     In 2012, the New York federal examiners again raised concerns to Deutsche Bank about the quality of its data.  For example, after conducting its 2012 annual assessment, the FRBNY flagged a specific concern about how a Deutsche Bank subsidiary was classifying potentially troubled assets.  The unit, DBTCA, was not properly assessing the value of collateral when it reported the value of loans where borrowers were at risk of defaulting, resulting in "inaccurate" reporting to investors.[14]

63.     The FRBNY's internal control and reporting concerns intensified when a review of the bank's regulatory reporting commenced in August of 2013.  At a September meeting with two of Deutsche Bank's top U.S. executives, federal officials described the bank's reporting as the worst among its peers, according to a Deutsche Bank email about issues raised by regulators.  Mr. Muccia, a 40-year veteran of bank regulation, and his team said the Bank's U.S. unit had misclassified the riskiness of 20% of its loans.  Despite finding dozens of problems, Mr. Muccia said he thought the federal team was "*just scratching the surface*," according to the email.  *Id*.

64.     A few months later, Mr. Muccia sent his letter detailing the FRBNY's findings and more than a half-dozen areas in need of "immediate" action.  *Id*.

65.     Many of the problems stemmed from what the letter called a "disjointed" regulatory-reporting system and "weaknesses" in the technology systems used by Deutsche Bank subsidiaries. Instead of automatically compiling and reporting data to federal regulators, Deutsche Bank officials were making manual changes to more than 800 pieces of data, the letter said.  That data was tied to a variety of balance-sheet items, such as certain types of loans and

---

[14] *See* David Enrich, Jenny Strasburg and Eyk Henning, *Deutsche Bank Suffers From Litany of Reporting Problems, Regulators Said: Letter From New York Fed Said Some Reports From Deutsche Bank's U.S. Operations Were 'Inaccurate and Unreliable'*, WSJ, July 22, 2014; *see also WSJ Staff, Excerpts from New York Fed's Letter to Deutsche Bank*, WSJ, July 22, 2014.

deposits, whose values totaled about $337 billion.  *Id*.  These and other deficiencies contributed to significant AML violations.

66.     Deutsche Bank did not disclose FRBNY's findings and concerns to investors.

67.     Moreover, as described in a December 2013 letter from the FRBNY to Deutsche Bank's U.S. executives, significant regulatory reporting issues were also highlighted in 2012 by an external consulting firm, which Plaintiff reasonably believes is KPMG LLP.  Deutsche Bank did not disclose the significant regulatory issues found by the external consulting firm to investors.

### F.   The December 11, 2013 Letter from the Federal Reserve Bank of New York

68.     Reportedly, on December 11, 2013, the Federal Reserve Bank of New York wrote a stinging letter to Deutsche Bank's U.S. executives outlining their concerns about the Bank's lack of appropriate internal controls, governance, auditing and technology systems in the bank's U.S units:

> The Federal Reserve Bank of New York (FRBNY) conducted a review of selected regulatory reports filed by Deutsche Bank Trust Corporation (DBTC) and Deutsche Bank AG New York branch (DBNY), collectively (DB) as of March 31, 2013. Our objectives were to assess the accuracy of the regulatory reports, the efficacy of the governance for the reporting processes, and progress achieved in addressing issues identified during the last review conducted in 2007.
>
> We have concluded that the regulatory reports provided by DB are of low quality, inaccurate and unreliable. The size and breadth of errors strongly suggest that the firm's entire U.S. regulatory reporting structure requires wide-ranging remedial action. ***We also concluded that no progress was made in remediating prior supervisory concerns as the firm's U.S. operations regulatory reporting process continues to be fragmented and suffers from weak or inadequate internal controls. Moreover, longstanding weaknesses in the firm's information technology infrastructure impair the firm's ability to produce accurate regulatory reports. Lastly, we conclude that oversight by the Compliance and Internal Audit functions is inadequate and ineffective.***
>
> The errors identified from our review result from several root causes including: systems limitations, coding errors; misinterpretation of instructions; inadequate analysis and documentation of the quality assurance process; and poor coverage by Internal Audit and Compliance Group. Additionally, there is a lack of

ownership by the lines of business (LOBs) in ensuring data integrity, data validation, and the continuous monitoring of data quality. The limitations of the firm's information technology systems necessitate excessive manual intervention, which expose the firm to significant operational risk and misstated regulatory reports.

***Since 2002, the FRBNY has highlighted significant weaknesses in the firm's regulatory reporting framework that has remained outstanding for a decade. Our review disclosed that several previous attempts by the firm failed to produce sustainable solutions to addressing the weakness in the regulatory reporting process or to improve the quality of data. The scope of the most recent project to address these weaknesses, known as the Bank Regulatory Reporting Program (BRRP) developed in 2012 was not comprehensive.*** While the BRRP focused on both short-term interim and longer-term strategic solutions using the firm's global Strategic Reporting and Information Delivery Program (StRIDe), the planned project scope was limited and would not have addressed the issues identified during our review. Discussions with FRBNY supervisory staff resulted in an expansion of the project's scope and in additional financial and managerial resources being devoted to the BRRP.

While these changes are encouraging, we remind management that in the interim effective compensating controls designed to produce high quality, accurate regulatory reports must be put in place. ***In addition to the requirements outlined below, given the long standing, unresolved repeat nature of our findings, coupled with the public nature of regulatory reports, additional remediation requirements will be forthcoming. The matters below require immediate attention by the DBAG NY Branch Executive Committee, Board of Directors and Senior Management:***

Matters Requiring Immediate Attention ("MRIA")

1. Repeat Issues/Inadequate Governance:

We found that most of the issues identified in our current review are repeat issues that were previously highlighted to management over the past decade. These include: a disjointed and inadequate regulatory reporting infrastructure; inadequate monitoring functions; insufficient breadth and depth of regulatory reporting training; limited accountability policies; and material errors and poor data integrity. ***Additionally, significant regulatory reporting issues were highlighted in 2012 by an external consulting firm. Internal Audit and the firm's Quality Assurance Group also remain unresolved. Most concerning is the fact that although the root causes of these errors were not eliminated, prior supervisory issues were considered remediated and closed by Senior Management.*** The DBAG NY Branch Executive Committee and Board of Directors are required to immediately ensure that the root cause of all issues identified by supervisors, or other control areas within DB (e.g., external consulting firms, Quality Assurance Group, Internal Audit) are addressed and validated by an independent group.

2. Fragmented Regulatory Reporting Information Technology Infrastructure:

The firm's regulatory reporting infrastructure is fragmented and ineffective in ensuring high quality, accurate reports. Regulatory reporting information is compiled from a variety of applications and data sources, these data sources cannot be reconciled to report control totals. Additionally, multiple manual adjustments (in excess of 800 and totaling approximately $337 billion) are required to prepare the FR Y- 9C. These adjustments require substantial resources, lack transparency and do not allow for sufficient time to effectively review and analyze the data, prior to filing with the FRBNY. Lastly, the firm does not have the capability to effectively implement the new complex reporting requirements. The DBAG NY Branch Executive Committee and Board of Directors are required to immediately ensure that automation efforts to improve the quality of regulatory reports are effectively executed. In the interim, Senior Management must implement compensating controls so that manual adjustments and workarounds are effectively implemented, clearly explained, well documented and auditable.

3. Lack of Data Integrity/Quality:

Examiners found material reporting errors and other data quality weaknesses across LOBs and legal entities (LEs). Additionally, we observed ineffective preventive internal controls over the data entered into operational systems, poorly maintained static customer information and the lack of requisite documentation at the point of origin of a transaction (i.e., inception or at the onboarding of transactions), which later resulted in material reporting errors. Other factors contributing to regulatory reporting weaknesses include the lack of a data governance process to ensure data integrity in subsystems as well as misinterpretation of reporting instructions. These issues raise significant concerns about the adequacy of financial internal controls for the regulatory reporting process. The firm must undertake corrective action to improve the quality of its regulatory and structure reports and more generally, the data acquisition and maintenance processes. Toward this end, the DBAG NY Branch Executive Committee and Board of Directors are required to immediately ensure that Senior Management maintains high quality information in subsystems. This should include 'scrubbing' of product systems to enhance the integrity of information at the point of origin and when onboarding transactions. Additionally, the firm must conduct a comprehensive review of customer information files (static data) to identify discrepancies across products, implement changes in source systems, and ensure changes are sustainable.

4. Inadequate Accountability Framework:

The governance framework of the firm's business infrastructure and financial recordkeeping environment is a shared responsibility of the LOBs, Finance, Risk, and Information Technology functions. The firm lacks an effective accountability process to ensure a high quality of data that is used to develop accurate regulatory and more generally, management information reports. With regard to reports filed with the FRBNY, the firm has not developed a formal Accountability Policy and

governance structure that clearly articulates roles and responsibilities for all areas responsible for the integrity of regulatory reports.

Supervisors expect firms to develop effective accountability policies and practices. Key components of an effective accountability policy include: (a) developing an integrated governance structure for the escalation and effective monitoring and resolution of all identified issues across all reports and processes; (b) maintaining a comprehensive issues log that tracks issue owner, includes root cause analyses and solutions; affected entities; impacted reports and schedules; remediation owners, and target completion dates; and (c) incorporating a sustainable enforcement process, which defines accountability for accuracy of regulatory reports.

Senior Management of the banking organization is required to immediately:

– Increase the effectiveness of the accountability process and improve data quality by:

– Establishing a formal accountability policy that delineates roles and responsibilities for data owners and Finance staff and developing an effective and sustainable enforcement process, which requires accountability for accuracy of all regulatory reports across LOBs and LEs. The policy should reflect management's expectations of employees in preserving the integrity of the firm's regulatory and organizational structure reporting requirements to ensure that changes are communicated to the FRBNY timely and accurately.

– Maintaining a comprehensive issues log that tracks issue owner, root cause analysis, reports and schedules affected; date the issue was identified; interim and strategic solutions; remediation owner; and target completion dates.

– Improving the firms Data Quality Assurance Validation Attestation processes conducted by LOBs by including outstanding reporting issues outlined in the firm's issues log, Internal Audit, Compliance Group, supervisory findings; and the accuracy of static customer and product identification data at the point of origin of the transaction.

7. Inadequate Independent Review and Monitoring Functions

Compliance and Monitoring Surveillance & Inspections:

The Compliance Group's risk assessment process and testing program failed to identify the firm's **systemic breakdown in the operation of various customer deposit accounts** that resulted in wide-spread, longstanding violations of Regulation D (Reg D).

The testing performed by Monitoring Surveillance & Inspection's (MSI) was limited to only one aspect of Regulation D in which the broader Compliance Group's risk assessment deemed the risk to be moderate, and excluded other significant aspects of the regulation that were deemed as low risk, including time deposits (early withdrawal penalties); MMDAs (six-transfer limit), and demand deposit sweep program (missing sweep agreements or agreements lacking requisite language). **The failure to detect violations arose from a fundamental**

*lack of understanding of the requirements of Regulation D, ineffective risk assessment process and is reflective of a breakdown in the independent monitoring and oversight function of the Compliance Group to include MSI.*

Internal Audit:

Internal Audit (IA) failed to detect long-standing weaknesses in the overall regulatory reporting framework. ***More specifically, our review of the results of IA's reviews of regulatory reporting from 2009 to present identified only one instance in 2012 that highlighted a critical weakness in the reporting framework. An external consulting firm conducted the regulatory review that highlighted the deficiency. The failure of Compliance and Internal Audit to detect the systemic breakdown in the regulatory reporting process is unacceptable.*** The DBAG NY Branch Executive Committee and Board of Directors are required to immediately take corrective action to ensure Senior Management increases the level of control staff expertise needed to effectively conduct their respective oversight roles and responsibilities. Both Compliance and IA must improve their respective risk assessments, and monitoring and testing work programs related to regulatory reporting internal controls and framework and other ancillary support functions to ensure compliance with laws and regulations and regulatory reporting requirements.

8. Violations of Regulation D:

We determined that certain accounts were being operated in violation of Regulation D. Consequently, the DBAG NY Branch Executive Committee and Board of Directors are required to immediately conduct an independent, firm-wide review of all deposit accounts and investment and sweep account arrangements operated during 2013 to ensure accounts are operated in accordance with Regulation D. DB must provide a written summary of the results of the aforementioned firm-wide review to FRBNY, including but not limited to:

– a list of all clients determined to be ineligible for sweep transactions (to include netted sweep balances), the criteria used to determine ineligibility and the corresponding corrective actions;

– the average daily balance for each client and the aggregate average daily balance across all ineligible clients for these sweeps;

– a list of MMDAs accounts operated in violation of Reg. D. along with samples of clients notifications regarding transactions that exceed Regulation D requirements and other corresponding corrective actions;

– a list of early withdrawals of time deposits where penalties were not imposed, client notices and other corresponding corrective actions; and

– changes to LOB internal controls, IA and Compliance function's processes, policies and procedures to ensure ongoing compliance with Reg. D.

Based on the results of this review, restated regulatory reports may be required as well as a "make up" of required reserves.

At the conclusion of this review, we discussed with management regulatory reporting exceptions. The Appendix to this letter lists the affected reports and describes major issues identified. Under separate cover, Kenneth Lamar, Senior Vice President, the Federal Reserve Bank of New York's Statistics Function, will provide a detailed listing of all the errors identified during our review.

69.     Deutsche Bank did not disclose the contents of the letter nor its specific interactions with the FRBNY to investors.

70.     CW2, described *infra* at 53-56, said that the "litany" of financial reporting problems identified in the 2013 Federal Reserve Bank letter (*i.e.*, a disjointed regulatory reporting system and weaknesses in technology systems used by DB subsidiaries) were "absolutely" consistent with what CW2 observed during the relevant period in 2013 when he/she served as an officer for Suspicious Activity Reports ("SARs") in Jacksonville.  CW2 added that senior Deutsche Bank managers were aware of options for mitigating risks to the Bank's AML functions.  "This could have been avoided and improved years ago," CW2 said.  Similarly, when asked about the weaknesses described in the Federal Reserve Bank of New York's December 22, 2013 letter, CW3, described *infra* at 56-59, said "I know that Deutsche Bank had fundamental problems" that were known ("I saw these things happen") and that most could have been addressed with rigorous oversight, effective internal audits, and recurring training.  CW3 remarked that the critique was directed at weaknesses that existed during the tenure of his/her employment in Jacksonville and were well known within the organization.  "None of this is new," CW3 said.  "These are some of the things that [were issues] when I left in August 2012." According to CW3, the "disjointed and inadequate regulatory reporting infrastructure; inadequate monitoring functions; insufficient breadth and depth of regulatory reporting training; limited accountability policies; and material errors and poor data integrity" described in the December 2013 Federal Reserve letter were consistent with the problems CW3 observed while working for Deutsche Bank, especially the lack of internal audits and independent testing and

evaluation—activities that fall under the Federal Reserve's category of "inadequate monitoring functions." CW3 added: "I can also say that there are certain steps . . . that should have been implemented by Deutsche Bank. Some banks have a good culture, it depends on the choices that the management ha[s] made."

### G. During the Class Period, the Board of Governors of the Federal Reserve System Ordered Deutsche Bank to Cease and Desist and Imposed a Civil Monetary Penalty For Unsafe and Unsound Practices Related to the Illicit Transmission of Funds

71.     **Since at least 2002**, the New York State Department of Financial Services ("NYSDFS"), and the Board of Governors of the Federal Reserve System ("Board of Governors") have been conducting an investigation into the practices of Deutsche Bank concerning the transmission of funds to and from the U. S. through DBTCA [the New York subsidiary through which Deutsche Bank AG conducts its operations in the U. S.] and unaffiliated U.S. financial institutions, including by and through entities and individuals subject to sanctions regimes imposed under the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701-06, and the Trading with the Enemy Act, 50 U.S.C. §§ 5 and 16, both of which are administered by OFAC (collectively, the "OFAC Regulations").[15]

72.     On November 4, 2015, the Board of Governors found that **"Deutsche Bank lacked adequate risk management and compliance policies and procedures to ensure that activities conducted at offices outside the U. S. complied with applicable OFAC Regulations and were timely reported in response to inquiries by the Federal Reserve Bank of New York** ("Reserve Bank")."

---

[15] *See* Board Governors of the Federal Reserve System, *Order to Cease and Desist and Order of Assessment of a Civil Money Penalty* (November 4, 2015) ("Cease and Desist and Money Penalty Order," issued pursuant to the Federal Deposit Insurance Act).

73.     The Board of Governors found that *"[f]rom at least November 2001 to January 2006*, certain overseas offices of Deutsche Bank, in Eschborn, Germany and Bangalore, India, developed and/or implemented a practice for processing certain U.S. dollar-denominated funds transfers through DBTCA and through unaffiliated U.S. financial institutions involving parties subject to OFAC Regulations that did not contain relevant information within the payment messages necessary for DBTCA and other U.S. financial institutions to determine whether these transactions were carried out in a manner consistent with U.S. law, which caused intermittent violations of OFAC Regulations."

74.     Due to these "unsafe or unsound practices," on November 4, 2015, the Board of Governors issued against Deutsche Bank an Order to Cease and Desist and Order of Assessment of a Civil Money Penalty Issued Upon Consent Pursuant to the Federal Deposit Insurance Act, As Amended, requiring Deutsche Bank to "implement improvements in its oversight and compliance program for activities involving the offices of Deutsche Bank and its subsidiaries outside the U. S. that in whole or in part impact the ability of DBTCA and unaffiliated U.S. financial institutions to comply with applicable OFAC Sanctions."

75.     According to its provisions, the Cease and Desist Order is "binding upon Deutsche Bank and each of its institution-affiliated parties."

76.     In the meantime, the *New York State Department of Financial Services* ("NYDFS"), with which the Federal Reserve was jointly acting, *described a deliberate, systematic evasion of U.S. sanctions at Deutsche Bank as a matter of bank policy*:

- From at least 1999 through 2006, Deutsche Bank used non-transparent methods and practices to conduct more than 27,200 U.S. dollar clearing transactions valued at over $10.86 billion on behalf of Iranian, Libyan, Syrian, Burmese, and Sudanese financial institutions and other entities subject to U.S. economic sanctions, including entities on the Specially Designated Nationals

("SDN") List of the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC").

- Starting at least in 1999, Bank employees recognized that U.S. sanctions rules, which applied at that time or over the course of subsequent years to Iranian, Syrian, Libyan, Burmese, or Sudanese customers or to customers who were listed on OFAC's SDN list, would pose problems for U.S. dollar payments sent to or cleared through the U.S., including clearing done through Deutsche Bank New York. Payments involving sanctioned entities were subject to additional scrutiny and might be delayed, rejected, or frozen in the United States. In order to facilitate what it saw as "lucrative" U.S. dollar business for sanctioned customers, Bank employees developed and employed several processes to handle dollar payments in non-transparent ways that circumvented the controls designed to detect potentially-problematic payments.

77.     The NYDFS explained that the methods used by Deutsche Bank employees to circumvent sanctions included altering the information contained in SWIFT messages ("wire stripping") and using anonymous cover messages to disguise the transactions ("non-transparent cover payments"). Employees at all levels in the bank seem to have known about, and been actively involved in, these practices. The NYDFS includes some quotations from the employees' scheming emails:

- Let's not revert to the client in writing due to the reputational risk involved if the e-mail goes to wrong places. Someone should call [the client] and tell them orally and ensure that the conversation is not taped. . . . Let's also keep this e-mail strictly on a 'need-know' basis, no need to spread the news…what we do under OFAC scenarios.

78.     *Employee handbooks even contained information on how to handle transactions involving sanctioned countries or institutions*:

- Special attention has to be given to orders in which countries/institutes with embargos are involved. Banks under embargo of the US (e.g., Iranian banks) must not be displayed in any order to [Deutsche Bank New York] or any other bank with American origin as the danger exists that the amount will be frozen in the USA.

36

### H. During the Class Period, German Regulator BaFin Raided Deutsche Bank's Headquarters and Arrested the Legal Department Head Responsible for the Bank's AML operations

79.     Reportedly, *commencing with 2012*, the German federal bank supervisor BaFin was investigating Deutsche Bank for suspicious money-laundering transactions, which the bank reported too late to the police.  In December 2012, 500 police officers raided Deutsche Bank's Frankfurt headquarters and other offices.  The raid was part of an investigation on the Bank's complicity in a massive tax fraud using electronic trading of $CO_2$ emission certificates.[16]

80.     The investigation reached Deutsche Bank's board room itself.  Defendants Fitschen and Krause were accused of having signed a questionable sales tax return from 2009.[17]

81.     Reportedly, as part of the raid, the Legal Department Head responsible for the Bank's AML operations was arrested.

82.     At the time, experts *estimated that €8-10 billion of criminal money was laundered* through the Bank's electronic trading of $CO_2$ emission certificates.

### I. During the Class Period, UK's Financial Watchdog Placed Deutsche Bank's London Office Under Enhanced Supervision

83.     *In 2014*, UK's financial regulatory agency, the Financial Conduct Authority ("FCA") *put Deutsche Bank's London office under enhanced supervision based on concerns about the Bank's governance and controls*.[18]

84.     As detailed *infra* at 144, on March 2, 2016, the FCA sent Deutsche Bank a letter stating that the Bank has "serious" and "systemic" failings in its controls against money

---

[16] *See Regulator probes Deutsche Bank over money laundering controls – report*, Reuters Business News, Aug 17, 2013; *Head Office Raided in Tax Probe: Deutsche Bank CEO Under Investigation*, Spiegel On-Line, Dec. 12, 2012; *Suspicion of Collusion: Authorities Raid Deutsche Bank Again*, Spiegel On-Line, Dec. 20, 2012.

[17] *Head Office Raided in Tax Probe: Deutsche Bank CEO Under Investigation*, Spiegel On-Line, Dec. 12, 2012.

[18] *FCA Sees Issues in Deutsche Bank Reports*, Reuters, May 2, 2016.

laundering, terrorist financing and sanctions: "***Our overall conclusion was that Deutsche Bank UK had serious AML (anti-money laundering), terrorist financing and sanctions failings which were systemic in nature***." [19]

85.    Following these revelations, Institutional Shareholder Services ("ISS"), an influential shareholder consulting firm, advised Deutsche Bank's shareholders to vote in favor of the beginning of an independent audit process because "there are significant doubts concerning the ability of the supervisory board to investigate the potential illegal actions of its members, which reflects a conflict of interest."  The ISS recommendation came on the heels of the recent resignation of Georg Thoma, a member of Deutsche Bank's Supervisory Board and President of the Bank's Integrity Committee, who was accused by other board members of being "overzealous" in his investigation of the ties between the members of Deutsche Bank's executive management and the illicit schemes in which the Bank was involved.  Among other issues, the proposed audit would be designed to uncover whether Deutsche Bank had to pay heavier fines because its Management and Supervisory Board obstructed, misled, or failed to cooperate sufficiently with authorities.[20]

### J.   *During the Class Period, South Africa's Banking Regulator Fined Deutsche Bank for Lax AML Controls*

86.    In February 2015, South Africa's banking regulator fined Deutsche Bank $857,000.00 for failing to implement appropriate anti-money laundering controls.  The South African Reserve Bank ("SARB") ***inspected the Bank's Johannesburg branch in February 2014***

---

[19] Caroline Binham and James Shotter, *FCA warns Deutsche on 'serious' financial crime control issues: UK findings are latest blow for lender beset by misconduct issues,* Financial Times, May 1, 2016.

[20] Shotter, James, *ISS Backs Proposal for Audit at Deutsche Bank*, Financial Times, May 3, 2016.

to assess whether the Bank had appropriate anti-money laundering and combating the financing of terrorism controls in place and found that the Bank, among other things, must take remedial action to address deficiencies related to the areas of identifying and verifying Know-Your-Customer ("KYC") requirements.[21]  Deutsche Bank did not disclose the inspections and the nature of the interactions with SARB.

### K.  During the Class Period, Dubai's Regulator Fined Deutsche Bank For AML Violations

87.     On or around April 2015, the Dubai Financial Services Authority ("DFSA"), the regulator of the Dubai International Financial Centre, fined Deutsche Bank's Dubai branch $8.4 million for *"serious contraventions," including misleading the regulator and for failures in its internal governance and control systems related to booking clients and anti-money laundering processes*.  The fine is the largest the regulator has ever imposed since it was founded in 2004.[22]

88.     The DFSA, reportedly after receiving a tip-off, *began investigating the Bank for anti-money laundering failings on December 25, 2012*.  Deutsche Bank did not disclose the investigation and the nature of its interactions with the DFSA at the time.  The DFSA widened its enquiries in June 2013 to include additional anti-money laundering activities.  This fact was not disclosed by Deutsche Bank.  On February 19, 2014, the investigation was extended to include suspected contraventions of Article 66 of Regulatory Law 2204 (providing false and misleading information to the DFSA) and other contraventions.  The *bank was also found guilty of insubordination* under article Article 69, which stated that "[w]here the DFSA makes . . . any

---

[21] Jaclyn Jaeger, *South Africa Fines Deutsche Bank $857,000 for Lax AML Controls*, Compliance Week, Feb. 23, 2015.

[22] Nicolas Parasie, *Dubai Regulator Fines Deutsche Bank*, The Wall Street Journal, Apr. 15, 2015; *DFSA Fines Deutsche Bank $8.4 Million for Onboarding and AML Sins*, Compliance Matters, Vol. 2, No. 9, Apr. 2015.

requirement in relation to a person . . . such person must, unless he has a reasonable excuse, comply with such a requirement."

### During the Class Period, A Russian Mirror-Trade Scheme Perpetuated by Deutsche Bank High-Ranking Employees Resulted in $10 Billion Illegally Laundered

#### A. The Mirror-Trade Scheme

89.     Deutsche Bank recently admitted that it has found a total of $10 billion of suspicious trades, including $6 billion in so-called "mirror trades."[23]  Typically, in the mirror trades, a Deutsche Bank customer in Russia would buy local blue-chip Russian stock, such as Lukoil, for rubles, while another offshore customer would simultaneously sell the same stock in London for dollars.   A recent Deutsche Bank internal report analyzing the mirror trades described an interlocking web of offshore companies and Moscow brokers that attracted attention within the bank for high volumes of trading, often in just one direction, for example, exclusively share sales.  All the companies were controlled from Russia, according to the report, and placed their orders through the Bank's Moscow equities desk.

90.     Occurring between 2011 and 2015, these mirror trades allowed Russian customers to launder money from one country to another.  Deutsche Bank said that the total volume of the transactions under review is "significant."  By April 2016, Deutsche Bank identified more than 2,000 transactions that allegedly bypassed internal money-laundering controls.[24]  Defendant Cryan said the Bank was "vulnerable" with respect to possible large penalties for the Russian trades, representing that *provisions of approximately $1 billion euros to resolve the issue may*

---

[23]  Arno Schuetze & Kathrin Jones, *Deutsche Bank's suspicious Russian trades count rises to $10 billion*, Reuters, Dec. 22, 2015; *see also* Gregory White, Stephanie Baker, Keri Geiger and Irina Reznik, *Deutsche Bank Tally of Suspect Russia Trades at $10 Billion,* Bloomberg, Dec. 22, 2015.

[24]  *See* Keri Geiger and Gregory White, *Deutsche Bank Found `Systemic' Failure in Russia Cash Flight*, Bloomberg, April 14, 2016.

***not be sufficient***.  Cyan recognized that "it's not our finest hour" and said that Deutsche Bank

"clearly had a systems and control failure."

91.     As explained above, Defendants knew that the banks' anti-money laundering

processes and controls were infirm.  Russia, in particular, was a fertile ground for money

launderers during the Class Period.  Indeed, the former Central Bank governor of Russia, Sergei

Ignatiev, caused an uproar in 2013 shortly before the end of this tenure when he declared that

$49 billion a year is routinely laundered from Russia via banks and sham companies.  At the

time, Russia was seen as one of the most corrupt countries in the world, ranking 133rd out of 176

on Transparency International's Corruption Perceptions Index.[25]

92.     The process involving the Russian mirror trades is described in detail in the

August 29, 2016 New Yorker Article.[26]  The reporter, Ed Caesar, interviewed fourteen former

and current employees of Deutsche Bank in Moscow, and spoke with several people involved

with the clients about the mirror trades before penning the article.[27]  According to people with

knowledge of how mirror trades worked at Deutsche Bank, the main clients who were engaged

in the scheme came to the bank in 2011 through Sergey Suverov, a sales researcher.  Suverov left

the bank soon afterward.   Igor Volkov, a Russian broker, became the clients' primary

representative.  Volkov previously had worked at Antanta Kapital, a brokerage owned by Arcadi

Gaydamak, a Russian-Israeli billionaire.  Antanta Kapital ceased trading in 2008, and Gaydamak

was indicted in Israel for fraud and money laundering.  He received probation, but later spent

three months in prison, in France, for illegal arms trading.  In 2009, top managers at Antanta

---

[25]   Henry Meyer and Anatoly Temkin, *Russia 2012 Illegal Outflow Was $49 Billion, Central Bank Says*, Bloomberg, Feb. 20, 2013.

[26]   Ed Caesar, *Deutsche Bank's $10-Billion Scandal*, The New Yorker, Aug. 29, 2016 issue.

[27]   Plaintiff's investigator interviewed Mr. Caesar with respect to the contents of the article.

Kapital formed Westminster Capital Management, which became one of the first major mirror-trade clients.  As recounted by a Deutsche Bank employee Volkov was Westminster's "execution guy."  Volkov also began executing mirror trades for several other companies.

93.     Initially, the accounts that Volkov handled—funds based in Russia and overseas, with such names as Westminster, Chadborg, Cherryfield, Financial Bridge, and Lotus—placed conventional stock-market orders.  But Volkov soon made it clear to his contacts at Deutsche Bank that he wanted to make a large volume of simultaneous trades.

94.     Reportedly, at Deutsche Bank, each new fund that wished to trade with Deutsche Bank, known as a "counterparty," was supposed to be subjected to a "double check" by compliance departments in London and Moscow, to insure that papers were in order.  It appears that all the counterparties passed both internal reviews, since the trades were executed.  The bank was also required to complete a "know your client," or "KYC," assessment, and determine if the client had any taint of criminality.  Deutsche Bank did little to interrogate the source of funds—including those behind Westminster and other Volkov clients.  According to people who worked on the equities desk in 2011, the KYC procedure consisted of not much more than sales traders asking counterparties to fill in a paragraph stating the source of their funds.  "Nobody asked any further questions," a former employee told Mr. Caesar.

95.     Reportedly, the Russian equities desk generally had four sales traders who took calls from clients.  Two were American, and two, Dina Maksutova and Georgy Buznik, were Russian.  The sales traders reported to Defendant Wiswell, an American who was the Head of Equities of Deutsche Bank in Moscow, in charge of the Russian equities team, and to Carl Hayes, an executive in London.  Two other managers, Defendant Ozkan, in Moscow and Max

Koep, in London, oversaw the desk.  Maksutova and Buznik were allocated the equities desk's Russian clients.  Maksutova was assigned the clients represented by Volkov.

96.　　Four employees at Deutsche Bank in Moscow recall that nobody tried to hide the scheme.  Wiswell, Buznik, and Maksutova all met with Volkov, and his orders were discussed openly on the desk.  Other employees also remember that Hayes asked both Buznik and Wiswell about the mirror trades.  Several Deutsche Bank employees in London also knew about the mirror trades, even though the orders were taken in Moscow.  The London office executed half the transactions.  The trades were also documented by a computer system, called DB Cat, which catalogued every trade made by the bank.  Hayes and Koep, the supervisors in London, could call up trading receipts on their computers.

97.　　As reported, although many people at Deutsche Bank knew about the mirror trades, not everybody was happy about them.  In late 2012, Maksutova, the sales trader, went on maternity leave, and Buznik temporarily worked with Volkov. Buznik became uneasy that Volkov was executing identical buy and sell orders, and twice asked to meet with Wiswell to discuss the propriety of mirror trading. Wiswell, colleagues say, looked after Volkov's accounts personally.  Wiswell assured Buznik that the trades were legitimate.

98.　　One day in 2011, the Russian side of a mirror trade, for about ten million dollars, could not be completed: the counterparty, Westminster Capital Management, had just lost its trading license as part of a money-laundering sting.  (The Federal Financial Markets Service in Russia had barred two mirror-trade counterparties, Westminster and Financial Bridge, for money laundering).　The failed trade was a problem for Deutsche Bank because it had paid several million dollars for stock without receiving a cent from Westminster.  Reportedly, employees at all levels of a financial institution notice when a trading desk abruptly falls short by a few

million dollars.  The episode should have raised serious suspicions, especially given the revocation of Westminster's license, but it didn't.

99.     Then, when Westminster's personnel migrated en masse to Financial Bridge, Deutsche Bank's KYC unit approved the firm as a counterparty anyway.  In 2013, the Russian authorities annulled Financial Bridge's license, but by then a network of companies with offshore ownership and overlapping employees had been set up, allowing the scam to continue.

100.    Volkov resumed calling in mirror trades, on behalf of other counterparties.  These companies were supposedly subjected to a rigorous "client review" process, and all of them were deemed satisfactory by a Deutsche Bank compliance team. But there was a pattern suggesting malfeasance.  Reportedly, clients of the scheme consistently lost small amounts of money: the differences between Moscow and London prices of a stock often worked against them, and clients had to pay Deutsche Bank a commission for every transaction—between ten hundredths and fifteen hundredths of a percentage point per trade. The apparent willingness of counterparties to lose money again and again should have "sounded an air-raid alarm" that the true purpose of the mirror trades was to facilitate money laundering, said a former manager at Deutsche Bank.

101.    According to the New Yorker Article, Wiswell, Buznik, and Maksutova also knew that there was a common interest among the counterparties, because many of them were represented by Volkov.  But even Deutsche Bank employees who did not work on the desk could have concluded, after a cursory examination, how closely aligned the funds were.  For example, publicly available documents showed that Chadborg Trade LLP, which was based in the U.K., wholly owned Lotus Capital, which was based in Russia. Another British mirror-trades entity, ErgoInvest, was registered in the same office in Hertfordshire where Chadborg was registered. Westminster Capital Management, meanwhile, was bought in 2010 by a man named Andrey

Gorbatov.  In 2014, Gorbatov bought another Russian brokerage implicated in mirror trades: Rye, Man & Gor.  Clients of mirror trades said that the same people who established Westminster also established one of the other counterparties: Cherryfield Management, in the British Virgin Islands.  In January 2016, the Russian Central Bank revoked Rye's license in a move reportedly linked to the money laundering mirror-trade scheme by Deutsche Bank.[28]

102.    Reportedly, the counterparties were brokerages run by Russian middlemen who took commissions for initiating mirror trades on behalf of wealthy individuals and businesses eager to send their money offshore.  A businessman who wanted to expatriate illicit funds this way would invest in a Russian fund like Westminster, which would then use mirror trades to move that money into an offshore fund like Cherryfield.  The offshore fund then wired the money, in dollars, into the businessman's private offshore account.  A middleman who formed one of the Russian counterparty funds told Mr. Caesar that the cost of his services depended upon the Russian authorities' desire to stop the export of capital.  In 2011, when controls were lax, the fee was 0.2 per cent.  In 2015, when sanctions were strong, and President Putin was determined to retain as much wealth as he could in Russia, the fee rose to more than five per cent.

103.    Another Russian banker, who helped to set up the mirror-trade scheme, told Mr. Caesar that much of the money belonged to Chechens with connections to the Kremlin. Chechnya, the semi-autonomous region in the North Caucasus, is ruled by the notorious Ramzan Kadyrov, who is close with Russian president Vladimir Putin.  Chechnya receives huge subsidies from Russia, and much of the money has ended up in the pockets of figures close to Kadyrov. Indeed, the Deutsche Bank mirror-trades operation is linked to an even larger scheme to

---

[28] Jason Corcoran, *Russian CB Pulls Brokerage License Amid Deutsche Bank Scandal*, BNE IntelliNews, Jan. 25, 2016.

expatriate money: the so-called Moldovan scheme.   Starting in 2010, fake loans and debt agreements involving U.K. companies helped funnel about twenty billion dollars out of Russia to a Latvian bank, by way of Moldova.   When the Moldovan scheme unraveled, in late 2015, several people were arrested.   One was Alexander Grigoriev, a Russian financier who controlled Promsberbank—a now defunct institution, based in a Russian backwater town called Podolsk, which counted Igor Putin as a board member.   Two of Promsberbank's major shareholders, including Financial Bridge, have been accused of making mirror trades.   The Russian news agency RBC has reported that "the criminal dealings of Promsberbank" and the mirror trades at Deutsche Bank are related.

104.   In a wrongful dismissal action brought by Wiswell against Deutsche Bank, Wiswell vehemently objected to the Bank's attempts to portray him as the Machiavellian figure responsible for the Bank's woes, declaring that *at least 20 of his bosses and colleagues, including two supervisors in London, knew about the trades because they were carried out so routinely and openly*.[29]

105.   Currently, the mirror-trade scheme is being investigated, in addition to European authorities, by the U.S. Justice Department and by the New York's banking regulator, who are scrutinizing whether the Bank had appropriate compliance programs to safeguard against money laundering and whether it provided accurate information to regulators.[30]   The U.S. regulators

---

[29]   Liam Vaughan, Jake Rudnitsky, and Ambereen Choudhury, *A Russian Tragedy: How Deutsche Bank's "Wiz" Kid Fell to Earth: Mastermind or scapegoat, Tim Wiswell was at the heart of the bank's $10 billion mirror-trade scandal*, Bloomberg, Oct. 3, 2016.

[30] Arno Schuetze & Kathrin Jones, *Deutsche Bank's suspicious Russian trades count rises to $10 billion*, Business News, Dec. 22, 2015.

have asked Deutsche Bank for e-mails, memos, client lists and other documents in connection with the probe.[31]

106.    Deutsche Bank said that its own investigation found violations of internal policies and deficiencies in controls related to the illicit transactions.

### B.  Other Red Flags Disregarded by Deutsche Bank

107.    Further red flags began appearing inside Deutsche Bank in early 2014 regarding billions of dollars in suspect trades from Moscow.[32]  According to the findings of Deutsche Bank's own internal inquiry, which began in early 2015 and concluded with the preparation of an October 2015 internal report, *in January 2014, Cyprus-based Hellenic Bank filed a request for assistance to Deutsche Bank's London office, asking about "suspicious high-volume transactions"* through the account of a U.K.-registered company called Ergoinvest LLP.[33]  Hellenic sent at least two reminders to London before a response arrived, in March, from Deutsche Bank Moscow.  The equities office there—rather than its compliance or anti-money-laundering departments—vouched for the clients and the trades.  While one part of Deutsche Bank was defending Ergoinvest, yet another was posing questions about it: an anti-financial-crime unit at Deutsche Bank New York flagged questionable activity by the company, directing its inquiries to Hellenic Bank.  The Cyprus bank, receiving conflicting signals about Ergoinvest, began asking the New York unit for clarification.  It did not respond.  Despite months of crisscrossing questions, Deutsche Bank continued doing business with Ergoinvest—including

---

[31]  Keri Geiger and Greg Farrell, *DOJ Said to Probe Deutsche Bank on Russia Mirror Trades*, Bloomberg, Aug. 3, 2015.

[32]  Keri Geiger and Gregory White, *Deutsche Bank Found "Systemic" Failure in Russia Cash Flight*, Bloomberg, Apr. 14, 2016.

[33]  *Id.*

mirror trades, according to a report by the Russian Central Bank—until Russian authorities began asking about it and other brokers in 2015.

108.    It is reported that back office staffers in Moscow pieced together another suspicious example of money transfers, this time not involving Ergoinvest, the Deutsche Bank review found.  *Id.*  It showed both sides of a mechanism that was effectively moving cash out of Russia—a small Russian broker buying shares in Moscow, and a British Virgin Islands holding company selling the same stocks for cash in London.

109.    Indeed, trades by one of the Russian brokers raised suspicions inside Deutsche Bank and among at least one of its partner banks for months in early 2014.  *Id*.  ***An audit of Deutsche Bank's Moscow operations, performed in mid-2014 by an outside firm, found "severe weaknesses" in the unit's processes for vetting customers***.    This audit was not disclosed by Deutsche Bank to investors.

110.    ***The Russian Central Bank alerted Deutsche Bank in 2014*** about several Moscow brokerages it was trading with, and the Bank's own staff also raised concerns.  Deutsche Bank stopped doing business with a few of the companies.  But calls from Moscow back-office staff for a broader probe into such trades were ignored by superiors in London, Deutsche Bank found.

111.    In 2014, a business acquaintance of Gorbatov, Alexei Kulikov, who was later jailed on suspicion of fraud, met with a Deutsche Bank compliance officer in a café below the Bank's Moscow office, according to testimony provided by the employee to Russian police and seen by Bloomberg.  There, the employee said, Kulikov attempted to bribe the compliance officer to allow him and his associates to continue trading, indicating how much he was willing

to pay by writing a number on the screen of his cell phone. *The Deutsche Bank compliance officer declined the bribe and reported it to Deutsche Bank*.[34]

112.    Despite repeated warnings, *Deutsche Bank conducted an internal audit of the Moscow equities operation that gave it "satisfactory" grades and made no mention of the flagged trades.* This internal review was not disclosed to investors. *A year later, the bank's review of the handling of the transactions characterized that 2014 audit as marked by "severe shortcomings*." [35]

113.    After Russian authorities began interviewing people in the Moscow office about Ergoinvest and a local broker regarding possible tax evasion, Moscow staffers again alerted the bank's financial-crime team in London, sending a spreadsheet of the suspected mirror trades, according to a subsequent internal Bank report. *Id.*

114.    Several of the Russian brokers the Bank identified later had their licenses revoked by the Russian Central Bank. *Id.*

115.    The fallout from the money laundering scam was precipitous. In June 2015, Defendants Jain and Fitschen announced they would be stepping down. In Russia, Deutsche Bank adopted the nuclear option and shut down its Moscow investment bank. Reportedly, banking insiders told BNE IntelliNews that Deutsche Bank was forced to shut down its investment banking division in Russia after the Russian Central Bank threatened to revoke the bank's license amid the mirror-trade money laundering scheme.[36]

---

[34]   Liam Vaughan, Jake Rudnitsky, and Ambereen Choudhury, *A Russian Tragedy: How Deutsche Bank's "Wiz" Kid Fell to Earth: Mastermind or scapegoat, Tim Wiswell was at the heart of the bank's $10 billion mirror-trade scandal*, Bloomberg, Oct. 3, 2016.

[35]   Keri Geiger and Gregory White, *Deutsche Bank Found `Systemic' Failure in Russia Cash Flight*, Bloomberg, April 14, 2016.

[36]   Jason Corcoran, *Russian CB Pulls Brokerage License Amid Deutsche Bank Scandal*, BNE IntelliNews, Jan. 25, 2016.

116.     Reportedly, the Russian mirror-trade investigation has the potential of becoming as big as Libor, reaching billions of dollars in settlements.[37]

**Confidential Witnesses Attest To Deutsche Bank' Internally Known Deficiencies in Internal Controls, Particularly With Respect to Anti-Money Laundering Controls**

**A.  Information provided by CW1**

117.     CW1 was Director/Head of Russian Equity Sales from March 2008 to April 2010 and was based in the Moscow office of Deutsche Bank.  CW1 managed some of the Bank's largest clients and supervised 3 international salesmen, 3 domestic salesmen/sales-traders, and 2 corporate relations specialists.  CW1 reported to Defendant Wiswell, Deutsche Bank's head of Russian equities and sales in Moscow and to Brian Thomas, Deutsche Bank's Director of CEEMEA (Central Eastern Europe Middle East and Africa) Sales in London, speaking with him several times a week.  In Russia, CW1 also reported to Defendant Ozkan.

118.     CW1 explained that in 1996, American investor Boris Fedorov and Charles Ryan and Boris Fyodorvich formed United Financial Group (UFG), the first large Russian investment bank.  CW1 and Wiswell joined UFG in 2004.  CW1 described this period as the "wild wild East" for international banking.  As a Russia-based investment firm, CW1 said UFG was competing eagerly with more established investment operations.  In 2008, Deutsche Bank acquired a controlling interest in UFG, acquiring the investment group, its stable of clients, and its hard-charging, hard-partying team of salesmen and traders, which included Wiswell and CW1.  "UFG was a Russian bank competing with other Russian businesses tooth and nail," CW1 said.  At Deutsche Bank, Wiswell became head of equities and trades and CW1 became head of equities.

---

[37] Arno Schuetze & Kathrin Jones, *Deutsche Bank's suspicious Russian trades count rises to $10 billion*, Reuters, Dec. 22, 2015.

119.    CW1 stated that the root cause of Deutsche Bank's present day problems in Russia could be partly traced to the Bank's embrace of UFG's operating practices.  After the acquisition, Deutsche Bank undertook a due diligence review of its new clients.  But the vetting mostly involved Russian entities, which made the process uncertain. CW1 stated that Deutsche Bank's senior management should have looked at the situation and concluded, "We don't have the right systems in place" to manage the risk of doing business with all of UFG's clients.  "The truth of the matter is, if they (Deutsche Bank) had any decency, they would have stopped doing business with UFG's existing clients," CW1 said.  "They would have taken on new clients."  The goal of the UFG acquisition, however, was to establish a large entrepreneurial operation in Moscow, a market that was booming.  In the process, CW1 said, Deutsche Bank adopted UFG's aggressive operating style as its own.  This meant playing by what CW1 called the "Russian rules."   The aggressive competition for business meant lavishly entertaining clients and prospects, sponsoring long nights of drinking and "taking clients to strip clubs."  "There are Russian rules, and then there are the rest of the world's rules," CW1 said.  ***The issue here is nobody pays attention to the Russian rules. You know that it is illegal***."  But CW1 said, "most expats operated under the idea, it doesn't really matter if you get caught."  Fines were small; bribes were viewed as a cost of doing business.  ***It was understood that "there are government officials who are not supposed to have these bank accounts abroad," CW1 said.  "You are not supposed to be doing that. But the rules don't apply, if you have a loophole around it. That is the way that Russia works***."

120.    CW1 explained that Deutsche Bank managers made it clear that they endorsed the wide-open operating style. "We were operating, pre-[financial] crisis, from an attitude we could do anything," CW1 said.  At Deutsche Bank, the emphasis was to "make more money out of

Russia."  CW1 recalled a conversation he/she had with one of his/her bosses at Deutsche Bank who told him/her: "We really need ideas that make us the money. Don't think of us as a bank. Think of us as a little bit of a hedge fund. We can do all kinds of things."  In such an environment, CW1 said, high risk trades and losing trades did not raise eyebrows.  "Deutsche Bank wasn't the only bank doing it" in Russia, CW1 said.  "They are the only ones that got caught."  After the 2008 financial crash, the pressure to produce only added to the incentives to cut corners.  "You have to understand that this follows the financial crisis," CW1 said, and that the bank's senior management was gung ho to increase profits."

121.    After the move to Deutsche Bank, CW1 was required to attend training sessions on compliance and anti-money laundering*. CW1 said that the Bank's compliance staff were considered part of the "back office" and generally held in low regard.  "Realistically . . . the back office was one step above the janitors*."  If someone from compliance had raised an issue about a client's suitability or the propriety of a transaction, they would have been ignored.  He described the bank's KYC procedures as "a big pain in the ***."  CW1's salesmen were instructed to tell new customers: "We need these forms filled out. We can't do business with you unless you fill out these."  A salesman might suspect or wonder if he/she was dealing with money laundering, but would not get into that during the sale."  *If such scrutiny occurred at all, it didn't hold up the transactions*."

122.    As for detecting the involvement of Politically Exposed Persons ("PEP"), or checking the names of parties and counterparties against watch lists, CW1 doesn't remember ever doing that.  "*It was almost a 'Don't ask, don't tell' rule*," CW1 said.  "I was supposed to know all of the clients," but that was not realistic.  CW1 said that he relied on his/her salesmen and often the salesmen did not know whether the account in question belonged or was related to

a suspicious person or entity.  More broadly, CW1 said there was an understanding that "in Russia there is a direct overlap between government officials and the Russian mob.  That is really and truly the problem."  This was a knot CW1 and his/her salesmen didn't have time to untie.  "Technically speaking you can do that all day long.  The problem is that trying to figure out who the bad guys are, and who are *not* the bad guys, in Russia: You could be there all day."  CW1 observed that in most cases, what was problematic was the ultimate beneficiary or source of the money.  And typically, such things were not knowable.  If companies or entities "take in money from shady sources, how are you really going to know that."  CW1 said he/she relied on his/her salesmen to check the backgrounds of their parties but he acknowledged that the salesmen had little incentive to question anything about the transaction.  "If you left it up to the salesmen, they would approve Satan, in all honesty."

123.    According to CW1, Defendant Ozkan should have picked up on the mirror trade scheme because of the amounts involved and the trading volume.  CW1 said that such actions, including spikes in trading, would have been evident in reports Defendant Ozkan received.  "It is beyond me that [Ozkan] did not recognize what was going on," CW1 said.  According to CW1, Ozkan routinely "would look at client volumes, to my knowledge in 2010 . . . He should have seen the large spikes in activity that were reported."

### B.  Information provided by CW2

124.    CW2 was one of the first experienced compliance analysts hired by Deutsche Bank in December 2010 to supposedly beef up the bank's AML functions in the Jacksonville, FL office.  As an Associate Compliance Officer, CW2 reported to the Vice President for AML Compliance and carried out a variety of roles related to preparing and filing Suspicious Activity Reports ("SAR").  CW2 also assisted in testing, evaluating, and implementing the Bank's two primary automated systems, MANTAS and NORKOM, and prepared presentations on AML

activities for senior members of the AML staff in Jacksonville and New York.  CW2 attended approximately 10 meetings in Jacksonville when the Director of Compliance/AML was present.

125.   According to CW2, *in most suspicious transactions there was very little information about the ultimate beneficial owners*.  *CW2 viewed the bank's AML programs and internal controls over financial reporting as ineffective and poorly managed.  Known problems identified before the relevant period from 2013 to 2016 were not addressed.*  AML analysts complained frequently about weaknesses in the Bank's internal controls over AML and fraud detection.  These complaints were conveyed to Deutsche Bank's headquarters in New York, along with recommendations for improving SAR-related outcomes.

126.   CW2 stated that Deutsche Bank relied on a decentralized AML system with known weaknesses.   Globally, Deutsche Bank's system for detecting, investigating, and reporting suspicious financial transactions to the Financial Crimes Enforcement Network (FinCEN) relied on three operational nodes located in Bangalore, India, Jacksonville, FL, and New York, NY, with Bangladesh operating as the global intake point for SAR alerts, which were subsequently sent to Florida and then to New York.  To a large degree, these centers depended on information about suspect transactions that Client Service Officers in Deutsche Bank's foreign branches were supposed to collect and report.  These local bank officers, in turn, relied on information provided by client banks using the correspondent banking services offered by Deutsche Bank.  The quality of the information that local officers obtained from clients and passed along to other Deutsche Bank entities varied widely across the bank's far-flung network*.  In most suspicious transactions, there was little, if any, information about the ultimate beneficial owners of the funds transmitted through the Deutsche Bank system*.  "You almost

never know your clients, because your clients are your correspondent banks," CW2 said. Client Service Officers frequently failed to report information about the ultimate beneficiaries.

127.    The foreign branches that handled correspondent transactions did so on behalf of other foreign banks or entities that were their clients.  In theory, the Client Service Officer in a Deutsche Bank branch was supposed to elicit information about the transaction and record that data in a "Wire Transaction Memo."  In practice, compliance with these reporting requirements varied widely.

128.    The Deutsche Bank service officers were expected to use a standardized format for reporting this data that included fields for identifying information. The Wire Transaction Memo "should give us the name of the originators" and other relevant background, CW2 said, such as "the person who was actually originating the transaction and demographic information, address and bank account information with originating bank."  Frequently essential fields in the form were left blank, or filled with numbers or codes that were difficult to decipher.  "Often times we only received partial information, or 'cut off' information and inexplicable formatting errors, such as addresses rendered as a "series of numbers," CW2 said.    Additionally, the transmission messages included a report field known as "Originator-to-Beneficiary Information or Instructions ("OBII") that was "supposed to be used to explain the purpose of the payment." However, according to CW2, "these note fields weren't always populated by the bank processing the wires."

129.    CW2 described an "exodus" of AML compliance staff in late 2013.  This included CW2's supervisor on the Florida desk.  The VP for AML Compliance and David Levenberg, the Director and Global AML Monitoring Coordinator, also left Deutsche Bank.   "It was because of the action of leadership," CW2 said.  CW2 stated that he/she decided to change jobs because "it

became obvious that it was never going to improve."  CW2 attributed the failure of Deutsche Bank's officials to address known AML weaknesses to the fact that AML functions cost banks money and do not generate income, and noted that one of the limits to an effective AML program is the threat of losing a significant client.

### C.  Information provided by CW3

130.  CW3 was one of several experienced analysts hired by Deutsch Bank in December 2010 to beef up the bank's AML functions in the Jacksonville, Florida office.  CW3's expertise was in quantitative and qualitative analysis.  CW3 generated MANTAS batch reports and prepared monthly Management Information Systems ("MIS") reports for senior managers in New York.  Because of his/her technical expertise, CW3 reported to two supervisors:  the Vice President for AML Compliance in Jacksonville and the Vice President for Compliance who was based in a Deutsche Bank office in Jersey City, New Jersey, which handled day-to-day interaction with the AML staff.  Initially, CW3's primary function was to produce quantitative reports and trend analysis on the performance of AML functions and automated systems, and to help prepare reports that were discussed at weekly and monthly management meetings. "I was hired to work as a quantitative analyst," CW3 said. "I prepared the management reports on a weekly basis."  In addition to his/her other duties, CW3 assisted the bank's information technology (IT) staff in conducting User Acceptance Testing of newly developed rules and parameters in the MANTAS program. Further, CW3 was assigned to conduct productivity reviews, establish operational metrics, and develop office procedures for "Quantitative/Qualitative AML Management Information Systems reports for senior managers.

131.  According to CW3, *there was a significant need for "more management oversight over the entire AML program" on the part of senior management in New York.  "I*

*didn't see them provide" effective supervision and oversight of the AML programs in Jacksonville*.

132.    During his/her two-year tenure in Deutsche Bank's Jacksonville office, CW3 recalled one visit by internal auditors, but said their efforts struck him/her as superficial. "On paper they have something like that (internal audit)" CW3 said, but he/she saw no evidence of the onsite audit work required to verify the reliability of the bank's AML procedures or the effectiveness of the day-to-day work of AML analysts.   CW3 also stated that during his/her tenure, no independent testing or evaluation of the reliability of the automated AML systems was conducted in Jacksonville.   CW3 explained that this meant there was no systematic review by an "internal auditor to test your systems, test your process, to see if your AML" processes and policies are working as expected.   Moreover, "we didn't have any external (review) to come and actually do something like a test.  It didn't happen."

133.    According to CW3, inadequate training and separation of duties also created weaknesses in Deutsche Bank's AML functions.   CW3 describe weaknesses stemming from a decision by senior managers to limit and compartmentalize the use of an automated tool used to match names against individuals or entities on the Office of Foreign Asset Control (OFAC) sanctions list.   Upon joining the Deutsche Bank office in Jacksonville, AML analysts received basic training in OFAC search functions.    But CW3 said there was "no recurring training" to ensure that analysts were proficient in using the tool reliably.   "It was lacking. We were not adequately or properly trained on that piece of it," remarked CW3.  Moreover, the AML analysts were not given automated access to the OFAC search function in the NORKOM system. Deutsche Bank managers made a policy decision to limit such access to members of a Special Investigation team.   "OFAC exists on its own," CW3 said. "AML exists on its own."  While the

NORKOM case management software allowed for use of the OFAC search tool, "we didn't have a system that was built based on OFAC screening."

134.    For a period of time, CW3 was assigned to the Special Investigation team, whose mission was to provide enhanced scrutiny to selected transactions pursuant to provisions of the USA PATRIOT ACT.  As a result of CW3's previous assignment as an AML analyst, CW3 was able to observe the consequence of this separation of duties.  Officers in the foreign banks were supposed to run OFAC name checks at the time of the transaction, but did not always do so.  The primary function of AML analysts in Jacksonville was to research transactions that the MANTAS flagged as suspicious and either prepare a SAR or clear the alert.  AML analysts, however, could not do automated name checks against the sanctions list.  In instances where foreign branches failed to search the sanctions list, a suspect transaction that involved a sanctioned person or entity could have been cleared.  According to CW3, this was a weakness that a rigorous auditing and testing would have detected and attentive managers could have corrected.  ***What was missing, CW3 said, were systematic, end-to-end assessments by an "internal auditor to test your systems, test your process, to see if your AML" program is working as intended.  "We didn't have any external (review) to come and actually do something like a test.  It didn't happen."***

135.    CW3 also described a known vulnerability in the Bank's screening of PEPs.  Alerts about politically connected persons or entities are dictated by "watch lists" and "white lists."  The concept of checking names against a "watch list" is straightforward.  If a search returns a hit, the transaction is flagged.  In programming the screening systems, however, the ***Bank granted PEP "exemptions" to individuals and entities on the white list.  Once a person or business was placed on the white list, they had "an easy way" to launder funds***, CW3 said.

The transaction "is going to go through because you put those people on the white list.  It is not going to flag him for anything.  It is going to be allowed . . . the transaction is going to go through irrespective."

## Deutsche Bank's False Campaign to Regain the Public Trust

136.   During the Class Period, Deutsche Bank knew that the investing public's trust in the Bank was at its lowest as a result of the Bank's prior illegalities.  To regain that trust, the Bank declared that "Deutsche Bank is in a process of transformation . . . We want to win back people's trust in our bank . . . . In 2012, we . . .  developed our Strategy 2015+.  This signals a new chapter for us . . . Cultural change is . . . a prerequisite for restoring public trust in the banking industry. Deutsche Bank emphasizes integrity above all . . . . Effective corporate governance in accordance with high international standards is very important to Deutsche Bank."

137.   Defendants Fitschen and Jain represented publicly during the Class Period that Deutsche Bank's "goal of long-term cultural change" is "an essential element of Deutsche Bank's strategy and crucial to  helping restore the bond of trust with society."  They stated that "[a] strong, positive compliance culture, in which [employees] strictly adhere to Deutsche Bank's policies and respect all applicable laws and regulations in all jurisdictions," including compliance with the requirements of the Anti-Money Laundering and Anti-Bribery and Corruption Programmes "is essential to maintaining [the highest standards of integrity in all that we say and do]."  These principles applied to the entire Deutsche Bank Group.  Defendants Fistchen and Jain declared that "***We are personally committed to ensuring*** that all Deutsche Bank employees operate according to th[e] Code [of Business Conduct and Ethics for Deutsche Bank Group] in all our business activities and in our dealings with all of our stakeholders."

138.   Deutsche Bank emphasized that its "reputation is one of [its] most important assets."

139.    As described in detail below, during the Class Period, Defendants falsely and repeatedly reassured investors that the bank had significantly strengthened its internal controls to prevent exactly the type of money laundering that was concurrently occurring via the Russian mirror trades:

- Integrity.  We live by the highest standards of integrity in everything we say and do.  We will do what is right——not just what is allowed.

- 2013 was the second consecutive year in which we have invested in the bank's future growth and in further strengthening our controls while addressing ongoing legal and regulatory issues . . .  We have laid strong foundations for long-term cultural change, by launching our new values and beliefs and significantly tightening our control environment.

- Management believes that the Bank complies with the CBR [Central Bank of the Russian Federation] requirements related to risk management and internal control systems, including requirements related to the Internal Audit function, and that risk management and internal control systems are appropriate for the scale, nature and complexity of operations.

- Our anti-money laundering program provides strong support for international efforts to combat money laundering, financing terrorism and other criminal acts.  We scrutinize clients and current transactions using meticulous procedures and automated monitoring system through this compliance program.

- Our anti-money laundering requirements apply worldwide to all business units of the bank, regardless of their location . . . To ensure that we always apply the best possible compliance practices, we routinely review our goals and strategies for the prevention of money laundering.

- To ensure compliance, Deutsche Bank has an anti-corruption policy that is backed by: appropriate compliance training measures for staff; recording and monitoring of gifts and invitations; a worldwide whistleblowing hotline for reporting suspicious cases anonymously; risk-based procedures for monitoring third parties.

- Whether in the area of money laundering, corruption, or financial crime–the compliance management system of Deutsche Bank is geared to strict conformity with the law and has been achieving good results for years.

- How we combat financial crime: Deutsche Bank is committed to ensuring the robust risk management of financial crime. We have established an Anti Financial Crime Committee (AFCC), a group-wide oversight and governance body. Its responsibilities include ensuring conformity with the law, preventing criminal acts or exposing and investigating them – ranging from fraud and

money laundering to insider trading and data theft. The AFCC examines and assesses all risks relating to such actions within the Deutsche Bank Group.

- How we assess and accept clients:  We have developed effective procedures for assessing clients (Know Your Customer or KYC) and a process for accepting new clients in order to facilitate comprehensive compliance. Furthermore they help us to minimize risks relating to money laundering, financing of terrorism and other economic crime. Our KYC procedures start with intensive checks before accepting a client and continue in the form of regular reviews. Our procedures apply not only to individuals and corporations that are or may become our direct business partners, but also to people and entities that stand behind them or are indirectly linked to them.

## **Materially False and Misleading Statements**

### *A.  False and Misleading Statements Made in 2013*

140.    On January 31, 2013, Defendants Fitschen and Jain made the following statements at the Annual Press Conference, which Deutsche Bank posted on its website:

- We are determined to bring about deep cultural change at Deutsche Bank. That is what clients, society, and investors demand.  Our values are clear.  We believe in fundamental integrity of dealing . . .

141.    Deutsche Bank made the same or substantially similar statements to those in ¶140 above on or about April 20, 21, 24, 26, 30, May 1, 10, 17, 21, 30, June 7, 11, 19, 22, July 22, 26, September 15, 22, 29, Oct. 4, 8, 13, 18, 19, 31, November 3, 4, 13, December 9, 27, 2013, on its website.

142.    On or about March 12, 2013, Deutsche Bank issued its 2012 Annual Report ("2012 Annual Report"), which included a "Responsibility Statement by the Management Board" ("Responsibility Statement").[38]  The Responsibility Statement contained the following language: "To the best of our knowledge, and in accordance with the applicable reporting principles, the consolidated financial statements give a true and fair view of the assets, liabilities, financial position and profit or loss of the Group, and the Group management report includes a

---

[38]  References to Deutsche Bank in the Annual Report are to Deutsche Bank Aktiengesellschaft and its consolidated subsidiaries.

fair review of the development and performance of the business and the position of the Group, together with a description of the principal opportunities and risks associated with the expected development of the Group."  The Responsibility Statement was signed by Defendants Fitschen, Leithner, Ritchotte, Jain, Lewis, Krause, and Neske.

143.    The 2012 Annual Report represented that, pursuant to the Bank's Strategy 2015+, in 2012 Deutsche Bank made "significant progress" with respect to its culture.   Deutsche Bank stated that placing the Bank at the forefront of cultural change was a key element of Strategy 2015+.  It represented that "[d]uring 2012, we continued to strengthen our control environment, tightening our systems and processes and enhancing our monitoring capabilities."

144.    The 2012 Annual Report made the following additional representations: "One of the core objectives of our Strategy 2015+ is deep cultural change.  We consider this to be imperative . . . We have formulated a new set of ethical standards for our actions and continued to reinforce our control mechanisms."

145.    The 2012 Annual Report stated that "[k]ey risk categories for us include credit risk, market risk, operational risk, business risk (including tax and strategic risk), reputational risk and liquidity risk. We manage the identification, assessment and mitigation of top and emerging risks through a rigorous governance process and robust risk management tools and processes. Our proactive approach to identification and impact assessment aims to ensure that we mitigate the impact of these risks on our financial results, long term strategic goals and reputation."

146.    The Bank also disclosed the following with respect to how it manages operational risk:

> We manage operational risk based on a group-wide consistent framework that
> enables us to determine our operational risk profile in comparison to our risk

appetite and systematically identify operational risk themes and concentrations to define risk mitigating measures and priorities. The global operational risk framework is applicable to all risk types included in the definition for operational risk and thus also applies to each of the above defined individual risk types. The applied techniques [include]:

> -Our Lessons Learned process is required for events, including near misses, above € 1 million. This process includes but is not limited to: systematic risk analyses including a description of the business environment in which the loss occurred, including previous events, near misses and event specific Key Risk Indicators ("KRI"); consideration of any risk management decisions in respect of the specific risk taken; root cause analyses; identification of control improvements and other actions to prevent and/or mitigate recurrence; and assessment of the residual operational risk exposure.

The Lessons Learned process serves as an important mean to identify inherent areas of risk and to define appropriate risk mitigating actions. All corrective actions are captured and monitored for resolution via actions plans in our tracking system "dbTrack". Performance of all corrective actions and their resolution status is reported on a monthly basis to senior management via the ORMC.

> -We systematically utilize information on external events occurring in the banking industry to prevent similar incidents from happening to us, e. g. by particular deep dive analysis or risk profile reviews.

> -In addition to internal and external loss information, scenarios are utilized and actions are derived from them. The set of scenarios consists of relevant external scenarios provided by a public database and internal scenarios. The latter are generated to complete our risk profile.

> -Regular operational risk profile reports at group level for our business divisions, the countries in which we operate and our infrastructure functions are reviewed and discussed with the department's senior management. The regular performance of the risk profile reviews enables us to detect changes to the business unit's risk profiles as well as risk concentrations across the Group early and to take corrective actions.

> -We assess and approve the impact of changes to our risk profile as a result of new products, outsourcings, strategic initiatives and acquisitions and divestments.

> -Once operational risks are identified, mitigation is required following the "as low as reasonably practicable (ALARP)" principle by balancing the cost of mitigation with the benefits thereof and formally accepting the residual operational risk. Risks which contravene applicable national or international regulations and legislation cannot be accepted; once identified, such risks must always be mitigated.

> -We monitor risk mitigating measures identified via operational risk management techniques for resolution within our tracking tool "dbTrack".

63

Higher than important residual operational risks need to be accepted by the ORMC.

-We perform top risk analyses in which the results of the aforementioned activities are considered. The Top Risk Analyses are a primary input for the annual operational risk management strategy and planning process. Besides the operational risk management strategic and tactical planning we define capital and expected loss targets which are monitored on a regular basis within a quarterly forecasting process.

-KRIs are used to monitor the operational risk profile and alert the organization to impending problems in a timely fashion. They allow via our tool "dbScore" the monitoring of the bank's control culture and business environment and trigger risk mitigating actions. KRIs facilitate the forward looking management of operational risk based on early warning signals returned by the KRIs.

-In our bottom-up Self Assessment ("SA") process, which is conducted at least annually, areas with high risk potential are highlighted and risk mitigating measures to resolve issues are identified. In general, it is performed in our tool "dbSAT." On a regular basis we conduct risk workshops aiming to evaluate risks specific to countries and local legal entities we are operating in and take appropriate risk mitigating actions.

Additional methodologies and tools implemented by the responsible divisions are utilized to complement the global operational risk framework and specifically address the individual risk types. These include but are not limited to:

-Fraud Risk is managed based on section 25a of the German Banking Act as well as other legal and regulatory requirements on a risk based approach, governed by the Global Anti Fraud Policy and corresponding Compliance and Anti-Money-Laundering (AML) framework. In line with regulatory requirements a global risk assessment is performed on a regular basis. Within the general management of operational risks dedicated Fraud Risk relevant aspects are part of the Self Assessments.

147.    The 2012 Annual Report disclosed the following with respect to measuring the

Bank's effectiveness of internal controls:

Each year, management of the Group undertakes a formal evaluation of the adequacy and effectiveness of the system of ICOFR. This evaluation incorporated an assessment of the effectiveness of the control environment as well as individual controls which make up the system of ICOFR taking into account:

-The financial misstatement risk of the financial statement line items, considering such factors as materiality and the susceptibility of the particular financial statement item to misstatement.

-The susceptibility of identified controls to failure, considering such factors as the degree of automation, complexity, risk of management override, competence of personnel and the level of judgment required.

These factors, in aggregate, determine the nature and extent of evidence that management requires in order to be able to assess whether or not the operation of the system of ICOFR is effective. The evidence itself is generated from procedures integrated with the daily responsibilities of staff or from procedures implemented specifically for purposes of the ICOFR evaluation. Information from other sources also forms an important component of the evaluation since such evidence may either bring additional control issues to the attention of management or may corroborate findings. Such information sources include:

-Reports on audits carried out by or on behalf of regulatory authorities

-External Auditor reports

-Reports commissioned to evaluate the effectiveness of outsourced processes to third parties

In addition, Group Audit provides assurance over the design and operating effectiveness of ICOFR by performing periodic and ad-hoc risk-based audits. Reports are produced summarizing the results from each audit performed which are distributed to the responsible managers for the activities concerned. These reports, together with the evidence generated by specific further procedures that Group Audit performs also provide evidence to support the annual evaluation by management of the overall operating effectiveness of the ICOFR.

As a result of the evaluation, management has concluded that ICOFR is appropriately designed and operating effectively as of December, 31 2012.[39]

148.    The 2012 Annual Report disclosed the following financial revenue metrics:

consolidated total net revenues of €33.7 billion for the full year ended 2012; and total net

revenues for Europe, Middle East and Africa of €9.9 billion for full year ended 2012.

---

[39] Deutsche Bank failed to maintain an adequate system of internal controls in violation of the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"). Throughout the Class Period, Deutsche Bank consistently touted the sufficiency of its internal financial controls and procedures to the standards set forth by COSO by stating that its internal controls were effective based on the COSO criteria.  "As of December 31, 2012, management conducted an assessment of the effectiveness of our internal control over financial reporting based on the framework established in Internal Control – Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Based on this assessment performed, management has determined our internal control over financial reporting as of December 31, 2012 was effective based on the COSO framework." (Form 20-F pg. 76).  Similar assurances were made in Deutsche Bank's Form 20-F for the 2013, 2014 and 2015 years. (Form 20-F, pgs. 87, 92, 103, respectively).  These assurances were false and misleading.

149.    On March 28, 2013, Deutsche Bank Russia represented on its website that in order to counter the laundering of proceeds obtained by illegal means and the financing of terrorism, the bank executes controls in accordance with the Russian Federation legislation on countering the laundering of proceeds obtained by illegal means and the financing of terrorism. Deutsche Bank Russia further represented that special internal control measures are performed in accordance with Deutsche Bank LLC's internal control rules for the purpose of countering the laundering of proceeds obtained by illegal means and the financing of terrorism.  A special internal control is executed via special programs approved by the bank and via other internal measures.

150.    Based on information and belief, Deutsche Bank Russia made the same or substantially similar statements to those in ¶149 above on or about April 1, May 11, 30, June 18, August 17, 26, 31, Sept. 6, Nov. 4, 15, and Dec. 19, 2013, on its website.

151.    On March 28, 2013, Deutsche Bank Russia made the following statements on its website:

- Integrity.  We live by the highest standards of integrity in everything we say and do.  We will do what is right——not just what is allowed.
- Discipline.  We live by the rules and hold ourselves accountable to deliver on our promises—no excuses. . . . We protect our company resources, thinking and acting as a prudent owner.
- Partnership.  We act as responsible partners with all our stakeholders and regulators.

152.    Deutsche Bank Russia made the same or substantially similar statements to those in ¶151 above on or about April 1, May 11, 30, June 18, August 17, 26, 31, September 6, November 4, 15, and December 19, 2013, on its website.

153.    On or about March 29, 2013, Deutsche Bank Russia publicly issued IFRS Financial Statements for the year ended December 31, 2012.  The 2012 Financial Statements and

related disclosures were approved by the Management Board.  Defendant Bongartz signed the 2012 Financial Statements and related disclosures.

154.    The 2012 Financial Statements for Deutsche Bank Russia made the following statements with respect to risk management:

- The Bank has a dedicated risk management function on a global level to ensure that oversight and monitoring of risk is achieved in a robust manner.

155.    The 2012 Financial Statements for Deutsche Bank Russia disclosed the following financial revenue metrics: net fee and commission income of RUB 1.1 billion for full year ended December 2012.

156.    On or about April 12, 2013, Deutsche Bank issued its 2012 Corporate Responsibility Report, which contained the following statements by Defendants Fitschen and Jain, featured prominently at the front of the Report:[40]

- These are challenging times for the financial sector. The trust in banks is at a record low due to perceived conflicts of interest and selfish behavior.  We must renew the contract with society and strengthen the fabric of trust with all of our stakeholders. We have to demonstrate that we play a valuable role in society and that we act with integrity and responsibility. This goal can only be achieved through a profound change in culture. The clients, investors, and others we consulted during our strategic review in 2012 left us no doubt about that. We want Deutsche Bank to be at the forefront of this cultural change in our industry . . . Ethical conduct is critical, especially in client relationships . . . We are reviewing potential transactions and clients more critically than in the past.

157.    The 2012 Corporate Responsibility Report made the following representations:

- We are committed to high standards of Anti-Money Laundering (AML) practice and compliance with the directives of the financial Action Task Force on Money Laundering. We require management and employees to adhere to these standards in preventing the use of products and services for money-laundering purposes. Standards of AML compliance based on the German Anti-Money Laundering Act and the current guidelines of the German Federal

---

[40] Deutsche Bank's Corporate Responsibility Reports are part of Deutsche Bank's annual reporting publications presenting the Bank's performance and initiatives in each corresponding year.

Financial Supervisory Authority apply to all Deutsche Bank entities, regardless of geographic location. We frequently review AML strategies, goals, and objectives to maintain an effective program that reflects best practices for a diversified, global financial services firm.

- In order to comply with Anti-Money Laundering legal and regulatory requirements and to protect the bank against money laundering, terrorist financing, and financial crime, Know-Your-Customer (KYC) procedures are in place. Our KYC policy provides a framework for assessing potential risks relating to new adoptions and existing clients, including, among other escalations, the review of Politically Exposed Persons by senior management.

- Deutsche Bank is committed to fully comply with local and international anti-corruption and anti-bribery laws. This includes the bank's strict prohibition against receiving, accepting, offering, paying, or authorizing any bribe and any other form of corruption.

- We also expect transparency and integrity in all of our business dealings to avoid any improper advantage or the appearance of questionable conduct by employees or third parties with whom we do business. We have a dedicated anti-corruption policy and supporting processes, including employee training, recording, and monitoring of gifts and entertainment, maintaining a global "whistleblowing hotline", and risk-based review processes over third parties.

- We have increased our mandatory compliance training to ensure that employees are fully aware of and understand our policies. We also apply trainings to consultants, contractors, and temporary staff. A new automated enrollment process ensures that the mandatory master program is followed by each business line to provide the necessary training to new joiners. This includes local and divisional content, as well as core training.

- A strong risk-focused culture goes beyond following policies; it requires all employees to consistently behave in a way that safeguards the bank's reputation. To help embed this culture, in 2010 we launched the Risk Culture Initiatives program, which outlines five behaviors all employees need to demonstrate. These behaviors include being fully responsible for Deutsche Bank's risks; being rigorous, forward looking and comprehensive in the assessment of risk; inviting, providing and respecting challenge; trouble shooting collectively and placing Deutsche Bank and its reputation at the heart of all decisions. They have been communicated through a number of awareness campaigns targeted at all staff.

- As part of the program, we have added Risk Culture as a training category and increased the number of risk-related courses. We have also started rolling out the so-called Red Flags, a tracking and measurement process based on independently collected data. While breaches of policies and procedures have always been subject to strong disciplinary action, this additional measurement

mechanism emphasizes the importance of employees exhibiting our values and principles in everything they do. Results of the Red Flags analysis is an important factor in year-end reviews and can adversely affect promotion and compensation decisions. By the end of 2012, relevant incidents in our Corporate Banking and Securities and Global Transaction Banking divisions had fallen by nearly 50% compared to the end of 2011.

158.    On April 15, 2013, Deutsche Bank filed a Form 20-F for the fiscal year ended December 31, 2012 (the "2012 20-F") with the SEC, with false and misleading statements substantially similar to those set forth in the Bank's 2012 Annual Report, including that "Fraud Risk is managed based on section 25a of the German Banking Act as well as other legal and regulatory requirements on a risk based approach, governed by the Global Anti Fraud Policy and corresponding Compliance and Anti-Money-Laundering (AML) framework.   In line with regulatory requirements a global risk assessment is performed on a regular basis.   Within the general management of operational risks dedicated Fraud Risk relevant aspects are part of the Self Assessments."

159.    The 2012 20-F was signed by Defendants Fitschen, Jain, and Krause. The 2012 20-F also contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Fitschen, Jain, and Krause attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

160.    On April 20, 2013, Deutsche Bank made the following statements on its website:

- An effective control and monitoring system is a necessity in order to manage a company with global activities such as Deustche Bank.  We have established sophisticated processes and structures for that purpose.

- We ensure the responsible, value-driven management and control of Deutsche Bank through our system of corporate governance. Our system functions in accordance with high international standards, including the German Stock Corporation Act and the German Corporate Governance Code, the rules of the US Securities and Exchange Commission and the New York Stock Exchange.

- The Deutsche Bank Code of Business Conduct and Ethics as well as our policies and guidelines reflect our commitment to a wide range of external standards, principles and initiatives, including: Financial Action Task Force on Money Laundering.

- In order to reverse the loss of trust in the aftermath of the financial crisis, we have initiated a change in our corporate culture and strengthened our emphasis on sustainable corporate governance: Responsibility is the focus of our actions . . . It goes without saying that any and every type of corrupt behaviour on the part of our employees is prohibited. They are not permitted to accept, pay or approve any type of bribes. Our policy on prevention of corruption identifies our key principles. The measures for implementing our policies encompass: collection of information about gifts, providing a global hotline for information about breaches of the rules, risk-based checks by independent third parties and appropriate training measures for our staff.

161. Deutsche Bank made the same or substantially similar statements to those in ¶160 above on or about April 20, 21, 23, 24, 26, 30, May 1, 10, 17, 21, 30, June 7, 11, 19, 22, July 22, 26, September 15, 22, 27, 29, October 4, 8, 13, 18, 19, 31, November 3, 4, 13, and December 9, 17, 19, 27, and 30, 2013, on its website.

162. Deutsche Bank made the following statements on its website on April 20, 2013:

- Our anti-money laundering program provides strong support for international efforts to combat money laundering, financing terrorism and other criminal acts. We scrutinize clients and current transactions using meticulous procedures and an automated monitoring system through this compliance program.

- The Deutsche Bank anti-money laundering standard complies with the German Anti-Money Laundering Act and the guidelines of the German banking supervisory authority. It is also in line with the recommendations of the Financial Action Task Force on Money Laundering, an intergovernmental organization.

- Our anti-money laundering requirements apply worldwide to all business units of the bank, regardless of their location. All our employees and senior managers are required to comply with them to prevent our name or our products and services from being misused for money laundering purposes. To ensure that we always apply the best possible compliance practices, we routinely review our goals and strategies for the prevention of money laundering.

- Within the scope of our compliance program, Deutsche Bank has committed itself to fully complying with all local and international anti-corruption and anti-bribery laws. Our employees and senior managers are strictly prohibited from receiving, accepting, offering, paying or authorizing any bribe or any other form of corruption. Deutsche Bank also expects transparency and integrity in all business dealings to avoid any improper advantage or the appearance of questionable conduct on the part of employees or third parties with whom we do business.

- To ensure compliance, Deutsche Bank has an anti-corruption policy that is backed by: appropriate compliance training measures for staff; recording and monitoring of gifts and invitations; a worldwide whistleblowing hotline for reporting suspicious cases anonymously and risk-based procedures for monitoring third parties

163.   Deutsche Bank made the same or substantially similar statements to those in ¶162 above on or about April 21, 24, 26, 30, May 1, 10, 17, 21, 30, June 7, 11, 19, 22, July 22, 26, September 15, 22, 29, October 4, 8, 13, 18, 19, 31, November 3, 4, 13, December 9, 17, 19 27, 30, 2013, on its website.

164.   On or about April 20, 2013, Deutsche Bank represented on its website that it has a "stable foundation" that "minimiz[es] risks and "strengthen[s] sustainability," that "Deutsche Bank is constantly upgrading its stable system," and that in 2012 it "reinforce[d] [its] 'Red Flag' warning system."  In addition, Deutsche Bank made the following statements:

- What do we want to achieve?  We want to be a responsible business partner that attaches the highest priority to ethical conduct and integrity and protects the interests of our clients. Our corporate governance systems must guarantee monitoring, prevent rule violations and manage potential risks to the environment and society arising from our business activities in an effective manner. Our goal is to firmly embed sustainability principles into our operational activities.

- How are we achieving our goals?  As a minimum, we adhere to international standards and guidelines, in relation to areas such as compliance, data protection, anti-money laundering and corporate governance. New business initiatives, new products or changes in existing business are introduced only after they have undergone a stringent approval process.  Acting responsibly and protecting the interests of the various stakeholder groups in the process means that we constantly weigh risks against the benefits that are created. Business initiatives with a potentially negative effect on the environment or

society are subjected to painstaking scrutiny. Internal standards guarantee that certain transactions in sensitive sectors can be excluded.

- What have we achieved?  We are constantly improving our management and control processes. For example, in 2011 we introduced our framework for environmental and social risks, founded our Anti Financial Crime Committee and launched our Responsible Business Initiative for the private client business area. In 2012 we were recertified once again for the next three years according to the ISO 14001 Standard, we updated our Code of Ethics, which applies group-wide, and we reinforced our control processes, for example by introducing our "Red Flag" warning system.  With the aid of it we can identify and report violations of compliance regulations. Then the results are incorporated into decisions on promotions and bonus payments. At the end of 2012, the "Red Flag" incidents in the Corporate Banking & Securities as well as the Global Transaction Bank divisions already decreased by nearly 50% in comparison with the previous year. The corporate governance of Deutsche Bank is consistently geared to creating added value in the long term for everyone who participates directly or indirectly in our business activities.

165.    Deutsche Bank made the same or substantially similar statements to those in ¶164 above on or about April 21, 23, 24, 26, 30, May 1, 10, 17, 21, 30, June 7, 11, 19, 22, July 22, 26, September 15, 22, 27, 29, October 4, 8, 13, 18, 19, 31, November 3, 4, 13, and December 9, 17, 19, 27, and 30, 2013, on its website.

166.    On or about April 20,  2013, Deutsche Bank made the following statements about its compliance systems on its website:

(1)    Compliance with laws and regulations is a matter of course.  That is why we are reinforcing a well-developed compliance structure.  To that end we have created special structures and programs.

(2)    In our view, responsible corporate governance does not only mean adherence to laws, regulations, and standards. It requires a stringent compliance system. We have defined strict rules and guidelines for our staff across the entire spectrum of our areas of activity. Through our conformity with the law, we ensure that the company, its shareholders, clients and employees are protected as comprehensively as possible.

(3)    [T]o support our controls systems we have substantially expanded our "Red Flag" monitoring system. It reports all violations of compliance requirements in specific areas. Violations of guidelines and procedures have always been the target of substantial disciplinary measures. We have intensified that approach by comprehensively integrating the results of monitoring into management and reporting structures as well as decisions

by management relating to performance assessment, promotion and remuneration. This has already led to a perceptible improvement in conformity with the law: At the end of 2012, "Red Flag" incidents in our Corporate Banking and Securities and Global Transaction Banking departments dropped by 53 percent in comparison with the previous year.

(4)     Our anti-money laundering program provides strong support for international efforts to combat money laundering, financing terrorism and other criminal acts. We scrutinize clients and current transactions using meticulous procedures and an automated monitoring system through this compliance program.

(5)     Our anti-money laundering requirements apply worldwide to all business units of the bank, regardless of their location . . . To ensure that we always apply the best possible compliance practices, we routinely review our goals and strategies for the prevention of money laundering.

(6)     To ensure compliance, Deutsche Bank has an anti-corruption policy that is backed by: appropriate compliance training measures for staff; recording and monitoring of gifts and invitations; a worldwide whistleblowing hotline for reporting suspicious cases anonymously; risk-based procedures for monitoring third parties.

(7)     Whether in the area of money laundering, corruption, or financial crime– the compliance management system of Deutsche Bank is geared to strict conformity with the law and has been achieving good results for years.

(8)     How we combat financial crime: Deutsche Bank is committed to ensuring the robust risk management of financial crime. We have established an Anti Financial Crime Committee (AFCC), a group-wide oversight and governance body. Its responsibilities include ensuring conformity with the law, preventing criminal acts or exposing and investigating them – ranging from fraud and money laundering to insider trading and data theft. The AFCC examines and assesses all risks relating to such actions within the Deutsche Bank Group.

(9)     How we assess and accept clients:   We have developed effective procedures for assessing clients (Know Your Customer or KYC) and a process for accepting new clients in order to facilitate comprehensive compliance. Furthermore they help us to minimize risks relating to money laundering, financing of terrorism and other economic crime. Our KYC procedures start with intensive checks before accepting a client and continue in the form of regular reviews. Our procedures apply not only to individuals and corporations that are or may become our direct business partners, but also to people and entities that stand behind them or are indirectly linked to them.

167.    Deutsche Bank made the same or substantially similar statements to those in ¶166 above on or about April 21, 24, 26, 30, May 1, 10, 17, 21, 30, June 7, 11, 19, 22, July 22, 26,

September 15, 22, 29, Oct. 4, 8, 13, 18, 19, 31, November 3, 4, 13, December 9, 17, 19, 27, 30, 2013, on its website.

168.   At the Deutsche Bank's earnings call for Q1 2013 held on April 30, 2013, Defendant Jain made the following statements:

> So summing up.  When we launched Strategy 2015+, we identified five key levers: capital, costs, competencies in our core businesses, clients and culture. We are delivering on all of those.

169.   On or about June 19, 2013, Deutsche Bank publicly announced that the National Association of Securities Market Participants has bestowed on the bank the Best Research 2012 Award.  Defendant Wiswell chose this opportunity to tout Deutsche Bank's leadership in the Russian region:  "We are proud that Deutsche Bank's Research achievements are acknowledged by the market participants and become the best Research in 2012.  *This award is a testament to Deutsche Bank's leadership in the region* and we are pleased to be recognized for our outstanding analytics capabilities that support our clients in challenging markets."

170.   On December 4, 2013, Deutsche Bank announced in a press release that it reached a settlement with the European Commission as a result of the Bank's illicit acts regarding the submissions of interbank offered rates.  In connection with the settlement, Defendants Fitschen and Jain made the following statements: "The settlement relates to past practices of individuals which were in gross violation of Deutsche Bank's values and beliefs.  *Acting with integrity is a core value at Deutsche Bank, and we expect every employee to adhere to it.  We are attaching the highest institutional importance to ensuring that this type of misconduct does not happen again*." *The press release provided that "[a]s part of [Deutsche Bank]'s Strategy 2015+ the Bank is investing EUR 1 billion to elevate its systems and controls to best in class, including by increasing the headcount in its control functions*."

171.    The statements referenced in ¶¶140-141, 143-152, 154-158, 160-170 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the banks' internal controls, anti-money laundering compliance, culture, business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that, as explained in detail *supra*: (1) Deutsche Bank and Deutsche Bank Russia had serious and systemic failings in their systems and controls against money laundering, financing terrorism, aiding against international sanctions, and committing financial crimes; (2) Deutsche Bank and Deutsche Bank Russia's internal systems and controls over financial reporting and their disclosure controls and procedures were not effective; (3) the culture at Deutsche Bank and Deutsche Bank Russia had not changed, as employees, including top management in Russia, were engaging in money-laundering activities; (4) with respect to the reported financial revenue and/or income metrics, Deutsche Bank and Deutsche Bank Russia failed to disclose that a portion of those financial metrics were derived from illicit activities such as money laundering; and (5) as a result, Deutsche Bank and Deutsche Bank Russia's public statements were materially false and misleading at all relevant times.

### B.  False and Misleading Statements Made in 2014

172.    At the Deutsche Bank's earnings call for Q4 2013 held on January 20, 2014, Defendant Jain made the following statements:

> Crucially, let me finally finish by talking about culture. We cannot talk about the very high costs that we are paying for the legacy mistakes that we've made without being utterly committed to a culture which ensures that we don't wind up with new problems . . . please do not doubt our utter commitment to achieving this and the progress, as you can see on page 15, which is more or less a mechanical slide that lays out the process. The main thing which I can do for you right now is to reiterate the utter commitment of the senior management team at Deutsche Bank toward achieving this.

173.    Defendant Fitschen made the following statements at an Annual Press Conference

held on January 28, 2014:

> "And there's one thing I would like to tackle now. That's the question of culture.
> Now we know that here, we've got something to prove to you.  And we also are
> aware of the fact that many of you probably believe that we are on politically
> correct grounds, but that -- nevertheless, we still behave in the old way. Now what
> did we really bring about in terms of cultural change?
>
> We really want you to believe us, namely, that all of the progress that we have
> made would not have been possible if this had not been accompanied by a
> mindset throughout the entire bank. And this also applies to the future activities
> we are pursuing. So let me recap what we implemented after we added the
> cultural change as the fifth C to our ambitions.
>
> * * *
>
> And then within the GEC, we're really dedicated a lot of time to develop a set of
> principles, which we then published in summer 2013 as our new values and
> beliefs and which we also presented to all of our colleagues in the bank . . . And
> today, we can say with pride that there is no country, no region in the world where
> this matter has not been discussed intensively with the support of all of our top
> leaders.
>
> So you can see, our employees are more than willing to follow us in this cultural
> change. …And within 12 weeks after launching our values and beliefs, we have
> already achieved a 94% of members of our staff. And they will certainly take this
> to their heart and also change their mindset . . .
>
> * * *
>
> And last but not least, we also know that our cultural change will enable us to
> better meet the regulatory requirements that we are facing.
>
> * * *
>
> Whatever we do, the cultural change will certainly make sure that the sources, the
> possibilities of such errors arising will certainly decrease in number compared to
> the past. … Yet, we are confident that we will in the future no longer be above
> average in terms of litigations and other legal matters arising in an economy.

174.    At the January 28, 2014 Annual Press Conference, Defendant Jain stated:

> Let me assure you, cultural change is sweeping through the bank in every one of
> our 70-odd locations . . .

175.    In February 2014, Defendant Fitschen made the following statement, which was

posted on Deutsche Bank's website: "We are spending 1bn € to reinforce our systems and

controls and adapt these to changes in regulation by 2015.  We significantly strengthened our compliance department, adding some 200 people in 2013 and with plans to hire a similar number in 2014."

176.    Deutsche Bank made the same or substantially similar statements to those in ¶175 above on or about February 12, 15, March 12, 13, 15, 21, 30, 31, April 2, 13, 18, May 9, 10, 13, 17, 18-20, 26, 28, June 5, 19, 20, 23, 25, July 1, 2,  13, 14, 16, 18, 19, 23, 24, August 7, 8, 14, 17, 19, 20, 24, 27, 29, September 1, 3, 7, 11, 16, 24, 25, Oct. 2, 6, 17, 20, November 9, 16, 24, 29, December 2, 5, 9, 16-19, 29, 30, 2014, on its website.

177.    On February 7, 2014, Deutsche Bank Russia stated on its website that in order to counter the laundering of proceeds obtained by illegal means and the financing of terrorism, the bank executes controls in accordance with the Russian Federation legislation on countering the laundering of proceeds obtained by illegal means and the financing of terrorism.  Deutsche Bank Russia further represented that special internal control measures are performed in accordance with Deutsche Bank LLC's internal control rules for the purpose of countering the laundering of proceeds obtained by illegal means and the financing of terrorism.  A special internal control is executed via special programs approved by the bank and via other internal measures.

178.    Deutsche Bank Russia made the same or substantially similar statements to those in ¶177 above on February 13, April 8, July 5, 26, August 11, 12, 18, 25, September 1, 23, October 7, 14, 28, 29, November 11, 18, 25, December 17, 19, 24, 2014, on its website.

179.    On February 7, 2014, Deutsche Bank Russia made the following statements on its website:

- Integrity.  We live by the highest standards of integrity in everything we say and do.  We will do what is right——not just what is allowed.

- <u>Discipline.</u>  We live by the rules and hold ourselves accountable to deliver on our promises—no excuses. . . . We protect our company resources, thinking and acting as a prudent owner.

- <u>Partnership</u>.  We act as responsible partners with all our stakeholders and regulators.

180.    Deutsche Bank Russia made the same or substantially similar statements to those in ¶179 above on February 13, April 8, July 5, 26, August 11, 12, 18, 25, September 1, 23, October 7, 14, 28, 29, November 11, 18, 25, December 17, 19, 24, 2014, on its website.

181.    On February 12, 2014, Defendants Fitschen and Jain's statements made at the January 31, 2013 Annual Press Conference continued to be posted on Deutsche Bank's website as follows:

- We are determined to bring about deep cultural change at Deutsche Bank.  That is what clients, society, and investors demand.  Our values are clear.  We believe in fundamental integrity of dealing . . .

182.    Deutsche Bank made the same or substantially similar statements to those in ¶181 above on or about February 15, March 12, 13, 15, 21, 30, 31, April 2, 13, 18, May 9, 10, 13, 17, 18-20, 26, 28, June 5, 19, 20, 23, 25, July 1, 2,  13, 14, 16, 18, 19, 23, 24, August 7, 8, 14, 17, 19, 20, 24, 27, 29, September 1, 3, 7, 11, 16, 24, 25, October 2, 6, 17, 20, November 9, 16, 24, 29, December 2, 5, 9, 16-19, 29, 30, 2014, on its website.

183.    On or about February 12, 2014, Deutsche Bank made the following statements about its compliance systems on its website:

(1)    Compliance with laws and regulations is a matter of course.  That is why we are reinforcing a well-developed compliance structure.  To that end we have created special structures and programs.

(2)    In our view, responsible corporate governance does not only mean adherence to laws, regulations, and standards. It requires a stringent compliance system. We have defined strict rules and guidelines for our staff across the entire spectrum of our areas of activity. Through our conformity with the law, we ensure that the company, its shareholders, clients and employees are protected as comprehensively as possible.

78

(3)     [T]o support our controls systems we have substantially expanded our "Red Flag" monitoring system. It reports all violations of compliance requirements in specific areas. Violations of guidelines and procedures have always been the target of substantial disciplinary measures. We have intensified that approach by comprehensively integrating the results of monitoring into management and reporting structures as well as decisions by management relating to performance assessment, promotion and remuneration. This has already led to a perceptible improvement in conformity with the law: At the end of 2012, "Red Flag" incidents in our Corporate Banking and Securities and Global Transaction Banking departments dropped by 53 percent in comparison with the previous year.

(4)     Our anti-money laundering program provides strong support for international efforts to combat money laundering, financing terrorism and other criminal acts. We scrutinize clients and current transactions using meticulous procedures and an automated monitoring system through this compliance program.

(5)     Our anti-money laundering requirements apply worldwide to all business units of the bank, regardless of their location . . . To ensure that we always apply the best possible compliance practices, we routinely review our goals and strategies for the prevention of money laundering.

(6)     To ensure compliance, Deutsche Bank has an anti-corruption policy that is backed by: appropriate compliance training measures for staff; recording and monitoring of gifts and invitations; a worldwide whistleblowing hotline for reporting suspicious cases anonymously; risk-based procedures for monitoring third parties.

(7)     Whether in the area of money laundering, corruption, or financial crime– the compliance management system of Deutsche Bank is geared to strict conformity with the law and has been achieving good results for years.

(8)     How we combat financial crime: Deutsche Bank is committed to ensuring the robust risk management of financial crime. We have established an Anti Financial Crime Committee (AFCC), a group-wide oversight and governance body. Its responsibilities include ensuring conformity with the law, preventing criminal acts or exposing and investigating them – ranging from fraud and money laundering to insider trading and data theft. The AFCC examines and assesses all risks relating to such actions within the Deutsche Bank Group.

(9)     How we assess and accept clients:   We have developed effective procedures for assessing clients (Know Your Customer or KYC) and a process for accepting new clients in order to facilitate comprehensive compliance. Furthermore they help us to minimize risks relating to money laundering, financing of terrorism and other economic crime. Our KYC procedures start with intensive checks before accepting a client and continue in the form of regular reviews. Our procedures apply not only to

individuals and corporations that are or may become our direct business partners, but also to people and entities that stand behind them or are indirectly linked to them.

184.    Deutsche Bank made the same or substantially similar statements to those in ¶183

on February 12, 15, March 12, 13, 15, 21, 30, 31, April 2, 13, 18,, May 9, 10, 13, 17-20, 26, 28,

June 5, 19, 20, 23, 25, July 1, 2, 13, 14, 16, 18, 19, 23, 24, August 7, 8 14, 17, 19, 20, 24, 27, 29,

September 1, 3, 7, 11, 16, 24, 25, October 2, 6, 17, 20, November 9, 16, 24, 29, December 2, 5,

9, 16,-19, 29, 30, 2014, on its website.

185.    On or about February 12, 2014, Deutsche Bank represented on its website that it

has a "stable foundation" that "minimiz[es] risks and "strengthen[s] sustainability," that

"Deutsche Bank is constantly upgrading its stable system," and that in 2012 it "reinforce[d] [its]

'Red Flag' warning system."  In addition, Deutsche Bank made the following statements:

- What do we want to achieve?  We want to be a responsible business partner that attaches the highest priority to ethical conduct and integrity and protects the interests of our clients. Our corporate governance systems must guarantee monitoring, prevent rule violations and manage potential risks to the environment and society arising from our business activities in an effective manner. Our goal is to firmly embed sustainability principles into our operational activities.

- How are we achieving our goals?  As a minimum, we adhere to international standards and guidelines, in relation to areas such as compliance, data protection, anti-money laundering and corporate governance. New business initiatives, new products or changes in existing business are introduced only after they have undergone a stringent approval process.  Acting responsibly and protecting the interests of the various stakeholder groups in the process means that we constantly weigh risks against the benefits that are created. Business initiatives with a potentially negative effect on the environment or society are subjected to painstaking scrutiny. Internal standards guarantee that certain transactions in sensitive sectors can be excluded.

- What have we achieved?  We are constantly improving our management and control processes. For example, in 2011 we introduced our framework for environmental and social risks, founded our Anti Financial Crime Committee and launched our Responsible Business Initiative for the private client business area. In 2012 we were recertified once again for the next three years according to the ISO 14001 Standard, we updated our Code of Ethics, which applies group-wide, and we reinforced our control processes, for example by

introducing our "Red Flag" warning system.  With the aid of it we can identify and report violations of compliance regulations. Then the results are incorporated into decisions on promotions and bonus payments. At the end of 2012, the "Red Flag" incidents in the Corporate Banking & Securities as well as the Global Transaction Bank divisions already decreased by nearly 50% in comparison with the previous year. The corporate governance of Deutsche Bank is consistently geared to creating added value in the long term for everyone who participates directly or indirectly in our business activities.

186.    Deutsche Bank made the same or substantially similar statements to those in ¶185 above, on February 12, 15, March 12, 13, 15, 21, 30, 31, April 2, 13, 18, May 9, 10, 13, 17-20, 26, 28, June 5, 19, 20, 23, 25, July 1, 2, 13, 14, 16, 18, 19, 23, 24, August 7, 8 14, 17, 19, 20, 24, 27, 29, September 1, 3, 7, 11, 16, 24, 25, October 2, 6, 17, 20, 2014, November 9, 16, 24, 29, December 2, 5, 9, 16-19, 29, 30, 2014 on its website.

187.    On February 12, 2014, Deutsche Bank made the following statements on its website:

- An effective control and monitoring system is a necessity in order to manage a company with global activities such as Deustche Bank.  We have established sophisticated processes and structures for that purpose.

- We ensure the responsible, value-driven management and control of Deutsche Bank through our system of corporate governance. Our system functions in accordance with high international standards, including the German Stock Corporation Act and the German Corporate Governance Code, the rules of the US Securities and Exchange Commission and the New York Stock Exchange.

- The Deutsche Bank Code of Business Conduct and Ethics as well as our policies and guidelines reflect our commitment to a wide range of external standards, principles and initiatives, including: Financial Action Task Force on Money Laundering.

- In order to reverse the loss of trust in the aftermath of the financial crisis, we have initiated a change in our corporate culture and strengthened our emphasis on sustainable corporate governance: Responsibility is the focus of our actions . . . It goes without saying that any and every type of corrupt behaviour on the part of our employees is prohibited.  They are not permitted to accept, pay or approve any type of bribes.  Our policy on prevention of corruption identifies our key principles.  The measures for implementing our policies encompass: collection of information about gifts, providing a global hotline for

information about breaches of the rules, risk-based checks by independent third parties and appropriate training measures for our staff.

188.  Deutsche Bank made the same or substantially similar statements to those in ¶187 on February 12, 15, March 12, 13, 15, 21, 30, 31, April 2, 13, 18, May 9, 10, 13, 17-20, 26, 28, June 5, 19, 20, 23, 25, July 1, 2, 13, 14, 16, 18, 19, 23, 24, August 7, 8 14, 17, 19, 20, 24, 27, 29, September 1, 3, 7, 11, 16, 24, 25, October 2, 6, 17, 20, November 9, 16, 24, 29, December 2, 5, 9, 16,-19, 29, 30, 2014, on its website.

189.  On February 12, 2014, Defendants Fitschen and Jain' statements made at the January 31, 2013 Annual Press Conference continued to be posted on Deutsche Bank's website as follows:

- We are determined to bring about deep cultural change at Deutsche Bank. That is what clients, society, and investors demand.  Our values are clear.  We believe in fundamental integrity of dealing . . .

190.  The same or substantially similar statements to those in ¶189 above appeared on Deutsche Bank's website on or about February 15, March 12, 13, 15, 21, 30, 31, April 2, 13, 18, May 9, 10, 13, 17, 18-20, 26, 28, June 5, 19, 20, 23, 25, July 1, 2,  13, 14, 16, 18, 19, 23, 24, August 7, 8, 14, 17, 19, 20, 24, 27, 29, September 1, 3, 7, 11, 16, 24, 25, October 2, 6, 17, 20, November 9, 16, 24, 29, December 2, 5, 9, 16-19, 29, 30, 2014.

191.  On or about March 17, 2014, Deutsche Bank issued its 2013 Annual Report, which included a "Responsibility Statement by the Management Board" ("Responsibility Statement").[41]  The Responsibility Statement contained the following language: "To the best of our knowledge, and in accordance with the applicable reporting principles, the consolidated financial statements give a true and fair view of the assets, liabilities, financial position and profit

---

[41]  References to Deutsche Bank in the Annual Report are to Deutsche Bank Aktiengesellschaft and its consolidated subsidiaries.

or loss of the Group, and the Group management report includes a fair review of the development and performance of the business and the position of the Group, together with a description of the principal opportunities and risks associated with the expected development of the Group."   The Responsibility Statement was signed by Defendants Fitschen, Jain, Krause, Leithner, Lewis, Neske, and Ritchotte.

192.    The 2013 Annual Report included an Interview with the Chairmen of the Management Board.  Defendant Fitschen was quoted saying that "We laid solid foundations for cultural change.   We launched new values and beliefs [and] strengthened our control environment. . . ."  The Bank reiterated that "In 2013, Deutsche Bank laid the foundations for cultural change. It defined new values and beliefs [and] strengthened its governance and control mechanisms . . . . Integrity and responsibility are core principles on which cultural change rests. That is why, in 2013, we defined a clear set of values and beliefs, established guiding principles, tightened the bank's control environment and incorporated the values and beliefs in our performance management processes."

193.    The 2013 Annual Report stated that "2013 was the second consecutive year in which we have invested in the bank's future growth and in further strengthening our controls while addressing ongoing legal and regulatory issues."

194.    The 2013 Annual Report also stated that "We have laid strong foundations for long-term cultural change, by launching our new values and beliefs and significantly tightening our control environment."  It added that "Our control model across businesses, control functions and Audit will be further reinforced. We will pursue the strengthening of our control infrastructure and organization and review our business processes for additional risks."

195.    The 2013 Annual Report made the following additional representations:

- Key risk categories for us include credit risk, market risk, operational risk, business risk (including tax and strategic risk), reputational risk and liquidity risk. We manage the identification, assessment and mitigation of top and emerging risks through an internal governance process and the use of risk management tools and processes. Our approach to identification and impact assessment aims to ensure that we mitigate the impact of these risks on our financial results, long term strategic goals and reputation.

- [w]e have adopted a formal risk disclosure policy aiming to support a conclusion that our risk disclosures are in compliance with applicable legal, regulatory and accounting risk disclosure standards. A Risk Reporting Committee comprising senior representatives and subject matter experts from Finance and Risk governs our respective risk disclosure processes. Based upon our assessment and verification we believe that our risk disclosures presented throughout this risk report appropriately and comprehensively convey our overall risk profile.

196.    The 2013 Annual Report reported the following about the Bank's risk culture:

We seek to promote a strong risk culture throughout our organization. A strong risk culture is designed to help reinforce our resilience by encouraging a holistic approach to the management of risk and return throughout our organization as well as the effective management of our risk, capital and reputational profile . . . We have communicated the following risk culture behaviors through various communication vehicles: — Being fully responsible for our risks; — Being rigorous, forward looking and comprehensive in the assessment of risk; — Inviting, providing and respecting challenges; — Trouble shooting collectively; and — Placing Deutsche Bank and its reputation at the heart of all decisions.

To reinforce these expected behaviors and strengthen our risk culture, we conduct a number of group-wide activities. Our Board members and senior management frequently communicate the importance of a strong risk culture to support a consistent tone from the top. To further strengthen this message, we have reinforced our targeted training. In 2013, our employees attended more than 114,000 mandatory training modules globally including, for example, the Code of Business Conduct & Ethics, Fraud Awareness and An Introduction to MaRisk. As part of our ongoing efforts to strengthen our risk culture, we review our training suite regularly to develop further modules or enhance existing components.

197.    The 2013 Annual Report further represented the following: "We use a broad range of quantitative and qualitative methodologies for assessing and managing risks. As a matter of policy, we continually assess the appropriateness and the reliability of our quantitative tools and metrics in light of our changing risk environment."

198.   The 2013 Annual Report disclosed the following with respect to how the bank manages operational risk:

> We manage operational risk based on a Group-wide consistent framework that enables us to determine our operational risk profile in comparison to our risk appetite and systematically identify operational risk themes and concentrations to define risk mitigating measures and priorities.   The global operational risk framework is applicable to all risk types included in the definition for operational risk.   In order to cover the broad range of operational risk as outlined in the definition of operational risk, our framework applies a number of techniques. These aim to efficiently manage the operational risk in our business and are used to identify, assess and mitigate operational risk.   The applied techniques [include]:
>
> — Our Lessons Learned process is required for events, including near misses, above € 1 million. This process includes but is not limited to: — systematic risk analyzes including a description of the business environment in which the loss occurred, including previous events, near misses and event-specific Key Risk Indicators ("KRI"), — consideration of any risk management decisions in respect of the specific risk taken, — root cause analyzes, — identification of control improvements and other actions to prevent and/or mitigate recurrence, and — assessment of the residual operational risk exposure.
>
> — The Lessons Learned process serves as an important mean to identify inherent areas of risk and to define appropriate risk mitigating actions. All corrective actions are captured and monitored for resolution via actions plans in our tracking system "dbTrack". Performance of corrective actions is reported on a monthly basis to senior management via the ORMC.
>
> — We systematically utilize information on external events occurring in the banking industry to prevent similar incidents from happening to us, e. g. by particular deep dive analysis or risk profile reviews.
>
> — In addition to internal and external loss information, scenarios are utilized and actions are derived from them. The set of scenarios consists of relevant external scenarios provided by a public database and internal scenarios. The latter are generated to complete our risk profile.
>
> — Regular operational risk profile reports at Group level for our business divisions, for the countries in which we operate and for our infrastructure functions are reviewed and discussed with the department's senior management. The regular performance of the risk profile reviews enables us to detect changes to the business unit's risk profiles as well as risk concentrations across the Group early and to take corrective actions.
>
> — We assess and approve the impact of changes to our risk profile as a result of new products, outsourcings, strategic initiatives and acquisitions and divestments.

— Once operational risks are identified, mitigation is required following the "as low as reasonably practicable (ALARP)" principle by balancing the cost of mitigation with the benefits thereof and formally accepting the residual operational risk. Risks which contravene applicable national or international regulations and legislation cannot be accepted; once identified, such risks must always be mitigated.

— We monitor risk mitigating measures identified via operational risk management techniques for resolution within our tracking tool "dbTrack". Residual operational risks rated higher than important need to be accepted by the bearing divisions and the ORMC.

— We perform top risk analyzes in which the results of the aforementioned activities are considered. The Top Risk Analyzes are a primary input for the annual operational risk management strategy and planning process. Besides the operational risk management strategic and tactical planning we define capital and expected loss targets which are monitored on a regular basis within a quarterly forecasting process.

— KRIs are used to monitor the operational risk profile and alert the organization to impending problems in a timely fashion. They allow via our tool "dbScore" the monitoring of the bank's control culture and business environment and trigger risk mitigating actions. KRIs facilitate the forward looking management of operational risk based on early warning signals returned by the KRIs.

— In our bottom-up Self Assessment ("SA") process, which is conducted at least annually, areas with high risk potential are highlighted and risk mitigating measures to resolve issues are identified. In general, it is performed in our tool "dbSAT". On a regular basis we conduct risk workshops aiming to evaluate risks specific to countries and local legal entities we are operating in and take appropriate risk mitigating actions are utilized to complement the global operational risk framework and specifically address the individual risk types. These include but are not limited to:

— Fraud Risk is managed based on section 25a of the German Banking Act as well as other legal and regulatory requirements on a risk based approach, governed by the Global Anti-Fraud Policy and corresponding Compliance and Anti-Money-Laundering (AML) framework. In line with regulatory requirements a global risk assessment is performed on a regular basis. Within the general management of operational risks dedicated Fraud Risk relevant aspects are part of the Self Assessments.

199.    The 2013 Annual Report disclosed the following with respect to measuring the

Bank's effectiveness of internal controls:

Each year, management of the Group undertakes a formal evaluation of the adequacy and effectiveness of the system of ICOFR. This evaluation incorporated an assessment of the

effectiveness of the control environment as well as individual controls which make up the system of ICOFR taking into account:

— The financial misstatement risk of the financial statement line items, considering such factors as materiality and the susceptibility of the particular financial statement item to misstatement.

— The susceptibility of identified controls to failure, considering such factors as the degree of automation, complexity, risk of management override, competence of personnel and the level of judgment required.

These factors, in aggregate, determine the nature and extent of evidence that management requires in order to be able to assess whether or not the operation of the system of ICOFR is effective. The evidence itself is generated from procedures integrated with the daily responsibilities of staff or from procedures implemented specifically for purposes of the ICOFR evaluation. Information from other sources also forms an important component of the evaluation since such evidence may either bring additional control issues to the attention of management or may corroborate findings. Such information sources include:

— Reports on audits carried out by or on behalf of regulatory authorities;

— External Auditor reports;

— Reports commissioned to evaluate the effectiveness of outsourced processes to third parties.

In addition, Group Audit evaluates the design and operating effectiveness of ICOFR by performing periodic and ad-hoc risk-based audits. Reports are produced summarizing the results from each audit performed which are distributed to the responsible managers for the activities concerned. These reports, together with the evidence generated by specific further procedures that Group Audit performs also provide evidence to support the annual evaluation by management of the overall operating effectiveness of the ICOFR.

As a result of the evaluation, management has concluded that ICOFR is appropriately designed and operating effectively as of December 31, 2013.

200.    With respect to Deutsche Bank's risk reporting and measurement systems, the 2013 Annual Report stated that "[o]ur risk management systems are reviewed by Group Audit following a risk-based audit approach.  As a consequence our Management Board believes, for the purpose of Article 435 CRR, that our risk management systems are adequate with regard to our risk profile and strategy."

201.    The 2013 Annual Report disclosed the following financial revenue metrics: consolidated total net revenues of €31.9 billion for the full year ended 2013; consolidated total

net revenues of €33.7 billion for the full year ended 2012; total net revenues for Rest of Europe, Middle East and Africa of €4.5 billion for the full year 2013; and total net revenues for Rest of Europe, Middle East and Africa of €5.1 billion for the full year ended 2012.

202.   On March 20, 2014, Deutsche Bank filed a Form 20-F for the fiscal year ended December 31, 2013 (the "2013 20-F") with the SEC, with false and misleading statements substantially similar to those set forth in the Bank's 2013 Annual Report, including that "Fraud Risk is managed based on section 25a of the German Banking Act as well as other legal and regulatory requirements on a risk based approach, governed by the Global Anti-Fraud Policy and corresponding Compliance and Anti-Money-Laundering (AML) framework.   In line with regulatory requirements a global risk assessment is performed on a regular basis.   Within the general management of operational risks dedicated Fraud Risk relevant aspects are part of the Self Assessments."

203.   The 2013 20-F was signed by Defendants Fitschen, Jain, and Krause. The 2013 20-F also contained signed SOX certifications by Defendants Fitschen, Jain, and Krause attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

204.   On or about March 26, 2014, Deutsche Bank issued its 2013 Corporate Responsibility Report, which contained the following statements by Defendants Fitschen and Jain, featured prominently at the front of the Report:

- Eighteen months ago, we launched Deutsche Bank's Strategy 2015+ . . . As one of the key elements of this strategy, we committed ourselves to placing Deutsche Bank at the forefront of cultural change in our industry.  Restoring the bond of trust with society is a top priority – for the banking industry and for Deutsche Bank.

- During 2013, we laid important foundations for sustainable, long-term change. We defined a new set of Values and Beliefs, which define the type of

institution Deutsche Bank aspires to be. We developed these after seeking the views of some 52,000 of our staff, and launched them in our organization in July with the help of the bank's top-250 leaders. Together with our colleagues in the Group Executive Committee, we personally presented and discussed the new Values and Beliefs with more than 11,000 of our people.

- Our priority now is to embed these Values and Beliefs in everyday behaviors. To achieve this, we have changed the way we measure and manage performance. For example: Adherence to our Values and Beliefs now plays a significant role in determining the pay and prospects of Deutsche Bank staff.

- The path to cultural change also involves reinforcing our internal controls. During 2013, we significantly strengthened our Legal and Compliance capabilities and enhanced our risk management mechanisms. In addition, we are further reinforcing our control model across businesses, control functions and Group Audit – our "three lines of defense" against potential problems.

205.    The 2013 Corporate Responsibility Report made the following representations:

- A strong control framework must be accompanied by a culture that encourages employees to do the right thing, although it may not be mandated by the rules, regulations or legislation.  We have strengthened our compliance program and are further building a strong risk-focused culture, for example through expanding our Red Flags initiative.

- We have laid strong foundations for long-term cultural change by significantly tightening our control environment.  The Supervisory Board intensified its oversight of ethics through the creation of an Integrity Committee.  Our Risk Culture Initiatives Program reinforces the importance of employee behaviors. An enhanced Reputational Risk Management Program emphasizes individual responsibilities and provides guidance for business managers.

- Our policies and guidelines reflect our commitment to a wide range of external standards, principles and initiatives, including . . . Transparency International's Corruption Perceptions Index [and] Financial Action Task Force on Money Laundering.

- Any material issues or concerns about conduct must be reported and addressed. We maintain an open and supportive environment that encourages employees to raise questions and concerns, which can be discussed with supervisors or contacts in the bank, including the Compliance, Anti-Money Laundering, Anti-Bribery and AntiCorruption, Legal or Human Resources teams. Employees also have access to a hotline to report potentially unethical or inappropriate business practices anonymously. We operate an anti-retaliation policy regarding whistleblowers.

- Extensive training reinforces our standards. During 2013, 97% of the global bank population completed Compliance, Financial Crime and Risk Culture trainings. Over 300,000 assignments were completed by 83,223 staff across 70 countries and in ten languages.

206.    The 2013 Corporate Responsibility Report explained how Deutsche Bank is

"ensuring robust corporate governance":

- We ensure the responsible, value-driven management and control of Deutsche Bank through our system of corporate governance. Our system functions in accordance with high international standards, including the German Stock Corporation Act and the German Corporate Governance Code, the rules of the US Securities and Exchange Commission and the New York Stock Exchange.

- In 2013, our Supervisory Board intensified its oversight of ethics through the creation of an Integrity Committee. The committee advises and monitors the Management Board on its measures to ensure the economically sound, sustainable development of the company while protecting the resources of the natural environment, maintaining social responsibility and observing the principles of sound, responsible management and corporate governance. It is also concerned with the integration of these aspects into corporate culture. In particular, the committee deals with: -Monitoring the Management Board's measures to ensure the bank's compliance with legal requirements, authorities' regulations and the company's own in-house policies. -Regular review of the bank's Code of Business Conduct and Ethics with a view to fostering ethical and moral conduct within and outside the bank. -Precautionary monitoring and strategic analysis of the bank's legal and reputational risks that could place the entire bank at risk or lead to material claims for damages against current or former Management Board members and regularly advising and monitoring the Management Board with a view to avoiding such risks.

207.    The 2013 Corporate Responsibility Report also explained how Deutsche Bank is

"[a]cting against money laundering, bribery, corruption and other criminal activities":

- In 2013, we enhanced the governance, resources and processes of the Anti-Money Laundering (AML) function. Anti-Fraud, Anti-Bribery and Anti-Corruption were consolidated within the existing global AML function, and the new Head of AML & Financial Crime reports directly to the Management Board. The consolidated division is tasked with reinforcing policies, procedures and controls as well as communicating our zerotolerance stance on bribery and corruption to all employees, clients and third parties.

- Deutsche Bank is dedicated to complying with all applicable anti-fraud, anti-bribery and anti-corruption laws and regulations of the countries in which we

operate. We do not tolerate fraud, bribery or any form of corruption, and we do not provide or accept improper inducements in the course of our business dealings. All of our employees as well as third parties that act on Deutsche Bank's behalf are strictly prohibited from having any involvement in acts of fraud, bribery or corruption. If we cannot obtain or retain business without improper conduct, then we do not engage in that business.

- The Anti-Fraud, Anti-Bribery and Anti-Corruption program is strengthening policies, procedures and controls to address operational business risks. As part of this initiative, we have commissioned an assessment of global fraud, bribery and corruption risk in all divisions. Approximately 180 risk assessment workshops have taken place across all our major hubs, and the outputs will enhance our fraud, bribery and corruption risk management framework.

- Adherence to anti-money laundering regulations is absolutely fundamental to all Deutsche Bank entities regardless of geographic location. Each entity is required to adhere to minimum standards based on the German Banking Act, the German AntiMoney Laundering Act and the current guidelines of the German Federal Financial Supervisory Authority as well as further guiding principles on anti-money laundering.

- To familiarize staff with the relevant laws and regulations, as well as our policies and procedures to detect money laundering, we conduct training courses, including those stipulated by the German Anti-Money Laundering Act. All new employees receive this training and take refresher courses at least every two years.

- The 2013 training program concentrated on information protection and interest rate submissions as well as creating new training modules on sanctions, anti-money laundering, anti-bribery and anti-corruption. We are rolling out training on financial crime to all staff globally in 2014.

  - **Knowing our customers**. Effective action against money laundering relies on adequate and up-to-date information on client relationships. Know-Your-Customer (KYC) is an ongoing process, from the adoption of the client throughout the life of the relationship. Deutsche Bank's KYC policies cover new client adoption as well as regular reviews and screening of existing client relationships against internal and external lists of negative information. These policies provide a framework for governance, management oversight, risk assessment and escalation of potential risks to senior management.

  - **Knowing our customers**. As part of a group-wide KYC program, we performed a detailed assessment of existing KYC standards across business divisions and infrastructure functions in 2013 to identify effective measures to further strengthen the bank's defenses. We have begun an in-

depth review of the adherence of operations in 48 countries to Deutsche Bank principles. We will also establish a KYC Center of Excellence as a dedicated unit within the Anti-Money Laundering organization. This will bring together relevant subject matter expertise and will provide central oversight and advice, including guidance on KYC best practices.

208.    The 2013 Corporate Responsibility Report also explained how Deutsche Bank is

"[b]uilding a strong risk culture":

- Our Risk Culture Initiatives program reinforces the importance of employee behaviors for the bank's long-term success. This program emphasizes five behaviors that employees need to demonstrate: — Being fully responsible for the bank's risks — Being rigorous, forward-looking and comprehensive in assessing risk — Inviting, providing and respecting challenge — Trouble-shooting collectively — Placing Deutsche Bank and its reputation at the heart of all decisions.

- The importance of adhering to these behaviors is communicated through a variety of channels across all levels of the organization.

- The program also identifies and supports the implementation of mandatory Risk Culture training for all employees. In 2013, 82,028 employees enrolled in at least one Risk Culture course, covering topics such as fraud awareness, risk awareness and MaRisk (minimum requirements for risk management).

- **Using "Red Flags" to monitor risk-related behavior**.  The Risk Culture program's Red Flags initiative uses objective measures to assess employees' adherence to risk-related policies and processes. It allows senior managers to address risks more effectively and creates a stronger link between behavior and reward.

- Employees in breach of an applicable policy or process receive a Red Flag. All Red Flags are risk-weighted depending on the severity and frequency of the incident. Aggregated Red Flag scores are taken into account in reviews of performance, pay and promotion.

- Since its inception, the Red Flags process has been rolled out to Corporate Banking and Securities, Global Transaction Banking, Deutsche Asset and Wealth Management, Risk and the Non-Core Operations Unit. Further roll-outs are planned throughout 2014.

- Some Red Flag categories, such as overdue mandatory training and unauthorized employee trading, are relevant to all divisions and functions. Other categories, such as unauthorized crossings of "Chinese walls" or credit limits are specific to each division's risk profile. Red Flag categories are

reviewed on a regular basis – new indicators may be added, old ones retired or existing ones amended as appropriate.

- The system is designed to promote compliance, and where possible we help employees to avoid Red Flags. For example, employees receive automated e-mail reminders when they are enrolled in mandatory training or when they need to take mandatory time away. Supervisors are also able to access information on risks and policy breaches in their business areas.

- Since introducing Red Flags, the number of breaches has decreased steadily, indicating a positive change in risk-related behaviors.

209.    On or about March 31, 2014, Deutsche Bank Russia publicly issued IFRS Financial Statements for the year ended December 31, 2013.  The 2013 Financial Statements and related disclosures were approved by the Management Board.  Defendant Bongartz signed the 2013 Financial Statements and related disclosures.

210.    The 2013 Financial Statements for Deutsche Bank Russia made the following statements with respect to risk management:

- The Bank has a dedicated risk management function on a global level to ensure that oversight and monitoring of risk is achieved in a robust manner.

- Management is responsible for identifying and assessing risks, designing controls and monitoring their effectiveness. Management monitors the effectiveness of the Bank's internal controls and periodically implements additional controls or modifies existing controls as considered necessary.

- The Bank developed a system of standards, policies and procedures to ensure effective operations and compliance with relevant legal and regulatory requirements, including the following areas: requirements for appropriate segregation of duties, including the independent authorization of transactions; requirements for the recording, reconciliation and monitoring of transactions; compliance with regulatory and other legal requirements; documentation of controls and procedures; requirements for the periodic assessment of operational risks faced, and the adequacy of controls and procedures to address the risks identified; requirements for the reporting of operational losses and proposed remedial action; development of contingency plans; training and professional development; ethical and business standards; and risk mitigation, including insurance where this is effective.

- There is a hierarchy of requirements for authorization of transactions depending on their size and complexity. A significant portion of operations are automated and the Bank put in place a system of automated controls.

- Compliance with the Bank's standards is supported by a program of periodic reviews undertaken by the Internal Audit function. The Internal Audit function is independent from management and reports directly to the Supervisory Board. The results of the Internal Audit reviews are discussed with relevant business process managers, with summaries submitted to the Supervisory Board and senior management of the Bank.

- Management believes that the Bank complies with the CBR [Central Bank of the Russian Federation] requirements related to risk management and internal control systems, including requirements related to the Internal Audit function, and that risk management and internal control systems are appropriate for the scale, nature and complexity of operations.

- The organizational risk management and functions, tasks and authorities of the employees, committees and departments involved in the management of risk are clearly and unambiguously defined. All principles and guidelines are reviewed regularly and adapted and enhanced in line with internal and external developments.

- The Bank has a dedicated risk management function on a global level to ensure that oversight and monitoring of risk is achieved in a robust manner. This function is performed by the Risk Division under the lead of the Chief Risk Officer, who is a member of the Management Board, and is responsible for the identification, assessment, management and reporting of risks arising within operations across all businesses and risk types.

211.    The 2013 Financial Statements for Deutsche Bank Russia disclosed the following financial revenue metrics: net fee and commission income of RUB 1.3 billion for full year ended December 2013 and net fee and commission income of RUB 1.1 billion for full year ended December 2012.

212.    On or about April 2014, Deutsche Bank made the following public statements:

- We earn the trust of all of our stakeholders by always acting with integrity and holding ourselves to high standards. We seek to go beyond what is allowed and to do what is right.

- We do not tolerate corruption or any form of bribery and we do not provide or accept improper inducements in the course of our business dealings. We are an active participant in international and local efforts to combat financial

crime, including fraud, corruption, money laundering and the funding of terrorist and criminal activities. We also have an ongoing commitment to maintain effective controls to help prevent and detect illegal and unethical business practices.

- We maintain the trust of our shareholders, clients, business partners, colleagues and the communities in which we operate by keeping our commitments and acting with honesty and integrity in all of our business dealings.

- We comply with all laws and regulations . . . We do not engage with any external party that is involved in illegal or improper activities.

213.    Deutsche Bank made the following statements on its website in November 2014:

- Deutsche Bank Group will examine its Anti Money Laundering strategies, goals and objectives on an ongoing basis and maintains an effective Anti Money Laundering program for the Bank's business that reflects the best practices for a diversified, global financial services provider.

- Adherence to the Deutsche Bank Group Anti-Money Laundering Program is the responsibility of all employees. The program is formulated and directed by the Global Head of Anti Money Laundering. The program includes client screening and monitoring requirements, "know your customer" policies (including the requirement to establish the identity of beneficial owners), Embargo policies, record keeping requirements, the reporting of suspicious circumstances in accordance with relevant laws, and AML training.

214.    Deutsche Bank made the same or substantially similar statements to those in ¶213 on November 9, 16, 24, 29, December 2, 5, 9, 16, 19, 29, 30, 2014, on its website.

215.    The statements referenced in ¶¶172-190, 192-202, 204-208, 210-214 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the banks' internal controls, anti-money laundering compliance, culture, business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that, as explained in detail *supra*: (1) Deutsche Bank and Deutsche Bank Russia had serious and systemic failings in their systems and controls against money laundering, financing terrorism, aiding against international sanctions, and

committing financial crimes; (2) Deutsche Bank and Deutsche Bank Russia's internal systems and controls over financial reporting and their disclosure controls and procedures were not effective; (3) the culture at Deutsche Bank and Deutsche Bank Russia had not changed, as employees, including top management in Russia, were engaging in money-laundering activities; (4) with respect to the reported financial revenue and/or income metrics, Deutsche Bank and Deutsche Bank Russia failed to disclose that a portion of those financial metrics were derived from illicit activities such as money laundering; and (5) as a result, Deutsche Bank and Deutsche Bank Russia's public statements were materially false and misleading at all relevant times.

### C. False and Misleading Statements Made in 2015

216.    On January 2, 2015, Defendants Fitschen' statements made at the January 31, 2013 Annual Press Conference continued to be posted on Deutsche Bank's website as follows:

- We are determined to bring about deep cultural change at Deutsche Bank. That is what clients, society, and investors demand.  Our values are clear.  We believe in fundamental integrity of dealing . . .

217.    The same or substantially similar statements to those in ¶216 above appeared on Deutsche Bank's website on January 26, February 16, 18, 19, 25, March 11, 15, 16, 18, 23, 26, 30, April 1, 2, 17, 18, 29, 30, May 9, 10, 18, 21, 25, 29, June 4, 9, 10, 24, 26, 28, 29, July 1, 2, 5, 21, 27, 28, August 1, 3, 10, 13, 18, 20, September 5-7, 10, 12, 15, 18, October 2, 12, 27, 30, December 5, 2015.

218.    On January 2, 2015, Deutsche Bank made the following statements on its website:

- An effective control and monitoring system is a necessity in order to manage a company with global activities such as Deustche Bank.  We have established sophisticated processes and structures for that purpose.

- We ensure the responsible, value-driven management and control of Deutsche Bank through our system of corporate governance. Our system functions in accordance with high international standards, including the German Stock Corporation Act and the German Corporate Governance Code, the rules of the US Securities and Exchange Commission and the New York Stock Exchange.

- The Deutsche Bank Code of Business Conduct and Ethics as well as our policies and guidelines reflect our commitment to a wide range of external standards, principles and initiatives, including: Financial Action Task Force on Money Laundering.

- In order to reverse the loss of trust in the aftermath of the financial crisis, we have initiated a change in our corporate culture and strengthened our emphasis on sustainable corporate governance: Responsibility is the focus of our actions . . . It goes without saying that any and every type of corrupt behaviour on the part of our employees is prohibited. They are not permitted to accept, pay or approve any type of bribes. Our policy on prevention of corruption identifies our key principles. The measures for implementing our policies encompass: collection of information about gifts, providing a global hotline for information about breaches of the rules, risk-based checks by independent third parties and appropriate training measures for our staff.

219. Deutsche Bank made the same or substantially similar statements to those in ¶218 on January 26, February 16, 18, 19, 25, March 11, 15, 16, 18, 23, 26, 30, April 1, 2, 17, 18, 29, 30, May 9, 10, 18, 21, 25, 29, June 4, 9, 10, 24, 26, 28, 29, July 1, 2, 5, 21, 27, 28, August 1, 3, 10, 13, 18, 20, September 5-7, 10, 12, 15, 18, October 2, 12, 27, 30, December 5, 2015, on its website.

220. On or about January 2, 2015, Deutsche Bank made the following statements about its compliance systems on its website:

- Compliance with laws and regulations is a matter of course. That is why we are reinforcing a well-developed compliance structure. To that end we have created special structures and programs.

- In our view, responsible corporate governance does not only mean adherence to laws, regulations, and standards. It requires a stringent compliance system. We have defined strict rules and guidelines for our staff across the entire spectrum of our areas of activity. Through our conformity with the law, we ensure that the company, its shareholders, clients and employees are protected as comprehensively as possible.

- [T]o support our controls systems we have substantially expanded our "Red Flag" monitoring system. It reports all violations of compliance requirements in specific areas.

- Our anti-money laundering program provides strong support for international efforts to combat money laundering, financing terrorism and other criminal

acts. We scrutinize clients and current transactions using meticulous procedures and an automated monitoring system through this compliance program.

- Our anti-money laundering requirements apply worldwide to all business units of the bank, regardless of their location . . . To ensure that we always apply the best possible compliance practices, we routinely review our goals and strategies for the prevention of money laundering.

- To ensure compliance, Deutsche Bank has an anti-corruption policy that is backed by: appropriate compliance training measures for staff; recording and monitoring of gifts and invitations; a worldwide whistleblowing hotline for reporting suspicious cases anonymously; risk-based procedures for monitoring third parties.

- How we combat financial crime: Deutsche Bank is committed to ensuring the robust risk management of financial crime. We have established an Anti Financial Crime Committee (AFCC), a group-wide oversight and governance body. Its responsibilities include ensuring conformity with the law, preventing criminal acts or exposing and investigating them – ranging from fraud and money laundering to insider trading and data theft. The AFCC examines and assesses all risks relating to such actions within the Deutsche Bank Group.

- How we assess and accept clients:  We have developed effective procedures for assessing clients (Know Your Customer or KYC) and a process for accepting new clients in order to facilitate comprehensive compliance. Furthermore they help us to minimize risks relating to money laundering, financing of terrorism and other economic crime. Our KYC procedures start with intensive checks before accepting a client and continue in the form of regular reviews. Our procedures apply not only to individuals and corporations that are or may become our direct business partners, but also to people and entities that stand behind them or are indirectly linked to them.

221.    Deutsche Bank made the same or substantially similar statements to those in ¶220 on January 26, February 16, 18, 19, 25, March 11, 15, 16, 18, 23, 26, 30, April 1, 2, 17, 18, 29, 30, May 9, 10, 18, 21, 25, 29, June 4, 9, 10, 24, 26, 28, 29, July 1, 2, 5, 21, 27, 28, August 1, 3, 10, 13, 18, 20, September 5-7, 10, 12, 15, 18, October 2, 12, 27, 30, December 5, 2015, on its website.

222.    On or about January 2, 2015, Deutsche Bank represented on its website that it has a "stable foundation" that "minimiz[es] risks and "strengthen[s] sustainability," that "Deutsche

Bank is constantly upgrading its stable system," and that in 2012 it "reinforce[d] [its] 'Red Flag' warning system."  In addition, Deutsche Bank made the following statements:

- What do we want to achieve?  We want to be a responsible business partner that attaches the highest priority to ethical conduct and integrity and protects the interests of our clients. Our corporate governance systems must guarantee monitoring, prevent rule violations and manage potential risks to the environment and society arising from our business activities in an effective manner. Our goal is to firmly embed sustainability principles into our operational activities.

- How are we achieving our goals?  As a minimum, we adhere to international standards and guidelines, in relation to areas such as compliance, data protection, anti-money laundering and corporate governance. New business initiatives, new products or changes in existing business are introduced only after they have undergone a stringent approval process.  Acting responsibly and protecting the interests of the various stakeholder groups in the process means that we constantly weigh risks against the benefits that are created. Business initiatives with a potentially negative effect on the environment or society are subjected to painstaking scrutiny. Internal standards guarantee that certain transactions in sensitive sectors can be excluded.

- What have we achieved?  We are constantly improving our management and control processes. For example, in 2011 we introduced our framework for environmental and social risks, founded our Anti Financial Crime Committee and launched our Responsible Business Initiative for the private client business area. In 2012 we were recertified once again for the next three years according to the ISO 14001 Standard, we updated our Code of Ethics, which applies group-wide, and we reinforced our control processes, for example by introducing our "Red Flag" warning system.  With the aid of it we can identify and report violations of compliance regulations. Then the results are incorporated into decisions on promotions and bonus payments. At the end of 2012, the "Red Flag" incidents in the Corporate Banking & Securities as well as the Global Transaction Bank divisions already decreased by nearly 50% in comparison with the previous year. The corporate governance of Deutsche Bank is consistently geared to creating added value in the long term for everyone who participates directly or indirectly in our business activities.

223.    Deutsche Bank made the same or substantially similar statements to those in ¶222 on January 26, February 16, 18, 19, 25, March 11, 15, 16, 18, 23, 26, 30, April 1, 2, 17, 18, 29, 30, May 9, 10, 18, 21, 25, 29, June 4, 9, 10, 24, 26, 28, 29, July 1, 2, 5, 21, 27, 28, August 1, 3,

10, 13, 18, 20, September 5-7, 10, 12, 15, 18, October 2, 12, 27, 30, December 5, 2015, on its website.

224.     On or about February 9, 2015, Deutsche Bank Russia stated on its website that in order to counter the laundering of proceeds obtained by illegal means and the financing of terrorism, the bank executes controls in accordance with the Russian Federation legislation on countering the laundering of proceeds obtained by illegal means and the financing of terrorism. Deutsche Bank Russia further represented that special internal control measures are performed in accordance with Deutsche Bank LLC's internal control rules for the purpose of countering the laundering of proceeds obtained by illegal means and the financing of terrorism.   A special internal control is executed via special programs approved by the bank and via other internal measures.

225.     Deutsche Bank Russia made the same or substantially similar statements to those in ¶224 on February 9, 17, March 18, 26, 29, July 13, October 3, September 5, 6, 15, 2015, on its website.

226.     On February 9, 2015, Deutsche Bank Russia made the following statements on its website:

- Integrity.  We live by the highest standards of integrity in everything we say and do.  We will do what is right——not just what is allowed.

- Discipline.  We live by the rules and hold ourselves accountable to deliver on our promises—no excuses. . . . We protect our company resources, thinking and acting as a prudent owner.

- Partnership.  We act as responsible partners with all our stakeholders and regulators.

227.     Deutsche Bank Russia made the same or substantially similar statements to those in ¶226 on February 17, March 18, 26, 29, July 13, October 3, September 5, 6, 2015, on its website.

228.    On or about March 4, 2015, Deutsche Bank issued its 2014 Annual Report, which included a "Responsibility Statement by the Management Board" ("Responsibility Statement").[42] The Responsibility Statement contained the following language:  "To the best of our knowledge, and in accordance with the applicable reporting principles, the consolidated financial statements give a true and fair view of the assets, liabilities, financial position and profit or loss of the Group, and the Group management report includes a fair review of the development and performance of the business and the position of the Group, together with a description of the principal opportunities and risks associated with the expected development of the Group."  The Responsibility Statement was signed by Defendants Fitschen, Leithner, Ritchotte, Jain, Lewis, Christ, Krause, and Neske.

229.    The 2014 Annual Report stated that "Deutsche Bank has come a long way since 2012: Today it is a stronger, safer, better balanced and more responsible institution."

230.    The 2014 Annual Report included an Interview with the Chairmen of the Management Board.  Defendants Fitschen and Jain made the following statements:

Q:    You have stated that cultural change is crucial to restore trust in the banking industry.  Did Deutsche Bank sustain that effort in 2014?

A:    [Fitschen] We certainly did. We continued our investments to reinforce our Three Lines of Defense against conduct-related issues, and since we launched this initiative we have added some 700 people to the control units in our businesses. In CB&S, we established our Conduct and Control Group and put some 6,000 people, around 90% of our CB&S staff, through dedicated compliance and risk culture workshops. In Germany, around 400 Managing Directors, approximately 90% of our total, have now completed two-day seminars organized in cooperation with the Cologne Institute for Economic Research. We completed more than half a million compliance and risk culture training sessions, a third more than in 2013. We strengthened our governance structure by adding specific Management Board responsibilities for litigation and legal matters and by

---

[42]  References to Deutsche Bank in the Annual Report are to Deutsche Bank Aktiengesellschaft and its consolidated subsidiaries.

electing new members to our Group Executive Committee with dedicated responsibilities for compliance and regulatory affairs.

Q:      Is cultural change altering the way Deutsche Bank does business?

A:      [Jain]  Absolutely. CB&S, for example, restricted the sale of complex derivative products to specific client segments and discontinued business altogether with some clients where we saw potential reputational risks or where the business was not aligned to our values. In addition, we scrutinized over 1,250 potential transactions for possible environmental or social risks during 2014 – nearly double the number in 2013, and we reaffirmed our clear policy on potential transactions that may impact UNESCO World Heritage sites.

Q:      To sum up: Where does Deutsche Bank stand today?

A:      [Fistchen]  We are well aware that we still face challenges on the road ahead, but we believe it is important to look back at the road we have travelled since 2012. We have nearly doubled our core capital ratio, cut our balance sheet by nearly a quarter, or over € 500 billion, achieved robust performance across all four core businesses, invested significantly in infrastructure, systems and controls, and committed ourselves irreversibly to cultural change. Quite simply: Deutsche Bank today is a stronger, safer, better balanced and more responsible institution.

231.    The 2014 Annual Report made the following statements with respect to the

Bank's culture:

Deutsche Bank advanced and further embedded its cultural transformation in 2014. The bank recognizes the need for cultural change in the financial sector and is committed to being at the forefront of this change. Cultural change is also a prerequisite for restoring public trust in the banking industry. Deutsche Bank emphasizes integrity above all and is committed to a culture that aligns risks and rewards, attracts and develops talented individuals, fosters teamwork and partnership, and is sensitive to the needs of the society in which it operates. As part of Strategy 2015+, the bank launched a broad cultural change program. In the context of that cultural change program the bank conducted 100 town hall meetings and around 4,700 workshops in 2014 that covered the way the bank does business every day as well as employee performance reviews and the compensation system.

232.    The 2014 Annual Report also represented that "Effective corporate governance in

accordance with high international standards is very important to Deutsche Bank. In 2014, the

bank reaffirmed its strong commitment to responsible management and efficient control

structures with its House of Governance initiative and Three Lines of Defense program."

233.    It further represented that Deutsche Bank has taken concrete actions that strengthened and reinforced its controls:

> The Three Lines of Defense program is an integral part of Deutsche Bank's strategic agenda. It was initiated in the fourth quarter of 2013 by the Management Board in the context of heightened regulatory standards. The program builds on lessons learned from past control failures and aims to reinforce Deutsche Bank's non-financial risk management capabilities and compliance culture across all corporate divisions and infrastructure functions. Furthermore, it ensures consistency across the ongoing control enhancement initiatives throughout the bank. Deutsche Bank defines the three Lines of Defense as follows: The First Line of Defense includes all corporate divisions and selected infrastructure functions. First Line of Defense units are ultimately accountable for all risks and controls in their business processes. The Second Line of Defense encompasses all control functions such as Risk, Compliance, Legal, Human Resources, Finance and Tax. These are responsible for the design of Deutsche Bank's policy framework and independent risk assessment. Second Line of Defense units are independent from the First Line of Defense. The Third Line of Defense is Group Audit, which is responsible for providing independent and objective assurance on the effectiveness of risk management, internal controls and governance processes. In 2014, a systematic review was performed of Deutsche Bank's non-financial risk and control organizations and supporting management processes. This led to the following changes: − The bank established dedicated control units in each First Line of Defense to reinforce the division's accountability for the management of their control environment. − The risk and control responsibilities across the Second Line of Defense control functions were realigned within a common risk and control framework. For selected risks, new initiatives were launched to further strengthen Deutsche Bank's control framework. − The risk and control assessment approach was enhanced towards an integrated framework shared by all three Lines of Defense to ensure the use of common standards.

234.    The 2014 Annual Report stated that "Deutsche Bank increased scrutiny of client selection and business practices in light of the values. The bank also tightened its control environment by adopting a robust governance structure in which the business divisions take on increased responsibility for managing risk under the Three Lines of Defense program. The divisions continued to enhance client centricity by further developing client-product suitability assessments and internally introducing new client metrics. Deutsche Bank also launched a revised Code of Business Conduct and Ethics that guides employees' interactions with each other as well as external stakeholders."

235.    As an example of the cultural change it was implementing, Deutsche Bank stated that over the course of 2014, the Bank rigorously enhanced its systems and controls to monitor compliance with the bank's policies.  Moreover, the Corporate Banking and Securities' control and conduct organization was strengthened as an independent control unit within the business.

236.    The 2014 Annual Report further stated: "we live by the highest standards of integrity in everything we say and do."

237.    The 2014 Annual Report made the following additional representations:  "Key risk categories for us include credit risk, market risk, operational risk (including legal risk), business risk (including tax and strategic risk), reputational risk, liquidity risk, model risk and compliance risk (MaRisk, i.e., minimum requirements for risk management). We manage the identification, assessment and mitigation of top and emerging risks through an internal governance process and the use of risk management tools and processes. Our approach to identification and impact assessment aims to ensure that we mitigate the impact of these risks on our financial results, long term strategic goals and reputation."

238.    It further added: "[w]e have adopted a formal risk disclosure policy aiming to support a conclusion that our risk disclosures are in compliance with applicable legal, regulatory and accounting risk disclosure standards. A Risk Disclosure Committee comprising senior representatives and subject matter experts from Finance and Risk governs our respective risk disclosure processes. Based upon our assessment and verification we believe that our risk disclosures presented throughout this risk report appropriately and comprehensively convey our overall risk profile."

239.    The 2014 Annual Report reported the following about the Bank's risk culture:

We seek to promote a strong risk culture throughout our organization. A strong risk culture is designed to help reinforce our resilience by encouraging a holistic

approach to the management of risk and return throughout our organization as well as the effective management of our risk, capital and reputational profile . . . We have communicated the following risk culture behaviors through various communication vehicles: — Being fully responsible for our risks; — Being rigorous, forward looking and comprehensive in the assessment of risk; — Inviting, providing and respecting challenges; — Trouble shooting collectively; and — Placing Deutsche Bank and its reputation at the heart of all decisions.

To reinforce these expected behaviors and strengthen our risk culture, we conduct a number of group-wide activities. Our Board members and senior management frequently communicate the importance of a strong risk culture to support a consistent tone from the top. To further strengthen this message, we have reinforced our targeted training. In 2014, our employees attended more than 88,000 mandatory training modules globally including, for example, Global Information Security Awareness, An Introduction to MaRisk and the newly introduced 'Tone from the Top' module. As part of our ongoing efforts to strengthen our risk culture, we review our training suite regularly to develop further modules or enhance existing components.

240.    The 2014 Annual Report further represented that "[w]e use a broad range of quantitative and qualitative methodologies for assessing and managing risks. As a matter of policy, we continually assess the appropriateness and the reliability of our quantitative tools and metrics in light of our changing risk environment."

241.    The Bank also disclosed the following with respect to how it manages operational risk:

We manage operational risk based on a Group-wide consistent framework that enables us to determine our operational risk profile in comparison to our risk tolerance, to systematically identify operational risk themes and concentrations, and to define risk mitigating measures and priorities. The global operational risk framework is applicable to all risk types included in the definition for operational risk.  In order to cover the broad range of operational risk types as outlined in the definition of operational risk, our framework contains a number of operational risk management techniques. These aim to efficiently manage the operational risk in our business and are used to identify, assess and mitigate operational risks.  The applied techniques [include]:

— The Lessons Learned process is triggered for events, including near misses, above € 1 million. This process includes, but is not limited to: — systematic risk analyses, including a description of the business environment in which the loss occurred, previous events, near misses and event-specific Key Risk Indicators ("KRI"), — consideration of any risk management decisions

105

connected with the specific risk taken, — root cause analyses, — review of control improvements and other actions to prevent or mitigate the recurrence, and — assessment of the residual operational risk exposure.

— The Lessons Learned process is an important means of identifying emerging areas of risk and to define appropriate risk mitigating actions. All corrective actions are captured and monitored for resolution via actions plans in our tracking system "dbTrack". The execution of corrective actions is reported on a monthly basis to senior management via the ORMC.

— We systematically utilize information on external loss events occurring in the banking industry to prevent similar incidents from happening to us, e. g. by particular deep dive analyses or risk profile reviews.

— In addition to internal and external loss information, scenarios are utilized and actions are derived from them. The set of scenarios consists of relevant external scenarios provided by a public database and internal scenarios. The latter are generated to complete our risk profile.

— Regular operational risk profile reports at a Group level for our business divisions, for the countries in which we operate and for our infrastructure functions, are reviewed and discussed with the departments' senior management. Regular risk profile reviews enable us to detect changes in the business units' risk profiles as well as risk concentrations across the Group early on, and to take appropriate corrective actions.

— We assess and approve the impact of changes on our risk profile as a result of new products, outsourcing activities, strategic initiatives, and acquisitions and divestments.

— Once operational risks are identified, mitigation is required following the "as low as reasonably practicable (ALARP)" principle by balancing the cost of mitigation with the benefits thereof, and formally accepting the residual operational risk. Risks which violate applicable national or international regulations and legislation cannot be accepted; once identified, such risks must always be mitigated.

— When we implement risk mitigating measures, we monitor them until they are resolved within our tracking tool "dbTrack". Residual operational risks rated higher than "important" need to be accepted by the risk bearing division and the ORMC.

— We perform top risk analyses in which the results of the aforementioned activities are considered. The Top Risk Analyses are a primary input for the annual operational risk management strategy and planning process. Besides the operational risk management strategic and tactical planning, we define capital and expected loss targets which are monitored on a regular basis within a quarterly forecasting process.

— KRIs are used to monitor the operational risk profile and alert the organization to impending problems in a timely fashion. KRIs allow the monitoring of the bank's control culture and business environment and trigger

risk mitigating actions. They facilitate the forward looking management of operational risks, based on early warning signals returned by the KRIs.

— In our bottom-up self assessment ("SA") process, which is conducted at least annually, areas with high risk potential are highlighted, and risk mitigating measures to resolve issues are identified. On a regular basis we conduct risk workshops aiming to evaluate risks specific to local legal entities and the countries we operate in, and take appropriate risk mitigating actions.

Additional functions, methodologies and tools implemented by the responsible divisions are utilized to complement the global operational risk framework and specifically address the risk types. These include but are not limited to:

— Fraud Risk is managed based on section 25a of the German Banking Act (KWG) as well as other legal and regulatory requirements via a risk based approach, governed by the Global Anti-Fraud Policy and corresponding Compliance and Anti-Money-Laundering (AML) framework. In line with regulatory requirements, a global risk assessment is performed on a regular basis. Within the general management of operational risks, dedicated Fraud Risk relevant aspects are part of the self assessment process.

242.    The 2014 Annual Report disclosed the following with respect to measuring the

Bank's effectiveness of internal controls:

Each year, management of the Group undertakes a formal evaluation of the adequacy and effectiveness of the system of ICOFR. This evaluation incorporated an assessment of the effectiveness of the control environment as well as individual controls which make up the system of ICOFR taking into account:

— The financial misstatement risk of the financial statement line items, considering such factors as materiality and the susceptibility of the particular financial statement item to misstatement.

— The susceptibility of identified controls to failure, considering such factors as the degree of automation, complexity, risk of management override, competence of personnel and the level of judgment required.

These factors, in aggregate, determine the nature and extent of evidence that management requires in order to be able to assess whether or not the operation of the system of ICOFR is effective. The evidence itself is generated from procedures integrated with the daily responsibilities of staff or from procedures implemented specifically for purposes of the ICOFR evaluation. Information from other sources also forms an important component of the evaluation since such evidence may either bring additional control issues to the attention of management or may corroborate findings. Such information sources include:

— Reports on audits carried out by or on behalf of regulatory authorities;

— External Auditor reports;

107

— Reports commissioned to evaluate the effectiveness of outsourced processes to third parties.

In addition, Group Audit evaluates the design and operating effectiveness of ICOFR by performing periodic and ad-hoc risk-based audits. Reports are produced summarizing the results from each audit performed which are distributed to the responsible managers for the activities concerned. These reports, together with the evidence generated by specific further procedures that Group Audit performs also provide evidence to support the annual evaluation by management of the overall operating effectiveness of the ICOFR.

As a result of the evaluation, management has concluded that ICOFR is appropriately designed and operating effectively as of December 31, 2014.

243.    The 2014 Annual Report disclosed the following financial revenue metrics: consolidated total net revenues of €31.9 billion for the full year ended 2014; consolidated total net revenues of €31.9 billion for the full year ended 2013; consolidated total net revenues of €33.7 for the full year ended 2012; total net revenues for Rest of Europe, Middle East and Africa of €4.5 billion for the full year 2014, total net revenues for Rest of Europe, Middle East and Africa of €4.5 billion for the full year ended 2013; total net revenues for Rest of Europe, Middle East and Africa of €5.09 for the full year ended 2012; and net revenues of €161 million for the Russian Federation for the year ended December 31, 2014.

244.    On March 20, 2015, Deutsche Bank filed a Form 20-F for the fiscal year ended December 31, 2014 (the "2014 20-F") with the SEC, with false and misleading statements substantially similar to those set forth in the Bank's 2014 Annual Report, including that "Fraud Risk is managed based on section 25a of the German Banking Act (KWG) as well as other legal and regulatory requirements via a risk based approach, governed by the Global Anti-Fraud Policy and corresponding Compliance and Anti-Money-Laundering (AML) framework. In line with regulatory requirements, a global risk assessment is performed on a regular basis. Within the general management of operational risks, dedicated Fraud Risk relevant aspects are part of the self-assessment process."

245.    The 2014 20-F was signed by Defendants Fitschen, Jain, and Krause. The 2014 20-F also contained signed SOX certifications by Defendants Fitschen, Jain, and Krause attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

246.    In March 2015, Deutsche Bank issued its 2014 Corporate Responsibility Report, which contained the following statements by Defendants Fitschen and Jain, featured prominently at the front of the Report:

- We have already articulated values and beliefs which define the type of institution we aspire to be. In 2014, we continued to embed those values, and those beliefs, into every aspect of our activity.

- First and foremost among our values is integrity. During 2014, Deutsche Bank, like other leading banks, continued to work through litigation matters which arose because, in the past, instances occurred within Deutsche Bank where conduct fell short of what our stakeholders expect of us and what we expect of ourselves. In response, we continued to safeguard our organization against future problems by investing in our "Three Lines of Defense": our businesses, our control functions, and Group Audit. We have added around 700 people to strengthen controls in our business divisions, and we have further strengthened systems and internal controls during 2014.

247.    The 2014 Corporate Responsibility Report made the following representations as to "Deutsche Bank's Values and Beliefs:"

- Our values and beliefs guide our behavior. They help us to conduct business with the utmost integrity.

- Integrity: We live by the high-est standards of integrity in everything we say and do.

248.    The 2014 Corporate Responsibility Report also made the following representations regarding "Control processes: Combating financial crime," including AML, KYC, bribery and corruption:

- Combating financial crimes, including money laundering, terrorist financing, sanctions and embargoes, bribery and corruption and fraud, requires … internal controls.

- In line with Deutsche Bank's management approach to strengthen the oversight and controls framework, we have continued to enhance our internal controls. As part of our second Line of Defense, we consolidated responsibility for all types of financial crime into a new Anti-Financial Crime (AFC) division.

- In accordance with our values and beliefs, staff are encouraged to raise any questions or concern with managers or control functions.

- **Preventing money laundering and terrorist financing**. We target money laundering, terrorist financing and other financial crimes globally in accordance with the German Banking Act and other legislations. Complying with the regulations is fundamental for all of Deutsche Bank's operations regardless of their geographic location. A dedicated team within the AFC unit is responsible for preventing money laundering and financing terrorism.

- Our Anti-Money Laundering (AML) and Know Your Customer (KYC) policies aim to ensure: — Compliance with regulations governing identification, authentication, recording and archiving — Detection of suspicious transactions and processing internal suspicious activity alerts — Developing, updating, and executing of internal policies, procedures and controls — Clear definition of AML requirements to implement the Fund Transfers Regulation.

- These measures are implemented by the business and are evaluated and reviewed by the AFC function. They are updated at least annually. They expressly include the authority to prohibit individual transactions or business relationships.

- **Know Your Customer is essential for mitigating risks**. Effective action against money laundering and terrorist financing relies on adequate and up-to-date information on client relationships. In this context, KYC standards and procedures are critical to promote high ethical and professional standards and to protect banking facilities, products, and services from criminal misuse.

- In 2014, we developed a new framework for a risk-based approach to KYC that is applicable to all business divisions and entities. The framework includes advanced methodologies to assess the underlying risk factors such as country, industry and product risk. This contributes to the attainment of a robust concept for the overall AML client risk rating itself.

- Our KYC policies provide clear standards for governance and management oversight, including standardized reporting and documentation requirements and escalation of potential risks. Special scrutiny is required for relationships with high-risk clients and with clients known as "politically exposed persons". They must be reviewed and signed off by senior management and the AFC organization.

249.    The 2014 Corporate Responsibility Report contained the following statements regarding Deutsche Bank's "Risk culture" and "Red Flags:"

- Launched in 2010, Deutsche Bank's dedicated Risk Culture Initiatives program emphasizes that a strong risk culture depends as much on robust processes and controls as it does on employee awareness and conduct.

- Launched in 2010, Deutsche Bank's dedicated Risk Culture Initiatives program emphasizes that a strong risk culture depends as much on robust processes and controls as it does on employee awareness and conduct.

- The program promotes five essential behaviors that are consistent with Deutsche Bank's values and beliefs page 8 and that are necessary to maintain a strong risk culture: — Place Deutsche Bank and its reputation at the heart of all decisions — Be fully responsible for Deutsche Bank's risks — Invite, provide and respect challenge — Be rigorous, forward-looking and comprehensive in the assessment of risk — Troubleshoot collectively.

- The Risk Culture Initiatives program develops and supports a variety of initiatives to foster the required behaviors and corresponding risk awareness. These initiatives include targeted communication campaigns and training programs, as well as consistent monitoring through the Red Flags process.

- Tone from the Top emphasizes role of risk culture in leadership.

- Monitoring and assessing risk-related conduct: Introduced in 2010, the Red Flags process uses objective measures to assess employees' adherence to behaviors, policies, procedures and control processes. For Example, Red Flags are assigned for: — Breaches against the Gifts & Entertainment Policy — Breaches against the Employee Trading policy — Non-compliance with mandatory absence requirements — Non-compliance of mandatory training.

- As of January 2015, we have extended the Red Flags process to all divisions and infrastructure functions as well as Regional Management.

- In addition to monitoring risk-related breaches, the Red Flags process also helps to strengthen controls. We evaluate controls thoroughly before including them in the Red Flags process, and we use this as an opportunity to improve

them. This is followed by extensive communications to employees, emphasizing the importance of the control process and encouraging them to work through the details and the associated risk.

250.     On or about April 7, 2015, Deutsche Bank Russia publicly issued IFRS Financial Statements for the year ended December 31, 2014.  The 2014 Financial Statements and related disclosures were approved by the Management Board.  Defendant Bongartz signed the 2014 Financial Statements and related disclosures.

251.     The 2014 Financial Statements for Deutsche Bank Russia made the following representations with respect to risk management:

- The Bank has a dedicated risk management function on a global level to ensure that oversight and monitoring of risk is achieved in a robust manner.

- Management is responsible for identifying and assessing risks, designing controls and monitoring their effectiveness.  Management monitors the effectiveness of the Bank's internal controls and periodically implements additional controls or modifies existing controls as considered necessary.

- The Bank developed a system of standards, policies and procedures to ensure effective operations and compliance with relevant legal and regulatory requirements, including the following areas: requirements for appropriate segregation of duties, including the independent authorization of transactions; requirements for the recording, reconciliation and monitoring of transactions; compliance with regulatory and other legal requirements; documentation of controls and procedures; requirements for the periodic assessment of operational risks faced, and the adequacy of controls and procedures to address the risks identified; requirements for the reporting of operational losses and proposed remedial action; development of contingency plans; training and professional development; ethical and business standards; and risk mitigation, including insurance where this is effective.

- There is a hierarchy of requirements for authorization of transactions depending on their size and complexity. A significant portion of operations are automated and the Bank put in place a system of automated controls.

- Compliance with the Bank's standards is supported by a program of periodic reviews undertaken by the Internal Audit function.  The Internal Audit function is independent from management and reports directly to the Supervisory Board.  The results of the Internal Audit reviews are discussed with relevant business process managers, with summaries submitted to the Supervisory Board and senior management of the Bank.

- Management believes that the Bank complies with the CBR [Central Bank of the Russian Federation] requirements related to risk management and internal control systems, including requirements related to the Internal Audit function, and that risk management and internal control systems are appropriate for the scale, nature and complexity of operations.

- The organizational risk management and functions, tasks and authorities of the employees, committees and departments involved in the management of risk are clearly and unambiguously defined. All principles and guidelines are reviewed regularly and adapted and enhanced in line with internal and external developments.

252.    The 2014 Financial Statements for Deutsche Bank Russia disclosed the following revenue metrics: net fee and commission income of RUB 1.7 billion for full year 2014; and net fee and commission income of RUB 1.3 billion for full year 2013.

253.    In May 2015, Defendant Fitschen made the following statements, which Deutsche Bank posted on its website: "We invested in compliance and controls to ensure we meet new regulatory and reporting standards.  We invested in more efficient business platforms.  In total, we invested nearly 6 billion Euros to build a safer, more robust Deutsche Bank.  An investment of that scale is without precedent."

254.    Deutsche Bank made the same or substantially similar statements to those in ¶253 on May 9, 10, 18, 21, 25, 29, June 4, 9, 10, 24, 26, 28, 29, July 1, 2, 5, 21, 27, 28., August 1, 3, 10, 13, 18, 20, September 5-7, 10, 12, 15, 18, October 2, 12, 27, 30, December 5, 2015, on its website.

255.    On or about September 2015, Deutsche Bank made the following public statements:

- We earn the trust of all of our stakeholders by always acting with integrity and holding ourselves to high standards. We seek to go beyond what is allowed and to do what is right.

- We do not tolerate corruption or any form of bribery and we do not provide or accept improper inducements in the course of our business dealings. We are an active participant in international and local efforts to combat financial

crime, including fraud, corruption, money laundering and the funding of terrorist and criminal activities. We also have an ongoing commitment to maintain effective controls to help prevent and detect illegal and unethical business practices.

- We maintain the trust of our shareholders, clients, business partners, colleagues and the communities in which we operate by keeping our commitments and acting with honesty and integrity in all of our business dealings.

- We comply with all laws and regulations . . . We do not engage with any external party that is involved in illegal or improper activities.

256. Deutsche Bank made the same or substantially similar statements to those in ¶255

on September 5-7, 10, 12, 15, 18, October 2, 12, 27, 30, December 5, 2015, on its website.

257. On or about November 27, 2015, Deutsche Bank posted on its website the

following statements from Defendant Cyan:

- Since my first day as your colleague in July, I have emphasised the importance of ensuring that our business activities are controlled to high standards. That includes making sure that when we onboard new clients, or recertify existing relationships, we have a thorough understanding of their identity and aspirations, and confirm that we are a suitable partner to fulfil their needs.

- My colleagues on the Management Board and I have decided to review the know-your-client (KYC) and client on-boarding procedures across the Bank. By doing so, we aim to ensure that our procedures are thorough and transparent, and that they enable our business divisions to sustain lasting and valuable client relationships.

- Until the review is completed, we have decided to make two immediate changes.

- First, in certain locations that have higher risk weightings, we will suspend the on- boarding of new clients and the introduction of new products to existing clients.

- Second, across the business divisions and in all locations, we will begin to transact with new clients only after we have completed all KYC procedures and on-boarded them. In the past, we had allowed for these activities to take place concurrently.

258.    Deutsche Bank made the same or substantially similar statements to those in ¶257 on December 5, 2015, on its website.

259.    Deutsche Bank made the following statements on its website in 2015:

- Deutsche Bank Group will examine its Anti Money Laundering strategies, goals and objectives on an ongoing basis and maintains an effective Anti Money Laundering program for the Bank's business that reflects the best practices for a diversified, global financial services provider.

- Adherence to the Deutsche Bank Group Anti-Money Laundering Program is the responsibility of all employees. The program is formulated and directed by the Global Head of Anti Money Laundering. The program includes client screening and monitoring requirements, "know your customer" policies (including the requirement to establish the identity of beneficial owners), Embargo policies, record keeping requirements, the reporting of suspicious circumstances in accordance with relevant laws, and AML training.

260.    Based on information and belief, Deutsche Bank made the same or substantially similar statements to those in ¶259 on January 2, 26, February 16, 18, 19, 25, March 11, 15, 16, 18, 23, 26, 30, April 1, 2, 17, 18, 29, 30, May 9, 10, 18, 21, 25, 29, June 4, 9, 10, 24, 26, 28, 29, July 1, 2, 5, 21, 27, 28, August 1, 3, 10, 13, 18, 20, September 5-7, 10, 12, 15, 18, October 2, 12, 27, 30, December 5, 2015, on its website.

261.    The statements referenced in ¶¶216-227, 229-244, 246-249, 251-260 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the banks' internal controls, anti-money laundering compliance, culture, business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that, as explained in detail *supra*: (1) Deutsche Bank and Deutsche Bank Russia had serious and systemic failings in their systems and controls against money laundering, financing terrorism, aiding against international sanctions, and committing financial crimes; (2) Deutsche Bank and Deutsche Bank Russia's internal systems

and controls over financial reporting and their disclosure controls and procedures were not effective; (3) the culture at Deutsche Bank and Deutsche Bank Russia had not changed, as employees, including top management in Russia, were engaging in money-laundering activities; (4) with respect to the reported financial revenue and/or income metrics, Deutsche Bank and Deutsche Bank Russia failed to disclose that a portion of those financial metrics were derived from illicit activities such as money laundering; and (5) as a result, Deutsche Bank and Deutsche Bank Russia's public statements were materially false and misleading at all relevant times.

### D.  False and Misleading Statements Made in 2016

262.    On February 11, 2016, Deutsche Bank Russia stated on its website that in order to counter the laundering of proceeds obtained by illegal means and the financing of terrorism, the bank executes controls in accordance with the Russian Federation legislation on countering the laundering of proceeds obtained by illegal means and the financing of terrorism.  Deutsche Bank Russia further represented that special internal control measures are performed in accordance with Deutsche Bank LLC's internal control rules for the purpose of countering the laundering of proceeds obtained by illegal means and the financing of terrorism.  A special internal control is executed via special programs approved by the bank and via other internal measures.

263.    Deutsche Bank Russia made the same or substantially similar statements to those in ¶262 above on March 19 and April 5, 2016, on its website.

264.    On or about March 10, 2016, Deutsche Bank issued its 2015 Annual Report, which included a "Responsibility Statement by the Management Board" ("Responsibility Statement").[43]  The Responsibility Statement contained the following language: "To the best of our knowledge, and in accordance with the applicable reporting principles, the consolidated

---

[43] References to Deutsche Bank are to Deutsche Bank Aktiengesellschaft and its consolidated subsidiaries.

financial statements give a true and fair view of the assets, liabilities, financial position and profit or loss of the Group, and the Group management report includes a fair review of the development and performance of the business and the position of the Group, together with a description of the principal opportunities and risks associated with the expected development of the Group." The Responsibility Statement was signed by Defendants Cryan, Fitschen, and Lewis.

265. The 2015 Annual Report contained a statement by Defendants Cryan and Fitschen, representing that Deutsche Bank is "assessing carefully with whom we do business."

266. The 2015 Annual Report stated that Deutsche Bank is "strengthening [its] client on-boarding and KYC procedures."

267. The 2015 Annual Report disclosed the following with respect to Deutsche Bank's risk culture:

> We seek to promote a strong risk culture throughout our organization. Our aim is to help reinforce our resilience by encouraging a holistic approach to the management of risk and return throughout our organization as well as the effective management of our risk, capital and reputational profile. We actively take risks in connection with our business and as such the following principles underpin risk culture within our group: – Risk is taken within a defined risk appetite; – Every risk taken needs to be approved within the risk management framework; – Risk taken needs to be adequately compensated; and – Risk should be continuously monitored and managed.

> Employees at all levels are responsible for the management and escalation of risks. We expect employees to exhibit behaviors that support a strong risk culture. To promote this our policies require that behavior assessment is incorporated into our performance assessment and compensation processes. We have communicated the following risk culture behaviors through various communication vehicles: – Being fully responsible for our risks; – Being rigorous, forward looking and comprehensive in the assessment of risk; – Inviting, providing and respecting challenges; – Trouble shooting collectively; and – Placing Deutsche Bank and its reputation at the heart of all decisions.

> To reinforce these expected behaviors and strengthen our risk culture, we conduct a number of group-wide activities. Our Board members and senior management frequently communicate the importance of a strong risk culture to support a

consistent tone from the top. In addition, to drive staff understanding and knowledge of risk culture, a dedicated risk culture library of industry reports and articles has been established on DB's internal social media platform.

Throughout 2015, and into 2016, there has been increased focus on the effectiveness of training. Rather than introducing additional training modules, where feasible we are embedding new messages into existing courses to keep them up to date and timely, and to avoid 'learner overload'.

268.    The Bank also disclosed the following with respect to how it manages operational

risk:

We manage operational risk using the Group Operational Risk Management framework which enables us to determine our operational risk profile in comparison to our risk tolerance, to systematically identify operational risk themes and concentrations, and to define risk mitigating measures and priorities.

In order to cover the broad range of risk types underlying operational risk, our framework contains a number of operational risk management techniques. These aim to efficiently manage the operational risk in our business and are used to identify, assess and mitigate operational risks:

– Loss Data Collection: The continuous collection of operational risk loss events, as a prerequisite for operational risk management, includes detailed analyses, the identification of mitigating actions, and provision of timely information to senior management. All losses above € 10,000 are collected in our incident reporting system ("dbIRS").

– The Lessons Learned process is triggered for events, including near misses, above € 500 thousand. This process includes, but is not limited to: — systematic risk analyses, including a description of the business environment in which the loss occurred, previous events, near misses and event-specific Key Risk Indicators ("KRI"), — root cause analysis, — review of control improvements and other actions to prevent or mitigate the recurrence, and — assessment of the residual risk exposure.

The execution of corrective actions identified in this process are systematically tracked and reported monthly to senior management.

– Scenario Analyses: We complete our risk profile using a set of scenarios including relevant external cases provided by a public database and additional internal scenarios. We thereby systematically utilize information on external loss events occurring in the banking industry to prevent similar incidents from happening to us, for example through particular deep dive analyses or risk profile reviews.

– Emerging Risk Identification: We assess and approve the impact of changes on our risk profile as a result of new products, outsourcing activities, strategic initiatives, acquisitions and divestments as well as material systems and process changes. Once operational risks are identified and assessed, they are compared to the relevant specific risk appetite statement and either mitigated or accepted. Risks which violate applicable national or international regulations and legislation cannot be accepted; once identified, such risks must always be mitigated.

– Read-across Analysis: We continuously seek to enhance the process to assess whether identified issues require a broader approach across multiple entities and locations within Deutsche Bank. A review of material findings is performed in order to assess their relevance to areas of the Bank other than where they originated. We are developing business intelligence software to identify risk clusters across the bank accessing various sources of information. We aim to increase our predictive analysis and clustering capabilities and to identify risk concentrations in a timely manner through the use of this tool.

– Risk Mitigation: When we implement risk mitigating measures, we systematically monitor their resolution. Residual operational risks rated significant or above need to be accepted by the risk bearing division and reviewed for decision by the Head of Group ORM.

– We perform Top Risk Analyses in which the results of the aforementioned activities are considered. The Top Risk Analyses are a primary input for the annual operational risk management strategy and planning process and aim to identify our most critical risks in terms of probability and severity.

– Key Risk Indicators are used to monitor the operational risk profile and alert the organization to impending problems in a timely fashion. KRIs enable the monitoring of the bank's control culture and business environment and trigger risk mitigating actions. They facilitate the forward looking management of operational risks, based on early warning signals.

– In our bottom-up Self-Assessment ("SA") process, which is conducted at least annually, areas with high risk potential are highlighted, and risk mitigating measures to resolve issues are identified. On a regular basis we conduct risk workshops aiming to evaluate risks specific to local legal entities and the countries we operate in, and take appropriate risk mitigating actions. We are in the course of replacing this existing SA process by an enhanced Risk and Control Assessment process, supported by a group wide IT tool. We plan to substantially cover the Bank's nonfinancial operating units under this enhanced approach in 2016.

Additional functions, methodologies and tools implemented by the responsible second line Risk Type Controllers are utilized to complement the Group Operational Risk Framework and specifically address the risk types. These include but are not limited to:

– Fraud Risk is managed based on section 25a of the German Banking Act ("KWG") as well as other legal and regulatory requirements via a risk based approach, governed by our Global Anti-Fraud Policy and corresponding Compliance and Anti-Money-Laundering ("AML") framework. In line with regulatory requirements, a global risk assessment is performed on a regular basis. Within the general management of operational risks, dedicated Fraud Risk relevant aspects are part of the self-assessment process.

269.    The 2015 Annual Report disclosed the following with respect to measuring the

Bank's effectiveness of internal controls:

Each year, management of the Group undertakes a formal evaluation of the adequacy and effectiveness of the system of ICOFR. This evaluation incorporated an assessment of the effectiveness of the control environment as well as individual controls which make up the system of ICOFR taking into account:

– The financial misstatement risk of the financial statement line items, considering such factors as materiality and the susceptibility of the particular financial statement item to misstatement.

– The susceptibility of identified controls to failure, considering such factors as the degree of automation, complexity, and risk of management override, competence of personnel and the level of judgment required.

These factors, in aggregate, determine the nature and extent of evidence that management requires in order to be able to assess whether or not the operation of the system of ICOFR is effective. The evidence itself is generated from procedures integrated with the daily responsibilities of staff or from procedures implemented specifically for purposes of the ICOFR evaluation. Information from other sources also forms an important component of the evaluation since such evidence may either bring additional control issues to the attention of management or may corroborate findings. Such information sources include:

– Reports on audits carried out by or on behalf of regulatory authorities; – External Auditor reports;

– Reports commissioned to evaluate the effectiveness of outsourced processes to third parties.

In addition, Group Audit evaluates the design and operating effectiveness of ICOFR by performing periodic and ad-hoc risk-based audits. Reports are produced summarizing the results from each audit performed which are distributed to the responsible managers for the activities concerned. These reports, together with the evidence generated by specific further procedures that Group Audit performs also provide evidence to support the annual evaluation by management of the overall operating effectiveness of the ICOFR.

As a result of the evaluation, management has concluded that ICOFR is appropriately designed and operating effectively as of December 31, 2015.

270.    The 2015 Annual Report disclosed the following financial revenue metrics: consolidated total net revenues of €33.5 billion for the full year ended 2015; consolidated total net revenues of €31.9 billion for the full year ended 2014; consolidated total net revenues of €31.9 for the full year ended 2013; total net revenues for Rest of Europe, Middle East and Africa of €4.2 billion for the full year 2015; total net revenues for Rest of Europe, Middle East and Africa of €4.5 billion for the full year ended 2014; and total net revenues for Rest of Europe, Middle East and Africa of €4.3 for the full year ended 2013; and net revenues of €159 million for the Russian Federation for the year ended December 31, 2015.

271.    On March 11, 2016, Deutsche Bank filed a Form 20-F for the fiscal year ended December 31, 2015 (the "2015 20-F") with the SEC, with false and misleading statements substantially similar to those set forth in the Bank's 2015 Annual Report, including that "Fraud Risk is managed based on section 25a of the German Banking Act ("KWG") as well as other legal and regulatory requirements via a risk based approach, governed by our Global Anti-Fraud Policy and corresponding Compliance and Anti-Money-Laundering ("AML") framework. In line with regulatory requirements, a global risk assessment is performed on a regular basis. Within the general management of operational risks, dedicated Fraud Risk relevant aspects are part of the self-assessment process."

272.    The 2015 20-F was signed by Defendants Cryan, Fitschen, and Schenck. The 2015 20-F also contained signed SOX certifications by Defendants Cryan, Fitschen, and Schenck attesting to the accuracy of financial reporting, the disclosure of any material changes to the Bank's internal controls over financial reporting, and the disclosure of all fraud.

273.    The statements referenced in ¶¶262-263, 265-271 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts

pertaining to the banks' internal controls, anti-money laundering compliance, culture, business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that, as explained in detail *supra*: (1) Deutsche Bank and Deutsche Bank Russia had serious and systemic failings in their systems and controls against money laundering, financing terrorism, aiding against international sanctions, and committing financial crimes; (2) Deutsche Bank and Deutsche Bank Russia's internal systems and controls over financial reporting and their disclosure controls and procedures were not effective; (3) the culture at Deutsche Bank and Deutsche Bank Russia had not changed, as employees, including top management in Russia, were engaging in money-laundering activities; (4) with respect to the reported financial revenue and/or income metrics, Deutsche Bank and Deutsche Bank Russia failed to disclose that a portion of those financial metrics were derived from illicit activities such as money laundering; and (5) as a result, Deutsche Bank and Deutsche Bank Russia's public statements were materially false and misleading at all relevant times.

### The Truth Begins to Emerge

274.    On July 22, 2014, *The Wall Street Journal* published an article entitled "Deutsche Bank Suffers From Litany of Reporting Problems, Regulators Said," stating that the Federal Reserve Bank of New York found that the Company's U.S. operations suffer from a litany of serious financial-reporting problems that the Company has known about for years but not fixed, stating in pertinent part:

**Deutsche Bank Suffers From Litany of Reporting Problems, Regulators Said**

Letter From New York Fed Said Some Reports From Deutsche Bank's U.S. Operations Were 'Inaccurate and Unreliable'

**An examination by the Federal Reserve Bank of New York found that Deutsche Bank AG's giant U.S. operations suffer from a litany of serious**

**financial-reporting problems that the lender has known about for years but not fixed**, according to documents reviewed by The Wall Street Journal.

**In a letter to Deutsche Bank executives in December, a senior official with the New York Fed wrote that reports produced by some of the bank's U.S. arms "are of low quality, inaccurate and unreliable. The size and breadth of errors strongly suggest that the firm's entire U.S. regulatory reporting structure requires wide-ranging remedial action."**

The criticism from the New York Fed represents a rebuke to one of the world's biggest banks, and it comes at a time when federal regulators say they are increasingly focused on the health of overseas lenders with substantial U.S. operations.

**The Dec. 11 letter, excerpts of which were reviewed by the Journal, said Deutsche Bank had made "no progress" at fixing previously identified problems. It said examiners found "material errors and poor data integrity" in its U.S. entities' public filings, which are used by regulators, economists and investors to evaluate its operations. The problems ranged from data-entry errors to not taking into account the value of collateral when assessing the riskiness of loans.**

**The shortcomings amount to a "systemic breakdown" and "expose the firm to significant operational risk and misstated regulatory reports," said the letter from Daniel Muccia, a New York Fed senior vice president responsible for supervising Deutsche Bank.**

The New York Fed has various tools at its disposal to address shortcomings by banks it regulates. It can issue private letters demanding action, as it did with Deutsche Bank, or, in more severe cases, impose restrictions on banks' activities.

**The letter, which hasn't been previously reported, ordered senior Deutsche Bank executives to ensure steps were taken to fix the problems. It also said the bank might have to restate some of the financial data it has submitted to regulators.**

\*       \*       \*

The letter sent to Deutsche Bank shows that the New York Fed's concerns about its U.S. operations have been building for years.

**"Since 2002, the FRBNY has highlighted significant weaknesses in the firm's regulatory reporting framework that has remained outstanding for a decade," Mr. Muccia wrote. He added: "Most concerning is the fact that although the root causes of these errors were not eliminated, prior supervisory issues were considered remediated and closed by senior management."**

Paul Miller, a former Fed bank examiner, said it is uncommon for a bank to repeatedly fail to address problems over many years. "Usually when a regulator points something out, the bank fixes it," said Mr. Miller, now an analyst at FBR Capital Markets.

**Deutsche Bank's external auditor, KPMG LLP, also identified "deficiencies" in the way the bank's U.S. entities were reporting financial data in 2013, according to a Deutsche Bank email reviewed by the Journal.**

Deutsche Bank's annual report and other filings have included a letter from KPMG signing off on the bank's financial statements.

A KPMG spokesman declined to comment.

Deutsche Bank's U.S. operations have been the source of regular headaches for the lender, partly due to regulatory concerns about the adequacy of its capital buffers. The bank in June raised €8.5 billion of new capital by selling shares to investors.

The complaints from regulators largely center on data from two big U.S. Deutsche Bank subsidiaries, and the New York branch of the German parent company. That data goes into filings that all U.S.-regulated banks file with regulators each quarter. The resulting reports, crammed with thousands of lines of densely packed data, are a trove of information for regulators, analysts and investors.

But in 2002, 2007 and **2012, New York Fed examiners voiced concerns to Deutsche Bank about the quality of the data, according to the December letter.**

**After conducting its 2012 annual assessment**, for example, the New York Fed flagged a specific concern about how a Deutsche Bank subsidiary was classifying potentially troubled assets. **The unit, Deutsche Bank Trust Company Americas, wasn't properly assessing the value of collateral when it reported the value of loans where borrowers were at risk of defaulting, according to a New York Fed letter to Deutsche Bank in June 2013. Regulators said that made the unit's reports "inaccurate."**

The New York Fed's concerns intensified when a review of the bank's regulatory reporting got under way in August. At a September meeting with two of Deutsche Bank's top U.S. executives, **Fed officials described the bank's reporting as the worst among its peers, according to the Deutsche Bank email about issues raised by regulators.** Mr. Muccia, a 40-year veteran of bank regulation, and his team said **the trust-company unit had misclassified the riskiness of 20% of its loans. Despite finding dozens of problems, Mr. Muccia said he thought the Fed team was "just scratching the surface," according to the email.**

A few months later, Mr. Muccia sent his letter detailing the exam's findings and more than a half-dozen areas in need of "immediate" action.

**Many of the problems stemmed from what the letter called a "disjointed" regulatory-reporting system and "weaknesses" in the technology systems used by Deutsche Bank subsidiaries**. Instead of automatically compiling and reporting data to federal regulators, Deutsche Bank officials were making manual changes to more than 800 pieces of data, the letter said. That data was tied to a variety of balance-sheet items, such as certain types of loans and deposits, whose values totaled about $337 billion.

[Emphasis added].

275.    On this news, shares of Deutsche Bank fell $1.05 per share or approximately 3% from its previous closing price to close at $34.80 per share on July 22, 2014, damaging investors.

276.    On August 28, 2014, U.K. regulator the Financial Conduct Authority ("FCA") issued a statement that it had fined Deutsche Bank $7.8 million for failure to properly report millions of transactions. Bloomberg reported the fine in an article on that date titled "Deutsche Bank Fined $7.8 Million for Transaction Reporting Lapse."

A coding error reversed a buy/sell indicator, leading Deutsche Bank to improperly report on 29.4 million equity swap contracts for difference (sic) transactions, the Financial Conduct Authority said in a statement today.

Deutsche Bank "is a major market participant responsible for reporting millions of transactions every year," FCA Enforcement Director Tracey McDermott said in the statement. "There is simply no excuse for Deutsche's failure to get this right."

277.    In an update later on August 28, 2014, Bloomberg in "Deutsche Bank Fined $7.8 Million By U.K. Regulator for Transaction Reporting" reported that the FCA's website showed "Deutsche Bank's fine is the second-highest following the 5.6 million-pound penalty against Edinburgh-based RBS in July 2013."

278.    On August 28, 2014, Deutsche Bank's share price closed at $34.40, down -1.94% from the closing price of $35.08 on August 27, 2014.

279.    In a report dated October 3, 2014, analysts for Jefferies reduced their estimates and price target for Deutsche Bank, after increasing their forecast for litigation costs.

> We sharply cut our earnings estimates for Deutsche Bank largely to reflect the rights issue but also our expectation of higher litigation charges. We now expect some €4bn of litigation charges out to 2016 against €2.6bn previously given the rise in contingent liabilities and with the FX settlement looming ….Our Gordon Growth based PT subsequently drops to €38.20 from €45.10.

280.    On October 3, 2014, the price of Deutsche Bank shares declined from $34.29 at close on October 2, 2014 to close at $34.26, a change of -0.09%.

281.    Prior to announcement of third-quarter 2014 financial results, Deutsche Bank announced it would increase reserves by EUR894 million for pending litigation. In the Bank's earnings conference call on October 29, 2014, CFO Stefan Krause warned that future litigation costs were "unpredictable."

> As you can see here, net litigation provisions increased by approximately EUR800m, largely in connection with certain ongoing regulatory investigations impacting NCOU and CB&S. There continues to be significant uncertainty as of the timing and size of potential resolutions for some of our larger matters, and so actual litigation costs for the balance of the year are unpredictable.

During the call, K. Lakhani, an analyst for Citigroup, asked CFO Krause for information to provide some comfort about "the driver of the litigation charges in the quarter to help us understand where the reduction in the contingent litigation risk is coming from," but Mr. Krause refused to provide comfort in the form of specific information.  At the same time, he insisted the Bank was "comfortably provided for" in litigation reserves for known litigation risk.

> It is – this quarter, was several topics. It was not one large topic, it was several topics, in which we had seen new information throughout the quarter of settlements of other banks, in which we have seen progress in some of the investigation (sic) that are going on. And, as you know, every time at the end of the quarter we then – we reassess where we are at provision levels, You saw a movement from contingent into reserves, which basically tells you that these are topics that we had on the radar screen already. And that obviously by the fact that we got more concrete information, we could reserve for.

Based on our – currently, we are reserved for the known topics. Some topics
obviously are further down the process than others. FX is less down the process.
Many other topics are further down the process and that's all I can say in terms of
our provision. But we feel very comfortably provided for what we know at this
point in time.

282.    In an analyst's note dated October 30, 2014, assessing Deutsche Bank's news
releases the day before, Trefis opined that "legal problems are likely to drag down Deutsche
Bank's results for the foreseeable future."

283.    The market reacted to these statements about litigation risk with a two-day price
decline on October 29 and 30, 2014. On October 29, 2014, the price of Deutsche Bank's
common stock fell 3.94% to $31.20 from $32.48 at close on October 28.  On October 30, 2014,
the stock fell 1.38% to close at $30.77.

284.    After market close on March 11, 2015, media reported that Deutsche Bank Trust
Corp., a U.S. unit of the German parent Deutsche Bank, had failed the Federal Reserve's "stress
test." *Bloomberg*, in "Deutsche, Santander Units Fail; BofA Conditional Pass; Citi Pass,"
reported late on March 11, 2015, that of 31 banks tested, only Deutsche Bank and Santander
Holdings had failed.

Deutsche Bank Trust Corp., capital plan rejected on qualitative grounds given
numerous and significant deficiencies across risk-identification, measurement,
and aggregation processes; approaches to loss and revenue projection; internal
controls.

In a subsequent article on March 12, 2015, "*U.S. Stress Test Fail Negative for Deutsche,
Santander: Goldman*," Bloomberg stated that an analyst's note from Goldman Sachs opined the
two banks' failure to pass stress tests "may result in additional costs and is 'problematic' from a
reputational point of view."

285.    The change in the Bank's share price on March 12, 2015 was affected by this
negative information.

286.   On June 5, 2015, Bloomberg published an article entitled "Deutsche Bank Investigating $6 Billion of Possible Money Laundering by Russian Clients" stating that the Company is conducting an internal probe into possible money laundering by Russian clients that may involve about $6 billion of transactions over more than four years, stating in pertinent part:

**Deutsche Bank Investigating $6 Billion of Possible Money Laundering by Russian Clients**

by Ambereen Choudhury, Suzi Ring, Jake Rudnitsky and Greg Farrell June 5, 2015

— 9:15 AM EDT Updated on June 5, 2015 — 12:24 PM EDT

Deutsche Bank AG is conducting an internal probe into possible money laundering by Russian clients that may involve about $6 billion of transactions over more than four years, according to people with knowledge of the situation.

The Bank of Russia approached Deutsche Bank in October asking the firm to examine the stock-trading activities of some clients in the country, said one person, who asked not to be identified because the discussions are private.

**Benjamin Lawsky's Department of Financial Services in New York is looking at unusual trading activity at the firm in Russia, another person said. Deutsche Bank is analyzing data from 2011 through early 2015, and has alerted Britain's Financial Conduct Authority, the European Central Bank and Germany's Bafin of the investigation**, two people said.

\*   \*   \*

The transactions being examined involve stocks bought by Russian clients in rubles through Deutsche Bank, and simultaneous trades through London in which the bank bought the same securities for similar amounts in U.S. dollars, the people said. Deutsche Bank is probing whether the transactions allowed Russian clients to move funds out of the country without properly alerting the authorities, one person said.

\*   \*   \*

The value of the suspect trades may be higher than is currently being reviewed and the investigation is continuing, one person said. The role played by Deutsche Bank staff is still being looked at, the people said.

[Emphasis added].

128

287.   On this news, shares of Deutsche Bank fell $0.71 per share from its previous closing price to close at $30.63 per share on June 5, 2015, damaging investors.

288.   On August 3, 2015, *Bloomberg* published an article entitled "DOJ Said to Probe Deutsche Bank on Russia Mirror Trades" stating that the U.S Department of Justice is investigating billions of dollars of trades the Company made on behalf of Russian clients, stating in pertinent part:

**DOJ Said to Probe Deutsche Bank on Russia Mirror Trades** by Keri

Geiger and Greg Farrell

August 3, 2015 — 2:23 PM EDT Updated on August 4, 2015 — 4:02 AM EDT

**U.S. federal prosecutors are investigating billions of dollars of trades Deutsche Bank AG made on behalf of Russian clients as recently as this year**, according to people with knowledge of the situation.

**The Justice Department's criminal probe, which hasn't been previously reported, focuses on so-called mirror trades, these people said. Such trades may have allowed Russian clients to move funds out of the country without properly alerting authorities**, a person familiar with the situation has said.

\*        \*        \*

**New Headache**

The Russian trades have swiftly become a new headache for the bank. Bloomberg reported on June 5 that Deutsche Bank was conducting an internal investigation of whether $6 billion in trades in Moscow and London were connected with possible money laundering by Russian clients. **The bank was examining trades that took place from 2011 through early 2015**, people familiar with the situation said at the time of the report.

**"The sums we're talking about aren't peanuts," said Andreas Plaesier, an analyst at M.M. Warburg in Hamburg who recommends investors hold Deutsche Bank shares. "If you have several violations across the bank, then it becomes a lot harder to argue these are isolated incidents and that can drive up the fine you have to pay."**

\*        \*        \*

The trades under investigation involve stocks bought by Russian clients in rubles through Deutsche Bank, and simultaneous trades through London in which the bank bought the same securities for similar amounts in U.S. dollars, people familiar with the matter have said.

*        *        *

Those mirror trades have also come under scrutiny of New York's banking regulator, a person familiar with the matter has said. The state's Department of Financial Services has asked Deutsche Bank for e-mails, memos, client lists and other documents as it looks into **whether those trades were used to help Russian clients skirt U.S. sanctions laws**, according to the person. The DFS also asked for information about whether any of the bank's other operations, including those in New York, were connected with the trades, the person has said.

[Emphasis added].

289.    On this news, shares of Deutsche Bank fell $1.00 per share or approximately 3% over the next two trading days to close at $34.02 per share on August 4, 2015, damaging investors.

290.    On September 18, 2015, The Wall Street Journal published an article entitled "Deutsche Bank to Pull Investment-Banking Operations Out of Russia," stating that the Company is closing its investment-banking operations in Russia amid investigations by regulators from Europe and the U.S. of potential money laundering by the Company's Russian clients and the probing of the adequacy of the Company's compliance systems, stating in pertinent part:

**Deutsche Bank to Pull Investment-Banking Operations Out of Russia**

By **JENNY STRASBURG**

Sept. 18, 2015 4:53 a.m. ET

**Deutsche Bank AG will pull its investment-banking operations out of Russia, the German lender said Friday**, one of its first significant moves under a new co-chief executive planning broader companywide cutbacks.

The move, which the bank said will be largely complete by year-end, will affect around 200 investment-bank employees based in Russia who provide deal

130

advisory and securities-trading services, The Wall Street Journal reported last week.

Hundreds of other Deutsche Bank employees who work in Russia in technology, cash-management and certain other financing services for institutions such as banks and corporations are expected to stay in place. But the lender will now provide core investment-banking, stock-trading and other existing banking services to Russian clients from other cities.

The bank said it would use third-party Russian firms to execute trades where necessary.

Deutsche Bank said in its statement the closure of its Russia investment-banking business will "reduce complexity, costs, risk, and capital consumption."

**The move comes as the lender and regulators from Europe and the U.S. investigate potential money laundering by Russian clients of Deutsche**

**Bank, and probing the adequacy of the bank's compliance systems**, according to people familiar with the matter.

[Emphasis added].

291.    On this news, shares of Deutsche Bank fell $1.35 per share or approximately 5% from its previous closing price to close at $28.45 per share on September 18, 2015, damaging investors.

292.    After market close on October 7, 2015, Deutsche Bank announced it would take charges which would "materially impact third quarter 2015 results," including impairment of goodwill and intangibles in Corporate Banking and Securities and Private and Business Clients units, impairment of the carrying value of its stake in Hua Xia Bank Co. Ltd., and "[l]itigation provisions of approximately EUR 1.2 billion, the majority of which are not expected to be tax deductible."   The Bank's press release, "Deutsche Bank Announces Anticipated Charges Impacting Third Quarter 2015 Results," was carried by *Dow Jones Institutional News*.

293.    On October 8, 2015, Societe Generale issued a report in which analysts noted that the litigation charge of €1.2 bn exceeded the consensus estimate of €0.76 bn.  The analysts also opined that even so, these latest charges for litigation left litigation reserves under-estimated.

- **Litigation is still under-estimated.** Litigation costs of €1.2 bn in Q3 15 means that litigation reserves (€3.8 bn end-Q2 15) will now rise to c. €5 bn. It now looks like DBK is fully provisioned for DoJ RMBS fines to come, which we estimate at a gross $4.7bn (€4.2 bn). However, there are significant further fines in store which we think are barely provisioned and which are higher than consensus over 2016-17…Broadly speaking, OFAC, FX and Russia money laundering could each cost $1.5 bn (€1.3 bn) with another €1 bn for civil matters. Taking into account existing litigation reserves and consensus litigation estimates of €2.5bn over 2016-17, this indicates the shortfall in litigation costs could be about €1.7bn, equivalent to about 40bp on the CET1 ratio, or 15 bp in the leverage ratio) (sic; emphasis in original).

294.    On October 8, 2015, the price of Deutsche Bank shares dropped to $28.39 from $28.79 at close on October 7, 2015. This was a change of -1.39%.

295.    On October 29, 2015, *Bloomberg* published an article entitled "Deutsche Bank Sets Aside $1.3 Billion, Mostly for Russia Probe," stating that the Company set aside $1.3 billion in the third quarter to cover suspected wrongdoing at its Russian equity unit, and that it found violations of internal policies and identified weaknesses in its oversight regime during its probe of the so-called Russian mirror trades, stating in pertinent part:

**Deutsche Bank Sets Aside $1.3 Billion, Mostly for Russia Probe**

October 29, 2015 — 5:16 AM EDT Updated on October 29, 2015 — 1:31 PM EDT

**Deutsche Bank AG increased its litigation reserves by 1.21 billion euros ($1.3 billion) in the third quarter, mainly to cover suspected wrongdoing at the lender's Russian equity unit.**

**The firm said Thursday it found violations of internal policies and identified weaknesses in its oversight regime during its probe into the so-called mirror trades, which may have allowed Deutsche Bank's Russian clients to move funds out of the country without properly alerting authorities.**

132

"We can't say much because we don't know much and that's shame on us," co-Chief Executive Officer John Cryan said at an investor conference in London. "It looks as though the bank was used."

The U.S. Justice Department and authorities in the U.K. and Russia are investigating whether Germany's biggest bank adequately vetted $6 billion in transactions that were part of a possible money-laundering scheme, people with knowledge of the matter said earlier this year.

The Russian investigation adds to a long list of legal woes facing Deutsche Bank, which has been buffeted by multiple probes, the departure of several top executives and allegations that senior officials were aware of traders' efforts to rig markets.

The bank said it would invest in anti-money-laundering infrastructure and look at "exiting relationships and locations with unacceptable risks." Deutsche Bank reiterated that it has already taken disciplinary action against a number of people in connection with its internal probe of the Russian trades.

**The investigation "has identified certain violations of Deutsche Bank's policies and deficiencies in Deutsche Bank's control environment," the company said in its quarterly earnings statement.** It's the first time the bank has said internal rules were broken.

The bank has been "advised that it's not our job to try and find out where the money comes from or where it goes to," Cryan told reporters in Frankfurt earlier Thursday.

Bloomberg News reported earlier this month that several close associates of Russian President Vladimir Putin may have benefited from the Deutsche Bank trades. Some of the accounts under scrutiny appear to contain assets that belong to Putin associates, according to people familiar with the investigation. They include a relative of the president and two of his longtime friends, **Arkady and Boris Rotenberg, who grew rich from contracts with state-run firms and who are now under U.S. sanctions, the people said.**

[Emphasis added].

296.    On this news, shares of Deutsche Bank fell $2.42 per share or approximately 8% from its previous closing price to close at $27.89 per share on October 29, 2015, damaging investors.

297.    On November 4, 2015, Deutsche Bank agreed to pay penalties totaling $258 million for violating U.S. sanctions in transactions involving Iran, Libya, and Syria as well as

other countries. Dow Jones Institutional News reported the settlement, but also noted that investigation of these violations was not at an end.

> Deutsche Bank AG agreed on Wednesday to pay $258 million to New York and U.S. banking regulators for violating U.S. sanctions by handling restricted transactions involving Iran, Libya, Syria and other countries.

> New York's top financial regulator said Wednesday it would levy a $200 million penalty on the German lender and require it to fire six employees allegedly involved in the transactions. Deutsche Bank also agreed to pay $58 million to the U.S. Federal Reserve to resolve similar allegations.

> The New York regulator, the Department of Financial Services, said bank employees used "nontransparent methods and practices" to process more than $10.8 billion for financial institutions and others in Iran, Libya, Syria, Myanmar and Sudan that were subject to U.S. economic sanctions. The misconduct occurred between 1999 and 2006, the regulator said.

> We are pleased to have reached a resolution with the New York Department of Financial Services and the Federal Reserve," a Deutsche Bank spokeswoman said. "The conduct ceased several years ago, and since then we have terminated all business with parties from the countries involved."

> A related criminal investigation into the conduct by New York federal prosecutors and the Manhattan district attorney's office is continuing, according to a person familiar with matter [sic].

> Wednesday's settlement is the latest to stem from a long-running crackdown by U.S. authorities on European-headquartered banks that allegedly did deals with countries under U.S. sanctions.

298.     On November 4, 2015, the price of Deutsche Bank shares declined from $28.37 at close on November 3, 2013, to a closing price of $27.74.  This was a price decline of -2.22%.

299.     Analysts for Societe Generale issued a report dated January 13, 2016, which was critical of Deutsche Bank, and pessimistic regarding the outcome of litigation over facilitation of Russian money laundering.  Societe Generale described the potential impact of a settlement of the litigation on the Bank's financial condition as "quite significant."

> Regulation and litigation remain major concerns. DB is much more exposed to future regulatory and litigation burdens than its peers, according to our analysis.

Litigation is a particular concern. Outsize fines for Russian money laundering are the key reason why our litigation provision estimates over 2016-17 are c €3bn more than consensus estimates......

Regarding Russian money laundering, a large fine should be expected, but how much? The main precedent for such activity is HSBC, which was fined $1.9bn by US regulators for laundering $7bn in Mexico. Using this as a basis for estimation, DB should be in line for a fine of $1.6bn (€1.5bn) if we consider only $6bn of trades under investigation – but this regards US regulators only. The EU has also levied sanctions against Russia, so we should also expect a large fine here – we estimate roughly another €1bn. Additionally, the Russian issue opens up the potential for a new fine from OFAC (in addition to the $258m DB has already paid for legacy matters). There is also potential for a c.€0.5bn fine by the DFS, again for Russia.

Our base case then is that Russia could result in €4bn of fines, of which €1.5bn for DoJ, €1.0bn for the EU, €0.5bn for DFS and €1bn for OFAC.

Together with another €1bn in litigation costs for civil matters, we conclude that DB could be impacted by another €6bn in litigation costs over 2016-17, which is about €3bn more than what consensus currently has in its estimates for extra provisioning. This €3bn represents about an 80bp CET1 ratio impact on management's target RWA of €360bn for 2018, or 25bp on target leverage exposure of €1,250bn, so it is quite significant.

According to *Handelsblatt Global Edition* in an article titled "Dark Days for Deutsche Bank; Shares plunge," dated January 15, 2016, the negative Societe Generale report triggered the sell-off in Deutsche Bank shares on Thursday, January 14, 2016.

Mr. Lim reiterated his "sell" recommendation for Deutsche Bank shares and slashed his target price from €25 to €20, which prompted the sell-off. The analyst believes that the bank's thin capital base and unresolved legal risks could threaten the bank and its stock market value. Among other issues, Deutsche Bank is facing a large fine in the United States and allegations of money laundering in its Russian business.

300.    Deutsche Bank's share price declined from a closing price of $22.17 on January 13, 2016, to close at $22.01 on January 14, 2016, a decline of -0.72%.

301.    Late in the afternoon of January 20, 2016, Deutsche Bank surprised the market with a warning of a large fourth-quarter 2015 loss. News reports of the loss continued into the evening and into the next day, January 21, 2016.  A key driver of the fourth-quarter loss was €1.2

billion set aside for litigation charges, according to *Dow Jones Institutional News* in "Deutsche

Bank Sees Quarterly Loss on Litigation Charges," January 20, 2016.

> Deutsche Bank AG said Wednesday that it expects to report a decline in revenue and a loss for its fourth quarter, weighed by litigation and restructuring charges. The bank said it expects EUR 1.2 billion in litigation charges, most of which won't be tax deductible. It also expects restructuring and severance charges of around EUR 800 million related to its private and business clients business. It will also book a EUR 100 million impairment charge related to software.

> In all, Deutsche expects a loss of EUR2.1 billion and revenue of EUR6.6 billion.

*The New York Times* reported on January 21, 2016 that "[i]n a surprise earnings announcement,

Deutsche Bank on Wednesday reported a huge yearly loss of 6.7 billion euros ($7.3 billion as

the cost of past wrongdoing continued to weigh on its earnings."  According to the *Times*, "[t]he

bank, which is Germany's largest, said that it would deduct €1.2 billion from fourth-quarter

profit because of legal issues. Including money allocated in previous quarters, the total set aside

for litigation in 2015 is €5.2 billion, the bank said."   The Bank "did not say which of the

lawsuits against it or official investigations would cause the charges."   *Deutsche Welle* on

January 21, 2016, in "Deutsche Bank shares tumble after huge loss," linked the loss to

"[f]inancial wrongdoings" by the Bank.

> Deutsche Bank stocks have dropped to levels last seen during the 2008 financial crisis as investors are fleeing Germany's biggest lender following its announcement of a multi-billion euro loss for 2015….

> The bank blamed writedowns, litigation charges and restructuring costs for the plunge, fueling concerns Germany's biggest lender might now need to rise fresh capital to strengthen its finances….

> Financial wrongdoings

> Currently, Deutsche Bank is embroiled in some 6,000 lawsuits over allegations of money laundering and rate manipulation. Last May, it was fined a record $2.5 billion (4.8 billion euros) for its involvement in rigging interest rates. Now the bank has disclosed full-year litigation provisions of approximately 5.2 billion euros…..

Citibank analysts also see further "downside risk" on litigation. "We model another 3.6 billion euros in 2016 – which is likely to necessitate a capital raise," they told the news agency Reuters, adding that Citi was rating the stock "neutral/high risk" and cutting their price target to 20 euros from 27 euros.

Analysts at Goldman Sachs, which has a "neutral" stance on Deutsche Bank's stock, said they expected litigation issues to persist for a "multi-year period." But even without such charges, the underlying trends looked weak, they added.

302.    On January 20, 2016, Deutsche Bank shares closed at $19.33, down 5.34% from the closing price of $20.42 on the previous trading day.  On January 21, 2016, the shares closed at $18.58, a change of -3.88% from the close on January 20, 2016.

303.    On April 14, 2016, Bloomberg published an article entitled "Deutsche Bank Found 'Systemic' Failure in Russia Cash Flight," stating that the Company found a "systemic" failure in its internal controls that were designed to prevent money laundering and financial crime, and which allowed a "suspected money-laundering pattern" to pump as much as $10 billion out of Russia from 2012 through 2014, stating in pertinent part:

**Deutsche Bank Found `Systemic' Failure in Russia Cash Flight**

April 14, 2016 — 12:01 AM EDT Updated on April 14, 2016 — 3:50 AM EDT

Red flags started popping up inside Deutsche Bank AG in early 2014 about billions of dollars in suspect trades from Moscow. A Cypriot bank sent a query to London. Russia's central bank raised questions. Moscow back-office staffers compiled a list of dubious transactions.
Some of the warnings were ignored. Others were dismissed. It wasn't until early 2015, when Russian authorities began interviewing bank employees in Moscow, that top executives in Frankfurt were alerted and the bank began a full-scale internal investigation.

**What Deutsche Bank quickly found: a "systemic" failure in internal controls meant to prevent money laundering and financial crime. Those critical deficiencies, as it called them, allowed a "suspected money-laundering pattern" to pump as much as $10 billion out of Russia from 2012 through 2014.**

137

That is the harsh conclusion of an internal bank report analyzing the German lender's response to the so-called mirror trades, details of which were reviewed by Bloomberg News. Findings from the October 2015 report form the basis for this article, alongside details from a Russian central bank audit of the bank's operations that resulted last year in a fine for reporting lapses.

**Personal Oversight**

**Deutsche Bank's internal audit found that the missed warnings went beyond the Moscow office to the bank's compliance, financial-crimes and money-laundering watchdogs in London and New York.** Deutsche Bank's handling of the Russia trades is now being investigated by U.S. prosecutors and European regulators, adding to the string of legal challenges in the U.S. and elsewhere for the bank as it attempts to increase profitability.

The Frankfurt-based bank's shares are now trading for one-third of book value, as shareholders demand managers get a handle on losses and legal costs. Deutsche Bank has set aside about 5.5 billion euros ($6.2 billion) for potential liabilities including the Russian trades.

John Cryan, who took over as co-chief executive officer in July, has said he'll personally oversee efforts to navigate out of the legal storms. He said he hopes to resolve investigations into the Russia trades and other major legal issues this year. **The co-CEO said at a conference in London last month that "it's not our finest hour" and that the bank "clearly had a systems and control failure" related to Russian transactions.**

**'Weak Controls'**

"This could be expensive for Deutsche Bank with the U.S. authorities investigating and just given the sheer volume of the transactions we're talking about," said Andreas Plaesier, an analyst at M.M. Warburg in Hamburg who has a hold recommendation on the shares. "The weak controls really don't make Deutsche Bank look good, but any actual criminal energy is always going to be hard to stop."

\*  \*  \*

**Mirror Trades**

In the mirror trades, a Deutsche Bank counterparty in Russia would buy local blue-chip shares for rubles, while the same stocks would be sold in London for dollars, the bank and the Russian central bank reviews determined.

Such trades are legal in some cases. **What the U.S. Justice Department wants to know is whether Deutsche Bank broke anti-money-laundering protocols by not properly vetting them**, people familiar with the matter have said.

Deutsche Bank's internal report describes an interlocking web of offshore companies and Moscow brokers that attracted attention within the bank and from regulators for high volumes of trading, often in just one direction -exclusively share sales, for example. All the companies were controlled from Russia, according to the report, and placed their orders through the bank's Moscow equities desk.

Trades by one of those brokers raised suspicions inside the global bank and among at least one of its partner banks for months in early 2014. **An audit of Deutsche Bank's Moscow operations, performed in mid-2014 by an outside firm, found "severe weaknesses" in the unit's processes for vetting customers.** The Russian central bank alerted Deutsche Bank about several Moscow brokerages it was trading with, and the bank's own staff also raised concerns.

**Calls for Probe**

Deutsche Bank stopped doing business with a few of the companies. **But calls from Moscow back-office staff for a broader probe into such trades were ignored by superiors in London, Deutsche Bank found.**

Several of the Russian brokers the bank identified later had their licenses revoked by the country's central bank. But neither the central bank nor Deutsche Bank reports address a key issue: whose money was being handled.

Some of the money spirited out of Russia belonged to close associates of Russian President Vladimir Putin, people familiar with the matter have previously told Bloomberg News. These associates include a relative of the president and two of his longtime friends, Arkady and Boris Rotenberg, the people said.

There's no indication that the Rotenbergs or other individuals are under investigation. A representative for the Rotenbergs said the brothers weren't involved in any such transactions. The Kremlin has called the allegations unsubstantiated.

**First Clue**

The first clue about the mirror-trade activity arrived in January 2014, the bank's inquiry found. Cyprus-based Hellenic Bank filed a request for assistance to Deutsche Bank's London office, asking about "suspicious high-volume transactions" through the account of a U.K.-registered company called Ergoinvest LLP.

**Hellenic sent at least two reminders to London before a response arrived, in March, from Deutsche Bank Moscow. The equities office there -- rather than its compliance or anti-money-laundering departments -- vouched for the clients and the trades, the bank found.**

**While one part of Deutsche bank was defending Ergoinvest, yet another was posing questions about it: An anti-financial-crime unit in New York flagged questionable activity by the company, directing its inquiries to Hellenic Bank. The Cyprus bank, receiving conflicting signals about Ergoinvest, began asking the New York unit for clarification. It didn't respond, the bank found.**

### Crisscrossing Questions

Hellenic Bank declined to comment. Representatives for Ergoinvest -which is owned by companies registered in the Commonwealth of Dominica, according to U.K. corporate registration data -- couldn't be located to comment.

In spite of the months of crisscrossing questions, Deutsche Bank continued doing business with Ergoinvest -- including mirror trades, according to the Russian central bank report -- until Russian authorities began asking about it and other brokers in 2015.

For all the suspicions raised about Ergoinvest, the transactions that were flagged didn't represent a complete mirror trade.

**Soon, however, back office staffers in Moscow pieced together an example not involving Ergoinvest, the Deutsche Bank review found. It showed both sides of a mechanism that was effectively moving cash out of Russia -- a small Russian broker buying shares in Moscow, and a British Virgin Islands holding company selling the same stocks for cash in London.**

### Cutting Ties

In late August, senior Moscow executives decided to stop doing business with both companies, according to the Russian central bank report. The same day, the Moscow back office offered to help colleagues in London look for similar trades by other clients with Russian ties, the bank found. But there was no response to the request, the bank found.

Deutsche Bank told Russian regulators that it didn't follow up on the trades because at the time it believed they were an isolated episode, according to the central bank report.

**Even as warnings accumulated, Deutsche Bank conducted an internal audit of the Moscow equities operation that gave it "satisfactory" grades and made no mention of the flagged trades. Almost a year later, the bank's review of the**

**handling of the transactions characterized that 2014 audit as marked by "severe shortcomings."**

After Russian authorities began interviewing people in the Moscow office about Ergoinvest and a local broker regarding possible tax evasion, Moscow staffers again alerted the bank's financial-crime team in London, sending a spreadsheet of the suspected mirror trades, the bank found.

**Project Square**

More than a week passed. Still awaiting response from London, on Feb. 25, 2015, Moscow compliance staff raised the issue to an incident-management group in Frankfurt.

The bank opened a full-scale inquiry, calling it Project Square. In less than two months, **the bank turned up more than 2,000 transactions that bypassed internal money-laundering controls.**

The U.S. Department of Justice, the U.K.'s FCA, through a spokespeople, declined to comment, as did Bafin, Germany's banking supervisor.

Russia's central bank examined a year of trading and determined Deutsche Bank had been the victim of a criminal scheme -- issuing a fine of about $5,000 for lapses such as missed deadlines and failure of staffers to indicate their middle names on some documents, people familiar with the situation have said. The central bank has declined to comment on its probe and didn't immediately respond to a request for comment for this article.

Since its internal audit, the bank has cut much of its operations in Russia, without linking the move to the mirror-trade probe. It dismissed three people in Moscow, all of whom have denied wrongdoing and are contesting the bank's action.

[Emphasis added].

304.   On April 14, 2016, Deutsche Bank's share price declined 0.46% from the closing price on April 13, 2016, to close at $17.28.

305.   On Sunday, April 24, 2016, *Reuters* reported that a split had arisen among the Bank's board over whether the Bank's counsel had been overly zealous in responding to the scandals which embroiled the Bank. In the article "Deutsche Bank supervisory board split over scandal response – FAS paper," Reuters reported board members who wanted to put scandals behind them were unhappy with Bank Counsel Georg Thoma.

141

A dispute has arisen on Deutsche Bank's supervisory board over what some members view as the bank's legal counsel's over-zealous response to scandals it has been embroiled in, Frankfurter Allgemeine Sonntagszeitung reported . . .

"He exaggerates when he demands ever wider (internal) investigations and ever more lawyers are deployed," the paper quoted deputy supervisory board head Alfred Herling as saying.

It quoted a second supervisory board member, Henning Kagermann, as saying: "Though all imaginable care has been taken, it is important for us that Deutsche Bank finally closes this chapter and looks to the future with full force again."

Most board members were in agreement over this, Kagermann added.

Accountability for a failure to cooperate with authorities will be a major topic at the bank's annual general meeting on May 19, the paper said

306.    In response to this news, on the next trading day, April 25, 2016, Deutsche Bank's share price declined by -3.97% from the Friday close of $18.89, to close that Monday at $18.14.

307.    On April 28, 2016 during aftermarket hours, *Bloomberg* published an article entitled "Deutsche Bank's Thoma to Step Down in Wake of Board Clash," stating that that Georg Thoma, Chairman of the Supervisory Board of Integrity Committee, who was brought on the Board to help improve controls and work through the Company's various cases of misconduct, resigned as Chairman of the Committee effective immediately, stating in pertinent part:

**Deutsche Bank's Thoma to Step Down in Wake of Board Clash**

April 28, 2016 — 4:46 PM EDT Updated on April 29, 2016 — 5:06 AM EDT

**Deutsche Bank AG supervisory board member Georg Thoma is stepping down two years before his contract ends, capping a week of turbulence at Germany's biggest lender after criticism that he went too far in probing potential wrongdoing within its ranks.**

Thoma, 71, will end his service on May 28, Deutsche Bank said in a statement from Frankfurt late Thursday. He's resigning from the board's integrity committee with immediate effect, the bank said.

**Thoma, a Shearman & Sterling LLP lawyer, was left isolated after pushing to investigate Chairman Paul Achleitner and mounting intensive inquiries**

**into Deutsche Bank executives, people familiar with the matter have said. Friction arose as Thoma sought to examine potential links between individual board members and legal cases starting in 2014, one of the people said.**

That conflict burst into the open this week when at least two board members spoke out against him in public. Deputy Chairman Alfred Herling criticized him for being "overzealous" and spending too much in probing potential wrongdoing. Thoma hasn't responded to requests for comment on those assertions.

Deutsche Bank dropped 3.1 percent to 16.83 euros at 11:04 a.m. in Frankfurt. The shares have declined about 25 percent this year, while the Bloomberg Europe Banks and Financial Services Index lost 16 percent.

The remarks divided observers, with Dieter Hein, an analyst at Fairesearch-Alphavalue, saying Thoma was probably just doing his job, while Michael Seufert, an analyst at Norddeutsche Landesbank, said the question of going too far in probing wrongdoing is legitimate.

**'Lost Control'**

**Thoma was brought on to help improve controls and work through the bank's numerous cases of misconduct.** Achleitner told some colleagues at that time that the lawyer's experience would be a boon as post-financial-crisis scandals were just beginning to hit European banks, a person familiar with the matter said. The two men had worked on the privatization of the eastern German chemicals industry after the fall of communism, with Achleitner tapping Thoma for the board in 2013 as part of a wider overhaul.

[Emphasis added].

308.    On this news, shares of Deutsche Bank fell $0.50 per share or approximately 3% from its previous closing price to close at $18.96 per share on April 29, 2016, damaging investors.

309.    On May 1, 2016, *The Financial Times* published an article entitled "FCA warns Deutsche on 'serious' financial crime control issues," stating that the United Kingdom's Financial Conduct Authority ("FCA") sent a letter to Deutsche Bank on March 2, 2015, accusing it of having "serious" and "systemic" failings in its controls against financing terrorism, money laundering, aiding against international sanctions, and committing financial crimes. The FCA

stated that its investigation uncovered, among other things, incomplete documentations, lack of monitoring, and influencing staff to take actions related to specific clients, which all amounted to a "serious" and "systemic" controls failure. The article stated in pertinent part:

May 1, 2016 6:00 pm

**FCA Warns Deutsche on 'Serious' Financial Crime Control Issues**

Caroline Binham in London and James Shotter in Frankfurt

**Deutsche Bank has "serious" and "systemic" failings in its controls against money laundering, terrorist financing and sanctions, according to confidential findings by the UK's financial watchdog, which had already put the lender in supervisory "special measures".**

**The Financial Conduct Authority conducted an in-depth review last year that found a catalogue of shortcomings at the bank, ranging from missing documents and a lack of transaction monitoring to inappropriate pressure put on staff to take on certain clients.** The watchdog has now ordered a separate independent review, according to a recent letter sent by the FCA to Deutsche.

**"Our overall conclusion was that DB UK had serious AML (anti-money laundering), terrorist financing and sanctions failings which were systemic in nature," said the FCA's letter, dated March 2. "Effective senior management engagement and leadership on financial crime had been lacking for a considerable period of time."**

The FCA's findings are another blow to Germany's biggest lender, which has been beset by misconduct issues including the rigging of Libor and is subject to an investigation into $10bn of suspicious Russian trades. Last week, the Frankfurt-based company was caught up in a storm after one of its board members resigned following a clash over how to deal with past scandals.

In the wake of its review across Deutsche's offices in the UK, India and Dublin, the FCA has ordered a so-called skilled persons report — sometimes known as a Section 166 report — to assess remedial work Deutsche must now carry out. These reports typically take many months to complete. Their findings can then spark an FCA enforcement investigation, which also normally take months before any conclusions and penalties are published.

\* \* \*

The FCA's conclusions come after Deutsche's participation in the watchdog's anti-money laundering programme, which is testing 14 major banks' controls against financial crime, one lender at a time. It is a programme overseen by the

FCA's supervision rather than enforcement team, meaning any remedies ordered are usually not made public.

It is separate to the FCA's "enhanced supervision" that Deutsche has been subject to after a series of regulatory failures, including the rigging of Libor, for which it paid a record $2.5bn.

The programme is also distinct from an enforcement investigation into $10bn of suspicious trades involving its Russian business. The FCA is unlikely to report its findings in that probe this year, according to people familiar with the matter. US and German authorities are also scrutinizing the allegations.

[Emphasis added].

310.    On May 1, 2016, *Bloomberg* published an article entitled "Deutsche Bank Said to Be Faulted by FCA Over Lax Client Vetting," stating that the FCA faulted the Company for "serious" lapses in efforts to thwart money laundering and criticized the Company's ability to verify client's abilities and goals, or ensure that it wasn't aiding organizations subject to international sanctions, stating in pertinent part:

**Deutsche Bank Said to Be Faulted by FCA Over Lax Client Vetting**

May 1, 2016 — 7:05 PM EDT

**U.K. regulators faulted Deutsche Bank AG in a March letter for "serious" lapses in efforts to thwart money laundering**, capping a review that already prompted the firm to make changes, according to a person with knowledge of the matter.

**Examiners criticized the bank's ability to verify some clients' identities and goals, or ensure that it wasn't aiding organizations subject to international sanctions, the Financial Conduct Authority found in the March 2 letter sent to the firm**, according to the person, who asked not to be identified discussing confidential communications. The FCA outlined lapses in the U.K. within two parts of the company the global markets division and the corporate and investment banking business.

\* \* \*

Deutsche Bank has earmarked funds for the money-laundering probe examining how clients moved money out Russia. An internal report analyzing the company's response to signs of so-called mirror trades there found control deficiencies that may have let a "suspected money-laundering pattern" pump as much as $10 billion out of

the country from 2012 through 2014, Bloomberg reported last month. The company, under pressure to cut costs, said last year it would close its securities business in Russia.

The FCA acknowledged in the summary of its anti-money-laundering review that Cryan, who took office last July, was "determined" to improve Deutsche Bank's controls, the Financial Times wrote earlier on Sunday, quoting the letter. Still, the regulator found that until recently, **the bank's U.K. operations had "lacked a clear strategy and effective leadership in tackling the systemic AML failures that had occurred,"** the FT cited it as saying.

[Emphasis added].

311.    On this news, shares of Deutsche Bank fell $1.62 per share or approximately 9% over the next two trading days to close at $17.34 per share on May 3, 2016, damaging investors.

312.    On June 29, 2016, the U.S. Financial Industry Regulatory Authority ("FINRA") fined Deutsche Bank Securities Inc. for failing to provide complete and accurate trade data in an automated form and timely manner when requested.  *Business Wire* reported the regulatory action against the Bank entity that day in the article "FINRA Fines Deutsche Bank Securities $6 Million for Submitting Inaccurate and Late Blue Sheet Data."

FINRA and the SEC regularly request certain trade data, also known as "blue sheets," to assist in the investigation of market manipulation and insider trading, Federal securities laws and FINRA rules require firms to provide this information to FINRA and other regulators electronically upon request. Blue sheets provide regulators with critical detailed information about securities transactions, including the security, trade date, price, share quantity, customer name, and whether it was a buy, sale or short sale.   This information is essential to regulators' ability to discharge their enforcement and regulatory mandates . . .

FINRA found that from at least 2008 through at least 2015, Deutsche Bank experienced significant failures with its blue sheet systems used to compile and produce blue sheet data, including programming errors in system logic and the firm's failure to implement enhancements to meet regulatory reporting requirements. These failures caused the firm to submit thousands of blue sheets to regulators that misreported or omitted critical information on over 1 million trades.

Additionally, FINRA found a significant number of Deutsche Bank's blue sheet submissions did not meet regulatory deadlines. Firms typically have 10 business days to respond to a blue sheet request. Between January 2014 and August 2015,

approximately 40 percent of Deutsche Bank's blue sheets were not submitted to FINRA on a timely basis.

In the settlement, the Bank agreed to retain an independent consultant to improve its systems and procedures for blue sheet submissions. FINRA's investigation and final determination demonstrated the inadequacy of Deutsche Bank's information systems and management of regulatory and legal compliance.

313.   On June 29, 2016, Deutsche Bank shares closed at $14.09, a decline of -0.56% from the $14.17 closing price on June 28, 2016.

314.   Also on June 29, 2016, but after market close, the Federal Reserve System issued a press release, disclosing that Deutsche Bank Trust Corp. had, for the second consecutive year, failed the Board's stress test, "based on qualitative concerns." Subsequent news reports revealed that this Bank unit failed its stress test not because of lack of capital adequacy, but because of "material unresolved supervisory issues." The *Wall Street Journal Online* in the June 29, 2016 article "Fed Rejects Deutsche Bank Trust's Capital Plan; Fed says Deutsche Bank unit has 'material unresolved supervisory issues,'" disclosed that the regulator had found the Bank unit's data management to be deficient.

> The Federal Reserve rejected the capital plan of Deutsche Bank Trust Corp. in the regulator's annual stress test released Wednesday.
>
> This marks the second consecutive year in which the Fed faulted the U.S. transaction banking and wealth-management unit of German banking giant Deutsche Bank AG in its annual review. Although the U.S. central bank found that the unit had enough capital to weather a severe economic downturn, it rejected Deutsche Bank Trust Corp's capital plan for so-called qualitative reasons, citing "material unresolved supervisory issues."
>
> Among the deficiencies the Fed identified at the Deutsche Bank unit were an inability to properly measure risk and manage its data infrastructure.

315.    Following this latest regulatory criticism of Deutsche Bank's supervision of its operations, compliance with regulatory requirements, and management of its data systems, the Bank's share price fell from $14.09 at close on June 29, to $13.73 at close on June 30, 2016, a decline of -2.56 %.

316.    On July 27, 2016, Deutsche Bank released its results for the second quarter of 2016. *The Times* observed that quarterly profits had nearly been wiped out by charges taken against potential legal action.

> Deutsche Bank's quarterly profits plunged as the lender took a series of charges against potential legal action that all but wiped out its earnings. Deutsche said that it had made €20 million in the three months to the end of June after being forced to set aside more than €600 million, including €120 million in litigation provisions that contributed to a 98 per cent year-on-year fall in profits.

317.    Analysis of Deutsche Bank's announcement on July 27, 2016, continued on July 28, 2016.  For example, analysts for Natixis published a report dated July 28, 2016, in which they opined that information released by the Bank indicated substantial legal costs were likely to be incurred in the second half of 2016.

> **Legal costs: still a lot of uncertainty.**  Like Q1, almost no legal costs were booked in Q2 because there has been little progress when it comes to settling legal disputes (€0.1 bn vs. €1.2 bn in Q2 15 and €0.2 bn in Q1 16). The group confirmed that it is actively seeking to settle several of its major legal disputes by the end of 2016 – this suggests that legal costs will probably be substantial in H2 16 (NB. we expect additional costs of €2.9 bn over the full year vs. consensus €2.3 bn). (Emphasis in original).

318.    Following Deutsche Bank's release of second-quarter 2016 financial results, its share price closed at $13.63 on July 27, 2016, down -3.88% from a closing price of $14.18.  On July 28, 2016, the second day of the two-day share price decline, the Bank's shares fell to $13.25, a -2.79% change by market close.

319.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

320.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Deutsche Bank securities purchased on a U. S. exchange or pursuant to other transactions in the U. S. (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the corporate Defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

321.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Deutsche Bank securities were actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Deutsche Bank or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

322.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

323.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

324.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Deutsche Bank;

- whether the Individual Defendants caused Deutsche Bank to issue false and misleading public statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading public statements;

- whether the prices of Deutsche Bank securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and,

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

325.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

326.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Deutsche Bank securities are traded in efficient markets;

- Deutsche Bank's shares were liquid and traded with moderate to heavy volume during the Class Period;

- Deutsche Bank traded on the NYSE, and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of Deutsch Bank's securities; and

- Plaintiff and members of the Class purchased and/or sold Deutsche Bank securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

327.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

328.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## LOSS CAUSATION

329.    During the Class Period, as detailed herein, Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of the securities issued by the Defendant companies, and operated as a fraud or deceit on Class-Period purchasers of such securities by misrepresenting the bank's risks related to, among other things, the bank's integrity and transparency, compliance, anti-money laundering safeguards, and internal controls.

330.   Later, as the truth relating to Defendants' prior false statements, misrepresentations, omissions, and fraudulent conduct was disclosed to the market, and/or the risks associated with Defendants' misconduct materialized, the price of the bank's securities fell as the prior artificial inflation came out of the respective prices.  As a result of his purchases of the securities issued by the bank during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## COUNT I

### Violation of Section 10(b) of The Exchange Act and Rule 10b-5
### Against All Defendants

331.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

332.   This Count is asserted against all Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

333.   During the Class Period, Deutsche Bank, Deutsche Bank Russia, and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

334.   Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;
- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Deutsche Bank securities during the Class Period.

335.    Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of Deutsche Bank and/or Deutsche Bank Russia were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.   These defendants, by virtue of their receipt of information reflecting the true facts of Deutsche Bank and/or Deutsche Bank Russia, their control over, and/or receipt and/or modification of Deutsche Bank and/or Deutsche Bank Russia's allegedly materially misleading statements, and/or their associations with the banks, which made them privy to confidential proprietary information concerning the banks, participated in the fraudulent scheme alleged herein.

336.    Individual Defendants, who are the senior officers and/or directors of the banks, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other bank personnel to members of the investing public, including Plaintiff and the Class.

337.    As a result of the foregoing, the market price of Deutsche Bank securities was artificially inflated during the Class Period.   In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of Deutsche Bank securities during the Class Period in purchasing Deutsche Bank securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

338.    Had Plaintiff and the other members of the Class been aware that the market price of Deutsche Bank securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased Deutsche Bank's securities at the artificially inflated prices that they did, or at all.

339.    As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

340.    By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of Deutsche Bank securities during the Class Period.

## COUNT II

### Violation of Section 20(a) of the Exchange Act
### Against The Individual Defendants

341.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

342.    During the Class Period, the Individual Defendants participated in the operation and management of Deutsche Bank and Deutsche Bank Russia, and conducted and participated, directly and indirectly, in the conduct of the banks' business affairs.  Because of their senior positions, they knew the adverse non-public information regarding the banks' business practices.

343.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate full, accurate and truthful information with respect to Deutsche Bank and Deutsche Bank Russia's internal controls, anti-money laundering compliance, culture, business, operational and financial results, and to correct promptly any

public statements issued by Deutsche Bank and Deutsche Bank Russia, and the Individual Defendants, which had become materially false or misleading.

344.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings, which Deutsche Bank and Deutsche Bank Russia disseminated in the marketplace during the Class Period.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Deutsche Bank and/or Deutsche Bank Russia to engage in the wrongful acts complained of herein.  The Individual Defendants therefore, were "controlling persons" of Deutsche Bank and/or Deutsche Bank Russia within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Deutsche Bank securities.

345.    Each of the Individual Defendants, therefore, acted as a controlling person of Deutsche Bank and/or Deutsche Bank Russia.  By reason of their senior management positions and/or being directors of Deutsche Bank and/or Deutsche Bank Russia, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Deutsche Bank and/or Deutsche Bank Russia to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Deutsche Bank and/or Deutsche Bank Russia and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

346.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Deutsche Bank and/or Deutsche Bank Russia.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: December 16, 2016

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Jeremy A. Lieberman*
Jeremy A. Lieberman
Emma Gilmore
Adam G. Kurtz

600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email:
jalieberman@pomlaw.com
egilmore@pomlaw.com
agkurtz@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
Email: pdahlstrom@pomlaw.com

*Lead Counsel for Lead Plaintiff and Plaintiff Warren Ramanathan*

**BRONSTEIN, GEWIRTZ & GROSSMAN, LLC** Peretz Bronstein
 60 East 42nd Street, Suite 4600 New York, NY 10165 Telephone: (212) 697-6484 Facsimile (212) 697-7296
 Email: peretz@bgandg.com

*Additional Counsel for Lead Plaintiff and Plaintiff Warren Ramanathan*

157