

**Jeremy A. Lieberman**
Managing Partner

January 23, 2017

Honorable Analisa Torres
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007-1312

Re:   *In re Deutsche Bank Aktiengesellschaft Sec. Litig.,*
      *No. 16-cv-03495-(AT) (BCM) (S.D.N.Y.)*

Dear Judge Torres:

I write on behalf of Plaintiffs in response to Defendant Deutsche Bank Aktiengesellschaft AG's ("Defendant") January 16, 2017 letter to the Court and pursuant to Article III.A.ii of Your Honor's Individual Practices. As explained below, none of the purported deficiencies raised by Defendant has merit:

**Background**. Defendant takes issue with the length of Plaintiffs' Consolidated Amended Complaint ("CAC" or "Complaint"), but only a thorough presentation of the facts can detail the brazen *$10 billion money laundering scheme* perpetrated by Deutsche Bank and its employees— *which not even the bank denies has occurred*. The money-laundering scheme is the subject of world-wide government investigations, including by the U.S. Justice Department and the New York's banking regulator, and is widely expected to trigger hefty penalties in the billions to be levied against the bank. Revelation of the scheme *eviscerated over $20 billion* in Deutsche Bank's market capitalization, inflicting massive damages on investors.

The Complaint clearly sets forth false and misleading statements and explains why those statements are false and misleading. *See, e.g.*, CAC ¶¶166, 171. Deutsche Bank failed to address the significant internal control and reporting deficiencies that multiple government regulators demanded be addressed for years, including requests that it fully address the deficiencies in its anti-money laundering ("AML") policies and procedures, customer due diligence practices, risk management processes, and internal controls related to the bank's correspondent banking and funds transfer clearing activities. All the while, Deutsche Bank falsely assured investors that "Deutsche Bank [was] in the process of transformation . . . to win back people's trust," declaring that the bank had "significantly tighten[ed] [it]s control environment," that it had "robust" controls to prevent money laundering, and that it had "developed effective procedures for assessing clients" with "intensive checks" and "regular reviews."

Case 1:16-cv-03495-AT-BCM Document 66 Filed 01/23/17 Page 2 of 5



**The CAC pleads violations of the Securities Exchange Act.** The CAC pleads with particularity the statements alleged to have been false and misleading, the maker of the statements, when the statements were made, why they are false and misleading, and Defendant's scienter. For example, the CAC alleges that on or about April 20, 2013, Deutsche Bank AG made false and misleading statements on its website about the bank's compliance systems and AML procedures, stating *inter alia* that "[w]e have developed effective procedures for assessing clients (Know Your Customer or KYC) . . . Our KYC procedures start with intensive checks before accepting a client and continue in the form of regular reviews." ¶166. The falsity of these statements is manifest because: (i) the bank had serious and systemic failings in its systems and controls against money laundering, financing terrorism, aiding against international sanctions, and committing financial crimes (including unsound KYC procedures); (ii) the bank's internal systems and controls over financial reporting and their disclosure controls and procedures were not effective; (iii) and employees, including top management in Russia, were engaging in money-laundering activities. ¶171; *see also*, for example, ¶¶71-78, 125-126. Indeed, at the time these misstatements were made, as confidential witness CW2 explained, in most suspicious transactions there was little, if any, information about the beneficial owners, known problems identified before the relevant period from 2013 to 2016 were not addressed, and the bank's AML programs and internal controls were ineffective. *See, e.g.*, ¶125. CW2 attributed the refusal of Deutsche Bank to address known AML weaknesses to the fact that AML functions cost banks money and do not generate income, and noted that one of the limits to an effective AML program is the threat of losing a significant client. ¶129.

Deutsche Bank had been repeatedly notified of and asked by various governmental authorities to fix significant deficiencies in the bank's regulatory and control processes, including deficiencies concerning its AML procedures and the lack of appropriate oversight by compliance and internal audit. *See, e.g.*, ¶¶58-82, 88 (identifying, *inter alia*, multiple warnings from the Federal Reserve Bank of New York in 2002, 2007, 2012 and 2013, detailing unaddressed deficiencies that contributed to significant AML violations; detailing an October 2005 agreement with the Federal Reserve and the New York State Banking Department requiring the bank to improve its AML compliance policies and procedures through, among other things, appropriate due diligence of correspondent accounts for non-U.S. persons). The New York State Department of Financial Services, with which the Federal Reserve was jointly acting, described a deliberate, systematic evasion of U.S. sanctions at Deutsche Bank *as a matter of bank policy*. ¶¶76-78. Bank employees at all levels were actively involved in circumventing controls and permitting transactions involving sanctioned customers, and employee handbooks even contained tips on how to clear those transactions. *Id.* The illicit conduct occurred, according to the regulator, "[i]n order to facilitate what [the bank] saw as 'lucrative' U.S. dollar business for sanctioned customers." ¶76. And, commencing with 2012, the German federal bank supervisor BaFin started investigating Deutsche Bank for other suspicious money-laundering transactions, which the bank reported too late to the police. ¶79. In December 2012, 500 police officers raided Deutsche Bank's Frankfurt headquarters and other offices. *Id.* As part of the raid, the Legal Department Head responsible for the bank's AML operations was arrested. ¶81. The investigation reached Deutsche Bank's board room itself, with Defendants Fitschen



and Krause accused of wrongdoing. ¶80. At the time, experts estimated that €8-10 billion of criminal money was laundered through the Bank. ¶82.

Far from alleging what Defendant purports to be "general," "aspirational" statements or statements of belief or opinion concerning, for example, corporate codes of conduct, compliance and internal controls, the CAC pleads *specific* false and misleading *facts* actionable under the federal securities laws. *See, e.g.*, ¶143 ("[d]uring 2012, we continued to strengthen our control environment, tightening our systems and processes and enhancing our monitoring capabilities"); ¶156 ("The trust in banks is at a record low due to perceived conflicts of interest and selfish behavior. We must renew the contract with society and strengthen the fabric of trust with all of our stakeholders. We have to demonstrate that we play a valuable role in society and that we act with integrity and responsibility. Ethical conduct is critical, especially in client relationships . . . We are reviewing potential transactions and clients more critically than in the past."); ¶157 ("In order to comply with Anti-Money Laundering legal and regulatory requirements and to protect the bank against money laundering, terrorist financing, and financial crime, Know-Your-Customer (KYC) procedures are in place"); ¶162 ("Our anti-money laundering program provides strong support for international efforts to combat money laundering, financing terrorism and other criminal acts. We scrutinize clients and current transactions using meticulous procedures and an automated monitoring system through this compliance program"); ¶166 ("Whether in the area of money laundering, corruption, or financial crime—the compliance management system of Deutsche Bank is geared to strict conformity with the law and has been achieving good results for years"); ¶166 ("We have developed effective procedures for assessing clients . . . and a process for accepting new clients in order to facilitate comprehensive compliance . . . they help us to minimize risks relating to money laundering . . . Our procedures apply not only to individuals and corporations that are or may become our direct business partners, but also to people and entities that stand behind them or are indirectly linked to them"); ¶207 ("Effective action against money laundering relies on adequate and up-to-date information on client relationships. Know-Your-Customer (KYC) is an ongoing process, from the adoption of the client throughout the life of the relationship. Deutsche Bank's KYC policies cover new client adoption as well as regular reviews and screening of existing client relationships against internal and external lists of negative information.").

These and other statements were directly at odds with the truth and expose Defendant to a viable 10(b) claim under the federal securities laws. *See, e.g.*, *In re Goldman Sachs Group, Inc. Sec. Litig.*, No. 10-cv-3461, 2014 WL 2815571, at *4-5 (S.D.N.Y. June 23, 2014) ("Goldman's representations about its purported controls for avoiding conflicts were directly at odds with its alleged conduct" and the "statements about business practices were directly related to the subject of the fraud"); *City of Brockton Ret. Sys. v. Avon Products, Inc.*, No. 11-cv-4665, 2014 WL 4832321, at *16 (S.D.N.Y. Sept. 29, 2014) ("A reasonable investor could interpret Avon's statements about its allegedly elaborate internal controls operation as reflecting concrete steps that Avon had taken in this area, and might rely upon these statements as a guarantee that such steps had, in fact, been implemented"); *Lapin v. Goldman Sachs Grp., Inc.*, 506 F. Supp. 2d 221, 240-41 (S.D.N.Y. 2006) (the Second Amended Complaint does more than identify rosy



predictions or vague statements about Goldman's integrity; Goldman stated that such integrity "was at the heart" of its business and attempted to distinguish itself from other institutions based on its "truly independent investment research" while it allegedly knew the contrary was true). Moreover, Defendants did not preface these facts with words like Deutsche Bank "believes" or "thinks," which may have transformed these and other statements of fact into statements of opinion. *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund et al.*, 135 S. Ct. 1318, 1325 (2015) ("Most important, a statement of fact ('the coffee is hot') expresses certainty about a thing, whereas a statement of opinion ('I think the coffee is hot') does not").[1]

Defendant claims that the securities laws do not require a wrongdoer to disclose uncharged, criminal conduct. But where a defendant, like Deutsche Bank here, chooses to speak in half-truths, its conduct is unquestionably actionable under the federal securities laws. *See Louis S. Caiola v. Citibank, N.A., New York*, 295 F.3d 312, 331 (2d Cir. 2002).

**Defendants' Reservation of Rights**. Despite representing to the Court that he only acts on behalf of Deutsche Bank AG, counsel for Defendant improperly seeks to reserve with respect to "All Defendants" all rights regarding all grounds for dismissing the CAC, including: challenges under *Janus Capital Grp. v. First Derivative Traders*, 564 U.S. 135 (2011), about who is a "maker" of materially false and misleading statements; challenges under *Morrison v. Nat'l Australia Bank*, 561 U.S. 247 (2010), about the application of the U.S. federal securities laws; control person challenges; and personal jurisdiction attacks. These challenges are unfounded.[2]

*First*, the CAC properly identifies the "maker" of the materially false and misleading statements. *See, e.g.*, ¶141 (identifying Defendant as the maker of the statements); ¶142 (identifying Defendant as the maker of the 2012 Annual Report that contained false and misleading statements); ¶158 (identifying Defendant as the maker of the 2012 20-F that contained false and misleading statements); ¶160 (identifying Defendant as the maker of the statements). It is also "appropriate to invoke the group pleading doctrine and presume that . . . a high-level executive . . . who played a daily role in the company's operations, was a 'maker' of

---

[1] Any statements of opinion made by Defendant are actionable because, as the CAC pleads, Deutsche Bank was aware that its AML procedures were significantly deficient. *See, e.g.*, ¶¶58-82, 88, 125, 129.

[2] Counsel for Defendant Deutsche Bank AG agreed to accept service only for two of the individual defendants, Cryan and Schenck, but asked Plaintiffs for a 60-day stay of proceedings pending service on the remaining defendants. Plaintiffs declined, seeing no reason to delay the action against the served defendants, particularly where service for the remaining defendants in Germany, Russia, and Indonesia—where Defendant Wiswell is hiding—may take months, if not years to accomplish. *See, e.g., Export-Import Bank of the United States v. Asia Pulp & Paper Co.*, 2005 U.S. Dist. LEXIS 8902, at *2-13, 2005 WL 1123755 (S.D.N.Y. May 11, 2005) (over two and a half years from filing of summons and complaint to service in Indonesia).

Hon. Analisa Torres
January 23, 2017
Page 5


**POMERANTZ**

[statements] insofar as they related to . . . the division headed by [that executive]." *City of Pontiac Gen. Emps Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359 (S.D.N.Y. 2012).

*Second*, Plaintiffs acquired securities on the New York Stock Exchange. While Plaintiffs believe that the CAC adequately pleads a U.S. purchase under *Morrison* by stating that Plaintiffs "purchased Deutsche Bank securities on a United States exchange or pursuant to other transactions within the United States," Plaintiffs have offered Defendant to amend the complaint, to plead only that Plaintiffs "purchased Deutsche Bank securities on the New York Stock Exchange." Plaintiffs do not believe that such a minor amendment should delay any briefing schedule on the CAC and are willing to strike the excess language—"or pursuant to other transactions in the United States." Purchasing securities on a U.S. exchange falls squarely under the *Morrison* ambit.

*Third*, the CAC adequately pleads a primary violation. It also adequately pleads control by the individual defendants, each of which occupied senior positions at Deutsche Bank and participated in the operation and management of the bank.

*Fourth*, the Court has personal jurisdiction over Defendant because, among other things, it listed and made available for trading its common stock on the New York Stock Exchange, thereby expanding the pool of its investors and raising capital. Defendant also filed annual reports on Form 20-F and other reports with the U.S. Securities and Exchange Commission. By engaging in these acts, Defendant agreed to abide by the federal securities laws and the SEC rules and regulations, and purposefully availed itself of the benefits and protections of those laws. *See, e.g., Landry v. Price Waterhouse Chartered Accountants*, 715 F. Supp. 98, 101 (S.D.N.Y. 1989) (finding personal jurisdiction over nonresident defendants who invoked the benefit of trading stock on a United States market). The fact that this Court has personal jurisdiction over such a defendant is so well-established that it is seldom raised as a jurisdictional defense.[3]

                                      Respectfully submitted,

                                      */s/ Jeremy A. Lieberman*
                                      Jeremy A. Lieberman

cc:     Charles A. Gilman, Esq. via e-mail

---

[3] As the Second Circuit explained, "SEC filings generally are the type of devices that a reasonable investor would rely on in purchasing securities of the filing corporation." *Itoba v. LEP Group PLC*, 54 F.3d 118, 123 (2d Cir. 1995) (internal quotations omitted). Accordingly, there is a nexus between Defendant's purposeful contacts with the forum and the claims asserted.