**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------X

IN RE: DEUTSCHE BANK AKTIENGESELLSCHAFT
SECURITIES LITIGATION

No.: 16-cv-03495 (AT)(BCM)

-------------------------------------------------------------------X


**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**
**THE CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

Charles A. Gilman
David G. Januszewski
Tara H. Curtin
John M. Schoolman
CAHILL GORDON & REINDEL LLP
80 Pine Street
New York, NY 10005
(212) 701-3000

*Attorneys for Defendants Deutsche Bank*
*Aktiengesellschaft, John Cryan, Marcus*
*Schenck, and Anshuman Jain*

February 21, 2017

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................. 1

STATEMENT OF ALLEGED FACTS ..................................................................... 7

    A.    Deutsche Bank's Public Disclosures ................................................. 8

    B.    Deutsche Bank's Transformation During the Class Period ................... 10

    C.    Deutsche Bank's Internal Controls ........................................................ 11

    D.    Alleged AML Violations ...................................................................... 12

    E.    Allegations Against the Individual Defendants Served to Date ........... 13

        1.    Marcus Schenck ...................................................................... 13

        2.    John Cryan ............................................................................... 14

        3.    Anshuman Jain .......................................................................... 15

LEGAL STANDARD ............................................................................................ 17

ARGUMENT .......................................................................................................... 17

I.    Plaintiffs Fail to State a Claim of Securities Fraud Under Section 10(b) ......... 17

    A.    Plaintiffs Fail to Allege an Actionable Misstatement or Omission ........ 18

        1.    Aspirational Statements About Codes of Conduct Are Not Actionable ... 18

        2.    Statements of Belief or Opinion Are Not Actionable .............................. 23

        3.    The CAC Fails to Plead Any Actionable Omission ................................. 24

        4.    Allegations After October 29, 2015 Fail as a Matter of Law ................. 27

    B.    Plaintiffs Fail to Plead Fraud with Particularity .................................... 28

    C.    Plaintiffs Fail to Adequately Allege Scienter ....................................... 33

        1.    Plaintiffs Do Not Allege Defendants Had a Motive to Defraud ............ 35

        2.    Plaintiffs Do Not Adequately Allege Conscious Misbehavior or Recklessness ............................................................................ 35

II.    Plaintiffs Fail to State a Claim of Control Person Liability Under Section 20(a) ........... 40

CONCLUSION ....................................................................................................... 41

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Andropolis* v. *Red Robin Gourmet Burgers*,
505 F. Supp. 2d 662 (D. Colo. 2007) ................................................................6, 19

*ATSI Communications* v. *Shaar Fund*,
493 F.3d 87 (2d Cir. 2007) ....................................................................................40

*Basic* v. *Levinson*,
485 U.S. 224 (1988) ...............................................................................................20

*Batson* v. *Rim San Antonio Acquisition*,
2016 WL 6901312 (S.D.N.Y. Nov. 22, 2016) (Carter, J.) ............................... 11-12

*Bell Atlantic* v. *Twombly*,
550 U.S. 544 (2007) ...............................................................................................17

*Boca Raton Firefighters & Police Pension Fund* v. *Bahash*,
506 Fed. Appx. 32 (2d Cir. 2012) ................................................................... 3-4, 34

*Boguslavsky* v. *Kaplan*,
159 F.3d 715 (2d Cir. 1998) ..................................................................................40

*C.D.T.S.* v. *UBS AG*,
2013 WL 6576031 (S.D.N.Y. Dec. 13 2013) (Forrest, J.), *aff'd sub nom.*
*Westchester Teamsters Pension Fund* v. *UBS AG*, 604 Fed. Appx. 5 (2d Cir. 2015) ............33

*In re Canandaigua Securities Litigation*,
944 F. Supp. 1202 (S.D.N.Y. 1996) (Pollack, J.) ................................................24

*Carpenters Pension Trust Fund of St. Louis* v. *Barclays PLC*,
750 F.3d 227 (2d Cir. 2014) ....................................................................................5

*In re China Mobile Games & Entertainment Group Securities Litigation*,
2016 WL 922711 (S.D.N.Y. Mar. 7, 2016) (Wood, J.) ....................................36, 38

*In re Citigroup, Inc. Securities Litigation*,
330 F. Supp. 2d 367 (S.D.N.Y. 2004) (Swain, J.), *aff'd sub nom.*
*Albert Fadem Trust* v. *Citigroup*, 165 Fed. Appx. 928 (2d Cir. 2006) ........................ 4, 31-32

*In re Citigroup Inc. Securities Litigation*,
753 F. Supp. 2d 206 (S.D.N.Y. 2010) (Stein, J.) .................................................38

*City of Monroe Employees Retirement System* v. *Bridgestone*,
399 F.3d 651 (6th Cir. 2005) .................................................................................21

*City of Pontiac Policemen's & Firemen's Retirement System* v. *UBS AG*,
  752 F.3d 173 (2d Cir. 2014)................................................................ 4, 20, 24-25

*Cox* v. *Blackberry*,
  2016 WL 4470928 (2d Cir. Aug. 24, 2016) (summary order)...................................30

*Dalberth* v. *Xerox*,
  2014 WL 4390695 (2d Cir. Sept. 8, 2014) .................................................26

*In re DDAVP Direct Purchaser Antitrust Litigation*,
  585 F.3d 677 (2d Cir. 2009)..............................................................33

*Debora* v. *WPP Group*,
  1994 WL 177291 (S.D.N.Y. May 5, 1994) (Duffy, J.).......................................26

*Decker* v. *Massey-Ferguson*,
  681 F.2d 111 (2d Cir. 1982)..............................................................2

*Deutsche Zentral-Genossenchaftsbank AG* v. *HSBC North America Holdings*,
  2013 WL 6667601 (S.D.N.Y. Dec. 17, 2013) (Torres, J.)....................................8

*DiVittorio* v. *Equidyne Extractive Industries*,
  822 F.2d 1242 (2d Cir. 1987)..........................................................13, 17

*In re DNTW Chartered Accountant Securities Litigation*,
  2016 WL 7320984 (2d Cir. Dec. 15, 2016) (summary order) ..............................40

*ECA & Local 134 IBEW Joint Pension Trust of Chicago* v. *JP Morgan Chase*,
  553 F.3d 187 (2d Cir. 2009)........................................................ *passim*

*Estate of Sampson* v. *Georgeson Shareholder*,
  412 F.3d 103 (2d Cir. 2005)..............................................................21

*In re FBR Securities Litigation*,
  544 F. Supp. 2d 346 (S.D.N.Y. 2008) (Holwell, J.) .......................................25

*Garber* v. *Legg Mason*,
  347 Fed. Appx. 665 (2d Cir. 2009)........................................................21

*Glaser* v. *The9*,
  772 F. Supp. 2d 573 (S.D.N.Y. 2011) (Holwell, J.) ....................................36, 38

*Gusinsky* v. *Barclays PLC*,
  944 F. Supp. 2d 279 (S.D.N.Y. 2013) (Scheindlin, J.), *aff'd in relevant part sub nom.*
  *Carpenters Pension Trust Fund Fund of St. Louis* v. *Barclays PLC*,
  750 F.3d 227 (2d Cir. 2014)...........................................................5, 31

-iii-

*Indiana Public Retirement System* v. *SAIC*,
818 F.3d 85 (2d Cir. 2016)..................................................................... 5, 20-21

*Intermountain Stroke Center* v. *Intermountain Health Care*,
638 Fed. Appx. 778 (10th Cir. 2016).....................................................19

*Kalnit* v. *Eichler*,
264 F.3d 131 (2d Cir. 2001)...................................................................35

*In re Keyspan Securities Litigation*,
383 F. Supp. 2d 358 (E.D.N.Y. 2003) ...................................................26

*Liberty Ridge* v. *RealTeach Systems*,
173 F. Supp. 2d 129 (S.D.N.Y. 2001) (Pollack, J.) ...............................28

*Lopez* v. *Ctpartners Executive Search*,
173 F. Supp. 3d 12, 29 (S.D.N.Y. 2016) (Engelmayer, J.).......................6

*In re Magnum Hunter Resources Securities Litigation*,
26 F. Supp. 3d 278, 284, 292 (S.D.N.Y. 2014) (Forrest, J.),
*aff'd,* 616 Fed. Appx. 442 (2d Cir. 2015) ...................................3, 13, 34

*Matrixx Initiatives* v. *Siracusano*,
563 U.S. 27 (2011)..................................................................................17

*Medis Investor Group* v. *Medis Technologies*,
586 F. Supp. 2d 136 (S.D.N.Y. 2008) (Crotty, J.),
*aff'd,* 328 Fed. Appx. 754 (2d. Cir. 2009) ............................................39

*Menaldi* v. *Och-Ziff Capital Management Group*,
164 F. Supp. 3d 568, 580 (S.D.N.Y. 2016) (Oetken, J.).......................24

*In re Merrill Lynch & Co. Research Reports Securities Litigation*,
218 F.R.D. 76 (S.D.N.Y. 2003) (Pollack, J.)...........................................7

*In re Morgan Stanley Information Fund Securities Litigation*,
592 F.3d 347 (2d Cir. 2010) ..................................................................20

*In re Nokia Securities Litigation*,
423 F. Supp. 2d 364 (S.D.N.Y. 2006) (Karas, J.) .................................39

*Novak* v. *Kasaks*,
216 F.3d 300 (2d Cir. 2000)..........................................................7, 30, 36

*Omnicare* v. *Laborers District Council Construction Industry Pension Fund*,
135 S. Ct. 1318 (2015)...........................................................................24

*In re PetroChina Securities Litigation*,
120 F. Supp. 3d 340, 356 (S.D.N.Y. 2015) (Ramos, J.),
*aff'd sub nom. Klein* v. *PetroChina*, 644 Fed. Appx. 13 (2d Cir. 2016)...........................29, 34

*Plumbers and Pipefitters Local Union No. 630 Pension–Annuity Trust Fund* v. *Arbitron*,
741 F. Supp. 2d 474 (S.D.N.Y. 2010) (Koeltl, J.) ...................................................................33

*Prime Mover Capital Partners L.P.* v. *Elixir Gaming Technologies*,
793 F. Supp. 2d 651 (S.D.N.Y. 2011) (Kaplan, J.)..........................................................37, 39

*Reese* v. *Bahash*,
574 Fed. Appx. 21 (2d Cir. 2014) ............................................................................................5

*Retail Wholesale & Department Store Union Local 338 Retirement Fund* v. *Hewlett-Packard*,
845 F.3d 1268 (9th Cir. 2017) ...........................................................................................5, 19

*Rochez Brothers* v. *Rhoades*,
527 F.2d 880 (3d Cir. 1975)....................................................................................................40

*Rombach* v. *Chang*,
355 F.3d 164 (2d Cir. 2004)....................................................................................................18

*In re Sanofi Securities Litigation*,
155 F. Supp. 3d 386 (S.D.N.Y. 2016) (Castel, J.) .................................................................24

*Santa Fe Industries* v. *Green*,
430 U.S. 462 (1977).......................................................................................................... 3, 5-6

*Scott* v. *General Motors*,
605 Fed. Appx. 52 (2d Cir. 2015)............................................................................................5

*SEC* v. *First Jersey Securities*,
101 F.3d 1450 (2d Cir.1996)...................................................................................................40

*In re Security Capital Assurance Securities Litigation*,
729 F. Supp. 2d 569 (S.D.N.Y. 2010) (Batts, J.) ............................................................27, 38

*Seibert* v. *Sperry Rand*,
586 F.2d 949 (2d Cir. 1978)....................................................................................................26

*Sgalambo* v. *McKenzie*,
739 F. Supp. 2d 453 (S.D.N.Y.2010) (Scheindlin, J.) ............................................................38

*Shields* v. *Citytrust Bancorp*,
25 F.3d 1124 (2d Cir. 1994).....................................................................................................7

*Shtofmakher* v. *David*,
2015 WL 5148832 (S.D.N.Y. Aug. 17, 2015) (Torres, J.) ...............................................13, 17

*Slayton* v. *American Express*,
  604 F.3d 758, 777 (2d Cir. 2010) ........................................................34

*Smith* v. *Local 819 I.B.T. Pension Plan*,
  291 F.3d 236 (2d Cir. 2002).................................................................17

*In re Sotheby's Holdings*,
  2000 WL 1234601 (S.D.N.Y. Aug. 31, 2000) (Cote, J.) ......................38

*South Cherry Street* v. *Hennessee Group*,
  573 F.3d 98 (2d Cir. 2009)...................................................................36

*Stoneridge Investment Partners* v. *Scientific-Atlanta*,
  552 U.S. 148 (2008)..............................................................................17

*Teamsters Local 445 Freight Division Pension Fund* v. *Dynex Capital*,
  531 F.3d 190 (2d Cir. 2008)..................................................................34

*In re Time Warner Securities Litigation*,
  9 F.3d 259 (2d Cir. 1993).....................................................................24

*In re Tower Group International Securities Litigation*,
  2015 WL 5813393 (S.D.N.Y. Sept. 18, 2015) (Torres, J.) ............. *passim*

*In re UBS AG Securities Litigation*,
  2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012) (Sullivan, J.), *aff'd, City of Pontiac*
  *Policemen's & Firemen's Retirement System* v. *UBS AG*,
  752 F.3d 173, 185 (2d Cir. 2014).......................................................... *passim*

*In re Veeco Instruments Securities Litigation*,
  235 F.R.D. 220 (S.D.N.Y. 2006) (McMahon, J.) .................................35

*In re Weight Watchers International Securities Litigation*,
  2016 WL 2757760 (S.D.N.Y. May 11, 2016) (Kaplan, J.)....................23

*Weill* v. *Dominion Resources*,
  875 F. Supp. 331 (E.D. Va. 1994) ..........................................................6

*White* v. *Melton*,
  757 F. Supp. 267 (S.D.N.Y. 1991) (Kram, J.) ......................................26

*Williams* v. *WMX Technologies*,
  112 F.3d 175 (5th Cir. 1997) ..................................................................7

*Woodward* v. *Raymond James Financial*,
  732 F. Supp. 2d 425 (S.D.N.Y. 2010) (Patterson, J.) .............................7

*Woori Bank* v. *Citigroup*,
     2013 WL 1235648 (S.D.N.Y. Mar. 27, 2013) (Swain, J.)......................................................31

**Regulations**

17 C.F.R. § 240.10b-5(b) ................................................................................... *passim*

**Rules**

Fed. R. Civ. P. 8(a) ....................................................................................................................1

Fed. R. Civ. P. 8(e) ....................................................................................................................2

Fed. R. Civ. P. 12(b)(6).........................................................................................................1, 17

Fed. R. Civ. P. 9(b) ......................................................................................... 1, 7, 28-29, 33

**Statutes**

Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4 ........................ 7, 28, 33-34

Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j ............................ *passim*

Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t ................................ 39-40

Pursuant to the Court's Order dated January 23, 2017 (ECF 67), Defendant Deutsche Bank Aktiengesellschaft ("Deutsche Bank") respectfully submits this memorandum in support of its motion to dismiss Plaintiffs' Consolidated Amended Complaint (the "CAC") pursuant to Rules 8(a), 9(b), and 12(b)(6) of the Federal Rules of Civil Procedure.

The CAC names two corporate and twelve individual defendants.[1]  Deutsche Bank and its current chief executive and chief financial officers (John Cryan and Marcus Schenck) accepted service through counsel.  Despite the fact that this action was commenced on May 10, 2016, Plaintiffs have purported to serve only one other defendant, Anshuman Jain (former co-chairman and co-chief executive officer of Deutsche Bank).  *See* ECF 62.  We suggested that proceedings be stayed while Plaintiffs got their service squared away.  Plaintiffs refused.  *See* ECF 65 at 1 n.1.  This motion is therefore made on behalf of Deutsche Bank and Messrs. Cryan, Schenck and Jain.  All other Defendants reserve all rights.

## PRELIMINARY STATEMENT

This litigation was commenced in May 2016 by the filing of two actions (*Ranson*, 1:16-cv-03495 and *Ramanathan*, 1:16-cv-03539) with virtually identical 32- and 33-page complaints alleging violation of Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 promulgated thereunder against Deutsche Bank and four individual defendants, and secondary control person liability under Section 20(a) against the four individuals, in connection with misrepresentations and material omissions made with respect to Deutsche Bank's internal controls, codes of conduct, culture of compliance and ethical conduct, and compliance with local law and regulations.  The Court consolidated the actions (ECF 19), appointed a Lead Plaintiff

---

[1]  *See* CAC ¶ 12 (Deutsche Bank), ¶ 13 (Deutsche Bank Russia), ¶ 14 (Stefan Krause), ¶ 15 (Juergen Fitschen), ¶ 16 (Anshuman Jain), ¶ 17 (Stephan Leithner), ¶ 18 (Stuart Lewis), ¶ 19 (Rainer Neske), ¶ 20 (Henry Ritchotte), ¶ 21 (John Cryan), ¶ 22 (Marcus Schenck), ¶ 23 (Timothy Wiswell), ¶ 24 (Joerg Bongartz) and ¶ 25 (Batubay Ozkan).

(ECF 49), and granted Plaintiffs permission to file a single consolidated amended complaint (ECF 50).  Plaintiffs filed the CAC on December 16, 2016 (ECF 51).

However, instead of simply consolidating the two actions with a single pleading, Plaintiffs expanded the class they purport to represent, added eight additional corporate and individual defendants, and filed a 159-page "'everything but the kitchen sink' type of pleading." *Decker* v. *Massey-Ferguson*, 681 F.2d 111, 114–15 (2d Cir. 1982).  Speaking of a complaint less than half the size, the Court of Appeals in *Decker* made clear the importance of a careful review:

> In a prolix and discursive 69 page complaint, which is anything but the simple, direct, and concise statement mandated by Fed.R.Civ.P. 8(e), plaintiff's battery of lawyers seeks to charge Massey with liability for the losses sustained by class members who purchased Massey stock between 1976 and 1978. The complaint is an "everything but the kitchen sink" type of pleading which would give plaintiff's attorneys carte blanche in the area of liberal federal discovery. Because the "in terrorem" effect of such unfettered discovery would, to say the least, be substantial, it is important that the wheat in plaintiff's pleading be separated from the chaff.

*Id*.

When the wheat in Plaintiffs' pleading is separated from the chaff, it is clear that the CAC pleads at most a claim of corporate mismanagement — that management failed to assure that Deutsche Bank employees would abide by the Bank's Code of Conduct and comply with the law.   In their own words, Plaintiffs characterize the "Nature of the Action" as one about Deutsche Bank management's *failing to address*:

- "serious deficiencies in its anti-money laundering ('AML') systems and controls" (CAC ¶ 2);

- "significant internal control and reporting deficiencies" (CAC ¶ 3); and

- "[its] control environment" (CAC ¶ 4).

*See also* CAC ¶ 31 (alleging "the Management Board was responsible for managing the Bank"); CAC ¶ 51 (alleging "Deutsche Bank's management failed to prevent and adequately address [ ] manipulations of benchmark interest rates"); CAC ¶¶ 58–61, 68 (alleging management's failure

-2-

to address regulatory reporting "deficiencies" and "lack of appropriate internal controls");
CAC ¶¶ 70, 72, 85 (same); CAC ¶¶ 109–110 (alleging "severe weaknesses" in internal controls);
CAC ¶¶ 119–120 ("senior management should have looked at . . ."); CAC ¶ 129 (alleging a
"failure of Deutsche Bank's officials to address" AML issues); CAC ¶¶ 131, 133 (alleging a
need for "more management oversight"); CAC ¶¶ 171–273 (more of the same).   Plaintiffs'
mantra, repeated several times in the CAC, is that Deutsche Bank's management failed to
address "serious and systemic failings in their systems and controls" (CAC ¶¶ 171, 215, 261,
273), "internal systems and controls . . . [that] were not effective" (CAC ¶¶ 171, 215, 261, 273);
and a "culture" that "had not changed" (CAC ¶¶ 171, 215, 261, 273).

   Plaintiffs' claim is thus a claim of corporate mismanagement.

   But the federal securities laws do not create a federal remedy for corporate
mismanagement.   *See Santa Fe Industries* v. *Green*, 430 U.S. 462, 479 (1977) ("Congress by
§ 10(b) did not seek to regulate transactions which constitute no more than internal corporate
mismanagement.") (citation omitted); *Boca Raton Firefighters & Police Pension Fund* v.
*Bahash*, 506 Fed. Appx. 32, 36 (2d Cir. 2012) ("Section 10(b) . . . does not reach mere instances
of corporate mismanagement.") (internal quotation marks and citation omitted); *In re Magnum
Hunter Resources Securities Litigation*, 26 F. Supp. 3d 278, 284, 292 (S.D.N.Y. 2014) (Forrest,
J.) ("[w]hile it is certainly true that the allegations support an inference of the defendant having
had serious control deficiencies and accounting issues over an extended period, there is no
factual basis in the complaint to infer that, when the company made its statements—which failed
to either reveal the full extent of such issues, or simply failed to foretell the future—it was acting
with a knowledge of falsity or an intent to defraud . . . .   Mere allegations of corporate
mismanagement are not actionable"), *aff'd,* 616 Fed. Appx. 442 (2d Cir. 2015).   It is well-settled

that "allegations of mismanagement, even where a plaintiff claims that it would not have invested in an entity had it known of the management issues, are insufficient to support a securities fraud claim under section 10(b)." *In re Citigroup, Inc. Securities Litigation*, 330 F. Supp. 2d 367, 375–77 (S.D.N.Y. 2004) (Swain, J.), *aff'd sub nom. Albert Fadem Trust* v. *Citigroup*, 165 Fed. Appx. 928 (2d Cir. 2006).

Plaintiffs seem to believe that listing at great length every regulatory misstep alleged against Deutsche Bank since 2002 (a number of which Deutsche Bank self-identified and self-reported), can disguise the fact that they have not alleged any material misstatement or omission. The only statements that Plaintiffs cite are either general statements concerning corporate codes of conduct, internal controls, and the Bank's culture; or aspirational statements of belief or opinion — neither of which are actionable under the federal securities laws, as a matter of law.

At least seven times in recent years the Second Circuit has affirmed the dismissal of pleadings, such as the CAC in this case, where plaintiffs have alleged regulatory missteps in the face of prior aspirational statements concerning corporate codes of conduct, internal controls, culture of compliance and ethical conduct, and compliance with laws and regulations.  *See*

> *ECA & Local 134 IBEW Joint Pension Trust of Chicago* v. *JP Morgan Chase*, 553 F.3d 187, 205–206 (2d Cir. 2009) (statements that bank "set the standard for integrity," and had "highly disciplined" "risk management processes," were immaterial as a matter of law, because such statements were "so general that a reasonable investor would not depend on [them] as a guarantee that [the bank] would never take a step that might adversely affect its reputation") (internal quotation marks and citation omitted);
>
> *Boca Raton Firefighters & Police Pension Fund* v. *Bahash*, 506 Fed. Appx. 32, 37 (2d Cir. 2012) ("generalizations about [the] company's business practices and integrity" were immaterial as a matter of law) (citation omitted);
>
> *City of Pontiac Policemen's & Firemen's Retirement System* v. *UBS AG*, 752 F.3d 173, 185 (2d Cir. 2014) (statements about code of conduct and internal controls were not actionable as a matter of law, because no reasonable investor would consider such statements as "guarantee[s] of some concrete fact or outcome");

*Reese* v. *Bahash*, 574 Fed. Appx. 21, 23 (2d Cir. 2014) (defendant's statements concerning its "integrity" were immaterial as a matter of law, because such statements were "too general to cause a reasonable investor to rely upon them as a guarantee");

*Carpenters Pension Trust Fund of St. Louis* v. *Barclays PLC*, 750 F.3d 227, 235 (2d Cir. 2014) (statements "concerning the company's minimum control requirements" were not actionable as a matter of law);

*Scott* v. *General Motors*, 605 Fed. Appx. 52, 54 (2d Cir. 2015) (statement about strengthening defendant's "reputation" was "too general to cause a reasonable investor to rely upon it"); and

*Indiana Public Retirement System* v. *SAIC*, 818 F.3d 85, 97–98 (2d Cir. 2016) (statements regarding defendant's "culture of high ethical standards, integrity, operational excellence, and customer satisfaction" were not actionable as a matter of law, because such statements were "too general to cause a reasonable investor to rely upon them") (internal quotation marks and citation omitted).

Four weeks ago the Court of Appeals for the Ninth Circuit affirmed the dismissal of a securities fraud class action, stating: "[A] code of conduct is 'inherently aspirational.' Such a code expresses opinions as to what actions are preferable, as opposed to implying that all staff, directors, and officers always adhere to its aspirations." *Retail Wholesale & Department Store Union Local 338 Retirement Fund* v. *Hewlett-Packard*, 845 F.3d 1268, 1276 (9th Cir. 2017) (citations omitted). Even though the company had publicly committed to "living [its] values and conducting business consistent with [ ] high ethical standards," the Ninth Circuit held that to find such statements actionable was "simply untenable, as it could turn all corporate wrongdoing into securities fraud." *Id.* (citing *Santa Fe Industries*, 430 U.S. at 478–89).

If generalizations about codes of conduct, corporate ethics, corporate culture, and integrity such as those that form the core of the CAC in this case were sufficient to support a claim for securities fraud, "then every individual who purchased the stock of a company that was later discovered to have broken *any* law could theoretically sue for fraud. This is precisely what the Second Circuit sought to avoid when it declined to bring within the sweep of federal securities laws many routine representations made by investment institutions." *Gusinsky* v.

-5-

*Barclays PLC*, 944 F. Supp. 2d 279, 289–90 (S.D.N.Y. 2013) (Scheindlin, J.) (internal quotation marks and citation omitted), *aff'd in relevant part sub nom. Carpenters Pension Trust Fund of St. Louis* v. *Barclays PLC*, 750 F.3d 227 (2d Cir. 2014).

"[A] code of ethics . . . is inherently aspirational; it simply cannot be that every time a violation of [a corporate code of conduct] occurs, a company is liable under federal law for having chosen to adopt the code at all, particularly when the adoption of such a code is effectively mandatory." *Lopez* v. *Ctpartners Executive Search*, 173 F. Supp. 3d 12, 29 (S.D.N.Y. 2016) (Engelmayer, J.) (citation omitted); *see also Andropolis* v. *Red Robin Gourmet Burgers*, 505 F. Supp. 2d 662, 683 (D. Colo. 2007) ("The crux of Plaintiff's argument is that even though there were numerous signals, as reported by confidential witnesses, of [defendant's] corporate deficiencies, [defendant] misstated that management had evaluated and approved the Company's disclosure procedures and internal reporting controls, and omitted to state that these systems were significantly deficient. I find the 'central thrust' of Plaintiff's allegations concerning [defendant's] corporate deficiencies allege no more than corporate mismanagement and, thus, do not support a federal cause of action.") (citations omitted).

The CAC is nothing more than an attempt to manufacture a securities fraud claim out of allegations of corporate mismanagement based on aspirational statements that are far too generalized to support a claim and, even if they could, are completely untethered to any facts that make those statements false or misleading. *See Weill* v. *Dominion Resources*, 875 F. Supp. 331, 336–337, 340 (E.D. Va. 1994) (dismissing with prejudice securities fraud class action that, as here, sought by reliance on a corporate Code of Ethics to "circumvent" the rule announced by the Supreme Court in *Santa Fe Industries*, 430 U.S. at 479). It is inevitable that, despite having robust compliance programs, internal controls and codes of conduct, problems will occur. No

compliance program is entirely failsafe.  The securities laws do not require perfection, and the Court of Appeals has "refused to allow plaintiffs to proceed with allegations of 'fraud by hindsight.'"  *Novak* v. *Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000) (internal citation omitted). "People in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future; subject to what current data indicates, they can be expected to be confident about their stewardship and the prospects of the business that they manage."  *Shields* v. *Citytrust Bancorp*, 25 F.3d 1124, 1129–30 (2d Cir. 1994).

As demonstrated below, the CAC fails both to identify actionable misstatements or omissions, and to plead facts supporting a strong inference of fraud or scienter on the part of each Defendant with the requisite particularity required by Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA").  *See In re Tower Group International Securities Litigation*, 2015 WL 5813393, at *4 (S.D.N.Y. Sept. 18, 2015) (Torres, J.); *In re UBS AG Securities Litigation*, 2012 WL 4471265, at *9 (S.D.N.Y. Sept. 28, 2012) (Sullivan, J.), *aff'd, City of Pontiac*, 752 F.3d 173 (2d Cir. 2014).

## STATEMENT OF ALLEGED FACTS

As shown by Plaintiffs' 159-page pleading in this case, "[a] complaint can be long-winded, even prolix, without pleading with particularity.  Indeed, such a garrulous style is not an uncommon mask for an absence of detail."  *Williams* v. *WMX Technologies,* 112 F.3d 175, 178 (5th Cir. 1997); *see also In re Merrill Lynch & Co. Research Reports Securities Litigation*, 218 F.R.D. 76, 78 (S.D.N.Y. 2003) (Pollack, J.) ("The Amended Complaint . . . spans 98 pages and 367 separate paragraphs. The prolix, discursive, redundant, argumentative, and disjointed assertions contained therein are improper."); *Woodward* v. *Raymond James Financial*, 732 F. Supp. 2d 425, 428 & n.2 (S.D.N.Y. 2010) (Patterson, J.) ("The Amended Complaint is lengthy

— 112 pages long, containing 356 paragraphs . . . .  The Court notes that the extreme length of the Amended Complaint is an independent ground for dismissal . . . .").

The relevant facts alleged in the CAC — which are assumed true for purposes of this motion — are as follows.

A.     **Deutsche Bank's Public Disclosures**

Deutsche Bank is a German company which "provides investment, financial, and related products and services worldwide."  CAC ¶ 12.  It is "a leading global universal bank." CAC ¶ 31.  As required by NYSE and SEC rules, Deutsche Bank has adopted a Code of Business Conduct and Ethics for all employees (the "Code of Ethics"), which is posted on its website.  CAC ¶ 160.  The CAC repeatedly references Deutsche Bank's public filings, which in turn mention the Bank's Code of Ethics, and quotes at length from such filings.  *See, e.g.,* CAC ¶ 31, n.1 (listing Deutsche Bank Annual Reports for 2012–2015); *see also* CAC *passim.*

We provide these documents,[2] which the Court may properly consider on this motion to dismiss.  *See Deutsche Zentral-Genossenschaftsbank AG* v. *HSBC North America Holdings*, 2013 WL 6667601, at *4 (S.D.N.Y. Dec. 17, 2013) (Torres, J.).

Deutsche Bank's Code of Ethics and SEC Form 20-Fs contain aspirational statements concerning the Bank's endeavors to comply with ethical standards as well as local laws and regulations.  CAC ¶¶ 158, 202, 244, 271; *see also* Gilman Aff. Ex. 1 (2012 Form 20-F) at

---

[2]     *See* Affirmation of Charles A. Gilman, dated February 21, 2017 ("Gilman Aff."), attaching, *inter alia,* (i) Deutsche Bank's SEC Forms 20-F for the years 2012–2015 (Ex. 1 (2012 Form 20-F); Ex. 2 (2013 Form 20-F); Ex. 3 (2014 Form 20-F); Ex. 4 (2015 Form 20-F)), and (ii) Deutsche Bank's Annual Reports to Shareholders for the years 2012–2015 (Ex. 5 (2012 Annual Report); Ex. 6 (2013 Annual Report); Ex. 7 (2014 Annual Report); Ex. 8 (2015 Annual Report)).

Financial Report 157[3]; Ex. 2 (2013 Form 20-F) at Financial Report 180; Ex. 3 (2014 Form 20-F) at Financial Report 205; Ex. 4 (2015 Form 20-F) at Annual Report 115.

The Form 20-Fs include a standard certification (the "Certification") some of which were signed by some of the individual defendants, certifying that, based on their knowledge, the SEC Form 20-Fs contained accurate financial reporting and disclosed all material changes to the Bank's internal controls over financial reporting, and that the Bank disclosed all known instances of fraud.  CAC ¶¶ 159, 203, 245, 272; *see* Gilman Aff. Ex. 1 (2012 Form 20-F) at Exs. 12.2, 13.2; Ex. 2 (2013 Form 20-F) at Exs. 12.2, 13.2; Ex. 3 (2014 Form 20-F) at Exs. 12.2, 13.2; Ex. 4 (2015 Form 20-F) at Exs. 12.2, 12.3, 13.2, 13.3.

Deutsche Bank's Annual Reports contained similar statements regarding compliance with ethical and legal standards as well as aspirational statements regarding initiatives the Bank was undertaking to develop a culture of compliance.  CAC ¶¶ 142–48, 191–201, 228–43, 264–70; *see* Gilman Aff. Ex. 5 (2012 Annual Report) at 6; Ex. 6 (2013 Annual Report) at 4, Financial Report 23, 50; Ex. 7 (2014 Annual Report) at 21; Ex. 8 (2015 Annual Report) at 3, 90.

Plaintiffs allege that the statements in Deutsche Bank's Annual Reports, Form 20-F's, and Code of Ethics were false and misleading because, *in retrospect*, certain of Deutsche Bank's internal controls proved to be lacking; actions by certain Bank employees allegedly violated the terms of the Code of Ethics; and Bank employees were aware of internal control weaknesses at the Bank, allegedly exposing the Company to risk of investigation and disciplinary action by various governmental and regulatory authorities.  These allegations are made *in hindsight*, based

---

[3]   Certain of the Bank's public filings incorporate at the end of the document a Financial or Annual Report, which restarts page numbering.  We reference such reports where we are citing those pages.

in large part on problems that were self-identified, self-reported, and disclosed by Deutsche Bank, and constitute at most allegations of corporate mismanagement, not securities fraud.

### B.    Deutsche Bank's Transformation During the Class Period

As alleged in the CAC, throughout the proposed Class Period (which followed on the heels of the worst global financial crisis since the Great Depression), Deutsche Bank has been in the midst of transforming its compliance culture and has continuously emphasized the importance of conducting its affairs in an ethical manner. *See, e.g.,* CAC ¶¶ 140, 144, 151, 156, 172, 173, 179, 181, 189, 192. This cultural overhaul was in large part for the purpose of reversing the global "loss of trust" between financial institutions and the investing public in the wake of the financial crisis. *See, e.g.,* CAC ¶¶ 156, 160. As a result, the Bank's "Strategy 2015+" initiative, which was meant to dictate the way forward for the Bank, had as one of its "core objectives" "deep cultural change." CAC ¶ 144. Through adoption of the Strategy 2015+ initiative, Deutsche Bank committed to "placing [the Bank] at the forefront of cultural change" in the financial industry. CAC ¶ 204. As a result of the Strategy 2015+ initiative, the bank put in place new ethical standards applicable to all employees and placed an increased focus on reinforcing internal control mechanisms. CAC ¶ 144.

Plaintiffs take great liberties with what Deutsche Bank in fact said regarding such initiatives. For example, Plaintiffs allege the Bank stated at a press conference on January 31, 2013: "We are determined to bring about deep cultural change at Deutsche Bank . . . Our values are clear. We believe in fundamental integrity of dealing. . . ." CAC ¶ 181. But Plaintiffs elide from their quotation the following that was also stated by Deutsche Bank at the same time: "We are under no illusions. The journey will take years, not months" and "[d]oes that mean we have eliminated the risk? No, it doesn't. Some deliberate, calculated abuse by individuals is always a risk, in every large organization." Gilman Aff. Ex. 9 (Jan. 31, 2013 Press Conference) at 12, 13.

Deutsche Bank openly stated that "deep cultural change will take a number of years" and "disclosure controls and procedures or systems . . . may not prevent all errors and fraud." Gilman Aff. Ex. 5 (2012 Annual Report) at 6, Financial Report 187.  The Bank announced its commitment to cultural change, but was forthright that this change would not take place overnight. Gilman Aff. Ex. 7 (2014 Annual Report) at 29–30 ("Cultural change at Deutsche Bank is a multi-year journey . . . work still remains to be done in the years ahead.").  The Bank cautioned that internal controls, no matter how well conceived and operated, can provide only reasonable, not absolute, assurance.  *See* Gilman Aff. Ex. 5 (2015 20-F) at Financial Report 187.

A sampling of Plaintiffs partial and often misleading quotations of Deutsche Bank's public filings and statements is laid bare in Appendix A, attached hereto.  "[T]he Court need not accept as true allegations in the [complaint] that are directly contradicted by documents incorporated by reference into the [complaint]."  *Batson* v. *Rim San Antonio Acquisition*, 2016 WL 6901312, at *5 (S.D.N.Y. Nov. 22, 2016) (Carter, J.) (marshaling authorities).

Deutsche Bank did much more than simply pay lip service to its commitment to cultural change — "As part of [Deutsche Bank]'s Strategy 2015+ the Bank [invested] EUR 1 billion to elevate its systems and controls to best in class."  CAC ¶ 170; *see also* CAC ¶ 175.

## C.    Deutsche Bank's Internal Controls

Throughout the alleged Class Period Deutsche Bank maintained and improved upon its control framework in an effort to promote compliance with laws and regulations in its business affairs.  That framework included the development of robust risk management and internal control systems to prevent financial crime.  *See, e.g.,* CAC ¶ 166 ("We have established an Anti Financial Crime Committee . . . .  Its responsibilities include ensuring conformity with the law, preventing criminal acts or exposing and investigating them").  In particular, the Bank developed Anti-Money-Laundering ("AML") controls and Know-Your-Customer ("KYC") procedures

-11-

which were intended to "protect the bank against money laundering, terrorist financing, and financial crime."  CAC ¶ 157; Gilman Aff. Ex. 11 (2012 Corporate Responsibility Report) at 44.

In their purported quotations from Deutsche Bank documents, Plaintiffs neglect to quote those passages where the Bank made crystal clear that "any internal control system . . . no matter how well conceived and operated, can provide only reasonable, but not absolute assurance that the objectives of that control system are met" and "[a]s such, disclosure controls and procedures or systems . . . may not prevent all errors and fraud."  Gilman Aff. Ex. 5 (2012 Annual Report) at Financial Report 187; *see also* Gilman Aff. Ex. 6 (2013 Annual Report) at Financial Report 273; Gilman Aff. Ex. 7 (2014 Annual Report) at Financial Report 303–304; Gilman Aff. Ex. 8 (2015 Annual Report) at 235.  Again, "the Court need not accept as true allegations in the [complaint] that are directly contradicted by documents incorporated by reference into the [complaint]." *Batson*, 2016 WL 6901312, at *5.

### D.    Alleged AML Violations

Despite the Bank's internal control framework, the CAC alleges that between 2011 and 2015 a subsidiary of the Bank located in Moscow, Russia engaged in trade with Russian counterparties which the Bank later self-identified as potentially problematic.  CAC ¶¶ 89–90. Upon identifying those transactions, the Bank promptly informed investors that the Bank "had a systems and control failure." CAC ¶ 90. Jumping on the Bank's own identification and self-reporting, Plaintiffs allege that these failings evidence a systemic internal control failure which Defendants knew or should have known was occurring at the Bank.  CAC ¶ 215.

Plaintiffs ignore that internal controls are meant to detect as much as to dissuade wrongdoing, and the fact that Deutsche Bank detected, self-identified and self-reported matters alleged in the CAC shows that internal controls did exist and that they worked.  Plaintiffs' claim that the Bank's controls were not strong enough, or were not enforced enough, or that the culture

of the workforce was not good enough is a claim of corporate mismanagement, not securities fraud. *See In re Magnum Hunter Resources Securities Litigation*, 26 F. Supp. 3d at 284, 292 (S.D.N.Y. 2014) (Forrest, J.), *aff'd,* 616 Fed. Appx. 442 (2d Cir. 2015).

### E.   Allegations Against the Individual Defendants Served to Date

"'Where multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his alleged participation in the fraud.'" *Shtofmakher* v. *David*, 2015 WL 5148832, at *9 (S.D.N.Y. Aug. 17, 2015) (Torres, J.) (quoting *DiVittorio* v. *Equidyne Extractive Industries*, 822 F.2d 1242, 1247 (2d Cir. 1987)). Plaintiffs are required — *as to each defendant* — to identify with particularity those statements made by that defendant that are alleged to be materially false or misleading and to allege facts giving rise to a strong inference of scienter by that defendant. *See In re UBS AG Securities Litigation*, 2012 WL 4471265, at *9 (Sullivan, J.), *aff'd, City of Pontiac*, 752 F.3d 173 (2d Cir. 2014); *In re Tower Group International Securities Litigation*, 2015 WL 5813393, at *4 (Torres, J.). The CAC fails to satisfy this minimum pleading requirement.

Here, Plaintiffs have sued twelve individuals, but in the nine months since the commencement of this action have filed Returns of Service with respect to only three — Marcus Schenck, John Cryan, and Anshuman Jain. The allegations against each are impermissibly thin.

**Marcus Schenck.** In Plaintiffs' 159-page, 346-paragraph CAC, Defendant Schenck is mentioned by name only twice: once, where he is listed as a Defendant, and described as "the CFO of Deutsche Bank and a Member of the Bank's Management Board since May 21, 2015" (CAC ¶ 22); and again where he is mentioned, among others, as having signed Deutsche Bank's 2015 Form 20-F, dated March 11, 2016 (CAC ¶ 272).

That is it. Schenck is alleged to have taken his job on May 21, 2015 and, among others, to have signed one document near the end of the proposed class period. There is no specific

allegation of scienter or of any false or misleading statement by Schenck. There is no allegation that Schenck did not honestly believe in the accuracy of the one document he signed at the time that he signed it. The allegations against Schenck do not state a claim of securities fraud. *See In re Tower Group*, 2015 WL 5813393, at *4 (Torres, J.); *UBS AG Securities Litigation*, 2012 WL 4471265, at *9.

**John Cryan.** In Plaintiffs' 159-page, 346-paragraph CAC, Defendant Cryan is mentioned by name just eight times. He is listed as a Defendant, and described as "Deutsche B[an]k's CEO since May 2016," and that he "had served as the Co-Chief Executive Officer of Deutsche Bank from July 1, 2015 to May 2016, and was the Co-Chairman of the Bank's Management Board during the Class Period." CAC ¶ 21. There are three mentions of Cryan, among others, as having signed Deutsche Bank's 2015 Form 20-F and the Responsibility Statement by the Management Board contained in the 2015 Annual Report, in which he is alleged to have stated that the Bank is "assessing carefully with whom we do business." CAC ¶¶ 264, 265, 272. The remaining references are quotations that Plaintiffs attribute to Cryan, three of which are from publicly available news sources, and one of which is unattributed. *See* CAC ¶ 90 (unattributed quote that the Bank is "vulnerable" to possible large penalties and that the Bank "had a systems and control failure"); CAC ¶ 295 (October 29, 2015 Bloomberg article reporting that the Bank set aside $1.3 billion, "mainly to cover suspected wrongdoing at the lender's Russian equity unit" and quoting Cryan as stating "we don't know much and that's shame on us" and that the bank has been "advised that it's not our job to try and find out where the money comes from or where it goes to"); CAC ¶ 303 (April 14, 2016 Bloomberg article reporting that "top executives in Frankfurt" were not alerted to the situation in Russia "until early 2015," following which the Bank "began a full-scale internal investigation" and found a systemic

-14-

failure of internal controls in its Moscow, Russia subsidiary.  The article quotes Cryan as stating "it's not our finest hour" and that the Bank "clearly had a system and control failure"); CAC ¶ 310 (May 1, 2016 Bloomberg article reporting that UK regulators faulted Deutsche Bank for lax client vetting, and that the regulators "acknowledged . . . that Cryan, who took office last July, was 'determined' to improve Deutsche Bank's controls").

That is it.  Cryan is alleged to have joined Deutsche Bank on July 1, 2015, and has been quoted as commenting on historic problems *pre-dating* his association with Deutsche Bank, and is alleged, among others, to have signed two documents near the end of the proposed class period in 2016.  There is no specific allegation of scienter or of any false or misleading statement by Cryan.  There is no allegation that Cryan did not honestly believe everything he is quoted in the CAC as saying at the time that he said it.  There is no allegation that Cryan did not honestly believe in the accuracy of the two documents he signed at the time that he signed them.  The allegations against Cryan do not state a claim of securities fraud.  *See In re Tower Group*, 2015 WL 5813393, at *4 (Torres, J.); *UBS AG Securities Litigation*, 2012 WL 4471265, at *9.

**Anshuman Jain.**  In Plaintiffs' 159-page, 346-paragraph CAC, Defendant Jain (who served at the Bank longer) is mentioned more times that Schenck or Cryan (but some of those are *in haec verba* repeats, and none of them serve to state a claim).  Jain is mentioned as a Defendant, and described as "the Co-Chairman of Deutsche Bank's Management Board from 2009 to June 30, 2015, and the Bank's Co-Chief Executive Officer from May 31, 2012 to June 30, 2015."  CAC ¶ 16.  He is mentioned, among others, as having signed various documents during his tenure at the Bank including: the Management Responsibility Statement contained in Deutsche Bank's Annual Reports for 2012–2014 (CAC ¶¶ 142, 191, 228); the Corporate Responsibility Reports for 2012–2014 (CAC ¶¶ 156, 204, 246); and Form 20-Fs and

certifications contained therein for 2012–2014 (CAC ¶¶ 159, 203, 245).   Additional mentions refer to general rhetoric regarding cultural change at the Bank, which Plaintiffs attribute to Jain from public sources including press conferences and earnings calls, often where Jain is allegedly just one, among others, having "made" such statements.   CAC ¶ 137 (alleged statement on an unidentified date, in an unidentified source regarding the Bank's "goal of long-term cultural change"); CAC ¶ 140 (regarding the Bank as "determined to bring about deep cultural change"); CAC ¶ 168 (regarding the launch and "delivering on" Strategy 2015+); CAC ¶ 170 (press release announcing a settlement with the European Commission); CAC ¶ 172 (discussing the Bank's commitment "to a culture that ensures that we don't wind up with new problems");   CAC ¶ 174 ("Let me assure you, cultural change is sweeping through the bank in every one of our 70-odd locations");   CAC ¶ 181 ("We are determined to bring about deep cultural change at Deutsche Bank. That is what clients, society, and investors demand.   Our values are clear. We believe in fundamental integrity of dealing"); CAC ¶ 189 (same as CAC ¶ 181); CAC ¶ 230 (statement regarding cultural change at the Bank).   There are two more mentions to Jain, but they are irrelevant as they relate to two individuals who worked under Jain (CAC ¶ 51) and to Jain's announcement in June 2015 that he would be stepping down (CAC ¶ 115).

That is it. While Jain is mentioned more often, that is only because his tenure with the Bank was longer.  As with the others, there is no specific allegation of scienter or of any false or misleading statement by Jain.  There is no allegation that Jain did not honestly believe everything he is quoted in the CAC as saying at the time that he said it.  There is no allegation that Jain did not honestly believe in the accuracy of the documents he signed at the time that he signed them. The allegations against Jain do not state a claim of securities fraud.  *See In re Tower Group*, 2015 WL 5813393, at *4 (Torres, J.); *UBS AG Securities Litigation*, 2012 WL 4471265, at *9.

**LEGAL STANDARD**

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure a complaint must plead "enough facts to state a claim that is plausible on its face." *Bell Atlantic* v. *Twombly*, 550 U.S. 544, 570 (2007); *Smith* v. *Local 819 I.B.T. Pension Plan*, 291 F.3d 236, 240 (2d Cir. 2002) ("[C]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss.").

Plaintiffs have sued two corporations and twelve individuals for fraud.  "'Where multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his alleged participation in the fraud.'"  *Shtofmakher* v. *David*, 2015 WL 5148832, at *9 (Torres, J.) (quoting *DiVittorio* v. *Equidyne Extractive Industries*, 822 F.2d 1242, 1247 (2d Cir. 1987)).  Allegations made about "Defendants" in the ambiguous plural are insufficient.  *Id.* at *9.  Plaintiffs are required — *as to each defendant* — to identify with particularity those statements made by that defendant that are alleged to be materially false or misleading and to allege facts giving rise to a strong inference of scienter by that defendant.  *See In re Tower Group,* 2015 WL 5813393, at *4 (Torres, J.); *UBS AG Securities Litigation*, 2012 WL 4471265, at *9.

**ARGUMENT**

**I.      Plaintiffs Fail to State a Claim of Securities Fraud Under Section 10(b)**

To allege a viable claim under Section 10(b) and Rule 10b-5, Plaintiffs must plead six essential elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives* v. *Siracusano,* 563 U.S. 27, 37–38 (2011) (quoting *Stoneridge Investment Partners* v. *Scientific-Atlanta,* 552 U.S. 148, 157 (2008)).

**A.**    **Plaintiffs Fail to Allege an Actionable Misstatement or Omission**

In order to state a claim for fraud under Section 10(b), Plaintiffs must allege actionable misstatements or omissions.  Under Rule 10b-5 it is unlawful for any person "[t]o make any untrue statement of fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b).  To adequately plead an actionable misstatement, Plaintiffs "must demonstrate with specificity why and how" the alleged statement was false and misleading, *Rombach* v. *Chang*, 355 F.3d 164, 174 (2d Cir. 2004), and that the statement was material.  *ECA & Local 134 IBEW Joint Pension Trust of Chicago* v. *JP Morgan Chase*, 553 F.3d 187, 206 (2d Cir. 2009).  The statements alleged in the CAC to be fraudulent fail on both counts.

**1.**    **Aspirational Statements About Codes of Conduct Are Not Actionable**

Plaintiffs allege that Deutsche Bank's statements concerning its commitment to maintaining "[e]ffective corporate governance in accordance with high international standards" (CAC ¶ 136), to operating in compliance with local laws and regulations (CAC ¶¶ 142, 166), and to fostering a culture of compliance through a robust Code of Ethics (CAC ¶¶ 196, 248) were fraudulent.  However, such statements are not actionable under federal securities law.  The Second Circuit has routinely rejected hindsight pleadings based on aspirational statements about corporate codes of conduct, internal controls, culture of compliance and ethical conduct, and compliance with local laws and regulations.  *See ECA,* 553 F.3d at 206 (Defendant's statement that it "set the standard for best practices in risk management techniques . . . is so general that a reasonable investor would not depend on it as a guarantee that [defendant] would never take a step that might adversely affect its reputation . . . . Finding that [defendant's] statements constitute a material misrepresentation would bring within the sweep of federal securities laws many routine representations made by investment institutions.  We decline to broaden the scope

of securities laws in that manner.") (internal quotations and citations omitted).  *See also* the seven Second Circuit decisions marshaled at pages 4–5, *supra*.

The aspirational statements alleged in the CAC are not actionable both because Plaintiffs have failed to establish materiality, and because Plaintiffs have failed to allege that such statements were false or misleading at the time they were made.  *See Retail Wholesale & Department Store Union Local 338 Retirement Fund* v. *Hewlett-Packard*, 845 F.3d 1268, 1276 (9th Cir. 2017) ("A contrary interpretation — that statements such as . . . 'we make ethical decisions,' or [statements by company management regarding commitment to ethical standards], can be measured for compliance — is simply untenable, as it could turn all corporate wrongdoing into securities fraud.") (citation omitted); *Intermountain Stroke Center* v. *Intermountain Health Care*, 638 Fed. Appx. 778, 794 (10th Cir. 2016) ("A company's essentially mandatory adoption of a code of ethics simply does *not* imply that all of its directors and officers are following that code of ethics. . . . Further, *a code of ethics is inherently aspirational;* it simply cannot be that every time a violation of that code occurs, a company is liable under federal law for having chosen to adopt the code at all, particularly when the adoption of such a code is effectively mandatory.") (citation and internal quotations omitted); *Andropolis* v. *Red Robin Gourmet Burgers*, 505 F. Supp. 2d 662, 668 (D. Colo. 2007) ("[T]he mandatory nature of the adoption of a [code of ethics] makes clear that all public companies—whether run by crooks or angels—will adopt just such a code," and this adoption "simply does not imply that all of its directors and officers are following that code of ethics.").

In order to state a claim for securities fraud, a plaintiff must allege with particularity that a statement by the defendant was materially false or misleading.  *ECA*, 553 F.3d at 206.  A statement is only material to the extent that plaintiff alleges "defendants' representations, taken

-19-

together and in context, would have misled a reasonable investor." *In re Morgan Stanley Information Fund Securities Litigation*, 592 F.3d 347, 360 (2d Cir. 2010) (internal quotation marks and citation omitted). To be material, "'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'" *ECA*, 553 F.3d at 197 (quoting *Basic* v. *Levinson*, 485 U.S. 224, 231–32 (1988)). General statements expressing corporate optimism and commitment to ethics, integrity, and high standards of business are immaterial as a matter of law. *Indiana Public Retirement System* v. *SAIC*, 818 F.3d 85, 97–98 (2d Cir. 2016) (dismissing claim for securities fraud based on "statements about [defendant's] commitments" to a "culture of high ethical standards, integrity, [and] operational excellence" because such statements are "no more than puffery" and "too general to cause a reasonable investor to rely upon them.") (internal quotations omitted); *City of Pontiac*, 752 F.3d 173, 182 (2d Cir. 2014) ("It is well-established that general statements about reputation, integrity, and compliance with ethical norms are inactionable puffery, meaning that they are too general to cause a reasonable investor to rely upon them."). Section 10(b) limits liability to statements that are "*sufficiently specific* for an investor to reasonably rely on that statement as a guarantee of some concrete fact of outcome." *Id.* at 185 (emphasis added).

The statements alleged in the CAC as fraudulent are precisely the type of generalized aspirational statements lacking the level of specificity that would cause an investor to "rely on that statement as a guarantee." *See, e.g.*, CAC ¶ 136 ("Effective corporate governance in accordance with high international standards is very important"); CAC ¶ 137 ("A strong, positive compliance culture, in which [employees] strictly adhere to . . . policies and respect all applicable laws and regulations . . . is essential to maintaining [the highest standards of integrity

in all that we say and do]"); CAC ¶ 156 ("We have to demonstrate that we play a valuable role in society and that we act with integrity and responsibility. Ethical conduct is critical."); CAC ¶ 166 ("Whether in the area of money laundering, corruption, or financial crime — the compliance management system of Deutsche Bank is geared to strict conformity with the law"); CAC ¶ 231 ("The bank recognizes the need for cultural change in the financial sector and is committed to being at the forefront of this change"); CAC ¶ 248 ("Our Anti-Money Laundering . . . and Know Your Customer . . . policies aim to ensure: Compliance with regulations").

As a matter of law, such aspirational statements are not material and cannot be the basis for a securities fraud claim. *See Indiana Public Retirement System,* 818 F.3d at 98 ("Plaintiffs' claim that these statements were knowingly and verifiably false when made does not cure their generality, which is what prevents them from rising to the level of materiality required to form the basis for assessing a potential investment."); *see also ECA*, 553 F.3d at 206 ("No investor would take such statements seriously in assessing a potential investment, for the simple fact that almost every investment bank makes these statements."). Statements with such generality, "lack[ing] a standard against which a reasonable investor could expect them to be pegged" are "too squishy, too untethered to anything measurable, to communicate anything that a reasonable person would deem to be important to a securities investment decision." *City of Monroe Employees Retirement System* v. *Bridgestone*, 399 F.3d 651, 671 (6th Cir. 2005).

Deutsche Bank made numerous disclosures throughout the Class Period that informed investors that such statements were merely aspirational. The "total mix" for purposes of the materiality inquiry includes "all information reasonably available to the shareholders," *Estate of Sampson* v. *Georgeson Shareholder*, 412 F.3d 103, 110 (2d Cir. 2005) (internal quotation marks omitted), including statements made in SEC filings. *See also Garber* v. *Legg Mason*, 347 Fed.

-21-

Appx. 665, 668 (2d Cir. 2009).  Throughout the documents cited in the CAC Deutsche Bank informed the public that statements regarding its culture of compliance and adherence to ethical norms were recitations of broad corporate standards and aspirational goals.  For example, Plaintiffs allege that the statement in Deutsche Bank's 2013 Annual Report that "We laid solid foundations for cultural change. We launched new values and beliefs [and] strengthened our control environment" was materially misleading because, in hindsight, some elements of the Bank's control environment were lacking.  CAC ¶ 192. However, Plaintiffs quotation is selective and the Bank made clear *in the very same sentence*, that "[w]e're under no illusions.  We know cultural change is a long-term, multiyear effort; but we are on the right track."  Gilman Aff. Ex. 6 (2013 Annual Report) at 4; *see also* <u>Appendix A</u>.

The public statements Deutsche Bank made regarding internal controls were also accompanied by frank statements about the risk of legal and financial consequences if the Bank's policies and procedures proved ineffective at preventing financial crimes.  For example, in its 2012 Form 20-F filing, (Gilman Aff. Ex. 1), Deutsche Bank disclosed at the beginning of the alleged Class Period:

- That the Bank engages or has engaged "in a limited amount of business with counterparties, including government-owned or –controlled counterparties, in certain countries or territories that are subject to comprehensive sanctions . . . .  [S]hould our policies [ensuring compliance with regulatory requirements] prove to have been ineffective, we may be subject to regulatory action that could materially and adversely affect our business." (*id.* at 24);

- A previous failing in AML reporting, noting that employees "failed to issue a suspicious activity report under the Anti-Money Laundering Act" (*id.* at 62);

- Risks in "disclosure controls and procedures or systems for internal control over financial reporting," noting that "[a] control system, no matter how well conceived and operated, can provide only reasonable, not absolute assurance that the objectives of the control system are met" and "may not prevent all error and all fraud. . . . [C]ontrols can be circumvented by the individual acts of some persons, by collusion of two or more people, or by management override of the control.  Because of the inherent limitations in a cost-

effective control system, misstatements due to error or fraud may occur and not be detected." (*id.* at 78);

- Risk that employees may participate in "dishonesty, for personal and/or business gain or to avoid personal and/or business loss such as falsification and/or alteration of records and/or reports, facilitation, breach of trust, intentional omission, misrepresentation, concealment, misleading, and abuse of position in order to obtain personal gain, business advantage and/or conceal improper/unauthorized activity." (*id.* at Financial Report 155).

Deutsche Bank made similar disclosures in it 2013, 2014, and 2015 Form 20-F filings. *See* Gilman Aff. Ex. 2 (2013 Form 20-F) at 27, 67, 89; Ex. 3 (2014 Form 20-F) at 30, 33, 73, 94; and Ex. 4 (2015 Form 20-F) at 37, 39, 84, 105. *See also* Appendix A. Such information was public and readily available to reasonable investors.

## 2. Statements of Belief or Opinion Are Not Actionable

Many of the alleged misstatements in the CAC are statements of belief or opinion. *See, e.g.*, CAC ¶ 246 ("We have already articulated values and beliefs which define the type of institution we aspire to be. In 2014, we continued to embed those values . . . into every aspect of our activity."); CAC ¶ 181 ("[W]e believe in fundamental integrity of dealing . . . "); CAC ¶ 200 ("our Management Board believes . . . that our risk management systems are adequate . . . "); CAC ¶ 238 ("we believe that our risk disclosures . . . appropriately and comprehensively convey our overall risk profile"). The CAC points to statements by Deutsche Bank that its "control and monitoring system" was "effective" and "sophisticated" (CAC ¶ 160), but these are also statements of belief or opinion, and Plaintiffs have failed to allege that these beliefs and/or opinions were not honestly held at the time stated.

"A statement of opinion is not misleading just because external facts show the opinion to be incorrect. . . . Where the speaker's opinion or belief is genuine, a bare allegation that her opinion or belief ultimately proved incorrect is not enough to survive a motion to dismiss after *Omnicare*." *In re Weight Watchers International Securities Litigation*, 2016 WL 2757760, at *5

& n.43 (S.D.N.Y. May 11, 2016) (Kaplan, J.) (citing *Omnicare* v. *Laborers District Council Construction Industry Pension Fund*, 135 S. Ct. 1318 (2015)); *see also In re Sanofi Securities Litigation*, 155 F. Supp. 3d 386, 402 (S.D.N.Y. 2016) (Castel, J.) (dismissing securities fraud claim where, *inter alia*, alleged misstatements were based on speaker's own belief and plaintiffs failed to allege any facts showing speaker did not believe what he said).  Thus, as Plaintiffs have not alleged that Defendants did not genuinely hold their beliefs and opinions at the time they were stated, all alleged misstatements that are statements of opinion or belief are not actionable and cannot survive this motion.

### 3.    The CAC Fails to Plead Any Actionable Omission

Plaintiffs also attempt to state a claim for securities fraud based on material omission due to Deutsche Bank's alleged failure to disclose alleged criminal misconduct at the Bank and government investigations into shortcomings in the Bank's internal controls.  Such allegations likewise fail.  "[D]isclosure is not a rite of confession, and companies do not have a duty to disclose uncharged, unadjudicated wrongdoing."  *City of Pontiac*, 752 F.3d at 184 (internal quotation marks and citation omitted); *see also In re Canandaigua Securities Litigation*, 944 F. Supp. 1202, 1209 (S.D.N.Y. 1996) (Pollack, J.) ("Plaintiffs merely sound the familiar refrain that any comment by a corporation imposes an affirmative duty to disclose all marginally-related material information. There is no such obligation or duty.").

A duty to disclose only arises when disclosure is necessary to make other related statements not misleading or where required by statute.  *In re Time Warner Securities Litigation*, 9 F.3d 259, 268 (2d Cir. 1993) ("We do not hold that whenever a corporation speaks, it must disclose every piece of information in its possession that could affect the price of its stock.").  This is true even where the company has made statements to the market regarding its "integrity and transparency" or compliance with regulatory investigations.  *Menaldi* v. *Och-Ziff Capital*

*Management Group*, 164 F. Supp. 3d 568, 580 (S.D.N.Y. 2016) (Oetken, J.).  For a duty to arise, there must be a "connection between the illegal conduct and the [allegedly misleading] statements beyond the simple fact that a criminal conviction would have an adverse impact upon the corporation's operations in general or bottom line."  *In re FBR Securities Litigation*, 544 F. Supp. 2d 346, 357 (S.D.N.Y. 2008) (Holwell, J.) (internal quotation marks and citation omitted). Further, "companies are not obligated to speculate as to the myriad of consequences, ranging from minor setbacks to complete ruin, that might have befallen the company if the [illegal conduct were] discovered, disclosed or terminated."  *Id.* (internal quotation marks and citation omitted).

In its 159 pages, the CAC fails to allege that any Defendant was aware of *any* of the alleged wrongdoing during the alleged Class Period.  The *only* allegation that could be viewed as linking alleged false statements and alleged criminal conduct is the allegation that "Deutsche Bank and Deutsche Bank Russia failed to disclose that a portion of [their] financial metrics were derived from illicit activities."  CAC ¶ 215.  But "companies do not have a duty to disclose uncharged, unadjudicated wrongdoing."  *City of Pontiac*, 752 F.3d at 184.  The Bank disclosed in its public filings the regulatory inquiries that could have a material impact on the Bank's operations and financial condition both in general terms, *see* Gilman Aff. Ex. 3 (2014 Form 20-F) at 24 ("We operate in a highly and increasingly regulated environment, potentially exposing us to liability and other costs, the amount of which may be substantial and difficult to estimate, as well as to legal and regulatory sanctions and reputational harm"), and by specifically identifying regulatory investigations concerning the conduct that Plaintiffs allege harmed the Bank.  *See* Gilman Aff. Ex. 3 (2014 Form 20-F) at 94 (discussing investigation of FX trading practices); Gilman Aff. Ex. 1 (2012 Form 20-F) at 24 ("Transactions with counterparties in

countries designated by the U.S. State Department as state sponsors of terrorism or persons targeted by U.S. sanctions may . . . result in regulatory action which could materially and adversely affect our business."); Gilman Aff. Ex. 4 (2015 Form 20-F) at 33 ("We are investigating the circumstances around equity trades entered into by certain clients in Moscow and London and have advised regulators and law enforcement authorities in several jurisdictions about those trades . . . .  The total volume of the transactions under review is significant. Our internal investigation of potential violations of law, regulation and policy and into the related internal control environment remains ongoing; to date it has identified certain violations of our policies and deficiencies in our control environment.").

There can be no claim of fraud by omission where the allegedly omitted facts are disclosed.  *See Dalberth* v. *Xerox,* 2014 WL 4390695, at *13 (2d Cir. Sept. 8, 2014) (affirming dismissal where alleged omissions were disclosed and "the investing public had access to this information"); *Debora* v. *WPP Group*, 1994 WL 177291, at *5 (S.D.N.Y. May 5, 1994) (Duffy, J.) ("A complaint fails to state a § 10(b) claim when the alleged omission has actually been disclosed."); *White* v. *Melton,* 757 F. Supp. 267, 272 (S.D.N.Y. 1991) (Kram, J.) ("The Court must dismiss a complaint founded on allegations of securities fraud if the allegedly omitted or misrepresented information was in fact appropriately disclosed.").

Further, where allegedly undisclosed material information is in fact readily accessible in the public domain, a defendant may not be held liable for failing to disclose this information.  *In re Keyspan Securities Litigation*, 383 F. Supp. 2d 358, 377 (E.D.N.Y. 2003) ("Although the underlying philosophy of the federal securities regulations is that of full disclosure . . . there is no duty to disclose information to one who reasonably should be already aware of it.") (citing *Seibert* v. *Sperry Rand,* 586 F.2d 949, 952 (2d Cir. 1978)).  Plaintiffs inundating and superfluous

-26-

recitation of publicly available reporting on Defendants' alleged wrongdoing only serves to deflate their argument that Defendants improperly failed to disclose this very same information. *See, e.g.*, CAC ¶¶ 274, 276, 282.

As the alleged misstatements include only aspirational statements concerning corporate codes of conduct and compliance, statements of belief or opinion, and not-actionable or not-actual omissions, the CAC fails to set forth a claim under Section 10(b).

### 4.   <u>Allegations After October 29, 2015 Fail as a Matter of Law</u>

Additionally, any statement made *after* the Bank disclosed the underlying issues alleged in the CAC is not actionable as a matter of law. *See In re Security Capital Assurance Securities Litigation*, 729 F. Supp. 2d 569, 598 (S.D.N.Y. 2010) (Batts, J.) ("[O]nce disclosures have been made in SEC filings, they cannot be carried forward and later alleged by Plaintiffs as fraudulent statements.  As such, Plaintiffs' allegations that Defendants' concealed investment in lower than the most senior tranches fail once Defendants disclosed such investment.").  On October 29, 2015, as alleged by the CAC (and as reflected in <u>Appendix A</u>), the Bank disclosed to the public in its quarterly earnings reports that "it found violations of internal policies and identified weaknesses in its oversight regime during its probe into the so-called mirror trades."  CAC ¶ 295.  After that date, Deutsche Bank's statements (and those are all of the statements allegedly signed or made by Schenck and Cryan) regarding the sufficiency of its internal controls and compliance with laws and regulations (including all allegedly fraudulent statements in the Bank's 2015 Form 20-F filing and 2015 Annual Report) could not have misled Plaintiffs, as a matter of law, because Defendants had already publicly disclosed the very facts that Plaintiffs allege made the later statements misleading in the first place.

**B.**     **Plaintiffs Fail to Plead Fraud with Particularity**

Even assuming the alleged misstatements are actionable (which they are not), the CAC fails to allege them with the particularity required by Rule 9(b) and the PSLRA.  Plaintiffs allege that Deutsche Bank stated between 2013 and 2016 that it had certain internal controls and risk management protocols in place and that it was working to improve its culture.  Plaintiffs also allege that Deutsche Bank faced some regulatory issues over the years, as far back as 2002, as any large organization does.  Plaintiffs expect the Court to connect the dots between these two sets of facts and find that the latter issues somehow make the former statements false.  But they are not connected.  That Deutsche Bank had some regulatory failings does not render false its generalized statements that it had, or believed it had, effective compliance programs and internal controls and that it was working to improve its culture of compliance.

In order to state a claim, Plaintiffs "must plead that the defendant made a false statement or omitted a material fact, with scienter, and that plaintiff[']s reliance on defendant's action caused plaintiff injury."  *In re Tower Group International Securities Litigation*, 2015 WL 5813393, at *4 (Torres, J.).  Furthermore, actions for violations of Section 10(b) of the Exchange Act and Rule 10b-5 are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the PSLRA.  Under Rule 9(b), "plaintiffs alleging fraud or mistake must state with particularity the circumstances constituting fraud or mistake."  *Id.*  To state a claim for fraud with the required particularity, the CAC must set forth: (i) precisely what statements or omissions were made in which documents or oral representations; (ii) the time and place of each such statement and the person responsible for making (or not making) them; (iii) the content of such statements and the manner in which they misled plaintiffs; and (iv) what the defendants obtained as a consequence of the fraud.  *See Liberty Ridge* v. *RealTeach Systems*, 173 F. Supp. 2d 129, 136 (S.D.N.Y. 2001) (Pollack, J.).

-28-

The CAC proceeds in three general parts.  First, the CAC lists investigations, settlements entered into, and fines paid by Deutsche Bank since 2008 for problems related to a $130 billion derivatives portfolio, Fannie Mae and Freddie Mac, LIBOR, and its "dark pool."  CAC ¶¶ 45–52.  It also alleges that as far back as 2002 and continuing through 2013 Deutsche Bank faced warnings from the Federal Reserve Bank of New York related to its regulatory reporting framework, CAC ¶¶ 58–70; that during the class period Deutsche Bank was fined by various regulators, CAC ¶¶ 71–88; and that during the class period the Russian mirror-trading scheme came to light, CAC ¶¶ 89–116.  Next, the CAC lists statements made by Deutsche Bank in various documents from 2013 to 2016, including annual reports, SEC filings, and on its website and in earnings calls, that it had in place effective internal controls and risk management policies and that it was working to change its culture.  CAC ¶¶ 140–273.  Finally, the CAC lists news articles purportedly showing the "truth" emerging, including a July 22, 2014 Wall Street Journal report headlined, "Deutsche Bank Suffers From Litany of Reporting Problems, Regulators Said," CAC ¶ 274, and a June 5, 2015 Bloomberg News article headlined, "Deutsche Bank Investigating $6 Billion of Possible Money Laundering by Russian Clients."  CAC ¶ 286.

Despite the CAC's bulk, Plaintiffs have failed to put forth any facts showing *how* the alleged misstatements were false or misleading *when they were made*.  The regulatory missteps it alleges are unconnected to the statements — indeed, many of them *pre-date* the statements and only serve to illustrate why Deutsche Bank was working to improve its culture and strengthen its internal controls and risk management.  Missteps that post-date the statements likewise fail to plead with particularity why and how the statements were false or misleading when made and, in any case, Plaintiffs have made no effort to tie the statements and actions together and it is not this Court's duty to do so.  *See In re PetroChina Securities Litigation*, 120 F. Supp. 3d 340, 356

(S.D.N.Y. 2015) (Ramos, J.) ("The Second Circuit has commented that district courts should not have to search the long quotations in the complaint for particular false statements, and then determine on its own initiative how and why the statements were false . . ."), *aff'd sub nom. Klein* v. *PetroChina*, 644 Fed. Appx. 13 (2d Cir. 2016).

For example, CAC ¶ 166 is more than a page long, containing purportedly false and misleading statements from Deutsche Bank's website, including that "[t]o ensure compliance, Deutsche Bank has an anti-corruption policy that is backed by: appropriate compliance training measures for staff; recording and monitoring of gifts and invitations; a worldwide whistleblowing hotline for reporting suspicious cases anonymously; [and] risk-based procedures for monitoring third parties."  CAC ¶ 171 purports to explain how the statements in this paragraph and about two dozen others are false, but offers nothing more than conclusory statements, about the Bank's "serious and systemic failings in their systems and controls against money laundering, financing terrorism, aiding against international sanctions, and committing financial crimes."  *See* CAC ¶¶ 215, 261, 273 (where Plaintiffs use the same generic five-prong statement lacking the factual specificity required to demonstrate the preceding statements' falsity for the alleged misrepresentations in years 2014–2016).  Plaintiffs do not offer any detail as to *how* the Bank's systems were deficient; they merely recite publicized missteps and allege that earlier statements must therefore have been fraudulent.  Plaintiffs pleading strategy fails to recognize that there is no securities fraud by hindsight.  *Cox* v. *Blackberry*, 2016 WL 4470928, at *2 (2d Cir. Aug. 24, 2016) (Summary Order); *Novak* v. *Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000).  Plaintiffs fail to allege any facts with the requisite specificity supporting a strong inference that Deutsche Bank's statements were false or misleading *when made*.

Courts have rejected such attempts to base securities fraud actions on generalized statements about business practices untethered to any specific allegations of falsity.  In *Gusinsky* v. *Barclays PLC* the Court rejected Plaintiffs' attempt to base a claim for securities fraud on the bank's generalized statements about its business practices because the statements were insufficiently connected to the alleged wrongdoing — there the manipulation of LIBOR.  944 F. Supp. 2d 279, 289–90 (S.D.N.Y. 2013) (Scheindlin, J.), *aff'd in relevant part sub nom*, *Carpenters Pension Trust Fund of St. Louis* v. *Barclays*, 750 F.3d 227 (2d Cir. 2014).  "If this were sufficient," Judge Scheindlin noted, "then every individual who purchased the stock of a company that was later discovered to have broken *any* law could theoretically sue for fraud. This is precisely what the Second Circuit sought to avoid when it declined to bring within the sweep of federal securities laws many routine representations made by investment institutions." *Id.* (emphasis in original); *see Woori Bank* v. *Citigroup*, 2013 WL 1235648, at *4 (S.D.N.Y. Mar. 27, 2013) (Swain, J.) ("The Complaint thus paints a general picture of a business group allegedly engaging in various forms of serious misconduct that would call into question the integrity of its business operations . . . .  The law of fraud and Rule 9(b) do not, however, embrace claims founded on such atmospherics.  Rather, [to plead] fraud Plaintiffs must specify allegedly fraudulent statements and proffer specific factual allegations demonstrating their falsity.").

The CAC identifies numerous statements regarding the Bank's internal controls and the processes that were developed to ensure those controls were effective.  However, to state a claim for securities fraud, it is not enough to merely identify control processes and claim, *in retrospect*, that those processes were proven to be inadequate.  *In re Citigroup, Inc. Securities Litigation*, 330 F. Supp. 2d 367, 379 (S.D.N.Y. 2004) (Swain, J.) (dismissing claim for securities fraud

-31-

based on the sufficiency of internal controls).  Rather, in order to state a claim, a complaint must allege "facts showing that the descriptions of the processes were false or misleading *at the time* they were included in the public statements" or "facts showing that the processes were not followed."  *Id.* (emphasis added).  The CAC identifies statements regarding the existence of Deutsche Bank's control processes, *e.g.* CAC ¶ 143 ("During 2012 we continued to strengthen our control environment, tightening our systems and processes and enhancing our monitoring capabilities"); CAC ¶ 157 ("In order to comply with Anti-Money-Laundering legal and regulatory requirements and to protect the bank against money laundering, terrorist financing, and financial crime, Know-Your-Customer (KYC) procedures are in place"); CAC ¶ 207 ("Deutsche Bank's KYC policies cover new client adoption as well as regulator reviews and screening of existing client relationships against internal and external lists of negative information.").  But the CAC is devoid of any allegation that any such statement was false *at the time it was made* or that the processes described in those statements were not followed.

Further, Deutsche Bank simultaneously made clear in its SEC filings that internal controls over financial reporting have the "aim of providing reasonable but not absolute assurance against material misstatements in financial accounting" and that "any internal control system . . . no matter how well conceived and operated, can provide only reasonable, but not absolute assurance that the objectives of that control system are met."  Gilman Aff. Ex. 7 (2014 Annual Report) at Financial Report 303–304; *see also* Gilman Aff. Ex. 3 (2014 Form 20-F) at 92 ("[A] control system, no matter how well conceived and operated can provide only reasonable assurance of achieving [ ] control objectives.") and at 94 ("[D]isclosure controls and procedures or systems for internal control over financial reporting may not prevent all error and all fraud . . . Because of the inherent limitations in all control systems, no evaluation of controls can provide

absolute assurance that all control issues and instances of fraud, if any, within the company have been detected."); Gilman Aff. Ex. 1  (2012 Form 20-F) at 13, 22 (noting that internal controls could be disrupted by "serious employee misconduct or illegal activity," as well as "errors, inadvertent or intentional, made in the execution, confirmation or settlement of transactions or from transactions not being properly recorded, evaluated or accounted for.").

Despite its volume, the CAC fails to plead a violation of Section 10(b) with the particularity required by Rule 9(b) and the PSLRA and Plaintiffs turn a blind eye to the disclosures Defendants made throughout the Class Period.  *See* Appendix A.

**C.    Plaintiffs Fail to Adequately Allege Scienter**

To allege a violation of Section 10(b) Plaintiffs are also required to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind [*i.e.*, scienter]," 15 U.S.C. § 78u–4(b)(2)(A), otherwise the court "shall" dismiss the complaint. *Id.* at § 78u–4(b)(3)(A).

"In a case involving multiple defendants, plaintiffs must plead circumstances providing a factual basis for scienter for each defendant; guilt by association is impermissible." *In re DDAVP Direct Purchaser Antitrust Litigation*, 585 F.3d 677, 695 (2d Cir. 2009); *see also C.D.T.S.* v. *UBS AG*, 2013 WL 6576031, at *6 (S.D.N.Y. Dec. 13 2013) (Forrest, J.) ("Scienter must be separately pled and individually supportable as to each defendant; scienter is not amenable to group pleading."), *aff'd sub nom. Westchester Teamsters Pension Fund* v. *UBS AG*, 604 Fed. Appx. 5 (2d Cir. 2015); *In re UBS AG Securities Litigation*, 2012 WL 4471265, at *9 (Sullivan, J.) (same), *aff'd, City of Pontiac,* 752 F.3d 173 (2d Cir. 2014); *Plumbers and Pipefitters Local Union No. 630 Pension–Annuity Trust Fund* v. *Arbitron*, 741 F. Supp. 2d 474, 488 (S.D.N.Y. 2010) (Koeltl, J.) (same).  Moreover, scienter must be pleaded "with regard to each alleged act or omission." *In re Tower Group*, 2015 WL 5813393, at *4 (Torres, J.).  The

"inference of scienter must be more than merely plausible or reasonable — it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.*; *see Teamsters Local 445 Freight Division Pension Fund* v. *Dynex Capital*, 531 F.3d 190, 194 (2d Cir. 2008) ("While we normally draw reasonable inferences in the non-movant's favor on a motion to dismiss, [the PSLRA] establishes a more stringent rule for inferences involving scienter . . . .").

Once again, despite its girth, the CAC fails to do this and this Court is not required to attempt to piece together Plaintiffs' inadequate pleading. *See In re PetroChina Securities Litigation*, 120 F. Supp. 3d at 356 (S.D.N.Y. 2015) (Ramos, J.), *aff'd, Klein* v. *PetroChina*, 644 Fed. Appx. 13 (2d Cir. 2016) ("The Second Circuit has commented that district courts should not have to 'search the long quotations in the complaint for particular false statements, and then determine on its own initiative how and why the statements were false and how other facts might show a strong inference of scienter.'") (quoting *Boca Raton Firefighters & Police Pension Fund* v. *Bahash*, 506 Fed. Appx. 32, 38 (2d Cir. 2012)).

Plaintiffs' claims are based on the disclosure of problems self-identified and reported by Deutsche Bank, and on public statements that Deutsche Bank was taking actions to address them. But the law is clear that remedial efforts are "a prudent course of action that weakens rather than strengthens an inference of scienter." *Slayton* v. *American Express*, 604 F.3d 758, 777 (2d Cir. 2010). "The fact that defendants recognized problems, announced that they were implementing effective controls and procedures, and then recognized more problems does not indicate that their statements were false at the time that they were made." *In re Magnum Hunter Resources Securities Litigation*, 26 F. Supp. 3d 278, 295 (S.D.N.Y. 2014) (Forrest, J.), *aff'd,* 616 Fed. Appx. 442 (2d Cir. 2015).

1.      **Plaintiffs Do Not Allege Defendants Had a Motive to Defraud**

"Plaintiffs may allege scienter by either (1) showing the defendants' motive and opportunity to perpetrate fraud, or (2) alleging strong circumstantial evidence of conscious misbehavior or recklessness." *In re Tower Group*, 2015 WL 5813393, at *5 (Torres, J.).   In order to allege that Defendants had a motive to defraud, "plaintiffs must assert a concrete and personal benefit" to the individuals who allegedly perpetrated the fraud. *Kalnit* v. *Eichler*, 264 F.3d 131, 139 (2d Cir. 2001).

Plaintiffs fail to allege motive and opportunity to perpetrate fraud.  Plaintiffs have not asserted any "concrete" or "personal" benefit to Defendants for allegedly perpetrating the fraud, beyond those common to most corporate officers and corporations such as an implied desire to keep stock prices high and increase profits. *See, e.g.,* CAC ¶ 120 ("the bank's senior management was gung ho to increase profits").   But "[m]otives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute 'motive' for purposes of [establishing scienter]." *ECA,* 553 F.3d at 198.  Allegations relating to Defendants' motive to protect corporate reputation are "neither personal nor specific, but could be imputed to any publicly-owned corporation," and are therefore inadequate. *In re Veeco Instruments Securities Litigation*, 235 F.R.D. 220, 230 (S.D.N.Y. 2006) (McMahon, J.).

2.      **Plaintiffs Do Not Adequately Allege Conscious Misbehavior or Recklessness**

Plaintiffs may also establish scienter through alleging conscious misbehavior or recklessness.  However, having failed to establish motive, the burden is significantly higher. *See Kalnit*, 264 F.3d at 142 ("Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of

the circumstantial allegations must be correspondingly greater.")  Conscious misbehavior means "deliberate illegal behavior, such as securities trading by insiders privy to undisclosed and material information, or knowing sale of a company's stock at an unwarranted discount."  *Novak*, 216 F.3d at 308.  The CAC contains no such allegations.

Under a theory that Defendants recklessly disregarded the truth, Plaintiffs "must show that the defendant[s'] conduct is at the least[ ] conduct which is *highly unreasonable* and which represents *an extreme departure* from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Glaser* v. *The9*, 772 F. Supp. 2d 573, 587 (S.D.N.Y. 2011) (Holwell, J.) (emphasis added; internal quotation marks and citation omitted); *see South Cherry Street* v. *Hennessee Group*, 573 F.3d 98, 109 (2d Cir. 2009) ("By reckless disregard for the truth, we mean conscious recklessness—*i.e.*, a state of mind *approximating actual intent,* and *not merely a heightened form of negligence*.") (emphasis in original; internal quotation marks and citations omitted).

To adequately plead recklessness, Plaintiffs may either specifically allege the defendant's knowledge of facts or access to information contradicting defendant's public statements, or allege that the defendant failed to check information that it had a duty to monitor.  *Novak,* 216 F.3d at 308.  Plaintiffs "must *specifically identify* the reports or statements that are contradictory to the statements made," or must "provide specific instances in which Defendants received information that was contrary to their public declarations" and "[t]he allegations must show both (1) *specific* contradictory information [that] was available to the defendants (2) *at the same time* they made their misleading statements." *Glaser*, 772 F. Supp. at 588 (emphasis in original).  *See In re China Mobile Games & Entertainment Group Securities Litigation*, 2016 WL 922711, at *8 (S.D.N.Y. Mar. 7, 2016) (Wood, J.) ("Plaintiffs' allegations about subsequent actions say

nothing about the Defendants' state of mind *at the time* of the alleged misstatements.") (emphasis in original).

Plaintiffs' boilerplate pleading of scienter fails to meet this heightened standard. Plaintiffs have made no effort to allege the *specific* contradictory information that was available to Defendants at the same time as the alleged misstatements. *See* CAC ¶ 335 (claiming "[D]efendants, by virtue of their receipt of information reflecting the true facts of Deutsche Bank" participated in the fraud, *without alleging specifically what information Plaintiffs are referring to*). Plaintiffs' repetitive and formulaic allegation that "[materially false or misleading statements] were known to Defendants or recklessly disregarded by them" (CAC ¶¶ 171, 215, 261, 273) is insufficient. *See Prime Mover Capital Partners L.P.* v. *Elixir Gaming Technologies*, 793 F. Supp. 2d 651, 668 (S.D.N.Y. 2011) (Kaplan, J.) ("bald assertions that the defendants knew or should have known" are insufficient to establish scienter). So too, Plaintiffs' conclusory and generalized allegations that "Defendants acted with scienter" (CAC ¶ 335), and the "Individual Defendants . . . had actual knowledge . . . and intended to deceive . . . or, in the alternative, acted with reckless disregard for the truth" (CAC ¶ 336), are conclusory and not allegations of fact and thus fail to make allegations as against "each defendant" and "with regard to each alleged act or omission."

Nor have Plaintiffs alleged facts showing recklessness by any Defendant with regard to *each* alleged misstatement or omission. *See* CAC ¶ 70 (the allegation that "'Deutsche Bank had fundamental problems' that were known," does not allege that the individual defendants were among those that knew or that these issues were not also known by Plaintiffs). A laundry list of concerns and failures of oversight cannot serve as a "catch-all" allegation of scienter for *each* alleged misrepresentation by *each* defendant. *See* CAC ¶¶ 58–82, 88. Nor can publicly

available information.  *See In re Security Capital Assurance Securities Litigation,* 729 F. Supp. 2d 569, 595–96 (S.D.N.Y.2010) (Batts, J.) ("Any allegation that Defendants' statements and omissions were made recklessly because Defendants were aware of the housing market crisis fails . . . .  Plaintiffs were just as aware of the housing market crisis as they allege Defendants were, but they did not act on that information to sell their stock as the price declined.").

Plaintiffs' allegations pale in comparison to those held sufficient to survive a motion to dismiss where Plaintiffs actually identified "reports or other documents indicating defendants' recklessness as to their public statements' truth or falsity."  *Glaser*, 772 F. Supp. 2d at 588–89; *see, e.g., In re Citigroup Inc. Securities Litigation*, 753 F. Supp. 2d 206, 237 (S.D.N.Y. 2010) (Stein, J.) (strong inference of scienter satisfied when, *inter alia,* plaintiffs identified a specific "March 2007 report from Citigroup's quantitative credit strategy and analysis group allegedly describ[ing] the risks the subprime meltdown posed to the holders of CDO super senior tranches.")); *Sgalambo* v. *McKenzie,* 739 F. Supp. 2d 453, 481–82 (S.D.N.Y. 2010) (Scheindlin, J.) (finding scienter when the complaint "identifie[d] specific reports or documents that would have indicated that The Officers' public statements regarding the wells and Canadian Superior's inability to meets its financial obligations beginning late 2008 were inaccurate.").

Any implied allegation that Defendants should have known about the falsity of the alleged misstatements based on their corporate positions has been consistently rejected by this Court.  *In re China Mobile*, 2016 WL 922711, at *8 n.10 ("Plaintiffs essentially claim that Defendants should have known about the alleged related-party transactions and bribery based on their corporate position, a contention courts in this circuit consistently reject.") (citing *In re Sotheby's Holdings*, 2000 WL 1234601, at *7 (S.D.N.Y. Aug. 31, 2000) (Cote, J.) ("It is well established that boilerplate allegations that defendants knew or should have known of fraudulent

conduct based solely on their board membership or executive positions are insufficient to plead scienter.")); *see also In re Nokia Securities Litigation*, 423 F. Supp. 2d 364, 406 (S.D.N.Y. 2006) (Karas, J.) (generalized allegations that defendants knew or should have known because of their senior positions in the company do not allege scienter) (collecting cases); *Prime Mover Capital Partners L.P.* v. *Elixir Gaming Technologies*, 793 F. Supp. 2d 651, 668 (S.D.N.Y. 2011) (Kaplan, J.). Thus, Plaintiffs' bare allegations that Defendants Cryan, Schenck, and Jain held management and board positions such that they would sign public disclosures on behalf of the Bank are insufficient. CAC ¶¶ 16, 21–22, 159, 203, 245, 272, 335.

Plaintiffs' lack of specific contradictory information known by the individual defendants at the time of their statements, combined with the accurate disclosures Plaintiffs admit that Defendants made at the time the alleged wrongdoing came to light, further demonstrates that Plaintiffs have failed to allege that Defendants acted with an intention to recklessly disregard the truth. *See* CAC ¶ 90 ("Defendant [Cryan] said the Bank was 'vulnerable' with respect to possible large penalties for the Russian trades . . . Cryan recognized that 'it's not our finest hour.'"); CAC ¶ 295 (Bloomberg Article quoting Cryan as saying, "We can't say much because we don't know much and that's a shame on us . . . It looks as though the bank was used."). *See* Appendix A (compiling disclosures contained in Deutsche Bank's publicly filed documents).

"A defendant's failure to disclose particular information, by itself, can only constitute recklessness if there was an *obvious* duty to disclose this information." *Medis Investor Group* v. *Medis Technologies*, 586 F. Supp. 2d 136, 143 (S.D.N.Y. 2008) (Crotty, J.) (emphasis in original) (internal quotation marks and citations omitted), *aff'd,* 328 Fed. Appx. 754 (2d. Cir. 2009). As discussed at pages 24–27, *supra*, Plaintiffs have failed to allege such a duty. As such, Plaintiffs have failed to adequately plead scienter based on either motive or recklessness.

## II.   Plaintiffs Fail to State a Claim of Control Person Liability Under Section 20(a)

In order to allege liability under Section 20(a), Plaintiffs must show: "(1) a primary violation by a controlled person; (2) control of the primary violator by the alleged controlling person; and (3) 'that the controlling person was in some meaningful sense a culpable participant' in the primary violation." *Boguslavsky* v. *Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998) (citing *SEC* v. *First Jersey Securities*, 101 F.3d 1450, 1472 (2d Cir.1996). Where, as here, "[P]laintiffs failed to adequately allege a primary violation of § 10(b) . . . [their] § 20(a) claim fails." *In re DNTW Chartered Accountant Securities Litigation*, 2016 WL 7320984, at *2 (2d Cir. Dec. 15, 2016) (Summary Order) (citing *ATSI Communications* v. *Shaar Fund*, 493 F.3d 87, 108 (2d Cir. 2007)).

Plaintiffs also fail to allege that the individual defendants were "culpable participants" in any alleged violation.  *See ATSI*, 493 F.3d at 108 (requiring that the alleged controlling person actually participate in the alleged violation); *First Jersey Securities*, 101 F.3d at 1472–73 (same). The CAC alleges that, in their roles as officers and directors of Deutsche Bank, the individual defendants had influence over the activity of the Bank at various points in time, but the CAC does not allege *facts* to support that each of them either "intentionally furthered" the alleged violations or "prevented [their] discovery." *Rochez Brothers* v. *Rhoades*, 527 F.2d 880, 890 (3d Cir. 1975).  Plaintiffs simply state that the individuals "possessed the power to control the specific activities which comprise the primary violations" of Section 10(b) while including repetitious and conclusory allegations in the ambiguous plural that the violations "were known to Defendants or recklessly disregarded by them."  CAC ¶ 345; *see* CAC ¶¶ 171, 215, 261, 273. The abstract power to control is not "culpable participation," and alleging that individuals signed public filings without any allegation that they did not honestly believe in the accuracy of what they were signing when they signed it is not an allegation of culpable participation.

-40-

**<u>CONCLUSION</u>**

The Consolidated Amended Complaint should be dismissed.

Dated:   February 21, 2017                          Respectfully submitted,

                                                    <u>/s/ Charles A. Gilman</u>
                                                    Charles A. Gilman
                                                    David G. Januszewski
                                                    Tara H. Curtin
                                                    John M. Schoolman
                                                    CAHILL GORDON & REINDEL LLP
                                                    80 Pine Street
                                                    New York, NY 10005
                                                    (212) 701-3000

                                                    *Attorneys for Defendants Deutsche Bank*
                                                    *Aktiengesellschaft, John Cryan, Marcus*
                                                    *Schenck, and Anshuman Jain*

# APPENDIX A

**Plaintiffs' Quotations from Deutsche Bank Public Documents**

| Document | CAC | Plaintiffs' Quotation in CAC | Omitted Language and Disclosures |
|---|---|---|---|
| **Jan. 31, 2013 Annual Press Conference** <br><br> **(Gilman Aff. Ex. 9)** | ¶ 140 | • "We are determined to bring about deep cultural change at Deutsche Bank.  That is what clients, society, and investors demand.  Our values are clear.  We believe in fundamental integrity of dealing. . . ." (p. 13)[1] | • "[W]e have laid the foundations for longer-term culture change at Deutsche Bank. . . . [T]his must be a multi-year commitment." (p. 11) <br> • "Does this mean we have eliminated the risk?  No, it doesn't.  Some deliberate, calculated abuse by individuals is always a risk, in every large organization." (p. 12) <br> • "We are under no illusions.  The journey will take years, not months." (p. 13) |
| **2012 Annual Report** <br><br> **(Gilman Aff. Ex. 5)** | ¶¶ 142-147 | • "During 2012, we continued to strengthen our control environment, tightening our systems and processes and enhancing our monitoring capabilities." (p. 6) <br> • "One of the core objectives of our Strategy 2015+ is deep cultural change.  We consider this to be imperative… We have formulated a new set of ethical standards for our actions and continued to reinforce our control mechanisms." (Section 04: Further Information) <br> • "Key risk categories for us include credit risk, market risk, operational risk, business risk… reputational risk and liquidity risk...  Our proactive approach to identification and impact assessment aims to ensure that we mitigate the | • "We are under no illusions: deep cultural change will take a number of years." (p. 6) <br> • "[D]isclosure controls and procedures or systems . . . may not prevent all errors and fraud." (Financial Report 187) <br> • "The main risks in financial reporting are that either financial statements do not present a true and fair view due to inadvertent or intentional errors (fraud) or the publication of financial statements is not done on a timely basis." (Financial Report 187) <br> • "[Internal controls] provide[s] reasonable but not absolute assurance against material misstatements." (Financial Report 187) <br> • "The main risks in financial reporting are that |

---

[1] There are further quotations attributed to the documents contained herein in the CAC, as well as additional omitted language and disclosures, but for the sake of brevity we have selected a representative sample of both.

| Document | CAC | Plaintiffs' Quotation in CAC | Omitted Language and Disclosures |
|---|---|---|---|
| | | impact of these risks on our financial results, long term strategic goals and reputation." (Financial Report 46)[2]<br><br>• "Each year, management of the Group undertakes a formal evaluation of the adequacy and effectiveness of the system of [internal controls]." (Financial Report 190)<br><br>• "To the best of our knowledge, and in accordance with the applicable reporting principles, the consolidated financial statements give a true and fair view of the assets, liabilities, financial position and profit or loss of the Group, and the Group management report includes a fair review of the development and performance of the business and the position of the Group, together with a description of the principal opportunities and risks associated with the expected development of the Group." (Financial Report 415) | the financial statements do not present a true and fair view due to inadvertent or intentional errors (fraud) or the publication of financial statements is not done on a timely basis." (Financial Report 187)<br><br>• "[A]ny internal control system . . . no matter how well conceived and operated, can provide only reasonable, but not absolute assurance that the objectives of that control system are met. As such, disclosure controls and procedures or systems . . . may not prevent all errors and fraud. Further, the design of a control system must reflect the fact that there are resource constraints, and the benefits of controls must be considered relative to their costs." (Financial Report 187)<br><br>• "Due to the nature of our business, we are involved in litigation, arbitration, and regulatory proceedings in jurisdictions around the world and such matters are subject to many uncertainties." (Financial Report 237)<br><br>• "Strategy 2015+ confirms Deutsche Bank's commitment to its proven universal banking model, its German home market and its global business platform. Additional aspects include the need for continued risk reduction, organic growth of the capital base and enhanced operational excellence." (Financial Report 416) |

---

[2]     Certain of the Bank's public filings incorporate at the end of the document a Financial or Annual Report, which restarts page numbering.  We reference such reports where we are citing those pages.

| Document | CAC | Plaintiffs' Quotation in CAC | Omitted Language and Disclosures |
|---|---|---|---|
| **2012 IFRS Financial Statements** (Gilman Aff. Ex. 14) | ¶ 154 | • "The Bank has a dedicated risk management function on a global level to ensure that oversight and monitoring of risk is achieved in a robust manner." (p. 32) | • "The preparation of financial statements in conformity with IFRS requires management to make judgments, estimates and assumptions that affect the application of accounting policies and the reported amounts of assets, liabilities, income and expenses. Actual results could differ from those estimates." (p. 10) |
| **2012 Corporate Responsibility Report** (Gilman Aff. Ex. 11) | ¶¶ 156-157 | • "These are challenging times for the financial sector. The trust in banks is at a record low due to perceived conflicts of interest and selfish behavior. We must renew the contract with society and strengthen the fabric of trust with all of our stakeholders. We have to demonstrate that we play a valuable role in society and that we act with integrity and responsibility. This goal can only be achieved through a profound change in culture… We want Deutsche Bank to be at the forefront of this cultural change in our industry." (p. 2)<br>• "We are committed to high standards of Anti-Money Laundering (AML) practice and compliance with the directives of the financial Action Task Force on Money Laundering. We require management and employees to adhere to these standards in preventing the use of products and services for money-laundering purposes." (p. 44)<br>• "Deutsche Bank is committed to fully comply with local and international anti-corruption and anti-bribery laws. This includes the bank's strict prohibition against receiving, accepting, | • "But we know that more will need to be done. We are under no illusions about the challenges ahead. Cultural change is not a quick fix." (p. 3)<br>• "This means combining a culture of performance with a culture of responsibility. We know it will not be easy. It will not happen overnight." (p. 3)<br>• "We regard this report as a supplement to the Annual Review and the Financial Report of Deutsche Bank AG." (p. 90) |

| Document | CAC | Plaintiffs' Quotation in CAC | Omitted Language and Disclosures |
|---|---|---|---|
| | | offering, paying, or authorizing any bribe or any other form of corruption…We also expect transparency and integrity in all of our business dealings to avoid any improper advantage or the appearance of questionable conduct by employees or third parties with whom we do business." (p. 44-45) | |
| **2012 Form 20-F**<br><br>**(Gilman Aff. Ex. 1)** | ¶¶ 158-159 | • "Fraud Risk is managed based on section 25a of the German Banking Act as well as other legal and regulatory requirements on a risk based approach, governed by the Global Anti-Fraud Policy and corresponding Compliance and Anti-Money-Laundering (AML) framework.  In line with regulatory requirements a global risk assessment is performed on a regular basis.  Within the general management of operational risks dedicated Fraud Risk relevant aspects are part of the Self Assessments." (Financial Report 157)<br>• "The 2012 20-F was signed by Defendants Fitschen, Jain, and Krause. The 2012 20-F also contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Fitschen, Jain, and Krause attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud." (p. 90; Exs. 12.2, 13.2) | • "Cautionary Statement Regarding Forward-Looking Statements:  We make certain forward-looking statements in this document with respect to our financial condition and results of operations.  In this document, forward-looking statements include, among others, statements relating to:  - the potential development and impact on us of economic and business conditions and the legal and regulatory environment to which we are subject – the implementation of our strategic initiatives and other responses there to; - the development of aspects of our results of operations. . . . By their very nature, forward-looking statements involve risks and uncertainties, both general and specific… We caution you that a number of important factors could cause our results to differ materially from those we describe in any forward-looking statement.  These factors include, among others, the following: - the potential development and impact on us of economic and business conditions; - other changes in general economic and business conditions; - changes and volatility in currency exchange rates, interest rates and asset prices; - |

| Document | CAC | Plaintiffs' Quotation in CAC | Omitted Language and Disclosures |
|---|---|---|---|
| | | | changes in governmental policy and regulation, including measures taken in response to economic, business, political and social conditions. . . ." (p. 3-4)<br>• "An investment in our securities involves a number of risks. You should carefully consider the following information about the risks we face, together with other information in this document, when you make investment decisions involving our securities." (p. 11)<br>• "[N]egative perceptions concerning our business and prospects could develop as a result of large losses, changes of our credit ratings, a general decline in the level of business activity in the financial services sector, regulatory action, serious employee misconduct or illegal activity, as well as many other reasons outside our control and that we cannot foresee." (p. 13)<br>• "Operational risks may disrupt our businesses: We face operational risk arising from errors, inadvertent or intentional, made in the execution, confirmation or settlement of transactions or from transactions not being properly recorded, evaluated or accounted for." (p. 22)<br>• "Our risk management policies, procedures and methods leave us exposed to unidentified or unanticipated risks, which could lead to material losses. We have devoted significant resources to developing our risk management policies, procedures and assessment methods |

| Document | CAC | Plaintiffs' Quotation in CAC | Omitted Language and Disclosures |
|---|---|---|---|
| | | | and intend to continue to do so in the future. Nonetheless, the risk management techniques and strategies have not been and may in the future not be fully effective in mitigating our risk exposure in all economic market environments or against all types of risk, including risks that we fail to identify or anticipate." (p. 19)<br>• "Transactions with counterparties in countries designated by the U.S. State Department as state sponsors of terrorism or persons targeted by U.S. economic sanctions may . . . result in regulatory action which could materially and adversely affect our business.  We engage or have engaged in a limited amount of business with counterparties, including government owned or controlled counterparties, in certain countries which the U.S. State Department has designated as state sponsors of terrorism, including Iran and Cuba . . . ." (p. 24)<br>• "Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements.    Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate." (p. 77) |
| **Q4 2013 Earnings** | ¶ 172 | • "Crucially, let me finally finish by talking about culture.  We cannot talk about the very high costs that we are paying for the legacy mistakes | • "Culture is not something which you can change overnight.   I think that's something |

| Document | CAC | Plaintiffs' Quotation in CAC | Omitted Language and Disclosures |
|---|---|---|---|
| **Call**<br><br>**(Gilman Aff. Ex. 17)** | | that we've made without being utterly committed to a culture which ensures that we don't wind up with new problems… please do not doubt our utter commitment to achieving this and the progress, as you can see on page 15, which is more or less a mechanical slide that lays out the process. The main thing which I can do for you right now is to reiterate the utter commitment of the senior management team at Deutsche Bank toward achieving this." (p. 7) | which all of you will understand." (p. 7) |
| **Jan. 29, 2014 Annual Press Conference[3]**<br><br>**(Gilman Aff. Ex. 10)** | ¶¶ 173-174 | • "And there's one thing I would like to tackle now. That's the question of culture. Now we know that here, we've got something to prove to you… We really want you to believe us, namely, that all of the progress that we have made would not have been possible if this had not been accompanied by a mindset throughout the entire bank. And this also applies to the future activities we are pursuing." (p. 11)<br>• "[W]e know that our cultural change will enable us to better meet the regulatory requirements that we are facing." (p. 13)<br>• "Whatever we do, the cultural change will certainly make sure that the sources, the possibilities of such errors arising will certainly decrease in number compared to the past." (p. 14) | • "[W]e also had to admit that we had a couple of weaknesses, which we had to overcome in order to meet our ambitions, namely to put the bank into a leading position." (p. 3)<br>• "[W]e are fully aware of the enormous challenges we have set ourselves. And certainly, this will also entail some painful changes. That's part of the price we have to pay." (p. 4)<br>• "So part of the cultural change will also have to manifest itself in the increasing awareness of the risk for a financial institute, and I think this risk is something we want to foster and promote in all employees of our bank wherever they work." (p. 13)<br>• "Now there is no doubt 2013 was a tough year, but so will be 2014 as well. And of course, we have got full respect for the |

---

[3]     The CAC references an Annual Press Conference dated January 28, 2014. *See* CAC ¶ 173-174. We believe the date included therein was a typographical error as evidenced by the text of Gilman Aff. Ex. 10.

| Document | CAC | Plaintiffs' Quotation in CAC | Omitted Language and Disclosures |
|---|---|---|---|
| | | • "Let me assure you, cultural change is sweeping through the bank in every one of our 70-odd locations." (p. 22) | challenges lying ahead. Nevertheless, we are still fully confident we can also master these challenges." (p. 14-15) |
| **2013 Annual Report** (Gilman Aff. Ex. 6) | ¶¶ 191-201 | • "We laid solid foundations for cultural change. We launched new values and beliefs [and] strengthened our control environment . . ." (p. 4)<br>• "In 2013, Deutsche Bank laid the foundations for cultural change. It defined new values and beliefs [and] strengthened its governance and control mechanisms . . . ." (p. 23)<br>• "Integrity and responsibility are core principles on which cultural change rests. That is why, in 2013, we defined a clear set of values and beliefs, established guiding principles, tightened the bank's control environment and incorporated the values and beliefs in our performance management processes." (p. 27)<br>• "2013 was the second consecutive year in which we have invested in the bank's future growth and in further strengthening our controls while addressing ongoing legal and regulatory issues." (Financial Report 8)<br>• "We have laid strong foundations for long-term cultural change, by launching our new values and beliefs and significantly tightening our control environment… Our control model across businesses, control functions and Audit will be further reinforced. We will pursue the strengthening of our control infrastructure and | • "We're under no illusions. We know cultural change is a long-term, multi-year effort; but we are on the right track." (p. 4)<br>• "The implementation of our initiatives or the realization of the anticipated benefits might also be negatively impacted by certain economic factors [and] . . . [r]egulatory changes might increase our costs or restrict our activities . . . ." (Financial Report 50)<br>• "By nature of our business, we are involved in litigation, arbitration and regulatory proceedings . . . ." (Financial Report 50)<br>• "However, any internal control system . . . , no matter how well conceived and operated, can provide only reasonable, but not absolute assurance that the objectives of that control system are met. As such, disclosure controls and procedures or systems . . . may not prevent all errors and fraud." (Financial Report 273)<br>• "The main risks in financial reporting are that either financial statements do not present a true and fair view due to inadvertent or intentional errors (fraud) or the publication of financial statements is not done on a timely basis. These risks may reduce investor confidence or cause reputational damage and may have legal consequences including |

| Document | CAC | Plaintiffs' Quotation in CAC | Omitted Language and Disclosures |
|---|---|---|---|
| | | organization and review our business processes for additional risks." (Financial Report 50)<br>• "We use a broad range of quantitative and qualitative methodologies for assessing and managing risks. As a matter of policy, we continually assess the appropriateness and the reliability of our quantitative tools and metrics in light of our changing risk environment." (Financial Report 70)<br>• Responsibility Statement by Management Board: "To the best of our knowledge, and in accordance with the applicable reporting principles, the consolidated financial statements give a true and fair view of the assets, liabilities, financial position and profit or loss of the Group, and the Group management report includes a fair review of the development and performance of the business and the position of the Group, together with a description of the principal opportunities and risks associated with the expected development of the Group." (Financial Report 450) | banking regulatory interventions. A lack of fair presentation arises when one or more financial statement amounts or disclosures contain misstatements (or omissions) that are material. Misstatements are deemed material if they could individually or collectively, influence economic decisions that users make on the basis of the financial statements. To confine those risks of financial reporting, management of the Group has established [internal controls] with the aim of providing reasonable but not absolute assurance against material misstatements." (Financial Report 273) |
| **2013 Form 20-F**<br>**(Gilman Aff. Ex. 2)** | ¶¶ 202-203 | • "Fraud Risk is managed based on section 25a of the German Banking Act as well as other legal and regulatory requirements on a risk based approach, governed by the Global Anti-Fraud Policy and corresponding Compliance and Anti-Money-Laundering (AML) framework. In line with regulatory requirements a global risk assessment is | • "Cautionary Statement Regarding Forward-Looking Statements: We make certain forward-looking statements in this document with respect to our financial condition and results of operations. In this document, forward-looking statements include, among others, statements relating to: - the potential development and impact on us of economic |

| Document | CAC | Plaintiffs' Quotation in CAC | Omitted Language and Disclosures |
|---|---|---|---|
| | | performed on a regular basis. Within the general management of operational risks dedicated Fraud Risk relevant aspects are part of the Self Assessments." (Financial Report 180)<br>• "The 2013 20-F was signed by Defendants Fitschen, Jain, and Krause. The 2013 20-F also contained signed SOX certifications by Defendants Fitschen, Jain, and Krause attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud." (p. 100; Exs. 12.2, 13.2) | and business conditions and the legal and regulatory environment to which we are subject – the implementation of our strategic initiatives and other responses thereto; - the development of aspects of our results of operations . . . . By their very nature, forward-looking statements involve risks and uncertainties, both general and specific… We caution you that a number of important factors could cause our results to differ materially from those we describe in any forward-looking statement. These factors include, among others, the following: - the potential development and impact on us of economic and business conditions; - other changes in general economic and business conditions; - changes and volatility in currency exchange rates, interest rates and asset prices; - changes in governmental policy and regulation, including measures taken in response to economic, business, political and social conditions. . . ." (p. 3-4)<br>• "Risk Factors: An investment in our securities involves a number of risks. You should carefully consider the following information about the risks we face, together with other information in this document, when you make investment decisions involving our securities." (p. 11)<br>• "We operate in an increasingly regulated and litigious environment, potentially exposing us to liability and other costs, the amounts of |

| Document | CAC | Plaintiffs' Quotation in CAC | Omitted Language and Disclosures |
|---|---|---|---|
| | | | which may be difficult to estimate." (p. 22)<br><br>• "Our risk management policies, procedures and methods leave us exposed to unidentified or unanticipated risks, which could lead to material losses.  We have devoted significant resources to developing our risk management policies, procedures and assessment methods and intend to continue to do so in the future.  Nonetheless, the risk management techniques and strategies have not been and may in the future not be fully effective in mitigating our risk exposure in all economic market environments or against all types of risks, including risks that we fail to identify or anticipate." (p. 22)<br><br>• "We are currently the subject of regulatory and criminal industry-wide investigations relating to interbank offered rates, as well as civil actions.   Due to a number of uncertainties, including those related to the high profile of the matters and other banks' settlement negotiations, the eventual outcome of these matters is unpredictable, and may materially and adversely affect our results of operations, financial condition and reputation." (p. 23)<br><br>• "Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements.   Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of |

| Document | CAC | Plaintiffs' Quotation in CAC | Omitted Language and Disclosures |
|---|---|---|---|
| | | | changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate." (p. 88) |
| **2013 Corporate Responsibility Report**<br><br>**(Gilman Aff. Ex. 12)** | ¶¶ 204-208 | • "Eighteen months ago, we launched Deutsche Bank's Strategy 2015+… As one of the key elements of this strategy, we committed ourselves to placing Deutsche Bank at the forefront of cultural change in our industry. Restoring the bond of trust with society is a top priority – for the banking industry and for Deutsche Bank." (p. 5)<br>• "During 2013, we laid important foundations for sustainable, long-term change. We defined a new set of Values and Beliefs, which define the type of institution Deutsche Bank aspires to be." (p. 5)<br>• "The path to cultural change also involves reinforcing our internal controls. During 2013, we significantly strengthened our Legal and Compliance capabilities and enhanced our risk management mechanisms." (p. 6)<br>• "A strong control framework must be accompanied by a culture that encourages employees to do the right thing, although it may not be mandated by the rules, regulations, or legislation." (Section 1: Our Controls, p. 16)<br>• "We have laid foundations for long-term cultural change by significantly tightening our control environment." (p. 17) | • "We are under no illusions. We recognize that deep cultural change is a process of years, not months." (p. 5)<br>• "This remains a time of change for our industry, and we anticipate further challenges on the road ahead. However, as we approach the mid-point of Strategy 2015+, we can look back on important progress during 2013." (p. 7)<br>• Independent Assurance Statement by ERM Certification Services has a statement which reads: "The limitations of our engagement: The reliability of the assured data is subject to inherent uncertainties, given the available methods for determining, calculating or estimating the underlying information. It is important to understand our assurance conclusions in this context." (p. 91) |
| **2013 IFRS** | ¶¶ | • "The Bank has a dedicated risk management | • "Use of estimates and judgments: The |

-12-

| Document | CAC | Plaintiffs' Quotation in CAC | Omitted Language and Disclosures |
|---|---|---|---|
| **Financial Statements** (Gilman Aff. Ex. 15) | 209-210 | function on a global level to ensure that oversight and monitoring of risk is achieved in a robust manner." (p. 38)<br>• "Management is responsible for identifying and assessing risks, designing controls and monitoring their effectiveness. Management monitors the effectiveness of the Bank's internal controls and periodically implements additional controls or modifies existing controls as considered necessary." (p. 36)<br>• "There is a hierarchy of requirements for authorization of transactions depending on their size and complexity." (p. 36)<br>• "Compliance with the Bank's standards is supported by a program of periodic reviews undertaken by the Internal Audit function." (p. 37) | preparation of financial statements in conformity with IFRS requires management to make judgments, estimates and assumptions that affect the application of accounting policies and the reported amounts of assets, liabilities, income and expenses. Actual results could differ from those estimates." (p. 10-11).<br>• "The importance of a strong focus on risk management and the continuous need to refine risk management practice have become particularly evident during the financial market crisis." (p. 37) |
| **2014 Annual Report** (Gilman Aff. Ex. 7) | ¶¶ 228-243 | • "Deutsche Bank has come a long way since 2012: Today it is a stronger, safe, better balanced and more responsible institution." (Section: Contents)<br>• "We completed more than half a million compliance and risk culture training sessions. . . . We strengthened our governance structure by adding specific Management Board responsibilities for litigation and legal matters and by electing new members to our Group Executive Committee with dedicated responsibilities for compliance and regulatory affairs." (p. 6)<br>• "Deutsche Bank advanced and further embedded its cultural transformation in 2014. | • "Good progress on cultural change" and "Cultural change at Deutsche Bank is a multi-year journey, with strong senior management commitment and a clear tone from the top." (p. 29)<br>• "[W]ork still remains to be done in the years ahead." (p. 30)<br>• "To create and sustain a positive environment that encourages all employees to do the right thing, the values and beliefs have been and are still gradually being embedded into all of Deutsche Bank's business and people processes." (p. 30)<br>• "To confine those risks of financial reporting, management of the Group has established |

| Document | CAC | Plaintiffs' Quotation in CAC | Omitted Language and Disclosures |
|---|---|---|---|
| | | The bank recognizes the need for cultural change in the financial sector and is committed to being at the forefront of this change… Deutsche Bank emphasizes integrity above all and is committed to a culture that aligns risks and rewards, attracts and develops talented individuals, fosters teamwork and partnership, and is sensitive to the needs of the society in which it operates." (p. 21)<br><br>• "[W]e live by the highest standards of integrity in everything we say and do." (p. 31)<br><br>• Responsibility Statement by Management Board:  "To the best of our knowledge, and in accordance with the applicable reporting principles, the consolidated financial statements give a true and fair view of the assets, liabilities, financial position and profit or loss of the Group, and the Group management report includes a fair review of the development and performance of the business and the position of the Group, together with a description of the principal opportunities and risks associated with the expected development of the Group." (Financial Report 482) | ICOFR [internal controls over financial reporting] with the aim of providing reasonable but not absolute assurance against material misstatements . . . ." (Financial Report 303)<br><br>• "[A]ny internal control system, including ICOFR, no matter how well conceived and operated, can provide only reasonable, but not absolute assurance that the objectives of that control system are met."  (Financial Report 304) |
| **2014 Form 20-F**<br><br>**(Gilman Aff. Ex. 3)** | ¶¶ 244-245 | • "Fraud Risk is managed based on section 25a of the German Banking Act as well as other legal and regulatory requirements via a risk based approach, governed by the Global Anti-Fraud Policy and corresponding Compliance and Anti-Money-Laundering (AML) framework.  In line with regulatory | • "Cautionary Statement Regarding Forward-Looking Statements:  We make certain forward-looking statements in this document with respect to our financial condition and results of operations.  In this document, forward-looking statements include, among others, statements relating to: - the potential |

| Document | CAC | Plaintiffs' Quotation in CAC | Omitted Language and Disclosures |
|---|---|---|---|
| | | requirements a global risk assessment is performed on a regular basis. Within the general management of operational risks dedicated Fraud Risk relevant aspects are part of the self-assessment process." (Financial Report 205)<br>• "The 2014 20-F was signed by Defendants Fitschen, Jain, and Krause. The 2014 20-F also contained signed SOX certifications by Defendants Fitschen, Jain, and Krause attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud." (p. 106; Exs. 12.2, 13.2) | development and impact on us of economic and business conditions and the legal and regulatory environment to which we are subject – the implementation of our strategic initiatives and other responses there to; - the development of aspects of our results of operations . . . . By their very nature, forward-looking statements involve risks and uncertainties, both general and specific… We caution you that a number of important factors could cause or results to differ materially from those we describe in any forward-looking statement. These factors include, among others, the following: - the potential development and impact on us of economic and business conditions; - other changes in general economic and business conditions; - changes and volatility in currency exchange rates, interest rates and asset prices; - changes in governmental policy and regulation, including measures taken in response to economic, business, political and social conditions. . . ." (p. 3-4)<br>• "An investment in our securities involves a number of risks.  You should carefully consider the following information about the risks we face, together with other information in this document, when you make investment decisions involving our securities." (p. 11)<br>• "We operate in a highly and increasingly regulated and litigious environment, potentially exposing us to liability and other |

| Document | CAC | Plaintiffs' Quotation in CAC | Omitted Language and Disclosures |
|----------|-----|------------------------------|----------------------------------|
|  |  |  | costs, the amounts of which may be substantial and difficult to estimate, as well as to legal and regulatory sanctions and reputational harm." (p. 24)<br>• "We have also been named as a defendant in three putative class actions – two involving non-U.S. plaintiffs and one involving U.S. plaintiffs -- brought in the United States District Court for the Southern District of New York alleging anti- trust claims relating to the alleged manipulation of foreign exchange rates." (p. 26)<br>• "Our risk management policies, procedures and methods leave us exposed to unidentified or unanticipated risks, which could lead to material losses.  We have devoted significant resources to developing our risk management policies, procedures and assessment methods and intend to continue to do so in the future.  Nonetheless, the risk management techniques and strategies have not been and may in the future not be fully effective in mitigating our risk exposure in all economic market environments or against all types of risks, including risks that we fail to identify or anticipate." (p. 29)<br>• "We and our subsidiaries operate in a legal and regulatory environment that exposes us to significant litigation risks. As a result, we are involved in litigation, arbitration and regulatory proceedings and investigations in Germany and in a number of jurisdictions |

| Document | CAC | Plaintiffs' Quotation in CAC | Omitted Language and Disclosures |
|---|---|---|---|
| | | | outside Germany, including the United States, arising in the ordinary course of our businesses. Please refer to Note 29 'Provisions' to the consolidated financial statements for descriptions of certain significant legal proceedings. Additional legal proceedings that may have, or have had in the recent past, significant effects on our financial position or profitability are described below." (p. 72)<br>• "There are, as described below, inherent limitations to the effectiveness of any control system, including disclosure controls and procedures. Accordingly, even effective disclosure controls and procedures can provide only reasonable assurance of achieving their control objectives." (p. 92)<br>• "[D]isclosure controls and procedures or systems for internal control over financial reporting may not prevent all error and all fraud.... Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, within the company have been detected." (p. 94) |
| **2014 Corporate Responsibility Report**<br><br>**(Gilman Aff.** | ¶¶ 246-249 | • "We have already articulated values and beliefs which define the type of institution we aspire to be. In 2014, we continued to embed those values, and those beliefs, into every aspect of our activity." (p. 5) | • "The new KYC policy framework policy will be rolled out country-by-country through to 2016." (p. 21) |

| Document | CAC | Plaintiffs' Quotation in CAC | Omitted Language and Disclosures |
|---|---|---|---|
| Ex. 13) | | • "We have added around 700 people to strengthen controls in our business divisions, and we have further strengthened systems and internal controls during 2014." (p. 5)<br>• "Our values and beliefs guide our behavior. They help us to conduct business with the utmost integrity." (p. 8)<br>• "Combating financial crimes, including money laundering, terrorist financing, sanctions and embargoes, bribery and corruption and fraud, requires… internal controls." (p. 19)<br>• "Launched in 2010, Deutsche Bank's dedicated Risk Culture Initiatives program emphasizes that a strong risk culture depends as much on robust processes and controls as it does on employee awareness and conduct." (p. 24) | |
| **2014 IFRS Financial Statements**<br><br>**(Gilman Aff. Ex. 16)** | ¶¶ 250-251 | • "The Bank has a dedicated risk management function on a global level to ensure that oversight and monitoring of risk is achieved in a robust manner." (p. 38)<br>• "Management is responsible for identifying and assessing risks, designing controls and monitoring their effectiveness. Management monitors the effectiveness of the Bank's internal controls and periodically implements additional controls or modifies existing controls as considered necessary." (p. 35)<br>• "There is a hierarchy of requirements for authorization of transactions depending on their size and complexity." (p. 36) | • "The Supervisory Board and the Management Board have responsibility for the development, implementation and maintaining of internal controls in the Bank that are commensurate with the scale and nature of operations." (p. 35) |

-18-

| Document | CAC | Plaintiffs' Quotation in CAC | Omitted Language and Disclosures |
|---|---|---|---|
| | | • "Compliance with the Bank's standards is supported by a program of periodic reviews undertaken by the Internal Audit function." (p. 37)<br>• "Management believes that the Bank complies with the CBR [Central Bank of the Russian Federation] requirements related to risk management and internal control systems, including requirements related to the Internal Audit function, and that risk management and internal control systems are appropriate for the scale, nature, and complexity of operations." (p. 38) | |
| **2015 Annual Report**<br><br>**(Gilman Aff. Ex. 8)** | ¶¶ 264-270 | • Deutsche Bank is "assessing carefully with whom we do business" and "strengthening [its] client on-boarding and KYC procedures." (p. 3, 33)<br>• "We seek to promote a strong risk culture throughout our organization.  Our aim is to help reinforce our resilience by encouraging a holistic approach to the management of risk and return throughout our organization as well as the effective management of our risk, capital, and reputation profile… We expect employees to exhibit behaviors that support a strong risk culture." (p. 90)<br>• "We manage operational risk using the Group Operational Risk Management framework which enables us to determine our operational risk profile in comparison to our risk tolerance, to systematically identify operational risk themes and concentrations, | • [Internal controls have] the "aim of providing reasonable but not absolute assurance against material misstatements . . . ." (p. 235)<br>• "The main risks in financial reporting are that either financial statements do not present a true and fair view due to inadvertent or intentional errors (fraud) or the publication of financial statements is not done on a timely basis." (p. 235)<br>• "Any internal control system, including ICOFR, no matter how well conceived and operated, can provide only reasonable, but not absolute assurance that the objectives of that control system are met.  As such, disclosure controls and procedures or systems . . . may not prevent all errors and fraud.  Further, the design of a control system must reflect the fact that there are resource constraints, and the benefits of controls must be considered relative to their |

| Document | CAC | Plaintiffs' Quotation in CAC | Omitted Language and Disclosures |
|---|---|---|---|
| | | and to define risk mitigating measures and priorities." (p. 114)<br>• "Each year, management of the Group undertakes a formal evaluation of the adequacy and effectiveness of the system of ICOFR… As a result of the evaluation, management has concluded that ICOFR is appropriately designed and operating effectively as of December 31, 2015." (p. 238)<br>• Responsibility Statement by Management Board: "To the best of our knowledge, and in accordance with the applicable reporting principles, the consolidated financial statements give a true and fair view of the assets, liabilities, financial position and profit or loss of the Group, and the Group management report includes a fair review of the development and performance of the business and the position of the Group, together with a description of the principal opportunities and risks associated with the expected development of the Group." (p. 417) | costs." (p. 235) |
| **2015 Form 20-F**<br><br>**(Gilman Aff. Ex. 4)** | ¶¶ 271-272 | • "Fraud Risk is managed based on section 25a of the German Banking Act [ ] as well as other legal and regulatory requirements via a risk based approach, governed by the Global Anti-Fraud Policy and corresponding Compliance and Anti-Money-Laundering (AML) framework. In line with regulatory requirements a global risk assessment is performed on a regular basis. Within the general management of operational risks, | • "Cautionary Statement Regarding Forward-Looking Statements: We make certain forward-looking statements in this document with respect to our financial condition and results of operations. In this document, forward-looking statements include, among others, statements relating to: - the potential development and impact on us of economic and business conditions and the legal and regulatory environment to which we are |

| Document | CAC | Plaintiffs' Quotation in CAC | Omitted Language and Disclosures |
|---|---|---|---|
| | | dedicated Fraud Risk relevant aspects are part of the self-assessment process." (Annual Report 115)<br>• "The 2015 20-F was signed by Defendants Cryan, Fitschen, and Schenck. The 2015 20-F also contained signed SOX certifications by Defendants Cryan, Fitschen, and Schenck attesting to the accuracy of financial reporting, the disclosure of any material changes to the Bank's internal controls over financial reporting, and the disclosure of all fraud." (p. 115; Exs. 12.2, 12.3, 13.2, 13.3) | subject – the implementation of our strategic initiatives and other responses there to; - the development of aspects of our results of operations. . . . By their very nature, forward-looking statements involve risks and uncertainties, both general and specific... We caution you that a number of important factors could cause or results to differ materially from those we describe in any forward-looking statement. These factors include, among others, the following: - the potential development and impact on us of economic and business conditions; - other changes in general economic and business conditions; - changes and volatility in currency exchange rates, interest rates and asset prices; - changes in governmental policy and regulation, including measures taken in response to economic, business, political and social conditions… our success in implementing our strategic initiatives and other responses to economic and business conditions and the legal and regulatory environment and realizing the benefits anticipated therefrom. . . ." (p. 5-6)<br>• "An investment in our securities involves a number of risks. You should carefully consider the following information about the risks we face, together with other information in this document, when you make investment decisions involving our securities." (p. 13)<br>• "Regulatory and law enforcement agencies |

| Document | CAC | Plaintiffs' Quotation in CAC | Omitted Language and Disclosures |
|---|---|---|---|
| | | | globally are currently investigating us . . . ." (pp. 30-32, listing investigations into allegations of FX rates, LIBOR, and TIBOR manipulation, among others)<br>• "We are investigating the circumstances around equity trades entered into by certain clients in Moscow and London and have advised regulators and law enforcement authorities in several jurisdictions about those trades. . . . The total volume of the transactions under review is significant. Our internal investigation of potential violations of law, regulation and policy and into the related internal control environment remains ongoing; to date it has identified certain violations of our policies and deficiencies in our control environment." (p. 33)<br>• "There are . . . inherent limitations to the effectiveness of any control system . . . ." (p. 103)<br>• "A control system, no matter how well conceived and operated, can provide only reasonable, not absolute, assurance that the objectives of the control system are met. As such, disclosure controls and procedures or systems for internal control over financial reporting may not prevent all error and all fraud. Further, the design of a control system must reflect the fact that there are resource constraints, and the benefits of controls must be considered relative to their costs. Because of the inherent limitations in all control |

| Document | CAC | Plaintiffs' Quotation in CAC | Omitted Language and Disclosures |
|---|---|---|---|
|  |  |  | systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, within the company have been detected. These inherent limitations include the realities that judgments in decision-making can be faulty, and that breakdowns can occur because of simple error or mistake.   Additionally, controls can be circumvented by the individual acts of some persons, by collusion of two or more people, or by management override of the control.   The design of any system of controls also is based in part upon certain assumptions about the likelihood of future events, and any design may not succeed in achieving its stated goals under all potential future conditions; over time, control may become inadequate because of changes in conditions, or the degree of compliance with the policies or procedures may deteriorate.   Because of the inherent limitations in a cost-effective control system, misstatements due to error or fraud may occur and not be detected." (p. 105) |